# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Del Shea Perry, Trustee for the Heirs and
Next of Kin of Hardel Harrison Sherrell,

       Plaintiff,

vs.

Beltrami County;

MEnD Correctional Care, PLLC;

Sanford Health;
Sanford; Sanford Medical Center Fargo;

Calandra Allen (Jail Administrator),
Andrew Richards (Assistant Jail
Administrator), Edward Busta (Program
Director),
Corrections Sergeant Tyler Carraway,
Corrections Sergeant Anthony Derby,
Corrections Sergeant Mario Scandinato,
Corrections Officer Melissa Bohlmann,
Corrections Officer Jared Davis,
Corrections Officer Dana Demaris,
Corrections Officer Brandon Feldt,
Corrections Officer James Foss,
Corrections Officer Daniel Fredrickson,
Corrections Officer Chase Gallinger,
Corrections Officer Holly Hopple,
Corrections Officer Nicholas Lorsbach,
Corrections Officer Erin Meyer,
Corrections Officer Mitchell Sella,
Corrections Officer Christopher Settle,
Corrections Officer Marlon Smith,
Corrections Officer Jacob Swiggum,
Corrections Officer Joseph Williams,
Beltrami County employees, all in their
individual and official capacities and as
agents/employees of Beltrami County;

Todd Leonard, MD, Stephanie Lundblad,
CNP, Crystal Pedersen, RN, Michelle
Skroch, RN, Madison Brewster, Health

Court File No.

**COMPLAINT WITH
JURY DEMAND**

**Technician, and Katie Doe, whose true last name is presently unknown, Health Technician, MEnD Correctional Care employees, all in their individual and official capacities and as agents/employees of MEnD Correctional Care, PLLC;**

**Dustin G. Leigh, MD, individually and as employee/agent of Sanford Health and/or Sanford and/or Sanford Medical Center Fargo,**

**Defendants.**

## INTRODUCTION

For her Complaint, Del Shea Perry, in her capacity as Trustee for the heirs and next of kin of Hardel Harrison Sherrell, states and alleges as follows:

1. This is an action for money damages arising out of the September 2, 2018, in-custody death of Hardel Harrison Sherrell, which resulted from violations of well-settled federal civil rights and state law.

2. By order dated January 17, 2019, Dakota County District Court appointed Del Shea Perry ("Plaintiff") as Trustee for the Heirs and Next of Kin of Hardel Harrison Sherrell.

3. It is alleged that the individual Defendants violated Mr. Sherrell's constitutional rights under 42 U.S.C. §§ 1983 and 1988, and the Eighth and/or Fourteenth Amendments to the United States Constitution and engaged in negligence and medical malpractice leading to wrongful death.

## JURISDICTION

4. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law pursuant to 28 U.S.C. § 1367.

5.  To the extent diversity jurisdiction pursuant to 28 U.S.C. § 1332 is necessary as to the Sanford Defendants and Dr. Leigh, Plaintiff is a citizen of the State of Minnesota, Mr. Sherrell was a citizen of the State of Minnesota, Defendants are citizens of the States of North and South Dakota, and the amount in controversy exceeds the sum or value of $75,000.

## VENUE

6.  This Court is the proper venue for this proceeding under 28 U.S.C. § 1391, as the material events and occurrences giving rise to Plaintiff's cause of action occurred within the State of Minnesota.

## PARTIES

7.  Decedent Hardel Harrison Sherrell was at all material times a resident of the State of Minnesota and of full age and an inmate at the Beltrami County Jail, Bemidji, Minnesota.

8.  Plaintiff Del Shea Perry is Mr. Sherrell's biological mother and has been appointed as Trustee for the heirs and next of kin for Hardel Harrison Sherrell pursuant to Minn. Stat. § 573.02.

9.  Defendant Beltrami County is a municipal corporation and the public employer of all individually named County-employed Defendants. Defendant Beltrami County is sued directly and also on the theories of respondeat superior or vicarious liability and pursuant to Minn. Stat. § 466.02, for the actions of its officers and officials.

10. Defendant MEnD Correctional Care, PLLC, is a Minnesota corporate entity that, at all material times, was contracted by Beltrami County to provide medical services for Beltrami

County Jail inmates under the color of state law. Defendant MEnD , at all material times, employed Defendants Leonard, Lundblad, Pedersen, Skroch, Brewster, and Katie Doe.

11. Defendant Sanford Health is a South Dakota nonprofit corporation that owns, controls, and operates numerous medical facilities in the States of North Dakota, South Dakota, Minnesota, and Iowa. Defendant Sanford Health is a parent corporation that owns, controls, and operates numerous subsidiary corporations in the States of North Dakota, South Dakota, Minnesota, and Iowa, including Defendants Sanford and Sanford Medical Center Fargo, and is also the employer of Defendant Dr. Leigh. Defendant Sanford Health is a parent corporation that owns, controls, and operates the Sanford Bemidji Medical Center, located at 1300 Anne St. NW, Bemidji, MN 56601.

12. Defendants Sanford and Sanford Medical Center Fargo are North Dakota nonprofit corporations that own, control, and operate the Sanford Medical Center in Fargo, located at 5225 23rd Ave S., Fargo, ND 58104, and 801 Broadway N., Fargo, ND 58102. Defendants Sanford and Sanford Medical Center Fargo are the subsidiary corporations of Defendant Sanford Health and are the employers of Defendant Dr. Leigh.

13. Defendants Allen, Bohlmann, Busta, Carraway, Davis, Demaris, Derby, Feldt, Foss, Fredrickson, Gallinger, Hopple, Lorsbach, Meyer, Richards, Scandinato, Sella, Settle, Smith, Swiggum, and Williams, all sued in their individual, official, and employee/agent capacities, were at all times relevant to this complaint duly appointed and acting officials/employees of Defendant Beltrami County, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Minnesota and/or Beltrami County. These Defendants may be referred to below as "individual Beltrami County Defendants."

14. Defendants Leonard, Lundblad, Pedersen, Skroch, Brewster, and Katie Doe, all sued in their individual, official, and employee/agent capacities, were at all material times employed by MEnD Correctional Care, assigned to provide medical care and services to inmates at Beltrami County Jail, including Plaintiff, and were acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Minnesota, and/or Beltrami County. Defendant Dr. Leonard was the supervising doctor/physician at the Beltrami County Jail. These Defendants may be referred to below as "individual MEnD Defendants."

15. Defendant Dr. Leigh, at all material times, was employed by Sanford Health and/or Sanford and/or Sanford Medical Center Fargo, was assigned to provide medical care and services to patients at Sanford Medical Center Fargo, and was licensed to practice medicine in the States of Minnesota and North Dakota.


## FACTS

### Transfer to Beltrami County Jail and Initial Medical Care

16. On August 24, 2018, Mr. Sherrell was transferred from Dakota County Jail and booked into Beltrami County Jail without incident.  He was housed in cell block 207 in an upper bunk. He seemed to get along well with the inmates in his cell block and posed no problems for the correctional officers in that area.

17. On August 26, 2018, Mr. Sherrell complained of a headache and requested a blood pressure check.  Defendant Brewster, a Health Technician with MEnD Correctional Care, measured his blood pressure and found it to be elevated at 146/101.  Despite this finding, Defendant Brewster did not refer Mr. Sherrell for any additional care.

18. On August 27, 2018, Mr. Sherrell began complaining of chest pain.  Despite the serious nature of this symptom, Defendant Williams, a Corrections Officer, told Mr. Sherrell that he was required to enter a kite (jail communication) to request a blood pressure check.

19. A short while later, Defendant Nurse Pederson saw Mr. Sherrell in the jail clinic for a blood pressure check.  He complained of headaches, sharp left-sided chest pain with duration of 45 minutes, and low back, thigh and foot pain.  Defendant Pederson observed that he was sweating but did not check his temperature.  His blood pressure was elevated at 159/104 and his pulse was 101.  An electrocardiogram showed heart muscle abnormalities with probable damage to his lower heart muscle, a possible sign of a heart attack or other serious disease process.  Defendant Nurse Pederson spoke with Defendant Dr. Leonard, who ordered Tylenol, ibuprofen, and hydroxyzine, an antihistamine sometimes used for sedation, and placed Mr. Sherrell on a list to been seen during the next medical rounds.

**August 28, 2018:  Fall from Bunk and Accusations of "Faking"**

20. Early on the morning of August 28, 2018, Mr. Sherrell fell out of his top bunk.  He was unable to get up from the floor for 25 minutes.  Defendants Feldt and Lorsbach encountered Mr. Sherrell on the floor just after 4:00 a.m. but felt that he had lowered himself to the floor so refused to help him get up.  He was eventually assisted back into his bunk by his cellmates.  Mr. Sherrell shared his belief with Defendants Feldt and Lorsbach that he fell from his bunk because he had received muscle relaxers the prior afternoon.  He may have been under the mistaken belief that the hydroxyzine he received the day before was a muscle relaxer.  Defendant Feldt checked Mr. Sherrell's medication list and, not seeing muscle relaxers, accused Mr. Sherrell of lying.  He conveyed his belief that Mr. Sherrell was

"faking" to Defendant Lorsbach.  Mr. Sherrell's complaint to Defendant Feldt that he could
not feel his legs was ignored.

21. Later that morning, Mr. Sherrell was seen in the medical clinic by Defendant Nurse
Pederson, complaining of back pain on walking and lying down, and arm weakness.  She
observed that he was crying.  His blood pressure was elevated at 156/117.  Defendant
Pederson called Defendant Dr. Leonard, who prescribed ibuprofen, Flexeril, a muscle
relaxer, and Lisinopril, a medication to lower blood pressure.  He also ordered that Mr.
Sherrell be moved to a lower bunk and given an extra blanket.

22. Later that afternoon, Mr. Sherrell continued to complain about back pain and difficulties with
a lack of sensation and difficulty moving his legs.  At about 8:00  p.m., he explained to
Defendant Williams that he was not able to get out of his bunk to walk to the medication cart
to take his medications.  He was assisted by two cellmates to a standing position while
Defendant Williams gave him his medication and some water.  Other cellmates later assisted
him to the bathroom.

23. Also, at about 8:00 p.m. that night, Mr. Sherrell submitted a kite asking to be taken to the
hospital because "I can't feel my legs and can't be physically mobile" along with reporting
generalized muscle pain, numbness from the umbilicus down and generalized loss of control
of his arms.

**August 29, 2018:  Fall from Wheelchair and Move to Medical Segregation**

24. By the early morning of August 29, 2018, Mr. Sherrell was no longer able to support his own
weight.  He complained of this to Defendant Williams, who contacted Defendant Katie Doe.
Defendant Katie Doe contacted Defendant Nurse Pederson, who ordered that Mr. Sherrell be
moved to "a tank" (administrative segregation cell) until he could be further evaluated.  At

approximately 7:00 a.m., Defendant Williams and a few inmates put Mr. Sherrell into a

wheelchair and moved him into cell 215.  His activities and movements continued to be

monitored.

25. At about 8:00 a.m., Mr. Sherrell was sitting in a wheelchair with his legs on the bunk.  He

attempted to move himself into his bunk on his own.  He can be seen on video trying to use

his pant legs to move his legs off the bunk.  In the process, he fell out of the wheelchair.  He

tried to pull himself onto his bunk from the floor but was unable to do so.  His legs had

occasional spasmodic twitches but otherwise did not move.  Mr. Sherrell remained on the

floor for one hour, until Defendants Williams and Busta lifted him back into the wheelchair,

putting his legs back on the bunk.  Even then, Defendant Williams stated in his report that he

did not believe that Mr. Sherrell was unable to support his own weight or stand on his own so

he was hesitant to assist him.

26. At about 9:30 a.m., Mr. Sherrell was seen by Defendant Nurse Pederson, who noted a

significantly elevated blood pressure of 162/116 despite Mr. Sherrell being on

antihypertensive medication.  Mr. Sherrell complained that he was having difficulty

coordinating his arm and hand movements.  Still, in her notes Defendant Pederson claimed

that Mr. Sherrell moved his arms "just fine" during their conversation and stated her belief

that he had "faked" the fall from the wheelchair.  She contacted Defendant Dr. Leonard, who

discontinued Flexeril, the muscle relaxer he had been previously prescribed, discontinued

Mr. Sherrell's access to a wheelchair and replaced it with a walker, and placed Mr. Sherrell

on "activity watch," instructing staff to continue to document his movements via video

camera and written logs.

27. Defendant Nurse Pederson later came to cell 215 to take away the wheelchair Mr. Sherrell had been using.  Defendants Williams and Swiggum placed Mr. Sherrell partially on his bunk, removed the wheelchair, and left a walker next to the bed.

28. A short time later, Defendant Williams brought a lunch tray to the cell and asked Mr. Sherrell if he planned to eat.  Mr. Sherrell told him "he did not want to because he was having a hard time swallowing food as he told the nurse earlier."

29. At about 4:15 that afternoon, Defendant Settle attempted to assist Mr. Sherrell into a sitting position on his bunk, noting, "He complained of having little to no feeling in his hands and arms. He appeared to have a difficult time making contact with my hand to lift him…"

30. Defendant Williams brought Mr. Sherrell a food tray at about 4:30 p.m. but left it across the cell.  Mr. Sherrell attempted to use the walker to pull himself up but was unsuccessful.

31. While resting at 6:52 p.m., Mr. Sherrell fell out of his bunk.  Defendants Davis, Demaris and Smith pulled him onto the bunk in a sitting position with a pillow behind his back.  He had difficulty keeping his head back against the wall and it flopped forward.

32. At 7:58, Defendant Davis attempted to help Mr. Sherrell transfer from his bunk to a wheelchair.  Mr. Sherrell was unable to support his own weight and fell to the floor.  Defendant Carraway then entered and assisted getting Mr. Sherrell off the floor and into the wheelchair.  Defendant Carraway noted, "Sherrell had asked for a wheelchair, which we provided due to him not being able to stand and use the walker."

**August 30, 2018: Medical Override**

33. At approximately 7:40 a.m., Defendant Nurse Pederson examined Mr. Sherrell.  He stated that he could not feel anything from the waist down.  She checked his blood pressure, which was high at 168/109 even though Mr. Sherrell was taking antihypertensive medication.  She

used a temperature probe to test the bottoms of his feet and he did not move or respond.  She contacted Defendant Dr. Leonard, who ordered that Mr. Sherrell be taken to the emergency room.

34. That afternoon, Defendant Jail Administrator Allen notified Defendant Pederson that Mr. Sherrell would not be taken to the emergency room.  Defendant Allen stated that she was given information that Mr. Sherrell may be trying to escape.  Defendant Pederson notified Defendant Dr. Leonard that his medical order had been overridden by Defendant Allen.

35. That afternoon, Defendant Nurse Pederson notified Mr. Sherrell that he would not be going to the emergency room.

**August 31-September 1, 2018: Emergency Room Visit and Discharge with Instructions**

36. On August 31, 2018 at approximately 10:00 a.m., Mr. Sherrell was seen by Defendant CNP Lundblad for a provider visit.  Defendant Lundblad noted that Mr. Sherrell's symptoms had gone on for "3-4 days can't feel stomach down, trouble swallowing."  She observed facial drooping, slight slurring of speech, right hand and right-sided muscle weakness, and diaphoresis (sweaty, clammy skin).  She noted his uncontrolled high blood pressure and the possibility that he had experienced a stroke.  She ordered that Mr. Sherrell be taken to the emergency room right away and notified Defendant Allen and other staff.

37. At approximately 10:20 a.m., Mr. Sherrell was taken to the Emergency Room at Sanford Bemidji Medical Center, located at 1300 Anne St. NW, Bemidji, MN 56601. Dr. Hari Darshan Khalsa examined Mr. Sherrell and noted lower extremity weakness and loss of sensation, including loss of reaction to painful stimuli, upper extremity weakness, and complete upper and lower facial droop, all very concerning symptoms.  Dr. Khalsa ordered magnetic resonance imaging (MRI) studies to rule out cord compression, dissection, Bell's

palsy, and other serious disorders but the hospital's MRI machine was unavailable.   Dr. Khalsa ordered Mr. Sherrell to be taken by ambulance to Sanford Medical Center Fargo. During the ambulance trip, Mr. Sherrell had difficulty swallowing and ambulance staff had to suction his airway to keep it clear of saliva and mucous.

38. Upon his arrival at Sanford Medical Center Fargo, Mr. Sherrell was seen by Defendant Dr. Dustin G. Leigh in the emergency room.   Defendant Dr. Leigh examined him and found the same lower extremity weakness and loss of sensation, including loss of reaction to painful stimuli, upper extremity weakness, and complete left upper and lower facial droop that Dr. Khalsa had noted.   However, Defendant Leigh ignored those symptoms.   When the MRI studies were inconclusive, Dr. Leigh ordered no additional testing such as lumbar puncture for spinal fluid testing, nerve conduction tests or electromyography, all common tests for neurological infections and disorders.   Instead, he spoke with a corrections officer (believed to be Defendant Gallinger) who told him that Mr. Sherrell had been seen on a monitor during the night "moving his extremities without apparent difficulty." Defendant Dr. Leigh relied on this information and failed to explore other explanations for Mr. Sherrell's symptoms. Dr. Leigh ignored Mr. Sherrell's symptoms and determined that Mr. Sherrell was faking/lying.

39. Defendant Dr. Leigh discharged Mr. Sherrell with a primary diagnosis of "Malingering" and a secondary diagnosis of "Weakness."   However, he spoke with two corrections officers and sent discharge instructions to the jail.   The discharge instructions stated as follows:

> YOU SHOULD SEEK MEDICAL ATTENTION IMMEDIATELY, EITHER HERE OR AT THE NEAREST EMERGENCY DEPARTMENT, IF ANY OF THE FOLLOWING OCCURS:
> - Confusion, coma, agitation (becoming anxious or irritable).
> - Fever (temperature higher than 100.4ºF / 38ºC), vomiting.
> - Severe headache.
> - Signs of stroke (paralysis or numbness on one side of the body, drooping on one side of the face, difficulty talking).

- Worsening of weakness, difficulty standing, paralysis, loss of control of the bladder or bowels or difficulty swallowing.

Mr. Sherrell's Sanford medical records, including discharge instructions, were also sent via facsimile to the Beltrami County Jail medical office.

40. Mr. Sherrell was returned to the jail just after midnight on September 1, 2018.  When the transport vehicle arrived at the sally port, Mr. Sherrell asked for assistance to get out of the vehicle.  Defendants Frederickson, Gallinger, Scandinato, and Feldt initially helped him from the vehicle but when he was unable to stand on his own, they allowed him to drop to the floor.  He remained there for several minutes before they finally placed him in a wheelchair and wheeled him into the jail.  As he was being wheeled in, Mr. Sherrell's head flopped back.  One of the Defendants shoved his head brusquely forward.  On a video recording of the incident, Mr. Sherrell appeared to be crying.

41. Mr. Sherrell was placed in cell 214, another medical segregation cell with video cameras.  As he was placed on his bunk, his left arm was left hanging on the floor and his feet were off the end of the bunk.  A short time after being placed on his bunk, Mr. Sherrell attempted to grab his left arm with his right arm to pull it back on the bunk.  Instead, he rolled off the bunk onto the floor, his left arm pinned under his body.  His entire body seized.  Other than twitching, his legs never moved.  He was seen on video attempting many times to raise his head and call for help.  Despite this, Defendants Feldt, Foss, Smith, and others left Mr. Sherrell on the floor with no help whatsoever for nearly eight hours.  When Defendants Foss and Smith finally moved him back to his bunk, they attempted to sit him up.  He was unable to sit and fell backward, slamming his head into a wall.

42. In his notes, Defendant Feldt wrote, "Later that night I noticed that Hardel was laying on the floor and I reviewed camera footage and saw that he had made multiple small movements to

12

wiggle himself off that bunk and rolled to the floor."  Despite this, he ignored Mr. Sherrell's needs and made no attempt to move Mr. Sherrell from the floor.  He was left on the floor to suffer without assistance.  Further, there were no in-cell checks of Mr. Sherrell until 7:45 am, when Defendants Foss and Smith finally entered and moved him back to his bunk.  At that time, they attempted to sit him up.  He was unable to sit and fell backward, slamming his head into a wall.  It was clear that his weakness had become much worse and that he was paralyzed and no longer able to use any part of his body  in a coordinated way, which was a new development as of his return from the hospital early in the morning.

43. At 11:30 a.m. on September 1, 2018, Defendant Bohlmann relayed to Defendant Nurse Skroch that Mr. Sherrell was continuing to tell jail staff that he was unable to move his extremities and could not feel his legs.  She also advised Defendant Skroch that Mr. Sherrell was "not moving around much."  She asked Defendant Skroch to see Mr. Sherrell and to advise jail staff as to what they should be doing for him in terms of assisting him with toileting, eating and other activities.  Despite this request, Defendant Skroch did not see Mr. Sherrell but, instead, only reviewed his records.  She advised Defendant Bohlmann that since "there was nothing medically wrong with him," staff shouldn't be assisting him with feeding, toileting or other activities as he was "capable of doing it himself as he was medically cleared by the hospital." Had she examined Mr. Sherrell as requested, she would have seen that his condition had drastically deteriorated and that he was displaying symptoms that were included in Sanford Hospital's discharge instructions that would necessitate a return to the emergency room.

44. Although she observed for herself that Mr. Sherrell was "not moving around much," Defendant Bohlmann reported Defendant Skroch's information to Defendant Allen.

13

Defendant Allen told Defendant Bohlmann, "if medical states there is nothing wrong…then go with it."  At evening briefing, Defendant Bohlmann told Defendant Scandinato "medical stated that we didn't need to assist him with anything as there was nothing medically wrong with him and he was capable of doing it himself."

45. Throughout the day, Mr. Sherrell was unable to sit up or support his own weight in any way. By this point, Mr. Sherrell had become completely incontinent with urine and bowels, another new development as of his return from the hospital.  Every time corrections officers attempted to sit him up, he would flop to the side.  He spent most of the day on his back on a mattress on the floor of the cell.  Liquid food trays were periodically delivered to his cell but Mr. Sherrell was unable to reach them or coordinate his hand movements enough to bring any food toward himself.  Jail videos show his efforts to roll and wiggle his hand along the floor toward his food trays, always unsuccessfully.  Corrections officers made no efforts to help him with food or liquids.  His last fluid intake was at 7:58 a.m. that morning. Throughout the day, his extremities twitched and he appeared to have had numerous seizures. Defendants Foss, Sella, Smith, Gallinger, Bohlmann, Feldt, Lorsbach, Scandinato and others all observed these changes in Mr. Sherrell's condition but did not report them to jail medical staff or take any other action to get medical care for Mr. Sherrell. Mr. Sherrell also reported directly to medical staff that he was choking and completely unable to swallow, also additional developments since his return from the hospital, but these complaints were also ignored.

46. Defendant Dr. Leonard learned about Mr. Sherrell's deteriorating condition before end of day on September 1, 2018, but he took no action to have Mr. Sherrell properly diagnosed or transported to the emergency department per discharge instructions from Sanford.

47. Despite Mr. Sherell being in a medical segregation cell, no one checked on Mr. Sherrell in his cell between 8:16 p.m. and 11:02 p.m.  Further, after Defendant Lorsbach left a food tray in his cell at 11:02 pm, no one checked on Mr. Sherrell in his cell until 8:30 am on September 2.

**September 2, 2018: Complete Paralysis/Debilitation and Mr. Sherrell's Death**

48. On September 2, 2018, at 8:30 a.m., Defendant Nurse Skroch saw Mr. Sherrell.  She noted that as he was talking, only the right side of his mouth was moving.  Mr. Sherrell reported that he was unable to swallow. Nurse Skroch gave him a carton of apple juice but he initially declined.  Nurse Skroch offered it again and poured some in his mouth, at which point Mr. Sherrell reported that he was choking.  She ordered jail staff to assist him with feedings through use of a straw, to change his disposable briefs as needed, and to change his position periodically by rolling him and using blankets to prop him.  She notified Defendant Dr. Leonard of these changes in Mr. Sherrell's condition and, although he was displaying symptoms that were included in Sanford Hospital's discharge instructions that would necessitate a return to the emergency room, she made no other efforts to secure additional medical care for Mr. Sherrell.

49. Despite Mr. Sherrell being in a medical segregation cell, between approximately 12:00 pm until about 2:00 pm, no one checked on Mr. Sherrell in his cell.

50. Defendants Williams, Gallinger and Foss bathed Mr. Sherrell and observed that he was not able to move, support his own weight or otherwise assist them.  As Defendant Foss noted, "Hardel was physically unable to bathe himself due to an unknown medical condition. Hardel had been to Sanford Fargo where they were unable to diagnose him."  To bathe him, they dragged him on a mattress into a cell with a floor drain.

15

51. At about 2:00 p.m., Defendant Nurse Skroch saw Mr. Sherrell lying flat on the mattress in his cell, saliva rolling down his check. She reminded staff to use a straw to ensure Mr. Sherrell received hydration and to roll him to his side. However, she took no further action to address his deteriorating condition. Nurse Skroch took no action in response to Mr. Sherrell's complete paralysis, full urinary and bladder incontinence, inability to swallow, and complete debilitation.

52. Mr. Sherrell spent the rest of the day lying on a mattress on the floor of cell 215. At about 3:30 p.m., Defendants Williams, Gallinger and Foss entered Mr. Sherrell's cell and changed his briefs and pants. They cleaned a large pool of saliva from his pillow and rolled him to his side. After they left, Mr. Sherrell was unable to stay on his side and fell onto his back. Defendants took no action in response to Mr. Sherrell's complete paralysis, full urinary and bladder incontinence, inability to swallow, and complete debilitation.

53. At approximately 4:40 p.m., Defendants Williams and Gallinger entered Mr. Sherrell's cell to feed him. They asked if he was ready to eat and he appeared to mouth some words but was unable to speak. They attempted to sit him up but were unsuccessful. Shortly thereafter, Mr. Sherrell became unresponsive. Defendant Brewster came to the cell and attempted to take blood pressure readings from both arms but was unsuccessful. Mr. Sherrell's pulse began to drop rapidly and Defendant Williams retrieved an AED (automated external defibrillator). He also radioed the control booth to call 911 for an ambulance. Defendant Bohlmann placed the call for an ambulance.

54. Defendants Williams and Gallinger placed the AED pads on Mr. Sherrell's chest. On instruction by the device, Defendant Williams began chest compressions from a standing position over Mr. Sherrell. After a few minutes, Defendant Gallinger took over chest

compressions.  Bemidji police officer Robert Brogan then took over rescue efforts until Bemidji EMS arrived.  Resuscitation efforts were not successful and Mr. Sherrell was declared deceased at 5:25 p.m.

55. It was later learned through an independent autopsy review by a board certified forensic pathologist that Mr. Sherrell died from untreated Guillian-Barre Syndrome.  Guillian-Barre Syndrome is a form of progressive paralysis caused by an immune system attack on the nervous system after a viral infection such as influenza or a cold.  Classic symptoms include muscle weakness, numbness and tingling that starts in the legs and spreads to the upper body, low back pain, decreased ability to swallow, facial droop, escalating high blood pressure readings, and incontinence.  Although a fairly rare disorder, the existence of Guillian-Barre Syndrome is well-known to primary care and emergency physicians and nurses because it occurs after common viral infections.  There is no cure for Guillian-Barre Syndrome but most people recover completely with supportive hospital care.  Because paralysis of the respiratory muscles can occur as the disease progresses, care includes respiratory support such as mechanical ventilation, which requires hospitalization.

56. Had Defendant Dr. Leigh admitted Mr. Sherrell into the hospital and conducted further testing, Mr. Sherrell's condition would have been diagnosed and he would have been effectively treated with respiratory support. Had Defendant Dr. Leonard ordered Mr. Sherrell to be admitted into a hospital for diagnosis and care, Mr. Sherrell's condition would have been diagnosed and he would have been effectively treated with respiratory support. Dr. Leigh and Dr. Leonard both ignored serious and well-known symptoms associated with Guillian-Barre Syndrome and intentionally caused Mr. Sherrell to be housed in a county jail with minimal medical care and no available respiratory support. Dr. Leigh and Dr. Leonard

17

intentionally deprived Mr. Sherrell of the medical care necessary to treat his condition and keep him alive, which directly caused Mr. Sherrell's death.

57. The County and MEnD Defendants knew that Mr. Sherrell's condition had substantially deteriorated after her returned from the hospital and that Mr. Sherrell had developed a number of new symptoms that were specifically listed in the discharge instructions from Sanford, such as inability to swallow, full paralysis, worsening weakness, and loss of control of the bladder and bowels. The County and MEnD Defendants all knew the contents of the discharge instructions from Sanford but they intentionally ignored and disregarded the instructions and refused to "immediately" take Mr. Sherrell to the "nearest emergency department" as instructed. Had the County and MEnD Defendants recognized the changes in Mr. Sherrell's worsening condition, taken them seriously, and sought additional medical treatment when he developed the symptoms outlined in the Sanford discharge instructions, Mr. Sherrell would have received necessary medical treatment, including respiratory support, and would have survived and recovered from his condition. The County and MEnD Defendants intentionally deprived Mr. Sherrell of the medical care necessary to treat his condition and keep him alive, which directly caused Mr. Sherrell's death.

58. Beltrami County and the Beltrami County Jail have a history of violating state rules regarding well-check compliance as well as lack of training in emergency procedures for medical staff, as reported by the Minnesota Department of Corrections and other inmates.

59. As a direct and proximate result of Defendants' actions, Mr. Sherrell endured severe and prolonged physical and emotional/psychological pain and suffering, which ultimately resulted in his death and caused loss of life and related damages. As a direct and proximate

result of Defendants' actions, Mr. Sherrell's heirs and next of kin suffered damages enumerated in Minn. Stat. § 573.02, in an amount in excess of $75,000.


## CLAIMS FOR RELIEF

### COUNT 1: 42 U.S.C. § 1983 – EIGHTH AND/OR FOURTEENTH AMENDMENT DELIBERATE INDIFFERENCE VIOLATIONS AGAINST ALL INDIVIDUAL BELTRAMI COUNTY DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES AND ALL INDIVIDUAL MEND DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES.

60. Paragraphs 1 through 59 are incorporated herein by reference as though fully set forth.

61. Based on the above factual allegations, Defendants, through their actions, acting under the color of state law, violated Plaintiff's constitutional rights under the Eighth and/or Fourteenth Amendments to the United States Constitution through their deliberate indifference towards Mr. Sherrell's serious medical needs and through their deliberate indifference towards serious risk of injury/harm to Mr. Sherrell.

62. As a result of these constitutional violations, Mr. Sherrell and his heirs and next of kin suffered damages as aforesaid.


### COUNT 2: 42 U.S.C. § 1983 – EIGHTH AND/OR FOURTEENTH AMENDMENT (*MONELL*) VIOLATIONS AGAINST DEFENDANTS BELTRAMI COUNTY, MEND CORRECTIONAL CARE, PLLC, AND THE INDIVIDUAL BELTRAMI COUNTY AND MEND DEFENDANTS IN THEIR OFFICIAL CAPACITIES

63. Paragraphs 1 through 59 are incorporated herein by reference as though fully set forth.

64. Prior to September 2, 2018, Defendants developed and maintained policies and/or customs and/or practices exhibiting deliberate indifference to the constitutional rights of persons in their care and custody, which caused the violations of Mr. Sherrell's constitutional rights.

65. It was the policy and/or custom and/or practice of Defendants to inadequately supervise and train their employees, including the individual Defendants, thereby failing to adequately prevent and discourage further constitutional violations.

66. It was the policy and/or custom and/or practice of Defendants to detain severely ill inmates at the Beltrami County Jail instead of admitting such inmates into a hospital for medical treatment, thereby directly causing and contributing to constitutional violations.

67. It was the policy and/or custom and/or practice of Defendants to maintain inadequate supervision of severely ill inmates at the Beltrami County Jail, thereby directly causing and contributing to constitutional violations.

68. Prior to September 2, 2018, Defendants, acting with deliberate indifference towards the constitutional rights of citizens in their care and custody, failed to properly train their employees to hospitalize severely ill inmates, to maintain adequate supervision of severely ill inmates, to follow medical discharge instructions of medical professionals, and to recognize serious and life-threatening medical symptoms requiring emergency medical care.

69. As a result of these policies and/or customs and/or practices and/or lack of training, employees of Defendants, including the individual Beltrami County and MEnD Defendants named herein, believed that their actions would not be properly monitored by supervisory employees and that misconduct would not be investigated or sanctioned, but would be tolerated.

70. As a result of these policies and/or customs and/or practices and/or lack of training, employees of Defendants, including the individual Beltrami County and MEnD Defendants named herein, were not properly equipped to care for inmates with serious and life-threatening medical conditions.

71. These policies and/or customs and/or practices and/or lack of training and supervision were the cause of the violations of Mr. Sherrell's constitutional rights alleged herein.

## COUNT 3: MINN. STAT. § 573.02 – WRONGFUL DEATH CLAIM AGAINST BELTRAMI COUNTY AND THE INDIVIDUAL BELTRAMI COUNTY DEFENDANTS

72. Paragraphs 1 through 59 are incorporated herein by reference as though fully set forth.

73. Based on the above factual allegations, Defendants negligently caused Mr. Sherrell's death. Specifically, Defendants owed Mr. Sherrell a duty of care to have Mr. Sherrell hospitalized instead of detaining him in the county jail, to follow the discharge instructions from Sanford Medical Center Fargo, and to timely transport Mr. Sherrell back to the emergency room per discharge instructions from Sanford Medical Center Fargo. Defendants breached this duty of care when they refused to hospitalize Mr. Sherrell, failed to follow the discharge instructions from Sanford Medical Center Fargo, failed to timely transport Mr. Sherrell back to the emergency room per discharge instructions from Sanford Medical Center Fargo, and allowed him to slowly deteriorate while in their care until he died.

74. Defendants caused Mr. Sherrell's wrongful death through their deliberate indifference towards his serious medical needs (as alleged in Counts 1 and 2 above) and/or negligence (as alleged in the preceding paragraph).

75. Defendant Beltrami County is vicariously liable for the wrongful death caused by its employees/agents, the individual Beltrami County Defendants.

76. As a direct and proximate result of Defendants' wrongful death, Mr. Sherrell's heirs and next of kin have suffered damages enumerated in Minn. Stat. § 573.02, in an amount in excess of $75,000.

### COUNT 4: MINN. STAT. § 573.02 – WRONGFUL DEATH CLAIM AGAINST MEnD CORRECTIONAL CARE, PLLC, AND THE INDIVIDUAL MEnD DEFENDANTS

77. Paragraphs 1 through 59 are incorporated herein by reference as though fully set forth.

78. Based on the above factual allegations, Defendants have committed medical malpractice against Mr. Sherrell. Specifically, Defendants owed Mr. Sherrell a duty and standard of care, as recognized by the medical community, to properly diagnose and treat Mr. Sherrell's medical condition, to have Mr. Sherrell hospitalized instead of detaining him in the county jail, and to timely transport Mr. Sherrell back to the emergency room per discharge instructions from Sanford Medical Center Fargo. Defendants departed from this duty and standard of care when they misdiagnosed Mr. Sherrell's medical condition, refused to provide him necessary medical treatment, failed to follow the discharge instructions from Sanford Medical Center Fargo, and allowed him to slowly deteriorate while in their care until he died.

79. Defendants caused Mr. Sherrell's wrongful death through deliberate indifference to his serious medical needs (as alleged in Counts 1 and 2 above) and/or medical malpractice (as alleged in the preceding paragraph).

80. Defendant MEnD Correctional Care is vicariously liable for the wrongful death caused by its employees/agents, the individual MEnD Defendants.

81. As a direct and proximate result of Defendants' wrongful death, Mr. Sherrell's heirs and next of kin have suffered damages enumerated in Minn. Stat. § 573.02, in an amount in excess of $75,000.

**COUNT 5: MINN. STAT. § 573.02 – WRONGFUL DEATH CLAIM AGAINST SANFORD HEALTH, SANFORD, SANFORD MEDICAL CENTER FARGO, AND DR. LEIGH**

82. Paragraphs 1 through 59 are incorporated herein by reference as though fully set forth.

83. Based on the above factual allegations, Defendants have committed medical malpractice against Mr. Sherrell. Specifically, Defendants owed Mr. Sherrell a duty and standard of care, as recognized by the medical community, to properly diagnose and treat Mr. Sherrell's medical condition, to conduct additional neurological testing in addition to the MRI, and to admit Mr. Sherrell into their hospital instead of discharging him to the county jail. Defendants departed from this duty and standard of care when they ignored and refused to acknowledge Mr. Sherrell's symptoms, misdiagnosed his medical condition, refused to provide him necessary medical treatment, and discharged him to the county jail with a false diagnosis of malingering.

84. Defendants caused Mr. Sherrell's wrongful death through medical malpractice.

85. Defendants Sanford, Sanford Health, and Sanford Medical Center Fargo are vicariously liable for the wrongful death of its employees/agents, including Dr. Leigh.

86. As a direct and proximate result of Defendants' wrongful death, Mr. Sherrell's heirs and next of kin have suffered damages enumerated in Minn. Stat. § 573.02, in an amount in excess of $75,000.

**COUNT 6: NORTH DAKOTA CENTURY CODE § 28-01-26.1 (SURVIVAL ACTION): MEDICAL MALPRACTICE AGAINST SANFORD HEALTH, SANFORD, SANFORD MEDICAL CENTER FARGO, AND DR. LEIGH**

87. Paragraphs 1 through 59 are incorporated herein by reference as though fully set forth.

88. Based on the above factual allegations, Defendants have committed medical malpractice against Mr. Sherrell. Specifically, Defendants owed Mr. Sherrell a duty and standard of care,

as recognized by the medical community, to properly diagnose and treat Mr. Sherrell's medical condition, to conduct additional neurological testing in addition to the MRI, and to admit Mr. Sherrell into their hospital instead of discharging him to the county jail. Defendants departed from this duty and standard of care when they ignored and refused to acknowledge Mr. Sherrell's symptoms, misdiagnosed his medical condition, refused to provide him necessary medical treatment, and discharged him to the county jail with a false diagnosis of malingering.

89. Defendants caused Mr. Sherrell to suffer physical/emotional pain and suffering, wrongful death, and loss of life and related damages through medical malpractice.

90. Defendants Sanford Health, Sanford, and Sanford Medical Center Fargo are vicariously liable for the malpractice of their employees/agents, including Dr. Leigh.

91. As a direct and proximate result of Defendants' malpractice, Mr. Sherrell suffered damages as aforesaid.

## **RELIEF REQUESTED**

**WHEREFORE, Plaintiff requests that this Court grant the following relief:**

a. Issue an order granting Plaintiff judgment against Defendants, finding that Defendants violated Mr. Sherrell's constitutional rights under the Eighth/Fourteenth Amendments to the United States Constitution and that Defendants are liable to Plaintiff for all damages resulting from these violations, including damages for Mr. Sherrell's conscious pain and suffering and loss of life and related damages;

b. Issue an order granting Plaintiff judgment against Defendants, finding that Defendants caused Mr. Sherrell's wrongful death and that Defendants are liable to Plaintiff for all damages resulting from these violations;

c.   Award of compensatory damages to Plaintiff against all Defendants, jointly and severally;

d.   Award of punitive damages to Plaintiff against all Defendants, jointly and severally;

e.   Award of reasonable attorney's fees and costs to Plaintiff pursuant to 42 U.S.C. § 1988;

f.   Award of such other and further relief as this Court may deem appropriate.


**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL.**


THE LAW OFFICE OF ZORISLAV R. LEYDERMAN

Dated: <u>September 24, 2019</u>                    By: <u>s/ Zorislav R. Leyderman</u>
                                                                          ZORISLAV R. LEYDERMAN
                                                                          Attorney License No. 0391286
                                                                          Attorney for Plaintiff
                                                                          The Law Office of Zorislav R. Leyderman
                                                                          222 South 9th Street, Suite 1600
                                                                          Minneapolis, MN 55402
                                                                          Tel: (612) 876-6626
                                                                          Email: zrl@ZRLlaw.com