| | |
|---|---|
| **Del Shea Perry,** | **Court File No.: 19-cv-02580 (ECT/LIB)** |
| **Plaintiff,** | |
| vs. | **PLAINTIFF'S STATEMENT OF THE CASE** |
| **Beltrami County, et al.,** | |
| **Defendants.** | |

## INTRODUCTION

Plaintiff Del Shea Perry is the mother of Hardel Sherrell. Mr. Sherrell died while in the custody of Beltrami County Jail in September of 2018. He was 27 years old and a father to three minor daughters.

Mr. Sherrell was suffering from Guillain-Barre Syndrome, a treatable neurological condition that causes paralysis of extremities and, when left untreated, results in paralysis of respiratory organs and respiratory arrest. After being ignored and accused of faking by multiple medical and correctional staff, Mr. Sherrell suffered respiratory failure and suffocated to death while he lay paralyzed on the jail floor. After conducting a comprehensive independent investigation, Ms. Perry filed the present lawsuit against three separate entities responsible for Mr. Sherrell's untimely death. The Defendants include Beltrami County and its staff, MEND Correctional Care and its staff, and Sanford Health and its staff. The factual basis for Plaintiff's legal claims is outlined in detail below.

**STATEMENT OF FACTS**

**Transfer to Beltrami County Jail and Initial Medical Care.**

On August 24, 2018, Mr. Sherrell was transferred from Dakota County Jail and booked into Beltrami County Jail without incident. He was housed in cell block 207 in an upper bunk. He seemed to get along well with the inmates in his cell block and posed no problems for the correctional officers in that area.

On August 26, 2018, Mr. Sherrell complained of a headache and requested a blood pressure check. Defendant Brewster, a Health Technician with MEnD Correctional Care, measured his blood pressure and found it to be elevated at 146/101. Despite this finding, Defendant Brewster did not refer Mr. Sherrell for any additional care.

On August 27, 2018, Mr. Sherrell began complaining of chest pain. Despite the serious nature of this symptom, Defendant Williams, a Corrections Officer, told Mr. Sherrell that he was required to enter a kite (jail communication) to request a blood pressure check. A short while later, Defendant Nurse Pederson saw Mr. Sherrell in the jail clinic for a blood pressure check. He complained of headaches, sharp left-sided chest pain with duration of 45 minutes, and low back, thigh and foot pain. Defendant Pederson observed that he was sweating but did not check his temperature. His blood pressure was elevated at 159/104 and his pulse was 101. An electrocardiogram showed heart muscle abnormalities with probable damage to his lower heart muscle, a possible sign of a heart attack or other serious disease process. Defendant Nurse Pederson spoke with Defendant Dr. Leonard, who ordered Tylenol, ibuprofen, and hydroxyzine, an antihistamine sometimes used for sedation, and placed Mr. Sherrell on a list to been seen during the next medical rounds.

**August 28, 2018: Fall from Bunk and Accusations of "Faking."**

Early on the morning of August 28, 2018, Mr. Sherrell fell out of his top bunk. He was unable to get up from the floor for 25 minutes. Defendants Feldt and Lorsbach encountered Mr. Sherrell on the floor just after 4:00 a.m. but felt that he had lowered himself to the floor so refused to help him get up. He was eventually assisted back into his bunk by his cellmates. Mr. Sherrell shared his belief with Defendants Feldt and Lorsbach that he fell from his bunk because he had received muscle relaxers the prior afternoon. He may have been under the mistaken belief that the hydroxyzine he received the day before was a muscle relaxer. Defendant Feldt checked Mr. Sherrell's medication list and, not seeing muscle relaxers, accused Mr. Sherrell of lying. He conveyed his belief that Mr. Sherrell was "faking" to Defendant Lorsbach. Mr. Sherrell's complaint to Defendant Feldt that he could not feel his legs was ignored.

Later that morning, Mr. Sherrell was seen in the medical clinic by Defendant Nurse Pederson, complaining of back pain on walking and lying down, and arm weakness. She observed that he was crying. His blood pressure was elevated at 156/117. Defendant Pederson called Defendant Dr. Leonard, who prescribed ibuprofen, Flexeril, a muscle relaxer, and Lisinopril, a medication to lower blood pressure. He also ordered that Mr. Sherrell be moved to a lower bunk and given an extra blanket.

Later that afternoon, Mr. Sherrell continued to complain about back pain and difficulties with a lack of sensation and difficulty moving his legs. At about 8:00 p.m., he explained to Defendant Williams that he was not able to get out of his bunk to walk to the medication cart to take his medications. He was assisted by two cellmates to a standing position while Defendant Williams gave him his medication and some water. Other cellmates later assisted him to the bathroom. Also, at about 8:00 p.m. that night, Mr. Sherrell submitted a kite asking to be taken to

the hospital because "I can't feel my legs and can't be physically mobile" along with reporting generalized muscle pain, numbness from the umbilicus down and generalized loss of control of his arms.

**August 29, 2018: Fall from Wheelchair and Move to Medical Segregation.**

By the early morning of August 29, 2018, Mr. Sherrell was no longer able to support his own weight. He complained of this to Defendant Williams, who contacted Defendant Katie Doe. Defendant Katie Doe contacted Defendant Nurse Pederson, who ordered that Mr. Sherrell be moved to "a tank" (administrative segregation cell) until he could be further evaluated. At approximately 7:00 a.m., Defendant Williams and a few inmates put Mr. Sherrell into a wheelchair and moved him into cell 215. His activities and movements continued to be monitored.

At about 8:00 a.m., Mr. Sherrell was sitting in a wheelchair with his legs on the bunk. He attempted to move himself into his bunk on his own. He can be seen on video trying to use his pant legs to move his legs off the bunk. In the process, he fell out of the wheelchair. He tried to pull himself onto his bunk from the floor but was unable to do so. His legs had occasional spasmodic twitches but otherwise did not move. Mr. Sherrell remained on the floor for one hour, until Defendants Williams and Busta lifted him back into the wheelchair, putting his legs back on the bunk. Even then, Defendant Williams stated in his report that he did not believe that Mr. Sherrell was unable to support his own weight or stand on his own so he was hesitant to assist him.

At about 9:30 a.m., Mr. Sherrell was seen by Defendant Nurse Pederson, who noted a significantly elevated blood pressure of 162/116 despite Mr. Sherrell being on antihypertensive medication. Mr. Sherrell complained that he was having difficulty coordinating his arm and

hand movements. Still, in her notes Defendant Pederson claimed that Mr. Sherrell moved his arms "just fine" during their conversation and stated her belief that he had "faked" the fall from the wheelchair. She contacted Defendant Dr. Leonard, who discontinued Flexeril, the muscle relaxer he had been previously prescribed, discontinued Mr. Sherrell's access to a wheelchair and replaced it with a walker, and placed Mr. Sherrell on "activity watch," instructing staff to continue to document his movements via video camera and written logs.

Defendant Nurse Pederson later came to cell 215 to take away the wheelchair Mr. Sherrell had been using. Defendants Williams and Swiggum placed Mr. Sherrell partially on his bunk, removed the wheelchair, and left a walker next to the bed. A short time later, Defendant Williams brought a lunch tray to the cell and asked Mr. Sherrell if he planned to eat. Mr. Sherrell told him "he did not want to because he was having a hard time swallowing food as he told the nurse earlier."

At about 4:15 that afternoon, Defendant Settle attempted to assist Mr. Sherrell into a sitting position on his bunk, noting, "He complained of having little to no feeling in his hands and arms. He appeared to have a difficult time making contact with my hand to lift him…" Defendant Williams brought Mr. Sherrell a food tray at about 4:30 p.m. but left it across the cell. Mr. Sherrell attempted to use the walker to pull himself up but was unsuccessful. While resting at 6:52 p.m., Mr. Sherrell fell out of his bunk. Defendants Davis, Demaris and Smith pulled him onto the bunk in a sitting position with a pillow behind his back. He had difficulty keeping his head back against the wall and it flopped forward. At 7:58, Defendant Davis attempted to help Mr. Sherrell transfer from his bunk to a wheelchair. Mr. Sherrell was unable to support his own weight and fell to the floor. Defendant Carraway then entered and assisted getting Mr. Sherrell

5

off the floor and into the wheelchair. Defendant Carraway noted, "Sherrell had asked for a wheelchair, which we provided due to him not being able to stand and use the walker."

**August 30, 2018: Medical Override.**

At approximately 7:40 a.m., Defendant Nurse Pederson examined Mr. Sherrell. He stated that he could not feel anything from the waist down. She checked his blood pressure, which was high at 168/109 even though Mr. Sherrell was taking antihypertensive medication. She used a temperature probe to test the bottoms of his feet and he did not move or respond. She contacted Defendant Dr. Leonard, who ordered that Mr. Sherrell be taken to the emergency room. That afternoon, Defendant Jail Administrator Allen notified Defendant Pederson that Mr. Sherrell would not be taken to the emergency room. Defendant Allen stated that she was given information that Mr. Sherrell may be trying to escape. Defendant Pederson notified Defendant Dr. Leonard that his medical order had been overridden by Defendant Allen. That afternoon, Defendant Nurse Pederson notified Mr. Sherrell that he would not be going to the emergency room.

**August 31-September 1, 2018: Emergency Room Visit and Discharge with Instructions.**

On August 31, 2018 at approximately 10:00 a.m., Mr. Sherrell was seen by Defendant CNP Lundblad for a provider visit. Defendant Lundblad noted that Mr. Sherrell's symptoms had gone on for "3-4 days can't feel stomach down, trouble swallowing." She observed facial drooping, slight slurring of speech, right hand and right-sided muscle weakness, and diaphoresis (sweaty, clammy skin). She noted his uncontrolled high blood pressure and the possibility that he had experienced a stroke. She ordered that Mr. Sherrell be taken to the emergency room right away and notified Defendant Allen and other staff.

At approximately 10:20 a.m., Mr. Sherrell was taken to the Emergency Room at Sanford Bemidji Medical Center, located at 1300 Anne St. NW, Bemidji, MN 56601. Dr. Hari Darshan Khalsa examined Mr. Sherrell and noted lower extremity weakness and loss of sensation, including loss of reaction to painful stimuli, upper extremity weakness, and complete upper and lower facial droop, all very concerning symptoms. Dr. Khalsa ordered magnetic resonance imaging (MRI) studies to rule out cord compression, dissection, Bell's palsy, and other serious disorders but the hospital's MRI machine was unavailable. Dr. Khalsa ordered Mr. Sherrell to be taken by ambulance to Sanford Medical Center Fargo. During the ambulance trip, Mr. Sherrell had difficulty swallowing and ambulance staff had to suction his airway to keep it clear of saliva and mucous.

Upon his arrival at Sanford Medical Center Fargo, Mr. Sherrell was seen by Defendant Dr. Dustin G. Leigh in the emergency room. Defendant Dr. Leigh examined him and found the same lower extremity weakness and loss of sensation, including loss of reaction to painful stimuli, upper extremity weakness, and complete left upper and lower facial droop that Dr. Khalsa had noted. However, Defendant Leigh ignored those symptoms. When the MRI studies were inconclusive, Dr. Leigh ordered no additional testing such as lumbar puncture for spinal fluid testing, nerve conduction tests or electromyography, all common tests for neurological infections and disorders. Instead, he spoke with a corrections officer (believed to be Defendant Gallinger) who told him that Mr. Sherrell had been seen on a monitor during the night "moving his extremities without apparent difficulty." Defendant Dr. Leigh relied on this information and failed to explore other explanations for Mr. Sherrell's symptoms. Dr. Leigh ignored Mr. Sherrell's symptoms and determined that Mr. Sherrell was faking/lying.

Defendant Dr. Leigh discharged Mr. Sherrell with a primary diagnosis of "Malingering" and a secondary diagnosis of "Weakness." However, he spoke with two corrections officers and sent discharge instructions to the jail. The discharge instructions stated as follows:

> YOU SHOULD SEEK MEDICAL ATTENTION IMMEDIATELY, EITHER HERE OR AT THE NEAREST EMERGENCY DEPARTMENT, IF ANY OF THE FOLLOWING OCCURS:
> - Confusion, coma, agitation (becoming anxious or irritable).
> - Fever (temperature higher than 100.4ºF / 38ºC), vomiting.
> - Severe headache.
> - Signs of stroke (paralysis or numbness on one side of the body, drooping on one side of the face, difficulty talking).
> - Worsening of weakness, difficulty standing, paralysis, loss of control of the bladder or bowels or difficulty swallowing.

Mr. Sherrell's Sanford medical records, including discharge instructions, were also sent via facsimile to the Beltrami County Jail medical office.

Mr. Sherrell was returned to the jail just after midnight on September 1, 2018. When the transport vehicle arrived at the sally port, Mr. Sherrell asked for assistance to get out of the vehicle. Defendants Frederickson, Gallinger, Scandinato, and Feldt initially helped him from the vehicle but when he was unable to stand on his own, they allowed him to drop to the floor. He remained there for several minutes before they finally placed him in a wheelchair and wheeled him into the jail. As he was being wheeled in, Mr. Sherrell's head flopped back. One of the Defendants shoved his head brusquely forward. On a video recording of the incident, Mr. Sherrell appeared to be crying.

Mr. Sherrell was placed in cell 214, another medical segregation cell with video cameras. As he was placed on his bunk, his left arm was left hanging on the floor and his feet were off the end of the bunk. A short time after being placed on his bunk, Mr. Sherrell attempted to grab his left arm with his right arm to pull it back on the bunk. Instead, he rolled off the bunk onto the floor, his left arm pinned under his body. His entire body seized. Other than twitching, his legs

never moved. He was seen on video attempting many times to raise his head and call for help. Despite this, Defendants Feldt, Foss, Smith, and others left Mr. Sherrell on the floor with no help whatsoever for nearly eight hours. When Defendants Foss and Smith finally moved him back to his bunk, they attempted to sit him up. He was unable to sit and fell backward, slamming his head into a wall.

In his notes, Defendant Feldt wrote, "Later that night I noticed that Hardel was laying on the floor and I reviewed camera footage and saw that he had made multiple small movements to wiggle himself off that bunk and rolled to the floor." Despite this, he ignored Mr. Sherrell's needs and made no attempt to move Mr. Sherrell from the floor. He was left on the floor to suffer without assistance. Further, there were no in-cell checks of Mr. Sherrell until 7:45 am, when Defendants Foss and Smith finally entered and moved him back to his bunk. At that time, they attempted to sit him up. He was unable to sit and fell backward, slamming his head into a wall. It was clear that his weakness had become much worse and that he was paralyzed and no longer able to use any part of his body in a coordinated way, which was a new development as of his return from the hospital early in the morning.

At 11:30 a.m. on September 1, 2018, Defendant Bohlmann relayed to Defendant Nurse Skroch that Mr. Sherrell was continuing to tell jail staff that he was unable to move his extremities and could not feel his legs. She also advised Defendant Skroch that Mr. Sherrell was "not moving around much." She asked Defendant Skroch to see Mr. Sherrell and to advise jail staff as to what they should be doing for him in terms of assisting him with toileting, eating and other activities. Despite this request, Defendant Skroch did not see Mr. Sherrell but, instead, only reviewed his records. She advised Defendant Bohlmann that since "there was nothing medically wrong with him," staff shouldn't be assisting him with feeding, toileting or other

9

activities as he was "capable of doing it himself as he was medically cleared by the hospital." Had she examined Mr. Sherrell as requested, she would have seen that his condition had drastically deteriorated and that he was displaying symptoms that were included in Sanford Hospital's discharge instructions that would necessitate a return to the emergency room.

Although she observed for herself that Mr. Sherrell was "not moving around much," Defendant Bohlmann reported Defendant Skroch's information to Defendant Allen. Defendant Allen told Defendant Bohlmann, "if medical states there is nothing wrong…then go with it." At evening briefing, Defendant Bohlmann told Defendant Scandinato "medical stated that we didn't need to assist him with anything as there was nothing medically wrong with him and he was capable of doing it himself."

Throughout the day, Mr. Sherrell was unable to sit up or support his own weight in any way. By this point, Mr. Sherrell had become completely incontinent with urine and bowels, another new development as of his return from the hospital. Every time corrections officers attempted to sit him up, he would flop to the side. He spent most of the day on his back on a mattress on the floor of the cell. Liquid food trays were periodically delivered to his cell but Mr. Sherrell was unable to reach them or coordinate his hand movements enough to bring any food toward himself. Jail videos show his efforts to roll and wiggle his hand along the floor toward his food trays, always unsuccessfully. Corrections officers made no efforts to help him with food or liquids. His last fluid intake was at 7:58 a.m. that morning. Throughout the day, his extremities twitched and he appeared to have had numerous seizures. Defendants Foss, Sella, Smith, Gallinger, Bohlmann, Feldt, Lorsbach, Scandinato and others all observed these changes in Mr. Sherrell's condition but did not report them to jail medical staff or take any other action to get medical care for Mr. Sherrell. Mr. Sherrell also reported directly to medical staff that he was

choking and completely unable to swallow, also additional developments since his return from the hospital, but these complaints were also ignored.

Defendant Dr. Leonard learned about Mr. Sherrell's deteriorating condition before end of day on September 1, 2018, but he took no action to have Mr. Sherrell properly diagnosed or transported to the emergency department per discharge instructions from Sanford. Despite Mr. Sherrell being in a medical segregation cell, no one checked on Mr. Sherrell in his cell between 8:16 p.m. and 11:02 p.m. Further, after Defendant Lorsbach left a food tray in his cell at 11:02 pm, no one checked on Mr. Sherrell in his cell until 8:30 am on September 2.

**September 2, 2018: Complete Paralysis/Debilitation and Mr. Sherrell's Death.**

On September 2, 2018, at 8:30 a.m., Defendant Nurse Skroch saw Mr. Sherrell. She noted that as he was talking, only the right side of his mouth was moving. Mr. Sherrell reported that he was unable to swallow. Nurse Skroch gave him a carton of apple juice but he initially declined. Nurse Skroch offered it again and poured some in his mouth, at which point Mr. Sherrell reported that he was choking. She ordered jail staff to assist him with feedings through use of a straw, to change his disposable briefs as needed, and to change his position periodically by rolling him and using blankets to prop him. She notified Defendant Dr. Leonard of these changes in Mr. Sherrell's condition and, although he was displaying symptoms that were included in Sanford Hospital's discharge instructions that would necessitate a return to the emergency room, she made no other efforts to secure additional medical care for Mr. Sherrell.

Despite Mr. Sherrell being in a medical segregation cell, between approximately 12:00 pm until about 2:00 pm, no one checked on Mr. Sherrell in his cell. Defendants Williams, Gallinger and Foss bathed Mr. Sherrell and observed that he was not able to move, support his own weight or otherwise assist them. As Defendant Foss noted, "Hardel was physically unable

11

to bathe himself due to an unknown medical condition. Hardel had been to Sanford Fargo where they were unable to diagnose him." To bathe him, they dragged him on a mattress into a cell with a floor drain.

At about 2:00 p.m., Defendant Nurse Skroch saw Mr. Sherrell lying flat on the mattress in his cell, saliva rolling down his check. She reminded staff to use a straw to ensure Mr. Sherrell received hydration and to roll him to his side. However, she took no further action to address his deteriorating condition. Nurse Skroch took no action in response to Mr. Sherrell's complete paralysis, full urinary and bladder incontinence, inability to swallow, and complete debilitation.

Mr. Sherrell spent the rest of the day lying on a mattress on the floor of cell 215. At about 3:30 p.m., Defendants Williams, Gallinger and Foss entered Mr. Sherrell's cell and changed his briefs and pants. They cleaned a large pool of saliva from his pillow and rolled him to his side. After they left, Mr. Sherrell was unable to stay on his side and fell onto his back. Defendants took no action in response to Mr. Sherrell's complete paralysis, full urinary and bladder incontinence, inability to swallow, and complete debilitation.

At approximately 4:40 p.m., Defendants Williams and Gallinger entered Mr. Sherrell's cell to feed him. They asked if he was ready to eat and he appeared to mouth some words but was unable to speak. They attempted to sit him up but were unsuccessful. Shortly thereafter, Mr. Sherrell became unresponsive. Defendant Brewster came to the cell and attempted to take blood pressure readings from both arms but was unsuccessful. Mr. Sherrell's pulse began to drop rapidly and Defendant Williams retrieved an AED (automated external defibrillator). He also radioed the control booth to call 911 for an ambulance. Defendant Bohlmann placed the call for an ambulance.

Defendants Williams and Gallinger placed the AED pads on Mr. Sherrell's chest. On instruction by the device, Defendant Williams began chest compressions from a standing position over Mr. Sherrell. After a few minutes, Defendant Gallinger took over chest compressions. Bemidji police officer Robert Brogan then took over rescue efforts until Bemidji EMS arrived. Resuscitation efforts were not successful and Mr. Sherrell was declared deceased at 5:25 p.m.

It was later learned through an independent autopsy review by a board certified forensic pathologist that Mr. Sherrell died from untreated Guillain-Barre Syndrome (GBS). GBS is a form of progressive paralysis caused by an immune system attack on the nervous system after a viral infection such as influenza or a cold. Classic symptoms include muscle weakness, numbness and tingling that starts in the legs and spreads to the upper body, low back pain, decreased ability to swallow, facial droop, escalating high blood pressure readings, and incontinence. Although a fairly rare disorder, the existence of GBS is well-known to primary care and emergency physicians and nurses because it occurs after common viral infections. There is no cure for GBS but most people recover completely with supportive hospital care. Because paralysis of the respiratory muscles can occur as the disease progresses, care includes respiratory support such as mechanical ventilation, which requires hospitalization.

Had Defendant Dr. Leigh admitted Mr. Sherrell into the hospital and conducted further testing, Mr. Sherrell's condition would have been diagnosed and he would have been effectively treated with respiratory support. Had Defendant Dr. Leonard ordered Mr. Sherrell to be admitted into a hospital for diagnosis and care, Mr. Sherrell's condition would have been diagnosed and he would have been effectively treated with respiratory support. Dr. Leigh and Dr. Leonard both ignored serious and well-known symptoms associated with GBS and intentionally caused Mr.

Sherrell to be housed in a county jail with minimal medical care and no available respiratory support. Dr. Leigh and Dr. Leonard intentionally deprived Mr. Sherrell of the medical care necessary to treat his condition and keep him alive, which directly caused Mr. Sherrell's death.

The County and MEnD Defendants knew that Mr. Sherrell's condition had substantially deteriorated after her returned from the hospital and that Mr. Sherrell had developed a number of new symptoms that were specifically listed in the discharge instructions from Sanford, such as inability to swallow, full paralysis, worsening weakness, and loss of control of the bladder and bowels. The County and MEnD Defendants all knew the contents of the discharge instructions from Sanford but they intentionally ignored and disregarded the instructions and refused to "immediately" take Mr. Sherrell to the "nearest emergency department" as instructed. Had the County and MEnD Defendants recognized the changes in Mr. Sherrell's worsening condition, taken them seriously, and sought additional medical treatment when he developed the symptoms outlined in the Sanford discharge instructions, Mr. Sherrell would have received necessary medical treatment, including respiratory support, and would have survived and recovered from his condition. The County and MEnD Defendants intentionally deprived Mr. Sherrell of the medical care necessary to treat his condition and keep him alive, which directly caused Mr. Sherrell's death.

## **LEGAL CLAIMS**

Ms. Perry is pursuing various legal claims against various Defendants. Ms. Perry is suing the Beltrami County and MEND Defendants for Eight and/or Fourteenth Amendment deliberate indifference. Ms. Perry is suing MEND and Sanford for medical malpractice, and she is suing all defendants for wrongful death. Ms. Perry's claims are brought pursuant to 42 U.S.C. § 1983 as

well as North Dakota and Minnesota state law. Ms. Perry is seeking damages for Mr. Sherrell's physical/emotional pain and suffering as well as wrongful death damages pursuant to state law.

                                                                                 THE LAW OFFICE OF ZORISLAV R. LEYDERMAN

Dated: <u>March 6, 2020</u>                               By: <u>s/ Zorislav R. Leyderman</u>
                                                                         ZORISLAV R. LEYDERMAN
                                                                         Attorney License No. 0391286
                                                                         Attorney for Plaintiff
                                                                         The Law Office of Zorislav R. Leyderman
                                                                         222 South 9th Street, Suite 1600
                                                                         Minneapolis, MN 55402
                                                                         Tel: (612) 876-6626
                                                                         Email: zrl@ZRLlaw.com