UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Del Shea Perry, Trustee for the Heirs and
Next of Kin of Hardel Harrison Sherrell and
Personal Representative for the Estate of
Hardel Harrison Sherrell,

   Plaintiff,

v.

Beltrami County; MEnD Correctional Care,
PLLC; Sanford Health; Sanford; Sanford
Medical Center Fargo; Calandra Allen (Jail
Administrator), Andrew Richards (Assistant
Jail Administrator), Edward Busta (Program
Director), Corrections Sergeant Tyler
Carraway, Corrections Sergeant Anthony
Derby, Corrections Sergeant Mario
Scandinato, Corrections Officer Melissa
Bohlmann, Corrections Officer Jared Davis,
Corrections Officer Dana Demaris,
Corrections Officer Brandon Feldt,
Corrections Officer James Foss, Corrections
Officer Daniel Fredrickson, Corrections
Officer Chase Gallinger, Corrections Officer
Holly Hopple, Corrections Officer Nicholas
Lorsbach, Corrections Officer Erin Meyer,
Corrections Officer Mitchell Sella,
Corrections Officer Christopher Settle,
Corrections Officer Marlon Smith,
Corrections Officer Jacob Swiggum, and
Corrections Officer Joseph Williams,
Beltrami County employees, all in their
individual and official capacities and as
agents/employees of Beltrami County; Todd
Leonard, MD, Crystal Pedersen, RN,
Michelle Skroch, RN, and Madison
Brewster, Health Technician, MEnD
Correctional Care employees, all in their
individual and official capacities and as

File No. 19-cv-2580 (ECT/LIB)

**OPINION AND ORDER**

agents/employees of MEnD Correctional
Care, PLLC; and Dustin G. Leigh, MD,
individually and as employee/agent of
Sanford Health and/or Sanford and/or
Sanford Medical Center Fargo,

        Defendants.

---

Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, Minneapolis, MN, for
Plaintiff.

Peter W. Zuger and Kasey D. McNary, Serkland Law Firm, Fargo, ND, for Defendants
Sanford Health, Sanford, Sanford Medical Center Fargo, and Dustin Leigh, MD.

Stephanie A. Angolkar, Aaron Mark Bostrom, and Jason M. Hiveley, Iverson Reuvers,
Bloomington, MN, for Defendants Beltrami County, Calandra Allen, Andrew Richards,
Edward Busta, Corrections Sergeant Tyler Carraway, Corrections Sergeant Anthony
Derby, Corrections Sergeant Mario Scandinato, Corrections Officer Melissa Bohlmann,
Corrections Officer Jared Davis, Corrections Officer Dana Demaris, Corrections Officer
Brandon Feldt, Corrections Officer James Foss, Corrections Officer Daniel Fredrickson,
Corrections Officer Chase Gallinger, Corrections Officer Holly Hopple, Corrections
Officer Nicholas Lorsbach, Corrections Officer Erin Meyer, Corrections Officer Mitchell
Sella, Corrections Officer Christopher Settle, Corrections Officer Marlon Smith,
Corrections Officer Jacob Swiggum, and Corrections Officer Joseph Williams.

Carolin J. Nearing, Anthony J. Novak, and Bradley R. Prowant, Larson King, LLP, St.
Paul, MN, for Defendants MEnD Correctional Care, PLLC, Todd Leonard, MD, Crystal
Pedersen, RN, Michelle Skroch, RN, and Madison Brewster, Health Technician.

---

      Hardel Harrison Sherrell died of an untreated illness while he was an inmate in the

Beltrami County Jail.  Sherrell's mother, Del Shea Perry, brought this action in her capacity

as trustee for Sherrell's next of kin and as personal representative of his estate.  Relevant

here, Perry asserts two claims against Defendants Sanford Health, Sanford, Sanford

Medical Center Fargo, and an individual doctor that examined Sherrell (referred to

collectively as "Sanford").  The first is a wrongful-death claim under Minnesota law, which

2

Perry asserts on behalf of Sherrell's next of kin.  The second is a survival claim under North Dakota law, which Perry asserts on behalf of Sherrell's estate.  Sanford has moved for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing that North Dakota law should apply to Perry's claims against Sanford and that the Minnesota wrongful-death claim should accordingly be dismissed.

Sanford's motion will be granted in part and denied in part.  The motion will be granted to the extent it seeks to apply North Dakota's $500,000 cap on non-economic damages to Perry's wrongful-death claim.  Minnesota law has no such cap, and Minnesota's choice-of-law rules favor applying North Dakota law to resolve the conflict. The motion will be denied to the extent it seeks dismissal of the wrongful-death claim.  The Parties' agree that Minnesota law and North Dakota law conflict only with respect to the damages available on that claim, which means that Minnesota law should govern the claim in all other respects.  The wrongful-death claim will therefore be allowed to proceed under Minnesota law, subject to North Dakota's damages cap.

## I[1]

In late August 2018, Sherrell was transferred from the Dakota County Jail to the Beltrami County Jail.  Am. Compl. ¶ 16 [ECF No. 30].  A couple of days after the transfer, he began complaining of a headache and pain in his chest, low back, thigh, and feet, and he sought medical treatment at the jail.  *Id.* ¶¶ 17–19.  An exam revealed that his blood

---

[1]    In accordance with the standards governing a motion under Rule 12(c), the facts are drawn entirely from Perry's Amended Complaint.  *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014); *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

pressure and pulse were both elevated, and "[a]n electrocardiogram showed heart muscle abnormalities with probable damage to his lower heart muscle, a possible sign of a heart attack[.]" *Id.* ¶ 19. Jail doctors prescribed pain medication, a sedative, a muscle relaxer, and a medication to lower blood pressure, but did not initially recommend additional treatment. *Id.* ¶¶ 19–21.

Sherrell's condition worsened considerably over the next 72 hours. He began experiencing "a lack of sensation and difficulty moving his legs" and a "generalized loss of control of his arms." *Id.* ¶¶ 22–23. When he could no longer support his own weight, he was placed in a wheelchair and moved to an "administrative segregation cell" pending a further evaluation. *Id.* ¶ 24. While there, he fell out of his wheelchair and bunk bed, was unable to hold himself up in a sitting position, and reported having difficulty swallowing food. *Id.* ¶¶ 25–32. His blood pressure continued to rise despite the antihypertensive medication he was taking, and he eventually reported that he "could not feel anything from the waist down." *Id.* ¶ 33. This development prompted a jail doctor to order that Sherrell be taken to an emergency room, but the jail administrator initially overrode that order. *Id.* ¶¶ 33–35. When Sherrell's blood pressure continued to be "uncontrolled" and his other symptoms continued to worsen, a nurse practitioner at the jail again ordered that he be taken to the emergency room. *Id.* ¶ 36.

Sherrell was initially taken to the emergency room at Sanford Bemidji Medical Center in Bemidji, Minnesota, on August 31, 2018. *Id.* ¶ 37. To rule out certain disorders, the examining physician ordered magnetic resonance imaging (MRI) studies, but because "the hospital's MRI machine was unavailable," the doctor ordered Sherrell to be taken by

ambulance to Sanford Medical Center Fargo in Fargo, North Dakota.  *Id.*  In Fargo, Dr. Dustin Leigh examined Sherrell and noted the same weakness and loss of sensation that Sherrell had reported at the jail.  *Id.* ¶ 38.  When the MRI was inconclusive, however, Dr. Leigh declined to order additional testing.  *Id.*  Instead, relying on reports from a corrections officer, Dr. Leigh concluded that Sherrell was malingering and discharged him with instructions to return if he exhibited certain symptoms.  *Id.* ¶ 38–39.

When Sherrell returned to the Beltrami County jail early on September 1, officials once again placed him in a medical segregation cell overnight.  *Id.* ¶ 40–41.  Over the next 36 hours, his condition "drastically deteriorated."  *Id.* ¶ 43.  He again fell out of his bed, experienced multiple seizures, "was unable to sit up or support his own weight in any way," and began displaying several of the symptoms listed in his discharge instructions. *Id.* ¶¶ 41–45.  Nonetheless, prison doctors "took no action to have [him] properly diagnosed or transported to the emergency department," and he was left unattended for long periods of time.  *Id.* ¶¶ 46–47.  By the late afternoon of September 2, Sherrell became unresponsive and was declared dead after attempts to revive him were unsuccessful. *Id.* ¶¶ 53–54.  An autopsy revealed that Sherrell died from "untreated Guillian-Barre Syndrome"—a "form of progressive paralysis caused by an immune system attack on the nervous system after a viral infection[.]"  *Id.* ¶ 55.

Del Shea Perry, Sherrell's mother, brought this action in her capacity as trustee for Sherrell's next of kin and as personal representative of his estate.[2]  In Counts 1 through 4

---

[2]      In two separate orders, a Minnesota state court formally appointed Perry to these roles.  *Id.* ¶ 2.

of the operative Amended Complaint, Perry claims that Beltrami County and MEnD Correctional Care (a private contractor providing medical services in the jail), as well as a number of their individual employees, are liable under Minn. Stat. § 573.02 for wrongful death and under 42 U.S.C. § 1983 for violating Sherrell's constitutional rights. Am. Compl. ¶¶ 60–81. In Counts 5 and 6, Perry asserts a wrongful-death claim under Minn. Stat. § 573.02 and a survival claim under North Dakota Century Code § 28-01-26, both against Sanford. *Id.* ¶¶ 82–91. In the present motion, Sanford argues that Count 5 must be dismissed because North Dakota law applies to the wrongful-death claim.

## II

A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standard as a motion to dismiss under Rule 12(b)(6). *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Resolving Sanford's motion requires a choice-of-law analysis. "In a diversity case, a federal court applies the choice of law rules of the forum state." *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997). Courts in Minnesota follow a three-step process to answer choice-of-law questions. "[T]he first consideration is whether the choice of one state's law over another's creates an actual conflict." *Jepson v. Gen. Cas. Co. of Wisc.*, 513 N.W.2d 467, 469 (Minn. 1994). If a conflict exists, the next question is "whether the law of both states can be constitutionally applied"—*i.e.*, whether each state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id.* at 469–70 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981)). If the answer to both of these threshold questions is "yes," then the court applies five "choice influencing factors" to determine which state's law should apply: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." *Id.* at 470 (citing *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973)).

The Parties' arguments surrounding this motion raise two overarching and related issues. The first is the proper scope of the choice-of-law question in this case: if Sanford is correct that North Dakota law applies, does that state's law govern Perry's entire dispute with Sanford or only some subset of the issues involved? This question, which is intertwined with the definition of the relevant conflict between Minnesota and North Dakota law, will be addressed first. The second is the choice-of-law issue itself: do Minnesota's choice-of-law rules favor applying Minnesota or North Dakota law?

A

The Parties agree that Minnesota and North Dakota law conflict in a relevant and substantive way. Specifically, although both states authorize a decedent's next of kin to bring a wrongful-death action, *see* Minn. Stat. § 573.02; N.D. Cent. Code § 32-21-01, North Dakota limits the amount of "non-economic damages" to $500,000 when such cases arise out of "health care malpractice," N.D. Cent. Code § 32-42-02; *see id.* § 32-42-01 (providing relevant definitions).[3] The Parties also agree that the underlying principles of negligence governing Sanford's liability on the wrongful-death claim are the same under Minnesota and North Dakota law. *See* Defs.' Mem. at 9; Pl.'s Mem. at 12. What the Parties dispute is the impact that the conflict concerning available damages should have on their case. Sanford seems to argue that the law of only one state—North Dakota—should govern its entire dispute with Perry and that Perry's Minnesota wrongful-death claim must therefore be dismissed. *See* Defs.' Mem. at 5. Perry frames the conflict more narrowly. She argues that the conflict between Minnesota and North Dakota law only concerns the narrow issue of "medical malpractice damages." Pl.'s Mem. at 13. Under her approach,

---

[3]     Sanford identifies a second conflict between Minnesota and North Dakota law: Minnesota law does not allow survival actions like the one Perry asserts in Count 6, while North Dakota law does. *See* Defs.' Mem. at 5 [ECF No. 37]; *see also Strohn v. Xcel Energy Inc.*, 353 F. Supp. 3d 828, 834 (D. Minn. 2018). As discussed below, Minnesota courts address choice-of-law questions on an issue-by-issue basis, so the same state's law need not necessarily govern all aspects of both claims. *See* Pl.'s Mem. at 21–25 [ECF No. 39] (conducting a separate choice-of-law analysis for the survival claim); *cf. Jaco v. Bloechle*, 739 F.2d 239, 242 (6th Cir. 1984) (explaining that wrongful-death claims and survival claims are "distinct causes of action"). Because Sanford does not argue that Minnesota law applies to extinguish the survival claim or that the claim should be dismissed for any other reason, it is not necessary to say any more about it.

even if North Dakota law applies to limit the amount of damages, Minnesota law should still govern the rest of her wrongful-death claim, making dismissal of Count 5 inappropriate. *See id.* at 20.

Although the Parties do not address the issue directly in their briefing, their arguments evoke the concept of "*dépeçage*"—that is, the process of applying the law of different states "to resolve different issues in the same case." *Ewing v. St. Louis-Clayton Orthopedic Grp., Inc.*, 790 F.2d 682, 686 (8th Cir. 1986) (applying Missouri's choice-of-law rules); *see generally* Willis L. M. Reese, *Dépeçage: A Common Phenomenon in Choice of Law*, 73 Colum. L. Rev. 58 (1973).  Courts adopting this piecemeal approach to choice of law have reasoned that different choice-of-law rules might govern different legal issues, *see Putnam Res. v. Pateman*, 958 F.2d 448, 465 (1st Cir. 1992) (noting that Rhode Island applied different rules to contract- and tort-related issues), or that a particular interest driving a choice-of-law decision might carry more weight for some legal issues than for others, *see Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 76 (E.D.N.Y. 2000) (noting that applying *dépeçage* can "result in the application to each issue of the rule of the state with the greatest concern in the determination of that issue" (quoting Reese, *supra*, at 60)). To these courts, *dépeçage* is "desirable in many instances," *Ewing*, 790 F.2d at 686, because it "permits a more nuanced handling of certain multistate situations and thus forwards the policy of aptness," *In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, No. MDL 1448(RWS), 2006 WL 1288298, at *23 (S.D.N.Y. May 9, 2006).  By arguing that her Minnesota wrongful-death claim should survive even if North Dakota's cap on non-economic damages applies, Perry seems to be advocating *dépeçage* here.

While Minnesota courts have not used the term "*dépeçage*," they have endorsed the practice in substance by saying that "a choice of law determination is made on an issue-by-issue, and not case-by-case, basis."[4]  *Zaretsky v. Molecular Biosystems, Inc.*, 464 N.W.2d 546, 548 (Minn. Ct. App. 1990); *see also Brenner v. Nat'l Outdoor Leadership Sch.*, 20 F. Supp. 3d 709, 714 (D. Minn. 2014); *Lommen v. City of E. Grand Forks*, 522 N.W.2d 148, 151 (Minn. Ct. App. 1994).  In *Zaretsky*, for example, the Minnesota Court of Appeals held that a trial court should have calculated the amount of prejudgment interest to which a plaintiff was entitled under Minnesota law, even though New York law had governed the "substantive right of recovery."  464 N.W.2d at 548–49.  Although Minnesota courts have not explained the circumstances under which *dépeçage* should apply, one widely accepted approach is to apply one state's law to determine tort liability and another state's law to determine the extent of recovery—at least when doing so is otherwise consistent with the applicable choice-of-law rules.  *See, e.g.*, *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 348–51 (3d Cir. 2000); *Ellerton v. Ellerton*, 745 F. Supp. 2d 458, 465–66 (D. Vt. 2010); *Barrett v. Ambient Pressure Diving, Ltd.*, Civ. No. 06-cv-240-SM, 2008 WL 4934021, at *2 (D.N.H. Nov. 17, 2008); *Gordon v. E. Air Lines, Inc.*, 391 F. Supp. 31, 32–33 (S.D.N.Y. 1975); *see also* 1 Stuart M. Speiser *et al.*, *American Law of Torts*, § 2:19 (Mar. 2020 Update).

In view of these authorities and Minnesota's "issue-by-issue" approach to choice of law, it makes sense to adopt the more narrow framing of the choice-of-law question raised

---

[4]     At the hearing on Sanford's motion, both Parties agreed that Minnesota takes an issue-by-issue approach to choice of law.

by Sanford's motion.  In other words, the appropriate question to ask is whether Minnesota or North Dakota law should govern the extent of Perry's recovery on the wrongful-death claim, not her entire dispute with Sanford.  What this means for practical purposes is that, even if North Dakota law applies to the narrow damages issue, Perry could still bring a wrongful-death claim under Minnesota law, and dismissing the wrongful-death claim entirely would be inappropriate.  Three considerations support this approach.  First, the Parties' agree that the principles governing Sanford's liability are materially the same under both states' laws, and courts generally do not engage in a choice-of-law analysis absent a substantive conflict.  *See Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 93–94 (Minn. 2000).  Second, applying North Dakota's damages cap, if it is appropriate to do so, would be uncomplicated and unlikely to disrupt the Parties' expectations.  *See Ewing*, 790 F.2d at 686.  Third, this approach just makes practical sense.  If the damages cap applies, it would be more efficient for all Parties to simply proceed with Perry's wrongful-death claim rather than dismissing it without prejudice and requiring her to replead it under North Dakota law.

B

With all that in mind, turn to the choice-of-law question itself.  As already noted, the Parties agree that there is a substantive conflict between North Dakota and Minnesota law—specifically, the presence or absence of a cap on non-economic damages.  The Parties also agree that the factual record is sufficiently well-developed to decide the choice-of-law question, and neither Party disputes that each state's law could be constitutionally applied.

The only remaining step is to apply Minnesota's choice-influencing factors.  *See Jepson*, 513 N.W.2d at 470.

As the Parties acknowledge in their briefing, the first, third, and fifth factors are largely irrelevant in this case.  The first factor, the "predictability of results," applies "primarily to consensual transactions, and not to torts."  *Strohn v. Xcel Energy Inc.*, 353 F. Supp. 3d 828, 833 (D. Minn. 2018) (citing *Nesladek v. Ford Motor Co.*, 876 F. Supp. 1061, 1068 (D. Minn. 1994)).  This is because "[t]he objective of the predictability factor is to fulfill the parties' justified expectations," and tort actions, which generally "stem from unplanned accidents," do not implicate those expectations.  *Lommen*, 522 N.W.2d at 150. The third factor, "simplification of the judicial task," is also rarely significant in tort cases, at least when, as here, "the law of either state [can] be applied without difficulty."  *Jepson*, 513 N.W.2d at 472; *see also Burks v. Abbott Labs.*, 639 F. Supp. 2d 1006, 1013 (D. Minn. 2009); *Nodak Mut. Ins. Co.*, 604 N.W.2d at 95 (stating that this factor "has not been given much weight in" Minnesota Supreme Court precedent).[5]  The fifth factor, the "better rule of law," does not apply at all when a court can resolve a choice-of-law question using the other four factors, and in any event, it is less significant when the conflict at issue involves state statutes, as opposed to common law.  *See Whitney v. Guys, Inc.*, 700 F.3d 1118, 1124 (8th Cir. 2012) (addressing competing statutes of limitations and noting that "[l]egislatures

---

[5]     As Perry points out, Minnesota courts have said that "the judicial task is obviously simplified when a Minnesota court applies Minnesota law," *Jacobson v. Universal Underwriters Ins. Grp.*, 645 N.W.2d 741, 746 (Minn. Ct. App. 2002) (citation omitted), but because the conflict in this case is relatively straightforward, it is not clear that applying Minnesota law would be any simpler.  *See Nesladek v. Ford Motor Co.*, 46 F.3d 734, 739 (8th Cir. 1995).

rather than courts are best positioned to assess the comparative merits of the competing policy concerns" involved).  The Parties therefore focus their arguments on the second and fourth factors.

The second factor, "maintenance of interstate order," concerns "whether the application of Minnesota law would manifest disrespect for North Dakota's sovereignty or impede the interstate movement of people and goods." *Jepson*, 513 N.W.2d at 471.  The primary focus is on the contacts that each competing state has with the dispute.  "[W]here a state 'has little or no contact with a case and nearly all of the significant contacts are with a sister state, the factor suggests that a state should not apply its own law to the dispute.'" *Burks*, 639 F. Supp. 2d at 1013 (quoting *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620–21 (8th Cir. 2001)); *accord Johnson v. Parrish Tire Co.*, No. 06-cv-2267 (MJD/SRN), 2009 WL 10677525, at *5 (D. Minn. Mar. 30, 2009) ("[M]aintenance of interstate order weighs in favor of the state that has the most significant contacts with the facts relevant to the litigation.").  In tort cases, the location of the accident may be an especially relevant contact, *see Strohn*, 353 F. Supp. 3d at 833 (applying Minnesota law because the defendant company provided a product in Minnesota and the product "caused significant personal injury and property damage in Minnesota"), but the "mere fortuity of an accident's location is not necessarily dispositive," *Sportsman v. California Overland, Ltd.*, No. 17-cv-1064 (DWF/KMM), 2018 WL 1865930, at *4 (D. Minn. Apr. 18, 2018).[6]

---

[6]     Courts applying the interstate-order factor also consider whether there is evidence of forum shopping. *See Jepson*, 513 N.W.2d at 471.  There is no significant indication of forum shopping in this case.  Perry is a Minnesota resident—as was Sherrell—and all of the facts relating to Perry's claims against Beltrami County and its prison officials took

Minnesota and North Dakota both have somewhat significant contacts with Perry's wrongful-death claim against Sanford. Sherrell was a Minnesota resident, as is Perry. Sherrell first visited a Sanford facility in Minnesota (though no alleged wrongful conduct occurred at that facility), and he suffered the injuries resulting from the alleged malpractice in Minnesota. *See Kenna v. So-Fro Fabrics, Inc.*, 18 F.3d 623, 627 (8th Cir. 1994) (applying the same choice-of-law factors under North Dakota law and finding similar contacts relevant). On the other hand, all of the Sanford Defendants are North Dakota residents, and all of Sanford's alleged wrongful conduct occurred in North Dakota. Under the circumstances, this factor does not clearly favor either state's law. *See Blake Marine Grp. v. CarVal Invs. LLC*, 829 F.3d 592, 596 (8th Cir. 2016) (concluding that this factor was neutral when the alleged tortious conduct occurred and a defendant was based in Minnesota, but the plaintiff resided in, and the injury occurred in, Alabama).[7]

The fourth factor asks "which choice of law most advances a significant interest of the forum." *Nodak Mut. Ins. Co.*, 604 N.W.2d at 95 (citation omitted). "It 'requires

---

place in Minnesota, so Minnesota does not seem like an unnatural forum. Furthermore, although Perry is seeking to apply the law in a way that maximizes her potential recovery, that goal requires her to argue for the application of both Minnesota law (to her wrongful-death claim) and North Dakota law (to her survival claim). *Cf. Murray v. Cirrus Design Corp.*, No. 18-cv-2510 (NEB/LIB), 2019 WL 1086345, at *3 (D. Minn. Mar. 7, 2019) (concluding that there was no evidence of forum shopping where the plaintiff was trying to apply a non-forum-state's law).

[7]     Perry argues that applying North Dakota law would hamper interstate commerce because Minnesota residents facing a cap on potential recovery would be less likely to cross the border to seek medical care. Pl.'s Mem. at 16. Accepting this argument would require speculation, and it seems just as possible to speculate in the opposite direction. For example, if Minnesota law applied, the diminished certainty surrounding Sanford's potential liability could discourage it from soliciting Minnesota patients.

analysis not only of Minnesota's governmental interest, but also of [North Dakota's] public policy.'" *Murray*, 2019 WL 1086345, at *3 (quoting *Blake Marine Grp.*, 829 F.3d at 596); *see also Lommen*, 522 N.W.2d at 152 (considering "the relative policy interests of the two states"). "When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, . . . clearly the law of the interested state should be applied." *Nodak Mut. Ins. Co.*, 590 N.W.2d at 674 (citation omitted). But in a tort case in which multiple states have a legitimate interest and there is no clear winner, "the state where the accident occurred has the strongest governmental interest." *Burks*, 639 F. Supp. 2d at 1013–14 (citation omitted).

Minnesota and North Dakota both have significant interests at play here. "Minnesota courts have a recognized interest in seeing that all tort victims are fully compensated." *Jacobson*, 645 N.W.2d at 746; *see also Jepson*, 513 N.W.2d at 472; *Kolberg-Pioneer, Inc. v. Belgrade Steel Tank Co.*, 823 N.W.2d 669, 675 (Minn. Ct. App. 2012). At times, this interest has even led Minnesota courts to choose another state's law over their own. *See, e.g.*, *Bigelow v. Halloran*, 313 N.W.2d 10, 12–13 (Minn. 1981). North Dakota, in regulating its health care industry, has an interest in applying its non-economic-damages cap to alleged medical malpractice that occurs within its borders. *See Condon v. St. Alexius Med. Ctr.*, 926 N.W.2d 136, 142–43 (N.D. 2019) (upholding the constitutionality of the cap on non-economic medical-malpractice damages and noting that it was meant to "(1) increase [healthcare] access; (2) [to] control costs; and (3) to maintain or increase quality of health care in the state").

For four reasons, this factor slightly favors applying North Dakota's damages cap. First, given the close ties between Sanford and North Dakota, the state's interest in enforcing its damages cap is at its peak. All of the Sanford Defendants reside in North Dakota, and any damages award would primarily affect that state's health care system. Second, North Dakota's interest in this case is the product of a deliberate legislative choice to limit a specific category of damages. *See id.* (describing the legislative history leading to the passage of the damages cap). Minnesota's interest in fully compensating tort victims, by contrast, is generalized and aspirational, and it is drawn primarily from judicial decisions rather than a targeted legislative action. *See, e.g.*, *Bigelow*, 313 N.W.2d at 12–13. Indeed, concluding that Minnesota's legislature has a specific interest in allowing uncapped medical-malpractice damages would require an inference from its silence on the issue, and legislative inaction typically says little about legislative intent. *Cf. Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1015 (noting in the statutory-interpretation context that "[c]ongressional inaction lacks persuasive significance in most circumstances" (internal quotation marks and citation omitted)). Third, although Minnesota has a strong interest in seeing tort victims fully compensated, that interest is not a bright-line rule that requires courts to simply pick the state whose law promises the greatest potential recovery. Instead, it may deserve greater weight when a plaintiff faces the prospect of no recovery at all than when, as here, the amount of potential recovery is merely diminished. *Compare Bigelow*, 313 N.W.2d at 11–13 (applying Iowa law where the injury occurred in Iowa, the victim was an Iowa resident, and Minnesota law would have "extinguish[ed] plaintiff's cause of action"), *with Strohn*, 353 F. Supp. 3d at 833–34

(applying Minnesota law even though Nebraska law would have allowed greater recovery and noting that this conclusion would not leave the plaintiff "without the possibility of compensation").[8]  Finally, the fact that the alleged medical malpractice occurred in North Dakota slightly favors applying that state's law, even if the fortuitous nature of the conduct's location would not independently require that result.  *See Burks*, 639 F. Supp. 2d at 1013–14.

Perry has two main counterarguments.  First, relying primarily on *Sportsman v. California Overland, Ltd.*, No. 17-cv-1064 (DWF/KMM), 2018 WL 1865930 (D. Minn. Apr. 18, 2018), she argues that Minnesota's interest in compensating tort victims should triumph over North Dakota's damages cap.  In *Sportsman*, an Illinois resident sued a Minnesota trucking company and one of its drivers (a South Dakota resident) based on a traffic accident that occurred in Wisconsin.  *Id.* at *1–2.  Wisconsin law, unlike Minnesota law, capped damages "for loss of society and companionship" in a wrongful-death case at $350,000.  *Id.* at *3 (quoting Wis. Stat. § 895.04(4)).  The court concluded that the governmental-interest factor favored Minnesota law because applying Wisconsin's damages cap "would unfairly prevent [the plaintiff's] family . . . from being fully compensated consistent with the laws of [the defendant company's] home state."  *Id.* at *6.

---

[8]     Here, it is worth noting once more that Perry is also pursuing a survival claim under North Dakota law—a claim that would not be available to her under Minnesota law.  *See* Minn. Stat. § 573.01.  Although the survival claim is not at issue here, it is relevant in evaluating the impact on Minnesota's interest in ensuring that Perry receive full compensation.  *Cf. Kenna*, 18 F.3d at 627 (noting, albeit before the enactment of North Dakota's non-economic-damages cap, that North Dakota may show an even greater interest than Minnesota in compensating tort victims because it allows survival actions).

It specifically noted, however, that "no parties ha[d] meaningful Wisconsin contacts." *Id.* In this case, by contrast, the Sanford Defendants are all North Dakota residents and are participants in the health care system that North Dakota is seeking to regulate with its damages cap. Those distinctions make the difference.

Second, Perry argues that Sanford should not be allowed to benefit from North Dakota's non-economic-damages cap because it has strategically positioned its medical center on the border with Minnesota and solicited Minnesota residents as patients. *See* Pl.'s Mem. at 15–16. Perry draws a comparison to the law of personal jurisdiction, which asks whether a defendant has purposely targeted the forum state. *See, e.g.*, *Pederson v. Frost*, 951 F.3d 977, 981 (8th Cir. 2020). But personal jurisdiction involves different questions than choice of law. Personal jurisdiction is concerned primarily with the individual rights of defendants and the constitutional limitations on a court's power to bind them. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011). In that context, state interests are only "secondary." *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010). When a court is resolving a conflict of laws, however, state interests take on greater importance. *See, e.g.*, *Nodak Mut. Ins. Co.*, 590 N.W.2d at 673–74. Perry cites no authority for the proposition that a private actor's conduct can diminish a state's sovereign interest in which law applies to a dispute. In this case, North Dakota's interests—not the Parties' contacts with either state—are decisive.

*

In sum, Minnesota's choice-of-law factors slightly favor applying North Dakota's cap on non-economic damages to Perry's wrongful-death claim. Because there are no other

relevant conflicts between Minnesota and North Dakota law, however, Perry's wrongful-death claim will not be dismissed.  Instead, it will be allowed to proceed under Minnesota law, subject to the $500,000 damages cap.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants Sanford, Sanford Health, Sanford Medical Center Fargo, and Dr. Dustin Leigh's Motion for Partial Judgment on the Pleadings [ECF No. 35] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The motion is **GRANTED** to the extent it seeks to apply the cap on non-economic damages in N.D. Cent. Code § 32-42-02 to Plaintiff's wrongful-death claim under Minn. Stat. § 573.02.

2. The motion is **DENIED** in all other respects, including to the extent it seeks dismissal of Count 5 of the Amended Complaint.


Dated:  February 16, 2021               s/ Eric C. Tostrud
                                        Eric C. Tostrud
                                        United States District Court