# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Del Shea Perry, Trustee for the Heirs and
Next of Kin of Hardel Harrison Sherrell and
Personal Representative for the Estate of
Hardel Harrison Sherrell,

                            Plaintiff,

vs.

Beltrami County;
MEnD Correctional Care, PLLC;
Sanford Health; Sanford; Sanford Medical
Center Fargo; Calandra Allen (Jail
Administrator), Andrew Richards (Assistant
Jail Administrator), Edward Busta (Program
Director), Corrections Sergeant Tyler
Carraway, Corrections Sergeant Anthony
Derby, Corrections Sergeant Mario Scandinato,
Corrections Officer Melissa Bohlmann,
Corrections Officer Jared Davis,
Corrections Officer Dana Demaris,
Corrections Officer Brandon Feldt,
Corrections Officer James Foss,
Corrections Officer Daniel Fredrickson,
Corrections Officer Chase Gallinger,
Corrections Officer Holly Hopple,
Corrections Officer Nicholas Lorsbach,
Corrections Officer Erin Meyer,
Corrections Officer Mitchell Sella,
Corrections Officer Christopher Settle,
Corrections Officer Marlon Smith,
Corrections Officer Jacob Swiggum,
Corrections Officer Joseph Williams,
Beltrami County employees, all in their
individual and official capacities and as
agents/employees of Beltrami County;
Todd Leonard, MD, Crystal Pedersen, RN,

Case No. 19-cv-02580 KMM/LIB

Michelle Skroch, RN, and Madison
Brewster, Health Technician, MEnD
Correctional Care employees, all in their
individual and official capacities and as
agents/employees of MEnD Correctional
Care, PLLC;
Dustin G. Leigh, MD, individually and as
employee/agent of Sanford Health and/or
Sanford and/or Sanford Medical Center
Fargo,

                          Defendants.

---

## MEMORANDUM OF LAW IN SUPPORT OF BELTRAMI COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

### INTRODUCTION

This case arises from Hardel Sherrell's death at the Beltrami County Jail.

Before his death, Sherrell was regularly checked by Jail staff, monitored by video

24/7 while in medical segregation, and seen daily by MEnD medical professionals.

The Jail sent Sherrell to two hospitals, where he underwent physical exams, CT

scans, and MRIs, and was ultimately discharged without a diagnosis or treatment

plan. Jail staff trusted the medical professionals and followed their instructions

regarding how to care for Sherrell. Plaintiff fails to establish Fourteenth

Amendment deliberate indifference claims against the individual County

Defendants, *City of Canton* or *Monell* claims against the County, or wrongful death

claims against these Defendants. Accordingly, Plaintiff's claims must be dismissed.

## STATEMENT OF FACTS

**Sherrell's arrival at Beltrami County Jail**

On August 24, 2018, Sherrell was transferred from the Dakota County Jail to the Beltrami County Jail after a bench warrant was issued when he failed to appear at his felon in possession hearing. *Declaration of Calandra Allen, Ex. 2 Jail File, pp. 1-4*. Sherrell was booked into the Jail around 5:30 p.m. *Allen Decl. Ex. 1 Jail Surveillance Video, 8.24 West Garage 1 at 5:30:00, 8.24 Booking at 5:44:30; Declaration of Julia Kelly, Ex. 37 Booking*. During intake, Sherrell reported he suffered from seizures due to head trauma he incurred in a fight seven months earlier. *Allen Decl. Ex. 2, p. 6*. He claimed to be on the antipsychotic drug Seroquel and reported a prior respiratory failure with no known cause. *Id., p. 6; Kelly Decl. Ex. 31 Booking Medical Screening; Kelly Decl. Ex. 32, MEnD Medical Chart, p. 2*.

**August 26, 2018**

Throughout Sherrell's detention, Jail staff conducted regular welfare checks. *See generally Kelly Decl. Ex. 38 Welfare Checks*. On August 26, after two days of his detention passed without incident, Sherrell requested a blood pressure check. *Doc. 30, ¶ 17*. MEnD Health Tech Madison Brewster measured Sherrell's blood pressure at 146/101. *Id.; Ex. 32, p. 6*.

**August 27, 2018**

The next day, Sherrell complained of pain in his neck, side, and chest and requested another blood pressure check. *Ex. 32, p. 11; Kelly Decl. Ex. 28 Report 18000969, p. 5.* Sherrell also reported severe pain running from his back down his right leg, which he claimed he had for months. *Ex. 32, p. 11.* MEnD Nurse Crystal Pederson measured Sherrell's blood pressure at 159/104 and his pulse at 101. *Doc. 30, ¶ 18; Ex. 32, pp. 12, 24.* Nurse Pederson administered an EKG, sent the results to Dr. Todd Leonard, and called him regarding Sherrell. *Kelly Decl. Ex. 26 Pederson Depo. 44:11-18; Ex. 32, p. 11.* Following their discussion, Nurse Pederson placed Sherrell on a list to be seen by the provider during the next medical rounds, started a flowsheet to monitor Sherrell's blood pressure, and gave him Tylenol, ibuprofen, and hydroxyzine. *Pederson Depo. 42:13-19, 43:18-44:2; Ex. 32, p. 11; Doc. 30, ¶ 19.* When Sherrell agreed his pain sounded like sciatic nerve pain, Corrections Officer (CO) Joseph Williams and Nurse Pederson recommended lying on his side with a pillow between his legs. *Ex. 28, p. 6.*

**August 28, 2018**

Early on August 28, 2018, Sherrell lowered himself from the top bunk, put on his shoes, and walked to the bathroom. *Ex. 1 8.28 207-4 at 3:48:18-50:54.* After returning from the bathroom, Sherrell stood by his bed for ten minutes before sitting on the floor. *Ex. 1 8.28 207-4 at 3:51-4:06.* At 4:06 a.m., Sherrell told CO

Brandon Feldt he could not feel his legs from the knees down. *Kelly Decl. Ex. 9, Feldt Depo. 14:43-15:7; Ex. 28, p. 12; Ex. 1 8.28 207-4 at 4:06:24*. But CO Feldt observed Sherrell move his feet and legs. *Feldt Depo. 15:20-23; Ex. 28, p. 12; Ex. 1 8.28 207-4 at 4:06:26-8:31*. Sherrell also told CO Feldt he fell from his bunk because he had taken muscle relaxers the prior afternoon. *Ex. 28, pp. 10, 13*. CO Feldt reviewed surveillance footage and medical records and confirmed Sherrell had not fallen out of bed or been prescribed muscle relaxers. *Feldt Depo. 17:4-17; Ex. 28, pp. 10, 13*.

At 4:34 a.m., Sherrell also told CO Nicholas Lorsbach he could not move because he took too many muscle relaxers. *Ex. 28, p. 10; Ex. 1 8.28 207-5 at 4:34:40-39:52*. When CO Lorsbach told Sherrell he was not given muscle relaxants and asked if he should call medical staff, Sherrell became upset and refused to talk. *Ex. 28, p. 10*. CO Lorsbach also observed Sherrell moved his head and hands throughout the encounter. *Ex. 28, p. 10; Ex. 1 8.28 207-5 at 4:34:40-39:52*. At 4:57 a.m., Sherrell stood up and climbed onto his top bunk. *Ex. 28, p. 10; Ex. 1 8.28 0000-0600 207-6 at 4:53:45-5:00:18*. When CO Feldt returned for another welfare check, Sherrell had gotten back on the top bunk and remained quiet the rest of the night. *Ex. 28, p. 13*. Later that morning, Sherrell got out of bed and walked around the room before climbing back onto his top bunk. *Ex. 1 8.28 0000-0600 207-6 at 5:00:18 to 0600-1200 207-5 at 8:24:44*.

Nurse Pederson saw Sherrell at 8:00 a.m. *Ex. 32, p. 21.* Sherrell reported back pain and arm numbness and told Nurse Pederson he fell out of bed. *Id.* Sherrell's blood pressure was 156/117. *Id.* Nurse Pederson called Dr. Leonard, who ordered Sherrell be moved to a lower bunk with an extra blanket and given ibuprofen, Flexeril (a muscle relaxant), and Lisinopril (for high blood pressure). *Id., pp. 11, 21.* At 7:58 p.m., Sherrell submitted a kite requesting to go to the hospital because he could not feel or move his legs. *Id., p. 20.*

**August 29, 2018**

The next morning, Sherrell stated he felt weak and could not move, which Jail staff communicated to MEnD staff. *Ex. 28, p. 7.* At 6:25 a.m., a MEnD Health Tech called Nurse Pederson regarding Sherrell's kite. *Ex. 32, pp. 17-18; Pederson Depo. 122:16-123:7.* Nurse Pederson ordered Sherrell be moved into medical segregation until Nurse Cassandra Lindell arrived that morning. *Ex. 32, pp. 18-19; Ex. 28, p. 7; Pederson Depo. 123:7-15.* At 6:55 a.m., CO Williams put Sherrell into a wheelchair and moved him into Cell 215 for closer monitoring. *Ex. 28, p. 7; Ex. 1 8.29 0655-1200 207-2 at 6:47:20-53.* Around 8:04 a.m., Sherrell lowered himself to the floor but told CO Williams he fell out of bed. *Ex. 28, p. 7; Ex. 1 8.29 0600-1200 207-2 at 8:03:37-8:04:32.* At 9:07 a.m., CO Williams and Programs Director (PD) Edward Busta moved Sherrell into the wheelchair and placed the mattress under his legs. *Ex. 28, p. 7; Ex. 1 8.29 0600-1200 207-2 at 9:06:40-08:19.* At 9:26 a.m., CO

6

Williams brought Sherrell to Nurse Lindell for medical examination, and his blood pressure was 162/116. *Ex. 32, p. 20; Ex. 28, p. 7; Ex. 1 8.29 Nurses Station at 9:26:23-31:39, 0655-1200 215-2 at 9:25:15-26:16.*

Nurse Lindell noticed Sherrell had not taken Flexeril as prescribed. *Ex. 32, p. 20.* Sherrell reported numbness around his umbilical region that continued downward bilaterally. *Id.* Although Nurse Lindell observed Sherrell moving and waving his arms and hands, he said he could not when asked to do so. *Id.* Sherrell also said he could not move his legs but then lifted them off the floor. *Id.; see also Ex. 1 8.29 0655-1200 215-1 at 7:13:58-14:10.* Nurse Lindell told Sherrell he was seen standing and holding the phone that morning. *Ex. 32, p. 20.* After reviewing the video footage, Nurse Lindell noted Sherrell had moved himself back into his wheelchair after guiding himself to the floor. *Id.* However, as soon as the COs moved him to the bed, Sherrell went limp. *Id.* Finally, although Sherrell complained he was unable to swallow, Nurse Lindell observed him swallow multiple times without difficulty. *Id.* CO Williams returned Sherrell to Cell 215 and made sure he was comfortable. *Ex. 28, p. 7; Ex. 1 8.29 0655-1200 207-2 at 9:31:43-32:14.*

At 10:54 a.m., CO Williams observed Sherrell move across the cell in the wheelchair. *Ex. 28, p. 7; Ex. 1 8.29 0655-1200 207-3 at 10:54:24-55:19.* At 11:07 a.m., Sherrell rammed his wheelchair into the door and demanded someone talk to him.

*Ex. 28, p. 7.* CO Williams told Sherrell to wait until MEnD ordered a course of action. *Id.; Ex. 1 8.29 0600-1200 207-3 at 11:07:00-11:15:00.* Dr. Leonard decided to discontinue Flexeril, exchange Sherrell's wheelchair for a walker, and place him on a 24/7 activity watch during which staff would monitor and document Sherrell's movements via written logs. *Ex. 32, p. 19; see Kelly Decl. Ex. 35 MEnD Activity Log; see Kelly Decl. Ex. 36 MEnD Pass-on Log, p. 6.* At 12:23 p.m., Nurse Lindell visited Sherrell and told COs Williams and Jacob Swiggum that Dr. Leonard hoped this approach would encourage Sherrell to move and improve function. *Ex. 28, p. 7; Ex. 1 8.29 1200-2018 215-1 at 12:23:40-12:27:06, 2:15-2 at 12:27-28.* The COs placed Sherrell in bed and replaced the wheelchair with a walker. *Ex. 28, p. 7; Ex. 1 8.29 1200-2018 215-2 at 12:27:51-28:56.*

At 4:13 p.m., CO Christopher Settle helped Sherrell sit up at his request and placed the walker in front of him. *Ex. 28, p. 7; Ex. 1 8.29 0655-1200 215-6 at 4:13:00 to 215-7 at 4:14:37.* Not long after, CO Williams brought Sherrell food, helped him sit up, and encouraged him to eat and drink. *Ex. 28, p. 7; Ex. 1 8.29 1200-2018 215-8 at 4:35:20-39:49.* At 6:00 p.m., Sherrell rested in bed comfortably, while moving his arms and legs, and wiggling his toes. *Ex. 1 8.29 1800-2359 215-1 at 6:00.* At 6:52 p.m., Sherrell rolled himself onto the floor. *Id., 6:51:52-52:25.*

Once COs Jason Davis and Marlon Smith assisted Sherrell back into bed, Sherrell continued to move his extremities. *Id., 6:53:49-7:41:41.* After failing to

8

stand with the walker, Sherrell requested the wheelchair, which CO Davis and Corrections Sergeant Tyler Carraway retrieved. *Ex. 1 8.29 1800-2359 215-2 at 7:48; Kelly Decl. Ex. 29 Report 18000964, p. 3.* Once Sherrell was placed in the wheelchair, he moved himself in the wheelchair using his arms and legs. *Ex. 1 8.29 1800-2359 215-2 at 7:53.* Around 10:27 p.m., Sherrell wheeled himself out of his room for his hour out and made a phone call. *Ex. 1 8.29 1800-2359 215-3 at 10:27; Ex. 29, p. 3.* Sherrell returned to his cell around 11:30 p.m. *Ex. 1 8.29 1800-2359 215-3 at 11:31.* Shortly thereafter, COs Davis and Smith talked to Sherrell and helped him into bed. *Id. at 11:33; Ex. 29, p. 4.* Once in bed, Sherrell moved his legs despite having just received assistance from the wheelchair. *Ex. 1 8.29 1800-2359 215-3 at 11:35.* CO Davis then adjusted Sherrell's mattress to make him more comfortable. *Id.*

**August 30, 2018**

At 2:48 a.m., CO Davis refilled Sherrell's water and sat him up against the wall with a pillow at his request. *Ex. 29, p. 4; Ex. 1 8.29 2359 to 8.30 0600 215-4-1 at 2:48-55.* A few minutes later, CO Davis helped Sherrell lay down again. *Ex. 29, p. 4; Ex. 1 8.29 2359 to 8.30 0600 215-4-1 at 4:02:37-03:49.* Next, CO Davis moved Sherrell into the wheelchair at 4:02 a.m. at his request. *Ex. 29, p. 4.* When Sherrell moved around the room in the wheelchair using his hands and feet and began to slide, CO Davis helped Sherrell sit upright. *Id.; Ex. 1 8.29 2359 to 8.30 0600 215-4-1 at 4:03:47-10:14.* At 4:30 a.m., CO Davis retrieved Sherrell's blanket at his request.

9

*Ex. 29, p. 4.* At 4:40 a.m., COs Davis and Erin Meyer helped Sherrell remove his pants and underwear so he could use the bathroom and gave him a blanket to cover himself. *Ex. 29, p. 4; Ex. 1 8.29 2359 to 8.30 0600 215-4-2 at 4:30:00-4:41:46.* Upon learning Sherrell urinated himself, COs Davis and Meyer cleaned and changed Sherrell and the bedding, mopped the cell, and returned Sherrell to bed. *Ex. 29, p. 4; Ex. 1 8.29 2359 to 8.30 0600 215-4-2 at 4:47:27-5:02:15.*

At 7:40 a.m., CO Settle escorted Health Tech Katie Rutledg and Nurse Pederson to check on Sherrell, who stated he could not feel anything from the waist down, had urinated himself, and could not swallow due to a swollen throat. *Ex. 32, p. 22; Ex. 1 8.30 0600-1200 215-3-1-4 at 7:39:26-43:55.* Nurse Pederson took Sherrell's vitals and observed no throat swelling. *Ex. 32, p. 22.* CO Settle then escorted a public defender to visit Sherrell, who complained about his medical symptoms. *Ex. 29, p. 6; Ex. 1 8.30 0600-1200 215-3-1-4 at 8:02:22-05:08.* CO Settle informed the public defender that MEnD was working on a solution and told him to direct further questions to MEnD. *Ex. 29, p. 7.* Nurse Pederson called Dr. Leonard who wanted Sherrell evaluated by an emergency department due to his odd presentation of symptoms—not because Sherrell was having a medical emergency. *Ex. 32, p. 22; Pederson Depo. 46: 16-25; Kelly Decl. Ex. 25 Leonard Depo. 189:20-190:6.* At 8:48 a.m., CO Settle escorted Nurse Pederson to Sherrell, and she told him he would be transported to the emergency room that day. *Ex. 29, p. 7; Ex.*

*1 8.30 0600-1200 215-3-1-4 at 8:48:00 to 215-3-1-5 at 8:49:15.* Sherrell also said he could not swallow, and she placed him on a liquid diet. *Ex. 29, p. 6.* At 9:06 a.m., Sergeant Anthony Derby and COs Swiggum and Settle helped Sherrell use the toilet. *Ex. 28, pp. 6-7; 8.30 0600-1200 215-3-1-6 at 9:05:18-14:12.*

Nurse Pederson then conferred with Jail Administrator Calandra Allen regarding Sherrell's transport to the hospital but, due to HIPAA concerns, Nurse Pederson did not share with Administrator Allen why Dr. Leonard wanted Sherrell transferred to the emergency room. *Decl. Kelly Ex. 4 Beitel Depo. 113:7; Kelly Ex. 26, Pederson Depo. 48:4-24; Kelly Ex. 2, Allen Depo. 88:17-91:19.* Administrator Allen spoke with Sherrell's probation officer who was not aware of Sherrell having these medical issues and considered Sherrell a high flight risk. *Kelly Ex. 2, Allen Depo. 164:20-165:14.* In fact, Sherrell had been a fugitive from justice on at least three other occasions.[1] *Kelly Decl. Ex. 34 LETG Commendations.* The Jail also had

---

[1] In addition to committing serious felonies, such as aggravated domestic assault and child endangerment (*Kelly Decl. Ex. 1 MNCIS, Ex. 70 7/31/18 Report, p. 1*), Sherrell also repeatedly demonstrated a willingness to lie and escape by: fleeing the scene after striking a woman carrying her child in a crosswalk with his car, causing both to be hospitalized (*Kelly Decl. Ex. 41 7/13/09 Report, pp. 2-3, 5*); fleeing after stealing sunglasses from a vehicle (*Kelly Decl. Ex. 42 5/9/10 Report, pp. 1-3*); fleeing the scene after intentionally crashing into his ex-girlfriend's car with her and her daughter inside *(Kelly Decl. Ex. 52 9/7/16 Report)*; successfully escaping police on foot three separate times *(Ex. 43 7/20/10 Report, pp. 5-6, Ex. 45 9/7/11 Report, p. 1, Ex. 48 12/15/14 Report, p. 4)*; attempting to avoid arrest by running away and hiding from police three other times (*Kelly Decl. Ex. 44 5/6/11 Report, pp. 2-3, Ex. 46 1/10/12 Report, p. 2, Ex. 49 2/7/15 Report, pp. 6-8*); swindling innocent victims out of substantial sums of money using false names and stories before

several inmates successfully escape. *Allen Depo. 94:17-20*. A few months before Sherrell arrived, one inmate claimed to need to go to the emergency room but escaped out the back of the squad car during transport. *Id., 94:21-95-1*. These escape concerns were heightened because Sherrell was observed moving his legs and arms when he claimed he could not. *Id., 120:10-18*. In 2016, an inmate at the Jail faked similar symptoms Sherrell reported, went to the hospital and was diagnosed as "malingering." *Id., 166:1-25; Ex. 32, p. 22; Pederson Depo. 56:1-4*.

Nurse Pedersen told Administrator Allen that Sherrell could wait to be seen by a MEnD doctor the next day. *Allen Depo. 90:20-91:19, 124:19-126:20; Pederson Depo. 95:10-25*. MEnD staff made the decision delaying Sherrell's transport to the hospital until a medical provider could decide whether his medical symptoms warranted emergency care. *Allen Depo. 122:1-126:20; Pederson Depo. 83:3-84:7; Ex. 29, p. 6*.

At 11:36 a.m., CO Swiggum delivered Sherrell his lunch tray. *Ex. 29, p. 6; Ex. 1 8.30 0600-1200 215-3-1-7 at 11:36*. Sherrell ate the food and drank both juice boxes. *Ex. 29, p. 6; Ex. 1 8.30 0600-1200 215-3-1-7, 3-1-8, 3-1-9*. At 1:57 p.m., PD Busta sent an email to Jail staff notifying them Sherrell reported he could not eat, swallow,

---

disappearing (*Kelly Decl. Ex. 47 10/26/14 Report, pp. 1-2, Ex. 55 4/4/18 Report, pp. 1-2, Kelly Decl. Ex. 56 6/6/18 Report, p. 1*); giving police false names on four separate occasions (*Kelly Decl. Ex. 43 7/20/10 Report, pp. 4-6, Ex. 50 2/8/16 Report, pp. 4-5, Ex. 51 7/2/16 Report, p. 5, Ex. 53 1/22/17 Report, p. 4*); and by repeatedly failing to appear in court (*Kelly Decl. Ex. 45 9/7/11 Report, p. 2, Ex. 54 8/2/17 Report, pp. 2-5*).

get on the toilet, or do other daily tasks. *Decl. Kelly, Ex. 58, 8/30/18 Email*. PD Busta also stated Sherrell was on medical watch and instructed Jail staff to start a special watch log to monitor Sherrell's condition and activity. *Id.; see Kelly Decl. Ex. 30 Special Watch Log, pp. 3-6*. At 2:24 p.m., CO Swiggum escorted Nurse Pederson to Sherrell's cell where she informed Sherrell a doctor would see him at the Jail tomorrow morning. *Ex. 29, pp. 8-9; Ex. 1 8.30 1200-1800 215 3-1-19-2 at 2:24-25, 215 3-1-19-3 at 2:25-32*. When Sherrell asked if he could be around others, CO Swiggum told him he would remain in the cell for his own safety. *Ex. 29, p. 6*.

After Sherrell moved around the cell, he leaned forward onto the bed and slowly slid out of the wheelchair onto the floor. *Ex. 1 8.30 1200-1800 215-3-1-19-3 at 3:17-23*. When Sergeant Derby and COs Swiggum and Settle arrived, Sherrell told them he had fallen, and he thought a pinched nerve was causing these issues. *Ex. 29, pp. 7-8*. Sergeant Derby assured Sherrell he would see the doctor the next morning. *Ex. 29, p. 8*. The COs helped Sherrell back into bed and into an adult diaper and cleaned the floor. *Ex. 29, pp. 6-8; Ex. 1 8.30 1200-1800 215 3-1-19-3 at 3:31-38, 215-3-1-19-4 at 3:38-39*. At 4:36 p.m., COs Swiggum and Settle delivered Sherrell's dinner tray, and he began to eat. *Ex. 29, p. 7; Ex. 1 8.30 1200-1800 215-3-1-19-4 at 4:36-5:55*. At 6:16 p.m., CO Davis moved Sherrell onto his side at his request. *Ex. 29, p. 4; Ex. 1 8.30 1200-1800 215-3-1-19-4-1 at 6:16-20*. Later, COs Davis and Daniel Fredrickson moved Sherrell to the wheelchair at his request, and

Health Tech Caley Haugen gave him his medications. *Ex. 29, p. 4*; *Ex. 1 8.30 1200-1800 215-3-1-19-4-1 at 8:07:00-10:10*.

At 8:49 p.m., COs Davis and Fredrickson changed Sherrell's diaper and clothes and cleaned the cell. *Ex. 29, p. 3*; *Ex. 28, p. 8*; *Ex. 1 8.30 1800-2359 215-3-1-19-4-2 at 8:49-9:02*. CO Fredrickson gave Sherrell a new pillowcase, removed his socks, and placed a pillow over the sink to help Sherrell use the bathroom. *Ex. 28, p. 8*; *Ex. 1 8.30 1800-2359 215-3-1-19-4-2 at 8:49-9:02*. Sherrell thanked CO Fredrickson. *Ex. 28, p. 9*. At 10:48 p.m., Sherrell received fresh socks and a drink. *Ex. 1 8.30 1800-2359 215-3-1-19-4-3 at 10:48*. At 11:57 p.m., CO Davis brought Sherrell out of the cell for his hour out. *Ex. 29, p. 4*; *Ex. 1 8.30 1800-2359 215-3-1-19-4-4 at 11:57:42-55*.

**August 31, 2018**

At 12:30 a.m., CO Davis wheeled Sherrell back into the cell and, with CO Meyer's help, lifted Sherrell into bed, put his pillow under his head, and straightened his blanket. *Ex. 29, p. 4*; *Ex. 1 8.31 0600-1200 215-3-1-19-4-1 at 12:30-32*. Around 1:37 a.m., COs Davis and Fredrickson changed Sherrell's diaper, moved him to the wheelchair, and placed his mattress behind him. *Ex. 29, p. 6*; *Ex.1 8.31 0000-0600 215-3-1-19-4-2 at 1:36-40, 215-3-1-19-4-3 at 1:40-42*. At 1:56 a.m., CO Fredrickson resituated the mattress behind Sherrell, and CO Davis did the same at 2:14 a.m. *Ex. 29, p. 5*; *Ex. 1 8.31 0000-0600 215-3-1-19-4-3 at 1:56, 215-3-1-19-4-5 at*

14

*2:14*. After Sherrell wriggled out of the wheelchair, COs Davis and Fredrickson moved the mattress to the floor so Sherrell would not fall. *Ex. 29, p. 5; Ex. 1 8.31 0000-0600 215-3-1-19-4-6 at 2:31 to 3-1-19-4-7 at 2:52*. The COs also straightened out the blankets and refilled Sherrell's water. *Ex. 29, p. 5; Ex. 1 8.31 0000-0600 215-3-1-19-4-7 at 2:51-52*. At 4:41 a.m., COs Davis and Fredrickson laid Sherrell on his back *Ex. 29, p. 5; Ex. 1 8.31 0000-0600 215-3-1-19-4-8 at 4:41-43*. Sherrell then received breakfast at 7:12 a.m. *Ex. 1 8.31 0600-1200 215-1 at 7:12*.

Later that morning, Certified Nurse Practitioner (CNP) Stephanie Lundblad and Nurse Pederson entered the cell, changed Sherrell's diaper, and examined him. *Ex. 32, p. 22; Ex. 1 8.31 0600-1200 215-2 at 9:44-10:45*. CNP Lundblad noted Sherrell did not have feeling below his stomach, had trouble swallowing, and had right sided weakness. *Ex. 32, p. 22*. She observed facial drooping, slight slurring of speech, numbness, no Babinski reflex, muscle weakness, and diaphoresis. *Id.* CNP Lundblad also observed Sherrell could move his legs while sitting in the wheelchair and could sit up with difficulty. *Id.* CNP Lundblad decided Sherrell should be taken to the hospital, and the Jail immediately arranged for transport. *Id.; Ex. 28, p. 5; Ex. 29, p. 14*. COs James Foss and Mitchell Sella lifted Sherrell into the wheelchair and wheeled him to the sally port. *Ex. 29, p. 13; Ex. 1 8.31 0600-1200 215-2 at 9:57-10:01; 8.31 Sherrell Leaving for Hospital 0955-0956, 0955-0959, 1001-*

*1003, Garage View #1-1*. Sherrell was able to lift his legs off the floor during transport. *Ex. 29, p. 13; Ex. 1 8.31 Sherrell Leaving for Hospital 0955-0956*.

After the COs lifted Sherrell into the squad car, they drove Sherrell to the Sanford Hospital emergency room in Bemidji. *Ex. 29, pp. 13-14; Ex. 1 8.31 Sherrell Leaving for Hospital West Garage #2-1*. At the emergency room, Sherrell told Dr. Khalsa Darshan he fell off the top bunk four days ago, started having back pain and left facial droop, and lost the ability to move or feel his lower legs. *Kelly Decl. Ex. 68 Sanford Records, p. 6*. However, Sherrell could not pinpoint the area of numbness, saying "everything [wa]s numb." *Id.*

Dr. Darshan examined Sherrell and ordered CT scans, which showed no signs of acute intracranial pathology. *Id., pp. 1-65, 68*. The CT scan of Sherrell's chest showed his lungs were clear as well. *Id., p. 10*. Dr. Darshan decided to transfer Sherrell by ambulance to Sanford Hospital in Fargo, North Dakota for an MRI. *Id. 1-133; Ex. 29, p. 8*. In the ambulance, Sherrell said he was unable to swallow his own saliva, and ambulance staff suctioned it out of his mouth and took his vitals. *Ex. 28, p. 8; Kelly Decl. Ex. 59 Ambulance Records, pp. 3-6*. The ambulance arrived at the hospital at 5:25 p.m. *Ex. 59, p. 4*. Sherrell reported his symptoms to the nurse who wrote the following:

> Pt comes via ambulance from Bemidji and is currently in jail. Pt reports trying to get out of the top bunk to go to the bathroom and fell. Pt reports falling on his tail bone and now is having pain in his

neck and back. Pt also reports having numbness in his legs. Pt has decreased sensation in both lower extremities.

*Ex. 68, p. 71.*

When Dr. Dustin Leigh met Sherrell at 6:30 p.m., Sherrell told him he fell off the top bunk, landed on his tail bone, and could no longer feel or move his limbs. *Id., p. 68; Ex. 29, p. 9.* During the visit, Sherrell attempted to get CO Chase Gallinger to remove the restraints and allow him to call his girlfriend. *Ex. 29, pp. 8, 9.* CO Gallinger also observed Sherrell moving his upper body, hands, and feet. *Id., p. 9.* At 7:02 p.m., CO Fredrickson arrived at the emergency room. *Id.* Over the next hour and a half, Sherrell underwent labs and MRIs on his lumbar spine, thoracic spine, cervical spine, and brain. *Id.; Ex. 68, pp. 73-128.* Afterwards, Dr. Leigh told Sherrell the MRI results were **normal** and he should be able to walk if he tried. *Ex. 68, pp. 73-128; Ex. 29, p. 9; Gallinger Depo. 67:10-69:13.* When Sherrell asked if an STD, drugs, or medications would cause him to not be able to move, Dr. Leigh indicated it would not. *Ex. 29, pp. 9-10.* Dr. Leigh reiterated the MRI would have shown any issues and he should be able to walk. *Id., p. 10; Ex. 68, p. 71.* While Plaintiff alleges a CO told Dr. Leigh the Jail had video showing Sherrell moving his arms and legs without difficulty, COs Gallinger and Fredrickson deny any such statement was made. *Gallinger Depo. 66:7-67:4; Fredrickson Depo. 20:12-21:10.* Rather, CO Fredrickson told Dr. Leigh the Jail had video demonstrating Sherrell did not fall off the top bunk as he claimed. *Fredrickson Depo. 18:23-20:12.* The

17

hospital discharged Sherrell at 11:00 p.m. *Id.* COs Frederickson and Gallinger moved him into the wheelchair, and Dr. Leigh told Sherrell he needed to help get himself in the chair and he could walk if he wanted. *Ex. 29, p. 10*. Without seeing any signs of traumatic injury, breathing issues, or life-threatening issues, Dr. Leigh believed Sherrell should return to Jail under MEnD's medical care. *Kelly Decl. Ex. 24 Leigh Depo. 22:20-26:1; Ex. 68, p. 71*.

Dr. Leigh also noted Sherrell reported he could flick his arms and legs but could not hold them up. *Ex. 68, p. 68*. Despite reports of generalized weakness, Sherrell's sensation was intact and symmetric. *Id., p. 71*. Sherrell pulled away from painful stimuli of the lower extremities, had no pain with palpitation in his back, and had normal patellar reflexes. *Id.; Leigh Depo. 20:21-21:24*. Dr. Leigh also found the labs did not demonstrate any obvious cause for Sherrell's symptoms. *Ex. 68, p. 71*. After a prolonged period of observation in the emergency department, Dr. Leigh found no acute progressive neurological condition warranting hospitalization. *Id.* Rather, believing Sherrell was faking, Dr. Leigh diagnosed him with malingering and weakness, and discharged him without medication. *Id., p. 68; Leigh Depo. 80:6-9*. The discharge instructions stated Sherrell was suffering from generalized weakness or fatigue, which Sanford defined as follows:

> When a person is describing fatigue, they may feel tired out very quickly even with just a little activity. They may also say they are feeling tired, sleepy, easily exhausted, and unable to do normal activities because they don't seem to have enough energy.

*Ex. 68, pp. 129-32.* The discharge instructions made it clear Sherrell was not suffering from "true weakness:"

> When someone has true weakness, it means that the muscles are not working right. For example, a leg might be truly weak if you can't support your own weight on it or if you can't get up from a chair because the thigh muscles aren't strong enough.

*Id.* The discharge instructions recommended seeking immediate medical attention only if any of the following occurred:

- Confusion, coma, agitation;
- Fever;
- Severe headache;
- Signs of stroke (paralysis or numbness on one side of the body, drooping on one side of the face, difficulty talking);
- Worsening weakness, difficulty standing, paralysis, loss of bladder or bowels or difficulty swallowing.

*Id.*

The discharge instructions did **not** mention any serious medical condition or medical emergency -- just a diagnosis of malingering (faking) and boilerplate concerns to watch for with a recommendation Sherrell return to the emergency room. The discharge instructions were sent directly to MEnD and were never shared with Jail staff. *Kelly Decl. Ex. 27 Skroch Depo. 34:18-35:2; Pederson Depo. 68:12-21.* During the return to the Jail, Sherrell repeatedly asked to stop and to have his handcuffs adjusted because they were at first too loose and then they somehow became too tight. *Ex. 29, p. 10.*

**September 1, 2018**

When they arrived at the Jail's sally port around 12:30 a.m., Sherrell told the COs, "Just open the door. I can walk." *Ex. 29, p. 10.* As Corrections Sergeant Mario Scandinato attempted to remove Sherrell from the car, Sherrell went limp and dropped to the floor. *Ex. 29, p. 10; Ex. 1 9.1 West Garage View #2-4, 2-5.* Sherrell then told Jail staff he could move himself if he was lifted into the wheelchair. *Ex. 29, p. 10.* Sergeant Scandinato and CO Gallinger wheeled Sherrell to the cell, and COs Gallinger and Fredrickson placed him on the bed. *Ex. 29, p. 10; Ex. 1 9.1 West Garage View #2-6; 9.1 0045:0600 214-1.*

Around 6:45 a.m., CO Foss spoke with Sherrell after he had rolled onto the floor. *Ex. 1 9.1 0045-0600 214-1 at 2:27-34, 0600-1200 214-1 at 6:45.* An hour later, COs Smith and Foss spoke with Sherrell and helped him into bed. *Ex. 1 9.1 9.1 0600-1200 214-1 at 7:43-7:55.* Around 8:07 a.m., Sherrell told CO Sella and Smith he had taken Heroin and Fentanyl while in Jail, and thought the drugs were causing his symptoms. *Ex. 29, pp. 5, 10, 14; Ex. 1 9.1 0600-1200 214-1 at 7:56-8:20.* Later that morning, Nurse Michelle Skroch reviewed Dr. Leigh's notes. *Ex. 32, p. 8.* She also noted Jail staff had observed Sherrell wiggling all extremities and moving from the bed to the floor the night before, and Sherrell had changed his story every time the doctors told him nothing was wrong with him. *Id.; Skroch Depo. 37:25-38:12.* At

12:05 p.m., CO Foss brought fresh food and a wheelchair, spoke to Sherrell, and readjusted his mattress and pillow. *Ex. 1 9.1 1200-1800 214-1 at 12:05-07.*

At 2:05 p.m., Nurse Skroch visited Sherrell's cell and repeatedly told him to get up and walk, that he could walk, and that there was nothing wrong with him. *Ex. 29, pp. 10-11, 14; Ex. 1 9.1 1200-1800 214-1 at 2:05-08.* She observed Sherrell clear his throat, bounce his feet, knees, thighs, and hands, and wiggle his hips back and forth. *Ex. 32, p. 8; Skroch Depo. 57:5-9.* CO Sella also observed Sherrell wiggle his entire body. *Ex. 29, p. 14.* Nurse Skroch told the COs there was nothing medically wrong with Sherrell and instructed them to encourage him to move on his own and not to assist him in basic activities. *Skroch Depo. 73:14-25, 77:6-78:8, 79:19-80:6; Ex. 28, pp., 14-15.* Administrator Allen decided to follow Nurse Skroch's medical recommendation. *Ex. 28, pp. 14-15; Decl. Kelly Ex. 57 Bohlmann Depo. 77:22-78:4.*

Sherrell told Nurse Skroch he had not been truthful and actually thought an STD was the issue. *Ex. 32, p. 8; Ex. 29, p. 14.* She advised STDs did not present in this manner. *Ex. 32, p. 8.* Sherrell then told Nurse Skroch he might be having drug withdrawals. *Ex. 29, p. 14.* Nurse Skroch observed Sherrell was calm, did not fidget, did not sweat, had no shortness of breath or facial drooping, and had been able to swallow his medications that morning. *Ex. 32, pp. 8, 25; Skroch Depo. 55:21-22, 56:9-24, 60:15-24, 81:15-83:7.* Nor did she observe Sherrell choking or struggling to swallow his own saliva. *Skroch Depo. 61:13-21.*

21

Nurse Skroch called Sanford Hospital in Fargo and obtained the medical records from Sherrell's ER visit. *Id., 75:7-25; see generally Kelly Decl. Ex. 33 Sanford Fax*. At 5:30 p.m., Nurse Skroch called Dr. Leonard about Sherrell's diagnosis and they discussed each page of Sherrell's medical records. *Ex. 32, p. 8; Skroch Depo. 80:20-24, 92:9-93:1*. Dr. Leonard told her Sherrell should be scheduled for a neurology appointment the next business day, September 4. *Ex. 32, p. 8; Skroch Depo. 80:20-24, 96:9-97:4*. When Nurse Skroch left the Jail that evening, she did not believe Sherrell was experiencing a medical emergency. *Skroch Depo. 104:6-17*.

That afternoon, COs Gallinger and Smith helped Sherrell sit up to provide a urine sample for drug testing, which Sherrell did not provide. *Ex. 29, p. 14; Ex. 1 9.1 1200-1800 214-1 at 2:33-48*. Shortly after, Nurse Skroch noted COs reported Sherrell was able to hold himself up in a sitting position. *Ex. 32, p. 8; see Ex. 1 9.1 1200-1800 214-1 at 2:37-48*. At 3:17 p.m., CO Sella checked on Sherrell, sat him upright, sometimes against the wall and sometimes without support, spoke with him, and tried to get him to use the walker as Skroch instructed. *Ex. 1 9.1 1200-1800 214-1 at 3:17-41*. At 3:30 p.m., Sherrell's mother called and told CO Smith to tell Sherrell to "get himself together" so he could get off medical segregation and talk to his family. *Ex. 29, p. 5; Kelly Decl. Ex. 60 Perry Depo. 27:23*. CO Smith relayed the message to Sherrell. *Ex. 29, p. 4*. Around 4:04 p.m., COs Smith and Foss helped Sherrell lay on his back at his request, spoke with him, and covered him with a

blanket. *Ex. 1 9.1 1200-1800 214-1 at 5:09*. An hour later, CO Sella brought Sherrell dinner. *Id., 4:04-24*.

When CO Smith checked on Sherrell shortly after, Sherrell asked him to help him into the wheelchair to see if he could gain strength and mobility. *Id., 1800-2359 214-1 at 6:41-45; Ex. 29, p. 6; Ex. 28 p. 13*. However, each time COs Smith and Feldt attempted to do so, Sherrell arched his back and was unable to sit in the wheelchair. *Ex. 29, p. 5; Ex. 1 9.1 1800-2359 214-1 at 645-7:09*. The COs laid Sherrell on the mattress and covered him with a blanket. *Ex. 29, p. 5; Ex. 1 9.1 1800-2359 214-1 at 7:09-10*. At 11:02 p.m., CO Gallinger brought Sherrell food, and the COs continued to check on him through the night. *Ex. 1 9.1 1800-2359 214-3 at 11:03*.

**September 2, 2018**

At 7:43 a.m., CO Foss brought Sherrell breakfast. *Ex. 1 9.2  0600-1200 214-1 at 7:43*. At 8:15 a.m., COs Gallinger, Williams, and Foss helped Sherrell into the wheelchair and wheeled him out for a sponge bath after he had urinated. *Ex. 28, pp. 7, 11; Ex. 1 9.2  0600-1200 214-1 at 8:18*. At 8:30 a.m., Nurse Skroch checked on Sherrell. *Ex. 29, pp. 7, 11; Ex. 32, p. 7; Skroch Depo. 115:5-119:18*. Although Sherrell told her he could not bend at the waist, he was able to sit in the wheelchair and hold himself up with his legs straight and shoulders back. *Ex. 32, p. 7*. Sherrell's facial composure was normal except he only used the right side of his mouth for talking. *Id*. However, as the conversation continued, Sherrell used his entire

mouth. *Id.* Although Sherrell said he could not hold a juice box or swallow, he was able to swallow the juice Nurse Skroch poured into his mouth. *Id.* Based on her observations, Skroch believed Sherrell's condition had improved. *Skroch Depo. 143:7-144:9.*

After washing Sherrell, COs Foss, Williams, and Gallinger lifted him back into the wheelchair and placed him on a mattress on the floor. *Ex. 29, pp. 8, 11; Ex. 1 9.2  0600-1200 214-1 at 9:07-16.* They attempted to make him comfortable by drying him off, dressing him, placing his liquid food tray nearby, and putting pillows and blankets under and on him. *Ex. 29, pp. 8, 11; Ex. 1 9.2  0600-1200 214-1 at 9:07-16.* Sherrell thanked the COs for helping him. *Ex. 29, p. 11.*

Skroch observed Sherrell at 11:00 a.m. sleeping on his mattress holding the juice box. *Ex. 32, p. 7; Skroch Depo. 161:17-162:3.* She updated Dr. Leonard, and then instructed CO Melissa Bohlmann to have Jail staff assist Sherrell in drinking and moving. *Ex. 32, p. 7; Skroch Depo. 157:11-158:21.* At 11:38 a.m., CO Williams talked with Sherrell, adjusted his pillow, and wiped his face. *Ex. 1 9.2  0600-1200 214-2 at 11:38-40.* Sherrell received his lunch tray shortly after. *Id. at 11:51.*

At 2:00 p.m., Nurse Skroch observed Sherrell sleeping on his back with spit on his cheek but without having breathing distress. *Ex. 32, p. 7; Skroch Depo. 162:14-23.* She notified the sergeant on duty to move Sherrell to his side, to help Sherrell drink using a straw to ensure hydration, and to offer broth and other foods. *Ex. 32,*

24

*p. 7.* At 3:29 p.m., COs Williams, Gallinger, and Foss changed Sherrell's diaper and pants, propped him up on his side to prevent bed sores per MEnD's instructions, and wiped his face. *Ex. 28, p. 16; Ex. 1 9.2 1200-1735 214-3 at 3:29-36.* Sherrell thanked them for making him comfortable. *Ex. 29, p. 12.* Sherrell asked CO Williams to move his head to the edge of the mattress so he would not dirty his pillow if he needed to spit. *Ex. 28, p. 16.* CO Williams did, and Sherrell asked if CO Williams would help him try to walk. *Id.* CO Williams indicated he could not support Sherrell by himself. *Id.* When Sherrell asked if he would sit him up so he could try to stay upright, CO Williams said he would do so when he brought Sherrell dinner. *Id.* The COs left the cell at 3:36 p.m. *Ex. 1 9.2 1200-1735 214-3 at 3:36.* Jail staff also conducted well-being checks at 4:00 and 4:29 p.m. documenting on the special watch log that Sherrell was laying on his left side. *Ex. 30, p. 3.*

At 4:46 p.m., COs Gallinger and Williams went to help Sherrell eat dinner, consistent with instructions from MEnD. *Ex. 28, p. 12; Ex. 1 9.2 1200-1735 214-3 at 4:46-50.* Although Sherrell was breathing and had a strong pulse, he could only mouth words without making sound. *Ex. 29, p. 12; Ex. 28, p. 16.* After trying to sit him up, the COs called for medical assistance due to this new symptom. *Id.; Ex. 1 9.2 1200-1735 214-3 at 4:48-53.* Health Tech Brewster found Sherrell's pulse was 66 BPM and oxygen level was 98 percent, while the COs attempted to take his blood pressure. *Ex. 29, p. 12; Ex. 28, p. 16; Ex. 1 9.2 1200-1735 214-3 at 4:53-58.* When

25

Sherrell's pulse rate began to drop, CO Williams retrieved the AED and CO Gallinger radioed control to call 911. *Id.* The AED advised the COs use CPR instead of a shock. *Ex. 29, p. 12; Ex. 1 9.2 1200-1735 214-3 at 4:58*.

While one CO gave chest compressions, the other counted and held Sherrell's head. *Ex. 29, p. 12; Ex. 28, p. 17;  Ex. 1 9.2 1200-1735 214-3 at 5:00-01*. Once Bemidji police officers arrived, they guided the COs in conducting chest compressions. *Ex. 29, p. 12; Ex. 28, p. 17; Ex. 1 9.2 1200-1735 214-3 at 5:01-04*. When Bemidji EMS staff arrived, they took over attempts to revive Sherrell. *Ex. 29, p. 12; Ex. 28, p. 17; Ex. 1 9.2 1200-1735 214-3 at 5:04-12, 214-4 at 5:12-22*. At 5:23 p.m., efforts to revive Sherrell ceased, and he was pronounced dead. *Ex. 29, p. 12; Ex. 1 9.2 1200-1735 214-4 at 5:23-34*. The official and independent autopsy did not determine an anatomic cause of death. *Kelly Decl. Ex. 39 Autopsy Report, p. 12*.

Plaintiff now alleges Sherrell died from untreated Guillain-Barre Syndrome—a form of progressive paralysis generally caused by an immune system attack on the nervous system after a viral infection. *Doc. 30, ¶ 55*. It is a rare disorder without a known cure. *Id.* Although numerous physicians and medical staff examined Sherrell, no one diagnosed him with Guillain-Barre Syndrome or even mentioned this as a possibility.

### STANDARD OF REVIEW

Summary judgment is appropriate when there is no dispute between the parties about any genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### ARGUMENT

I.    **THE INDIVIDUAL BELTRAMI COUNTY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

Plaintiff asserts Eighth and/or Fourteenth Amendment claims against the Beltrami County COs based on deliberate indifference to Sherrell's serious medical needs. *Doc. 30, Count I*. This claim is barred by qualified immunity.

An officer is entitled to qualified immunity unless their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). Qualified immunity is a question of law to be decided by the district court, and it is "immunity from suit rather than a mere defense to liability." *Pearson*, 555 U.S. 223, at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991)). Simply put, "[q]ualified immunity is an entitlement not to

27

stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)).

As a pretrial detainee, Sherrell's claim is analyzed under the Fifth and Fourteenth Amendments instead of the Eighth Amendment. *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989). However, the Eighth Circuit applies the same deliberate-indifference standard for disregard-of-serious-medical-need. *Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014). "The deliberate-indifference standard requires 'both an objective and subjective analysis.'" *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (*quoting Hall v. Ramsey County*, 801 F.3d 912, 920 (8th Cir. 2015)).

### A. Sherrell Did Not Suffer from an Objectively Serious Medical Need.

First, Plaintiff must show Sherrell "suffered from a medical need that was objectively 'serious.'" *Christian v. Wagner*, 623 F.3d 608, 613 (8th Cir. 2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "To be objectively serious, a medical need must have been 'diagnosed by a physician as requiring treatment' or must be 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Barton v. Taylor*, 820 F.3d 958, 964 (8th Cir. 2016) (quoting *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014)).

While Guillain-Barre Syndrome is undoubtedly a serious medical condition, it is undisputed Sherrell was never diagnosed with that condition while he was

alive. Without a diagnosis, the issue is whether the condition was so obvious a layperson would have easily recognized the need for medical treatment. *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 483 (8th Cir. 2008).

The Eighth Circuit has found a serious medical need was obvious to a layperson where an inmate: complained of pain and complications eating food due to a broken jaw that appeared to jailers as deformed and "far out of place," *see Wise v. Lappin*, 674 F.3d 939, 940-41 (8th Cir. 2012) (*per curiam*); was pregnant, bleeding, and passing blood clots, *see Pool v. Sebastian Cty., Ark.*, 418 F.3d 934, 945 (8th Cir. 2005); had swollen and bleeding gums and complained of extreme tooth pain, *see Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004); experienced excessive urination, diarrhea, sweating, weight loss, and dehydration related to known diabetes, *see Roberson v. Bradshaw*, 198 F.3d 645, 647-48 (8th Cir. 1999); or exhibited signs of early labor and the inmate's medical records clearly documented a history of rapid labor and delivery, *see Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997).

Conversely, the Eighth Circuit has found a serious medical need was **not** obvious to a layperson where: an overweight inmate—who later died of an undiagnosed pulmonary edema—was unable to stand or walk, was unresponsive and "google-eyed," was rolling on the ground and groaning, smelled of urine, had a bloody mouth, and was breathing rapidly, but did not request medical

attention, *see Jones,* 512 F.3d at 482-83; and a pretrial detainee, who was found in a creek, was combative, gave nonsense answers to questions, began screaming in holding cell, and COs were aware detainee was under the influence of methamphetamine, *see Grayson*, 454 F.3d at 809-10.

Here, Sherrell's condition was not one that obviously required medical attention. Sherrell was discharged from the hospital on August 31, 2018, without being diagnosed with a serious medical condition after being examined by multiple medical professionals. Dr. Leigh's diagnoses of malingering and weakness do not establish a serious medical need. In fact, he was essentially diagnosed with faking. *See Leigh Depo. 78:21-6.* Because the medical professionals failed to find a serious medical need, Sherrell's condition could not be considered objectively obvious. Once Sherrell returned to the Jail on September 1, 2018, his condition did not noticeably change until 4:47 p.m. on September 2, 2018. Absent a change in his condition, Sherrell's symptoms did not objectively constitute a serious medical need obvious to a layperson until that time. Accordingly, Plaintiff's deliberate indifference claim must be dismissed.

### B. None of the Beltrami County Defendants Knew Sherrell Had a Serious Medical Condition and Deliberately Disregarded It.

In addition to having an objectively serious need, "[a] prison official may [only] be liable if the official has **actual knowledge** of a **substantial risk of serious harm**." *Schaub v. VonWald*, 638 F.3d 905, 920 (8th Cir. 2011) (emphasis added).

Thus, deliberate indifference requires one "knows of and disregards an excessive risk" to health and safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, Plaintiff must show each Defendant knew of and deliberately disregarded an objectively serious medical need. *Grayson v. Ross*, 454 F.3d 802, 808 (8th Cir. 2006). Prison officials must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also draw the inference. *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011). Thus, even a "failure to alleviate a significant risk that [] [one] should have perceived but did not … is not 'deliberate indifference.'" *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998) (quoting *Farmer*, 511 U.S. at 838). The level of culpability required is equal to criminal recklessness. *See Jenkins v. Cnty. of Hennepin, Minn.*, 557 F.3d 628, 632 (8th Cir. 2009). Here, by reasonably relying on medical staff, none of the COs knew of or deliberately disregarded an excessive risk to Sherrell's health.

### 1. The Beltrami County Defendants reasonably relied on medical staff.

The COs did not know of or deliberately disregard an excessive health risk because they reasonably relied on medical staff who said there was none. Officials are liable under § 1983 only if they fail to promptly provide an inmate with needed medical care, they deliberately interfere with the prison doctors' performance, or they tacitly authorize or are indifferent to the prison doctors' constitutional violations. *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002). "[P]rison officials

31

fulfill[] their duties in delivering requests to the medical staff." *Holden*, 663 F.3d at 343.

Here, none of the COs interfered with MEnD staff's medical care for Sherrell. To the contrary, each CO followed MEnD instructions in caring for and assisting Sherrell. Moreover, they fulfilled their duties by delivering Sherrell's complaints and requests to MEnD staff. Nor were the COs required to override the judgments and decisions of medical staff.

"Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors." *Meloy*, 302 F.3d at 849. The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision. *Id.* Nor can prison officials be "liable for the medical staff's diagnostic decisions." *Id.*

This is not a case where the Jail failed to provide medical attention. A MEnD medical technician was at the Jail from 6 a.m. to 10 p.m., and MEnD nurses provided Sherrell with daily care. *Scandinato Depo. 47:14-48:12; Pederson Depo. 43:4-44:22.* Sherrell was assessed, at a minimum, by MEnD Nurses Pederson, Lindell, and Skroch, CNP Lundblad, Dr. Leonard (remotely rather than in person), and health tech Brewster and Rutledg. Sherrell was also seen by EMTs, and nurses and

physicians at both Sanford Bemidji Medical Center and Sanford Hospital in Fargo where he underwent blood tests, CT scans, and MRIs.

Dr. Leigh diagnosed Sherrell with malingering—a "diagnosis" given when a patient complains of a fictitious condition for secondary gain. *Ex. 68, p. 68*; *Leigh Depo. 78:21-6*. After Sherrell returned to Jail on September 1, Nurse Skroch met with Sherrell and told him two different doctors saw him and found nothing wrong, and he needed to get up and move. *Skroch Depo. 51:5-16*. Nurse Skroch also relayed this information to the COs and instructed them not to assist him with daily activities. *Id., 73:14-25; 78:2*. Dr. Leonard did not even see the need to evaluate Sherrell in person. *Leonard Depo. 130:4-16*.

Here, the COs "w[ere] not responsible for examining [Sherrell] or treating him [themselves]." *Meloy*, 302 F.3d at 849. Even though Sherrell told some COs about his "condition and need," they justifiably relied on the opinion of the medical staff, which had more medical training. *Id.* Nothing in the record suggests the COs had reason to second guess these medical judgments. The COs did not have any reason to believe the medical professionals lacked information or proper training or that they relied upon incorrect information. *See McRaven v. Sanders*, 557 F.3d 974 (8th Cir. 2009) (denying qualified immunity where an officer knew the medical professional's diagnosis was based on incorrect information). As a result, the COs reasonably relied on medical staff.

2. *Beltrami County Defendants did not know Plaintiff had a serious medical need.*

The County Defendants did not know Sherrell had a serious medical need. Rather, they reasonably relied on the medical staff who told them Sherrell did not require emergency medical care and he was diagnosed with malingering and weakness. Jail staff had no reason to think Sherrell was not receiving proper medical care from the very medical professionals they trusted and paid to be responsible for such care.

Despite his repeated medical assessments and two hospital visits, Sherrell was never diagnosed with a serious medical condition. In addition to being under special medical observation in the Jail, Sherrell was attended to by MEnD nurses, two MEnD medical providers, and MEnD health techs. Sherrell was transported via ambulance to Sanford Bemidji Medical Center and Sanford Hospital in Fargo where he was thoroughly examined. *Kelly Decl. Exs. 59 and 67 Ambulance Records; Ex. 68*.

The record reflects a complex situation that baffled medical professionals who could not find a cause for Sherrell's condition. Even the official and independent autopsy did not determine an anatomic cause of death. *Kelly Decl. Ex. 39; Kelly Decl. Ex. 40 Dr. Youmans' Report, p. 2*. From this evidence, no reasonable jury could find the County Defendants, as laypersons, had actual knowledge of a serious medical need.

Nor did the discharge instructions give the County Defendants actual notice of a serious medical need. Jail staff handed over or otherwise referred discharge instructions directly to MEnD. *Kelly Decl. Ex. 6 Carraway Depo. 139:10-23; Kelly Decl. Ex. 7 Davis Depo. 48:12-18; Kelly Decl. Ex. 8 Demaris Depo. 19:2-25; Feldt Depo. 90:3-18; Kelly Decl. Ex. 10 Foss Depo. 60:1-5; Kelly Decl. Ex. 11 Fredrickson Depo. 53:21-54:3; Kelly Decl. Ex. 12 Gallinger Depo. 176:20-25; Kelly Decl. Ex. 14 Lorsbach Depo. 43:13-23; Kelly Decl. Ex. 17 Scandinato Depo. 122:17-123:2, 161:24-162:4; Kelly Decl. Ex. 18 Sella Depo. 62:25-63:15; Kelly Decl. Ex. 19 Settle Depo. 30:23-33:7; Kelly Decl. Ex. 21 Smith Depo. pt. 2, 86:4-23; Williams Depo. 98:2-8*. MEnD did not share these discharge instructions with Jail staff or otherwise communicate their contents. *Leonard Depo. 282:10-24; Pederson Depo. 66:16-70:14; Skroch Depo. 172:8-173:25.* Regardless, the conditions listed on the discharge instructions were virtually indistinguishable to the symptoms Sherrell complained of prior to his transfer to the hospital, rendering them useless. *Ex. 32; Ex. 68; see generally Exs. 28 and 29.* MEnD even executed confidentiality agreements with new COs instructing them not to seek out medical information regarding inmates. *See e.g. Allen Decl. Ex. 3, Employee Confidentiality Agreement.* In this case, MEnD simply instructed the COs to notify medical staff if Sherrell's condition changed. *Skroch Depo. 196:19-25.*

Consequently, none of the COs knew Sherrell had an excessive health risk, especially considering they did not have the benefit of 20/20 hindsight. *Gregoire v.*

35

*Class,* 236 F.3d 413, 418 (8th Cir. 2000). Even the actual trained medical professionals claimed to have no idea Sherrell had a health risk. Accordingly, this claim must be dismissed.

> ### 3. *Beltrami County Defendants did not deliberately disregard a known excessive risk to Sherrell's health.*

Without actual knowledge of any risk, the County Defendants could not have been deliberately indifferent. *Gregoire,* 236 F.3d at 417. Simply put, they could not deliberately disregard a risk they did not know existed. *See McRaven v. Sanders*, No. 07-6019, 2008 WL 4671836, at *9 (W.D. Ark. Oct. 21, 2008), *aff'd*, 577 F.3d 974 (8th Cir. 2009). Thus, the claim fails.

Alternatively, even if knowledge existed, the outcome would remain unchanged. The evidence demonstrates the County Defendants were not deliberately indifferent. They routinely checked on, spoke with, assisted Sherrell in his daily activities, and relayed his requests to MEnD. They also reasonably relied on the judgments and instructions of medical staff. Nothing in the record suggests any of the County Defendants acted with criminal recklessness, which is required for deliberate indifference. Accordingly, the claim must be dismissed.

> ### 4. *Plaintiff failed to identify specific constitutional violations by each Beltrami County Defendant based on their individual conduct.*

Government officials are only liable for their own misconduct. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010); *see Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir.

2006) ("Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed."). Here, although Plaintiff alleges twenty-one County individuals committed deliberate indifference, she fails to allege their individual conduct and knowledge violated Sherrell's constitutional rights. Because Plaintiff has failed to allege facts supporting any individual defendant's personal involvement and responsibility for the alleged constitutional violation, her deliberate indifference claim must be dismissed. *See Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999).

### a. Programs Director Edward Busta

For one minute, PD Busta helped lift Sherrell into his wheelchair on August 29, 2018. *Kelly Decl. Ex. 5 Busta Depo. 67:11-70:1; Ex. 28, p. 6.* This was the only time PD Busta encountered Sherrell, who was scheduled to see a MEnD doctor the next morning. *Busta Depo. 72:11-14.* On August 30, PD Busta sent an email to the COs asking them to maintain a log of Sherrell's movements because he had complained he could not eat, swallow, use the toilet, and other daily tasks. *Ex. 58.* Although PD Busta was generally made aware Sherrell was having a medical issue, he did not otherwise participate in his care. *Busta Depo. 71:21-72:10.* In fact, PD Busta left the jail at 3:00 p.m. on August 31—before Sherrell returned from the hospital— and did not return until after Sherrell's death. *Id., 56:12-18, 82:6-17.* These

allegations do not demonstrate PD Busta knew Sherrell had an excessive health risk and deliberately disregarded the same.

### b.  Sergeant Tyler Carraway

Sergeant Carraway had only two interactions with Sherrell during his overnight shift on August 29, 2018. *Carraway Depo. 45:4- 47:15*; *Ex. 29, p. 4*. During the first interaction, Sergeant Carraway helped CO Davis move Sherrell to a wheelchair. *Id*; *Ex. 1 8.29 1800-2359 215-2 at 7:48.* About an hour later, Sergeant Carraway provided Sherrell with water and his pillow. *Ex. 1 8.29 1800-2359 215-2 at 8:43; Carraway Depo. 48:1-5*. When Sergeant Carraway asked Sherrell if he needed anything else, Sherrell said he did not, and Sergeant Carraway left the cell. *Carraway Depo. 48:5-7*. Sergeant Carraway was aware Sherrell was under medical observation but had no reason to believe Sherrell was not being provided adequate medical care or that he required emergency care. *Id., 154:1-155:20*. Further, Sherrell was scheduled to see the doctor the next morning. These facts do not demonstrate Sergeant Carraway knew of and disregarded an excessive health risk. Accordingly, Sergeant Carraway's actions do not arise to deliberate indifference.

### c.  CO Dana Demaris

CO Demaris interacted only once with Sherrell on August 29, 2018 during his short overnight shift. *Demaris Depo. 11:3-14:10; Kelly Decl. Ex. 65 Demaris Timecard*. The brief encounter was so insignificant that CO Demaris did not

remember it until reviewing the video. *Demaris Depo. 11:8-13:17*. CO Demaris did not have any physical contact or conversations with Sherrell. *Id., 13:23-14:6*. After finishing his shift on August 29, CO Demaris did not return to the Jail until after Sherrell's death. *Id., 9:3-17; Kelly Decl. Ex. 64 Demaris Timecard*. These facts do not demonstrate CO Demaris knew of and disregarded an excessive health risk. Accordingly, his actions do not arise to deliberate indifference.

### d. Sergeant Anthony Derby

Plaintiff's Amended Complaint contains zero factual allegations against Sergeant Derby. *Doc. 30*. Sergeant Derby testified he assisted another CO get Sherrell to and from the toilet on the morning of August 30, 2018. *Kelly Decl. Ex. 71 Derby Depo. 27:12-29:3*. That afternoon, Nurse Peterson told Sergeant Derby that Sherrell should be taken to the doctor for evaluation. *Id., 39:2-16*. Sergeant Derby properly relayed the message to Administrator Allen and began to arrange for Sherrell's transport. *Id., 39:14-25*. However, Sergeant Derby was later told to cancel these arrangements because a MEnD doctor would visit Sherrell at the Jail the next day. *Id., 40:1-43:24*. Sergeant Derby returned to Sherrell's cell and helped him up from the floor. *Id., 33:3-23*. Sherrell told Sergeant Derby his symptoms were likely attributable to a pinched nerve in his back. *Id., 34:2-5*. Sergeant Derby told Sherrell he would be seen by the MEnD doctor in the morning. *Id., 34:12-15, 35:14-36:12*. After helping put a diaper on Sherrell, Sergeant Derby left the cell and did not

interact with Sherrell again. *Id., 34:2-5*. After leaving the Jail at 6 p.m., Sergeant Derby did not return until after Sherrell's death. *Id., 44:9-16*. These facts do not demonstrate Sergeant Derby knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

### e.   CO Jake Swiggum

CO Swiggum worked the day shift on August 29 and 30, 2018, during which time he assisted Sherrell with various tasks. *Ex. 29, p. 5*. On August 30, CO Swiggum heard Nurse Pederson tell Sherrell he was not going to the emergency room and instead would be seeing the MEnD doctor in the morning. *Kelly Decl. Ex. 22 Swiggum Depo. 32:4-13; Ex. 29, p. 6*. CO Swiggum believed this was a medical decision. *Id., 32:4-13.* Because his conduct does not exhibit subjective knowledge and disregard to an excessive health risk, no deliberate indifference occurred.

### f.   CO Christopher Settle

CO Settle's interactions with Sherrell were also limited to August 29 and 30, 2018. On August 29, Sherrell told CO Settle he had no feeling in his hands and arms. *Ex. 29, p. 6.* Throughout the day on August 30, CO Settle assisted Sherrell with various tasks. *Id.* CO Settle also observed Sherrell's medical assessment with Nurse Pederson that morning. *Id.* CO Settle also escorted Sherrell's public defender to his cell that morning. There is no evidence Sherrell's public defender believed Sherrell was suffering from a medical emergency. After CO Settle's shift

ended at 6 p.m. on August 30, he had no further involvement with Sherrell, who was scheduled to see the doctor the next morning. These facts do not demonstrate CO Settle knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

### g.  Assistant Jail Administrator Andrew Richards

Plaintiff's Amended Complaint contains zero factual allegations against Assistant Jail Administrator Andrew Richards, referred to as Lieutenant in the caption. *See generally Doc. 30*. Richards had no direct participation in any alleged constitutional violation. He never personally interacted with or observed Sherrell, nor was Richards involved in any of the decisions regarding Sherrell's transfer to the hospital. *Ex. 16, Richards Depo. 73:5-17, 146:13-20*. In fact, Richards did not learn about Sherrell until after he died. *Id., 24:25-26:2*. This conduct does not constitute deliberate indifference.

### h.  CO Holly Hopple

Plaintiff's Amended Complaint contains zero factual allegations against CO Holly Hopple. *See generally Doc. 30.* CO Hopple had no direct participation in any alleged constitutional violation. She had no personal contact with Sherrell during any of her shifts on August 30, August 31, or September 2, 2018. *Kelly Decl. Ex. 13 Hopple Depo. 22:5-20, 23:24-24:14; Kelly Decl. Ex. 66 Hopple Timecard.* On September 2, CO Hopple provided cover for the second-floor control room when other COs

assisted Sherrell during his medical emergency. *Ex. 28, p. 17*. She recorded her observations from the second-floor control room as COs attempted to resuscitate Sherrell. *Id., p. 18*. This does not constitute deliberate indifference.

i.   CO Melissa Bohlmann

CO Bohlmann lacked subjective awareness that Sherrell suffered from a serious medical condition and did not ignore any risks to his health. As the Officer in Charge, CO Bohlmann had no personal contact with Sherrell. *Ex. 57, Bohlmann Depo. 42:11-43:1*. On September 1, 2018, Sergeant Scandinato informed CO Bohlmann that Sherrell had returned from Fargo Hospital and was medically cleared after the doctors could not find anything wrong with him. *Ex. 28, pp. 14-15*. CO Bohlmann reported Sherrell's continued alleged symptoms to Administrator Allen and asked if COs should assist him in basic activities. *Id., p. 14*. After being told she should confer with medical staff, CO Bohlmann relayed Sherrell's reported symptoms to Nurse Skroch. *Id., p. 15*. Nurse Skroch told her there was nothing medically wrong with Sherrell and Jail staff should not assist him with his daily activities. *Id.* After Administrator Allen decided to follow Nurse Skroch's medical recommendation, CO Bohlmann relayed the plan to Sergeant Scandinato. *Id; Ex. 57, Bohlmann Depo. 77:22-78:4*. The next day, Nurse Skroch advised CO Bohlmann the COs should assist Sherrell in drinking fluids, eating, and changing his briefs as needed. *Id.; Ex. 57, Bohlmann Depo. 76:3-8*. Again, CO

Bohlmann dutifully relayed this information to Jail staff. *Ex. 57, Bohlmann Depo. 78:4-79:9*. COs Williams, Foss, and Gallinger worked under CO Bohlmann's supervision on September 2, and did not report any changes in Sherrell's condition. *Ex. 57, Bohlmann Depo. 84:4-23*. These facts do not demonstrate CO Bohlmann knew of and disregarded an excessive health risk. Accordingly, she did not act with deliberate indifference.

j.   CO Jared Davis

CO Davis booked Sherrell into the Jail on August 24, 2018. *Davis Depo. 19:14*. CO Davis observed a change in Sherrell's medical condition on August 29 when, near the beginning of his shift, CO Davis had to assist Sherrell get back into his bed after falling. *Ex. 65; Ex. 29, p. 3; Ex. 1 8.29 1800-2359 215-1 at 6:57*. However, his condition was confusing because based on the surveillance footage, Sherrell repeatedly moved his extremities throughout CO Davis's shift despite claiming he needed assistance. On the evening of August 30, CO Davis started a Special Watch Log documenting Sherrell's movement corroborated by surveillance footage. *Ex. 30; see Ex. 1 8.30 1800-2359 215-3-1-19-4-1*. Many other movements not documented in this log are reflected in the video. *Ex. 1 8.30 1800-2359 215-3-1-19-4-1 at 6:21-8:07*. COs Davis and Fredrickson assisted Sherrell back into his wheelchair at 8:07 p.m. *Ex. 29, p. 3*. A health technician entered Sherrell's cell and stayed with him as he

took his medication. *Ex. 1 8.30 1800-2359 215-3-1-19-4-1 at 8:09-8:10*. CO Davis continued to document his movements. *Ex. 30, p. 1*.

Regardless, CO Davis met Sherrell's needs. *Davis Depo. 38:16-24, 42:8-24, 44:8-20*. The record also shows CO Davis lacked the requisite subjective awareness. Because CO Davis wanted to know if there was something wrong with Sherrell, he asked whether there were any plans to bring him to the hospital. *Id., 34:11-36:1*. Before he left his shift on the morning of August 31, CO Davis learned plans were being made to take Sherrell to the hospital. *Id., 33:19-34:20*. CO Davis did not believe Sherrell required emergency medical treatment and had no reason to doubt the medical care he was receiving. *Id., 43:14-45:20*. The following morning, on August 31, Sherrell was transported to the hospital and CO Davis never saw Sherrell again. *Davis Depo. 32:24-33:7; Ex. 65, p. 2*. CO Davis knew Sherrell had received medical care and there were plans in place for Sherrell to receive more care. *Davis Depo. 44:21-45:9*. CO Davis reasonably declined to "assume to know more than a trained medical professional." *Id*. These facts do not demonstrate CO Davis knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

k.  CO Erin Meyer

Plaintiff does not mention CO Meyer in the factual allegations of the Amended Complaint. *See generally Doc. 30.* CO Meyer worked with CO Davis

44

during the overnight shift on August 29 to 30. *Ex. 29, pp. 2-3*. At 10:27 p.m. on August 29, CO Meyer helped wheel Sherrell to and from cell 215 so he could shower and make a phone call. *Kelly Decl. Ex. 15 Meyer Depo. 13:22-13:3*. At 11:01 p.m., CO Meyer dialed another phone call for Sherrell. *Id., 20:5-19*. Around 5:00 a.m. on August 30, CO Meyer held a blanket up while CO Davis changed Sherrell's clothes, mopped the floor, and lifted Sherrell onto the bed. *Id., 21:1-22:24*. CO Meyer had no further contact with Sherrell, who was scheduled to see the doctor that morning. *Id., 23:3-11; Kelly Decl. Ex. 62 Meyer Timecard*. Although CO Meyer was aware Sherrell was having difficulty moving, he did not know what, if anything, was wrong with Sherrell. *Meyer Depo. 24:21-25:21*. These facts do not demonstrate that CO Meyer knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

l.   CO Daniel Fredrickson

Prior to Sherrell's transport to the hospital on August 31, 2018, CO Fredrickson interacted with Sherrell to assist him. *Ex. 28, pp. 8-9*. For example, on August 30, CO Fredrickson assisted Sherrell move from his bed into the wheelchair. *Ex. 29, p. 3*. CO Fredrickson later assisted Sherrell change his briefs and bedding. *Id*. On August 31, at approximately 7 p.m., CO Fredrickson arrived at the Sanford Hospital to guard Sherrell. *Ex. 28, p. 7*. While at the hospital, CO Fredrickson assisted Sherrell transfer from the gurney to the bed and helped him

45

drink water through a straw. *Ex. 28, p. 7.* CO Fredrickson was then present at the hospital where multiple medical personnel thoroughly examined Sherrell. *Ex. 28, p. 7.* He heard Dr. Leigh deliver the test results to Sherrell and tell him there was nothing wrong and that he was ready to be discharged. *Ex. 28, p. 7.* CO Fredrickson correctly believed hospital staff had cleared Sherrell to return to the Jail. *Fredrickson Depo. 62:18-24.*

When Sherrell was released from the hospital, COs Gallinger and Fredrickson returned Sherrell to the Jail just after midnight on September 1. CO Fredrickson called Sergeant Scandinato to coordinate his assistance with Sherrell in the sally port. CO Fredrickson then assisted Sherrell into a wheelchair and returned him to his cell.

CO Fredrickson never believed Sherrell was experiencing a medical emergency on September 1. *Id., 68:22-69:1.* Nothing in CO Fredrickson's personal observations of Sherrell after his return from the hospital was different from his observations of Sherrell prior to his transfer to the hospital. Nor is there any evidence CO Fredrickson possessed special knowledge suggesting his reliance on medical staff was unreasonable. These facts do not demonstrate CO Fredrickson knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

m. CO Chase Gallinger

Plaintiff cannot show CO Gallinger possessed subjective awareness of a substantial risk to Sherrell and deliberately disregarded it. CO Gallinger repeatedly observed Sherrell receive medical attention and was consistently told nothing was wrong with him. Based on his own personal observations, nothing changed in Sherrell's condition that required CO Gallinger to override medical judgment and return Sherrell to the emergency room. When Sherrell's speech changed on the afternoon of September 2, 2018, CO Gallinger immediately alerted medical staff. Before then, CO Gallinger did not possess any special knowledge of Sherrell's condition.

CO Gallinger also observed Sherrell receive medical attention from medical staff at Sanford Bemidji Hospital. *Gallinger Depo. 23:3-24:17.* CO Gallinger knew Sherrell had reported his symptoms to the hospital medical staff. *Id., 46:16-20.* He then observed medical technicians attend to Sherrell during a two-and-a-half-hour transport via ambulance to Sanford Hospital in Fargo. *Id., 32:21-33:23.* And finally, CO Gallinger observed nurses and a physician attend to Sherrell at Sanford Hospital before being discharged. *Id., 41:12-43:16.*

CO Gallinger also observed Sherrell receive physical examinations, CT scans, blood tests, and MRIs. *Id., p. 9.* CO Gallinger also heard Sherrell complain about his restraints and observed him move his upper body, hands, and feet. *Id.*

Dr. Leigh and the nurses told CO Gallinger directly the MRI scans came back normal and the only reason Sherrell could not move was because he would not try. *Id.* Moreover, CO Gallinger was not aware of what the discharge instructions said. *Gallinger Depo. 83:6-15*. Regardless, CO Gallinger noticed no change between Sherrell's condition before and after visiting the hospital. *Id., 160:23-162:20.*

On September 1 at 2 p.m., CO Gallinger observed Sherrell's medical assessment with Nurse Skroch. *Ex. 29, pp. 10, 14; Gallinger Depo. 109:2-110:7*. During this visit, Nurse Skroch yelled at Sherrell to get up and move because two different emergency rooms evaluated him and found nothing wrong. *Skroch Depo. 51:5-16; Ex. 32, p. 8*. Likewise, Nurse Skroch found nothing new wrong with Sherrell during her assessment. *Skroch Depo. 70:2-11*.

On September 2, CO Gallinger was again present during Nurse Skroch's medical assessment of Sherrell. *Id., p. 11*. Again, CO Gallinger did not notice any change in Sherrell's condition from the day before. *Gallinger Depo. 117:20-118:14*. Later on September 2, when CO Gallinger did notice a change, he immediately called the MEnD health tech. *Id., 140:14-141:8*. Accordingly, the record shows CO Gallinger lacked subjective awareness of a substantial risk to Sherrell, did not deliberately disregard Sherrell's medical condition, and reasonably relied upon the medical judgments of medical personnel.

n.  CO Marlon Smith

CO Smith had multiple interactions with Sherrell in the Jail. *Kelly Decl. Ex. 20 Smith Depo. pt. 1, 24:12-16*. CO Smith observed Sherrell's condition both before he went to the hospital and after. *Ex. 29, pp. 2-3, 6*. On September 1, 2018, CO Smith interacted with Sherrell many times. *Smith Depo. 95:5-96:6*. Specifically, CO Smith helped Sherrell eat, get in and out of his wheelchair, and use the restroom. *Id., 82:9-21; 92:6-13*. Based on his observations, CO Smith believed Sherrell's condition was unchanged and did not warrant a report. *Id., 76:6-77:17*. By the time CO Smith ended his shift on September 1, he continued to believe Sherrell was not suffering from a medical emergency. *Id., 94:20-24*. Throughout the day, CO Smith reasonably relied on medical staff to take any steps needed for Sherrell's care. *Id., 98:22-100:2*. These facts do not demonstrate that CO Smith knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

o.  CO Brandon Feldt

CO Feldt observed Sherrell's condition during his overnight shift on August 28, 2018. *Ex. 28, p. 12*. On August 28, at approximately 4 a.m., Sherrell told CO Feldt he could not feel his legs from the knees down; however, Sherrell had just walked around the cell block. *2018 08 28 0000-0600 207-4, 4:06; Ex. 28, p. 12*. Sherrell then laid himself on the floor where he appeared to be resting until he

moved around 4:45 a.m. *8.28 0000-0600 207-5, 4:46*. CO Feldt's shift ended at 6 a.m. that day. *Kelly Decl. Ex. 63, Feldt Timecard*.

Next, CO Feldt observed Sherrell when he returned from the hospital in the early morning hours of September 1. *Id*. CO Feldt assisted other COs move Sherrell back to his cell because Sherrell claimed he was unable to walk or use his arms. *Feldt Depo. 24:15-25:9, 75:13-16; Ex. 28, p. 12*. At that time, CO Feldt was informed the hospital had cleared Sherrell after finding nothing wrong with him. *Feldt Depo. 25:16-21*. CO Feldt continued to monitor Sherrell throughout the night. *Ex. 28, p. 13*. CO Feldt returned for his next shift on the evening of September 1 and found Sherrell's condition was unchanged. *Ex. 28, p. 14*. CO Feldt was informed that medical had stated Sherrell could do things on his own. *Id.* Despite Sherrell seeing the nurse that day, nothing in MEnD's pass-on log indicated there were specific medical instructions for the overnight shift. *Ex. 36, pp. 2-3*. Sherrell was also repeatedly attended to by Medical Tech Brewster. *Ex. 32, p. 4*. CO Feldt and the other COs continued to monitor and help Sherrell move around on the evening of September 1. *Ex. 28, p. 13; Feldt Depo. 59:1-61:5*. At approximately 6:45 p.m., COs Feldt and Smith attempted to sit Sherrell in his wheelchair, but Sherrell's back continued to arch which prevented Sherrell from sitting up. *Ex. 28, p. 13; 2018 9.01 1800-2359 214-1 at 6:48*. After overhearing about the COs' efforts to sit Sherrell in his wheelchair, Medical Tech Brewster advised returning Sherrell to his

mattress on the floor to avoid any risk of falling. *Ex. 28, p. 10*. Because Sherrell's condition appeared unchanged, CO Feldt did not personally believe he was experiencing a medical emergency at any time during his overnight shift. *Feldt Depo. 61:6-9*. Furthermore, CO Feldt was aware medical staff knew of Sherrell's condition and he had no reason to circumvent or usurp their medical judgment. These facts do not demonstrate that CO Feldt knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

p. CO Nicholas Lorsbach

On August 28, 2018, CO Lorsbach spoke to Sherrell during his overnight shift at approximately 4:35 a.m. after Sherrell told CO Feldt he felt numbness in his legs. *2018 08 28 0000-0600 207-5, 4:34; Lorsbach Depo. 14:5-8*. During his next shift on August 28 at approximately 8 p.m., CO Lorsbach observed Sherrell receive assistance walking from another inmate. *Lorsbach Depo. 19:7-21:2*. CO Lorsbach did not have any contact with Sherrell again until September 1 at approximately 7 p.m. when he helped move Sherrell to the wheelchair. *Ex. 28, p. 10*. He was aware Sherrell had returned from the hospital and was medically sound. *Id*. CO Lorsbach was not provided any information concerning Sherrell's discharge instructions. *Lorsbach Depo. 27:20-31:7*. He was also instructed that Sherrell should be responsible for his own care. *Id*. Earlier that day, Nurse Skroch repeatedly assessed Sherrell's condition. *Ex. 32, p. 8*. Furthermore, Medical Tech Brewster was there

51

throughout the day and assisted COs with med pass. *Kelly Decl. Ex. 3, Amey Depo. 53:4-22; Ex. 32, pp. 4, 26.*

In addition, CO Lorsbach knew Sherrell had been evaluated by medical staff at the hospitals and by MEnD staff upon his return. Nothing in the record suggests CO Lorsbach had reason to doubt Sherrell was receiving adequate medical care or deliberately disregarded a known risk. While he knew Sherrell was under medical observation, CO Lorsbach did not observe a noticeable change after Sherrell returned from the hospitals. *Lorsbach Depo. 30:24-31:7, 39:8-40:2.* These facts do not demonstrate CO Lorsbach knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

q.  Sergeant Mario Scandinato

Sergeant Scandinato did not personally observe Sherrell's condition prior to going to the emergency room. *Scandinato Depo. 183:8-12.* On the evening of August 31, 2018, CO Gallinger called Sergeant Scandinato and informed him Sherrell was being discharged from Sanford Hospital. *Ex. 28, p. 11.* CO Gallinger told Sergeant Scandinato once Sherrell was informed of the discharge, Sherrell began asking the doctor about possible diagnoses such as STDs, drug use, withdrawals, or dehydrations, to which the doctor said no and that nothing was wrong with him. *Id.* Upon arriving back at the Jail, Sherrell initially told the COs he could stand, but then said he could not because he was having drug

withdrawals. *Scandinato Depo. 72:7-23; 82:3-83:9*. When returning Sherrell to his cell, Sergeant Scandinato observed he otherwise appeared healthy and alert. *Id., 88:24-89:6*. Based on the hospital's discharge of Sherrell, Sergeant Scandinato believed Sherrell might be faking his condition in an attempt to get back to the hospital. *Id., 95:21-96:5; 133:2-6*. Regardless, Sergeant Scandinato continued to conduct welfare checks on Sherrell until the end of his shift in the early morning hours of September 2. *Ex. 28, p. 11*. Nothing in the record shows Sergeant Scandinato observed or was aware of any changes in Sherrell's condition. These facts do not demonstrate that Sergeant Scandinato knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

### r. CO James Foss

Prior to Sherrell's transport to the hospital, CO Foss was aware Sherrell could not move on his own. CO Foss helped lift Sherrell into the squad car for his transport to the hospital on August 31, 2018 at approximately 9:45 a.m. *Ex. 29, p. 13*. CO Foss was informed the hospital had discharged Sherrell and the medical professionals did not find anything wrong with him. *Foss Depo. 32:6-12, 40:1-22*. On September 1, CO Foss did not notice Sherrell was weaker or moving less than on August 31. *Id., 26:9-28:5*. CO Foss did not observe any other drastic changes in Sherrell's condition that warranted a report to his supervisors or MEnD staff. *Id., 35:20-36:21*. In addition to helping him with several tasks, CO Foss regularly

monitored Sherrell on September 1 and 2, as reflected in the Special Watch Log.[2] *Ex. 30, pp. 1-2; Ex. 28, pp. 4-5*. CO Foss never received any information concerning Sherrell's discharge instructions. *Foss Depo. 32:6-12*. Regardless, there was no change in Sherrell's condition between CO Foss's daytime shifts on September 1 and 2. *Id., 47:2-16*. During this time, CO Foss observed Nurse Skroch tell Sherrell she believed he was faking his illness and that Sherrell needed to get up. *Id., 42:11-45:2*. While CO Foss was aware something was going on with Sherrell, he had no reason to believe Sherrell was in crisis. *Id., 52:12-18*. These facts do not demonstrate that CO Foss knew of and disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

s.   CO Mitchell Sella

At the beginning of his shift on the morning of August 31, 2018, Sherrell told CO Sella he could not move. *Ex. 29, p. 13*. CO Sella told Sherrell he was observed moving himself in the wheelchair on surveillance. *Id.* Sherrell replied he could only move while sitting in the wheelchair. *Ex. 29, Id., p. 13; Ex. 30,[3] p. 2*. Multiple COs told Sherrell he was being watched for movement. *See Ex. 28, p. 6*. Sherrell's worsening condition coincided with Sherrell's increasing awareness he was being watched for movement. CO Sella observed CNP Lundblad and Nurse

---

[2] Officer Foss's badge number was 8266. *Foss Depo. 62:19-20*.
[3] Officer Sella's badge number was 8241. *Sella Depo. 5:9*.

Pederson evaluate Sherrell later that morning prior to being transferred to the hospital. *Ex. 29, pp. 13-14.*

On September 1, CO Sella was never made aware of Sherrell's discharge instructions. *Sella Depo. 46:16-47:2.* Sherrell then told COs Sella and Smith illegal drugs were causing his illness. *Ex. 29, p. 14.* Sherrell later asked for a wheelchair so he could practice walking. *Id.* Then, at approximately 2:13 p.m., CO Sella observed Sherrell's medical visit with Nurse Skroch when she accused Sherrell of faking his condition. During that visit, Sherrell told her he believed he was withdrawing from Percocet, heroin, or an STD. CO Sella heard Nurse Skroch tell Sherrell he needed to get up and move. *Sella Depo. 55:3-8.* When CO Sella returned an hour later, Sherrell requested assistance to provide a urine sample. *Ex. 29, p. 14.* CO Sella then spent 15 minutes with Sherrell trying to help him move. *Id., pp. 14-15.* CO Sella did not believe Sherrell was suffering from a medical emergency, did not deliberately disregard a serious medical need, nor doubt Sherrell was receiving adequate medical care. *Sella Depo. 62:10-14.* Accordingly, CO Sella was not deliberately indifferent.

t.   CO Joe Williams

On August 27, 2018, Sherrell complained to CO Williams of chest pains. *Ex. 28, p. 5.* Ten minutes later, MEnD Nurse Pedersen evaluated Sherrell. *Depo. Ex.*

*28, p. 5; Ex. 32, p. 11*. Sherrell then received an EKG, and CO Williams believed the EKG results were normal. *Ex. 28, p. 6; Ex. 32, p. 12*.

On August 29, CO Williams consulted MEnD staff. *Ex. 28, p. 6*. Pursuant to MEnD's instructions, Sherrell was moved to a new cell so he could be monitored on surveillance camera. *Id.* CO Williams believed Sherrell lied when Sherrell told CO Williams he fell from his bunk. *Id.* When reviewing the video, CO Williams saw Sherrell had lowered himself to the floor instead. *Id.* CO Williams then obeyed MEnD instructions to remove the wheelchair and provide Sherrell with a walker to encourage him to move. *Id.*

On August 31, CO Williams noted Sherrell's condition had not improved, the nurse called the doctor, and Sherrell was taken to the hospital for further testing. *Id.* Next, CO Williams assisted Sherrell throughout September 2. *Ex. 29, p. 11*. He never received any information concerning Sherrell's discharge instructions. *Kelly Decl. Ex. 23 Williams Depo. 62:9-63:5*. CO Williams was also present when Nurse Skroch visited Sherrell that morning. *Id., 80:6-82:25*. CO Williams did not believe Sherrell was experiencing a medical emergency until he noticed a change in Sherrell's condition at 4:47 p.m. when Sherrell could no longer speak. *Id., 86:5-14, 92:2-93:4; Ex. 29, p. 12*. Immediately, CO Williams notified MEnD staff. *Id.* These facts do not demonstrate that CO Williams knew of and

disregarded an excessive health risk. Accordingly, he did not act with deliberate indifference.

### u.  Jail Administrator Calandra Allen

The County Defendants acknowledge Captain Allen's request to hold off on sending Sherrell to the hospital on August 30 is viewed with scrutiny in the 20/20 hindsight litigation provides. An official's failure to alleviate a significant risk she should have perceived but did not does not violate the Eighth or Fourteenth Amendment. *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) (*citing Farmer*, 511 U.S. at 838). Further, a CO "may misunderstand important facts ... and assess the legality of his conduct based on that misunderstanding." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 865 (8th Cir. 2006). A CO's mistake must be objectively reasonable. *Id.* at 565 (*quoting United States v. Leon*, 468 U.S. 897, 923 (1984)). When evaluating whether a defendant deliberately disregarded a risk, the court considers the "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the defendant's] position and alternative courses of action that would have been apparent to an official in that position." *Letterman*, 789 F.3d at 862 (*quoting Gregoire*, 236 F.3d at 419).

> ### i.  Jail Administrator Allen did not override a medical decision to bring Sherrell to the Hospital on August 30.

On August 30, 2018, Jail Administrator Allen did not override a medical order or refuse to transport Sherrell to the hospital against the advice of MEnD

staff. When Nurse Pederson relayed Dr. Leonard's recommendation[4] that Sherrell be taken to the hospital for evaluation, Nurse Pederson withheld information from Jail Administrator Allen regarding the details of Sherrell's medical condition due to HIPAA concerns. *Ex. 32, p. 21; Allen Depo. 88:4-89:5*; *Pederson Depo. 48:15-24*. Further, Dr. Leonard did not believe Sherrell was experiencing a medical emergency. *Leonard Depo. 189:20-190:6*. Rather, given Sherrell's "odd presentation" of symptoms, Dr. Leonard wanted him evaluated by an emergency department because it would have additional testing and technological capabilities the Jail did not. *Id., 190:3-6, 200:13-20*.

Because Jail Administrator Allen considered Sherrell a high flight risk, Jail Administrator Allen asked Nurse Pederson if this was an emergency or if a doctor could examine him at the Jail instead. *Allen Depo. 122:9-14, 228:20-229:9*. While Dr. Leonard would have "preferred" Sherrell was evaluated at the emergency department that day, Dr. Leonard spoke with Nurse Pederson and told her they had a medical provider coming the following morning, just 14 hours later. *Leonard Depo. 186:14-18*. After learning that Jail Administrator Allen was concerned about Sherrell as a flight risk, Dr. Leonard told Nurse Pedersen that medical staff could follow up the next morning. *Id., 195:17-196:11*. Nurse Pedersen then told Jail

---

[4] Contrary to Nurse Pederson's testimony, Dr. Leonard testified he cannot "order" anyone be sent to the emergency room, and in this case, it was his recommendation. *Leonard Depo. 186:22-25*.

Administrator Allen a MEnD doctor could examine Sherrell at the Jail the next morning. *Allen Depo. 90:20-91:19; Pederson Depo. 95:10-25*. Jail Administrator Allen agreed with that decision. *Allen Depo. 125:24-126:23*.

Although Nurse Pederson asked Dr. Leonard to call Jail Administrator Allen, Dr. Leonard never intervened and never spoke directly with Jail Administrator Allen, or otherwise attempted to persuade or explain the need for Sherrell's transfer to the hospital. *Pederson Depo. 58:1-12; Leonard Depo. 198:2-13*. Instead, Dr. Leonard accepted the alternative plan to have a MEnD provider evaluate Sherrell the next morning and confirmed they could revisit the situation if anything changed before that time. *Depo. Leonard 193:20-194:9, 198:2-13*. Thus, Jail Administrator Allen did not prevent Sherrell from receiving emergency medical care on August 30. Had MEnD told her it was a medical emergency, Jail Administrator Allen would have immediately arranged for Sherrell's transport. *Allen Depo. 231:3-8*. This is corroborated by the fact Jail Administrator Allen immediately arranged for Sherrell's transport to the emergency room the next morning as soon as Nurse Practitioner Lundblad requested it.

> ii.   Jail Administrator Allen did not deliberately disregard a substantial risk of harm to Sherrell.

As demonstrated above, Jail Administrator Allen did not override a medical recommendation to transport Sherrell for emergency medical care. In addition, there was nothing obvious to Jail Administrator Allen—a layperson—

that suggested Sherrell required emergency medical care. Even Dr. Leonard, the medical professional who recommended he go to the emergency room, did not believe Sherrell needed emergency care and agreed that Sherrell would be seen at the Jail the next morning.

Additionally, "[d]etainee[s] simply do not possess the full range of freedoms of ... unincarcerated individual[s]." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979).This is because courts must "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441 U.S. at 548. Accordingly, jail administration has "substantial discretion to devise reasonable solutions to the problems they face," particularly when safety and security interests are at stake. *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012).

In this instance, Jail Administrator Allen had legitimate security and safety concerns. After speaking with Sherrell's probation officer, Administrator Allen knew Sherrell was a high flight risk. Law enforcement records demonstrate Sherrell had repeatedly fled on foot and hid from the police, given false names to police, failed to appear in court, and swindled innocent victims. He also posed a

threat to safety, having committed dangerous felonies, including child endangerment and domestic aggravated assault. In addition, Administrator Allen knew several inmates had escaped from the Jail in the past. In fact, one had done so just months earlier during transport after demanding to go to the emergency room. Moreover, Sherrell's symptoms were admittedly odd and resembled those faked by a previous inmate to get to the hospital. Here, Jail staff had seen Sherrell moving his legs and arms. *Allen Depo. 120:6-12*. The possibility Sherrell might be faking his symptoms increased the risk he might attempt to flee if transported to the hospital. Even Dr. Leonard acknowledged Administrator Allen was forced to weigh information regarding Sherrell's "bizarre" condition against her "serious concerns" about the patient's security. *Id., 191:4-193:7*.

Considering these significant safety and security concerns, Administrator Allen's decision to have MEnD examine Sherrell the next morning was reasonable. This is particularly true because MEnD staff did not inform Administrator Allen that Sherrell needed immediate emergency care. Thus, even if Administrator Allen's actions were somehow deemed unreasonable, the record is clear she did not actually know Sherrell needed emergency care. Thus, she did not exhibit any deliberate indifference to Sherrell. Consequently, this claim must be dismissed against Administrator Allen.

          iii.     Any delay in going to the hospital did not detrimentally affect Sherrell's treatment or cause his death.

Even assuming Jail Administrator Allen's August 30, 2018 decision caused a delay in Sherrell's medical treatment, Plaintiff cannot show the delay had a detrimental effect. It is far too attenuated, with many intervening events, to establish the decision was a direct cause of Sherrell's death.

"To prevail on a claim that a delay in medical care constituted cruel and unusual punishment, an inmate must show . . . that a delay in medical treatment rises to the level of an Eighth Amendment violation," and "the objective seriousness of the deprivation" is "measured by reference to the effect of delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (quotation omitted). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id.* The objective portion of the deliberate indifference standard requires a showing of "verifying medical evidence" that the defendants ignored an acute or escalating situation, or that delays adversely affected the prognosis given the type of injury in this case. *Dulany v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997). Proof of causation by experts is required when a plaintiff complains about treatment of a sophisticated injury. *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002).

Here, Sherrell was thoroughly evaluated by two hospitals the next day. Neither hospital found anything wrong with him. Because there was no diagnosis

or treatment given at the hospital, any opinion Sherrell's life may have been saved had he been transferred to a hospital sooner is purely speculative, which cannot survive summary judgment. *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014). Finally, Plaintiff's own expert admits the delay did not cause Sherrell's death. Leslie Zun concluded that, had Sherrell been properly evaluated and admitted to the hospital, he would have recovered from his condition, regained independent respiratory function, and not died. *Kelly Decl. Ex. 69 Zun Report, p. 8.*

## II.   PLAINTIFF FAILS TO ESTABLISH PLAUSIBLE *MONELL* AND *CITY OF CANTON* CLAIMS.

Plaintiff asserts *Monell* and *City of Canton* claims against the County. Both claims require an underlying constitutional violation. *Ivey v. Audrain Cty., Mo.*, 968 F.3d 845, 851 (8th Cir. 2020); *see also Schulz v. Long*, 44 F.3d 643, 650 (8th Cir. 1995). Because no constitutional violation occurred, both claims warrant dismissal. In addition, "granting qualified immunity to the individual officer[s] necessarily forecloses liability against the municipality." *Roberts v. City of Omaha*, 723 F.3d 966, 976 (8th Cir. 2013). Finally, a mere policy violation does not constitute a constitutional violation. *See Edwards v. Baer,* 863 F.2d 606, 608 (8th Cir.1988).

Even if the Court determined a constitutional violation occurred and qualified immunity did not apply, it must evaluate whether an unconstitutional policy or custom caused the harm. Here, Plaintiff alleges the County had policies of inadequately supervising and training its employees, detaining severely ill

inmates instead of admitting them to the hospital, and inadequately supervising severely ill inmates. *Doc. 30, ¶¶ 65-68*. This is not enough.

First, Plaintiff's "boilerplate allegations [*Doc. 30, ¶¶ 63-71*] asserting the mere generic elements of a *Monell* claim without any factual allegations specific to this case … are insufficient." *D.B. v. Hargett*, No. CIV. 13-2781 MJD/LIB, 2014 WL 1371200, at *6 (D. Minn. Apr. 8, 2014). Second, these vague assertions are simply untrue. Training records demonstrate that Jail staff were trained on medical issues and recognition of emergency situations. *Allen Decl. Ex. 4, pp. 1-167; see Allen Depo. 257:24-258:20; Amey Depo. pp. 6-9; Depo. Carraway 63:1-11; Davis Depo., pp. 6, 42; Feldt Depo. 72:19-73-4*. In fact, County Policy 310.2.1 required COs to receive medical training consistent with Minn. R. 2911.1350, including the recognition of signs and symptoms of emergency situations and procedures for inmate transfers to appropriate medical facilities or other health care providers. *Kelly Decl. Ex. 61 Beltrami County Manual, pp. 92-93*. The fact medical professionals could not even pinpoint a diagnosis belies any argument Jail staff were inadequately trained. Similarly, there is no evidence the COs were inadequately supervised. Instead, they adhered to orders from their superiors and instructions from MEnD staff.

Even if Plaintiff could show the Jail inadequately supervised its employees, Plaintiff cannot show this occurred as a part of an unconstitutional policy or custom. A 'policy' is an official policy, a deliberate choice of a guiding principle or

procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge,* 165 F.3d 1197, 1204 (8th Cir. 1999). Plaintiff challenges just one policy—providing the discharge instructions to MEnD staff directly. This, however, is not unconstitutional. By providing the discharge instructions directly to MEnD staff, the Jail preserved private inmate health information and reasonably relied on MEnD staff to relay any pertinent information to Jail staff necessary for their care.

Meanwhile, a custom requires the "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." *Marks v. Doe 1,* 528 F. Supp. 3d 1008, 1013 (D. Minn. 2021). The unconstitutional practice must become "so 'permanent and well settled' as to have the effect and force of law." *Id. (citing Jane Doe A ex rel. Jane Doe B v. Special Sch. Dist. St. Louis Cty.,* 901 F.2d 642, 646 (8th Cir. 1990)). To do so, Plaintiff must "show prior incidents of factually similar unconstitutional conduct." *Id.; see Mettler*, 165 F.3d at 1205. However, Plaintiff has not known any other instances of similar conduct. Accordingly, these claims fail.

In addition, Plaintiff "must demonstrate the County had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Parrish v. Ball*, 594 F.3d 993, 997–98 (8th Cir. 2010) (citation omitted). Yet, Plaintiff has not sufficiently alleged that "similar incidents of unconstitutional

conduct 'occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials.'" *Marks*, 528 F. Supp. 3d at 1014 *(quoting Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 829 (8th Cir. 2013)). A governmental entity "may not be found to have been deliberately indifferent to or to have tacitly authorized conduct of which it was unaware." *P.H. v. Sch. Dist. of Kansas City*, 265 F.3d 653, 659 (8th Cir. 2001). Accordingly, Plaintiff has not plausibly alleged the County's policymaking officials "made a deliberate choice to ignore alleged violations." *Armstrong v. Minneapolis*, 525 F. Supp. 3d 954, 964 (D. Minn. 2021). As a result, Plaintiff's *Monell* and *City of Canton* claims must be dismissed.

## III.    PLAINTIFF'S WRONGFUL DEATH CLAIM MUST BE DISMISSED.

### A. Plaintiff's Wrongful Death Claim is Barred by Official Immunity and Vicarious Official Immunity.

Plaintiff claims the County Defendants breached their duty of care by refusing to transfer Sherrell to the hospital, and failing to follow the discharge instructions and to transfer him back to the hospital. *Doc. 30, ¶ 73.* But Plaintiff's state law claim is barred by official immunity.

Under Minnesota law, a public official is entitled to official immunity from state law claims when the official's duties require the exercise of discretion or judgment. *Dokman v. Cty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (citing *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)). In analyzing an

official's claim to immunity, the Court asks (1) whether the official's challenged acts were discretionary or ministerial, and (2) whether the challenged acts, "even though of the type covered by official immunity, were malicious or willful and therefore stripped of the immunity's protection." *Id.* (citing *Davis v. Hennepin County*, 559 N.W.2d 117, 122 (Minn. Ct. App. 1997)); *see Elwood v. Rice Cty.*, 423 N.W.2d 671, 677 (Minn. 1988).

"A discretionary act is one for which an official must exercise 'judgment or discretion.'" *Dokman*, 637 N.W.2d at 296 (quoting *Johnson v. State*, 553 N.W.2d 40, 46 (Minn. 1996)). By contrast, a ministerial act "involves merely the execution of a specific, absolute duty." *Id.* (citing *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998)). When MEnD medical staff recommended Sherrell receive further medical evaluation, Administrator Allen used her professional judgment on how to deliver that recommended care based on the information provided. In doing so, Allen called Sherrell's probation officer, discussed Sherrell's treatment options with Nurse Pederson, and instructed Jail staff to follow MEnD instructions. Even if the evidence demonstrates Allen elected to keep Sherrell at the Jail on August 30, that decision would also be discretionary, because it weighed the need for additional medical testing against security and safety concerns.

Similarly, the other individual Beltrami County Defendants exercised discretion when dealing with Sherrell. For instance, these individuals had to

determine whether Sherrell's condition changed or worsened. Plaintiff admits these actions were discretionary. On one hand, Plaintiff argues Jail staff should have deferred to the medical recommendation to send Sherrell to the hospital on August 30, and on the other, contend that they should have recognized the need to return Sherrell to the hospital contrary to his medical diagnosis and MEnD's recommendations on September 1 and 2.

Nor is there any evidence the County Defendants acted maliciously. As shown above, none of the County Defendants subjectively were aware of and disregarded a substantial health risk. For purposes of official immunity, malice "means intentionally committing an act that the official has reason to believe is legally prohibited." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999). A finding of malice "must be based on 'specific facts evidencing bad faith,'" not conclusory allegations. *Semler v. Klang*, 743 N.W.2d 273, 279 (Minn. Ct. App. 2007) (quoting *Reuter v. City of New Hope*, 449 N.W.2d 745, 751 (Minn. Ct. App. 1990)). Thus, the County Defendants are entitled to official immunity.

Finally, a county employer is entitled to vicarious official immunity when its employees are found to have official immunity. *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998). Because the County's liability arises from the same conduct for which the COs are immune, the County is entitled to vicarious official immunity.

### B. Plaintiff's Wrongful Death Claim Fails for Lack of Duty, Breach, and Causation.

A CO's duty "arises when the jailer knows or, in the exercise of reasonable care, should know of the danger." *Cooney v. Hooks*, 535 N.W.2d 609, 611 (Minn. 1995). The law only imposes a duty on a defendant where a specific harm was foreseeable. *See Sandborg v. Blue Earth Cty.*, 615 N.W.2d 61, 64 (Minn. 2000) (observing that, even in the "special" "jailer-detainee" context, a jailer only has a duty to protect the detainee against a "known possibility of self-inflicted harm"). "Foreseeability" should be decided by a court as part of its "duty" analysis in all but "close cases." *Domagala v. Rolland*, 805 N.W.2d 14, 27 (Minn. 2011). "To determine whether the risk of injury to the plaintiff is 'foreseeable,'" Minnesota courts "'look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility.'" *Doe 169 v. Brandon*, 845 N.W.2d 174, 178 (Minn. 2014).

Here, Plaintiff argues the County Defendants breached duties to bring Sherrell to the hospital, follow the discharge instructions to return him to the hospital, and to prevent him from deteriorating. *Doc. 30, ¶ 73*. However, no duty existed because the harm was not reasonably foreseeable.

None of the County Defendants subjectively believed Sherrell required emergency care until they checked on him at 4:46 p.m. on September 2. Nor should

they have. Before Sherrell went to the hospital, Jail staff reported their observations to MEnD staff and were told Sherrell would be seen by a MEnD doctor on August 31. Similarly, Administrator Allen was not told Sherrell required emergency care when she agreed to the alternative of having a MEnD doctor see him the next morning. This was especially reasonable given Sherrell's status as a high flight risk.

Likewise, the County Defendants cannot be liable for failing to follow the discharge instructions when they were not privy to their contents—either directly or indirectly through MEnD staff.[5] Nurse Pederson explained the discharge instructions were not the "officers' business" unless there was a safety issue. *Pederson Depo. 68:12-70:14*. Instead, the COs were simply instructed to alert medical staff if there was any change in Sherrell's condition. *Skroch Depo. 172:8-173:9; Amey Depo. 55:17-56:6*.

Once Sherrell returned from the hospital, the County Defendants did not have a duty to return him to the hospital because they reasonably relied on the

---

[5] Plaintiff's reliance on the discharge instructions is misguided, as Dr. Leigh admitted they were merely a template for patients experiencing weakness. *Leigh Depo. 40:9-19*. Further, Sherrell had already reported having many of the symptoms listed on the discharge instructions that would warrant a return to the hospital. *Compare Ex. 33, p. 9, with Ex. 33, p. 24, Ex. 29, pp. 3, 6, Ex. 32, pp. 2, 11, 18-21, Ex. 58, and Ex. 59*. Thus, experiencing these symptoms would not have constituted a change in Sherrell's condition. Conversely, Sherrell never exhibited the other symptoms listed on the discharge instructions—either before or after his hospital visit.

physician's diagnosis and MEnD staff and did not observe any changes in his condition. Thus, the County Defendants did not have a duty to bring Sherrell to the hospital on August 30, adhere to the discharge instructions, or return him to the hospital. Without a duty, there is no breach either.

Finally, Plaintiff cannot show that these alleged breaches caused Sherrell's death. As discussed above, Plaintiff's own expert admits the delay in going to the hospital did not cause Sherrell's death. Leslie Zun opines Sherrell would have regained independent respiratory function and survived if he had been properly evaluated and admitted to the hospital on August 31. *Ex. 69, p. 8*. Similarly, arguing a third hospital visit would have uncovered Sherrell's condition and allowed him to recover is purely speculative, which does not suffice to show causation. Consequently, even if official immunity does not apply, Plaintiff's wrongful death claim fails on the merits and must be dismissed.

## CONCLUSION

While Sherrell's death is undoubtedly tragic, that does not mean the County Defendants violated the Constitution. Rather, they reasonably relied on the assessments and instructions of medical professionals and cared for Sherrell as best they could. It is unreasonable to expect COs with no professional medical training to know Sherrell required emergency medical care when multiple medical professionals, CT scans, and MRIs determined he did not. Accordingly, the

County Defendants request the Court grant their Motion for Summary Judgment, and dismiss Plaintiff's claims in their entirety, with prejudice, together with costs and disbursements.

Dated: June 1, 2022

 s/ Julia C. Kelly
Jason M. Hiveley, #311546
Stephanie A. Angolkar, #388336
Julia C. Kelly, #392424
Aaron M. Bostrom, #401773
IVERSON REUVERS
9321 Ensign Avenue South
Bloomington, MN  55438
(952) 548-7200
jasonh@iversonlaw.com
stephanie@iversonlaw.com
julia@iversonlaw.com
aaron@iversonlaw.com

*Attorneys for Beltrami County and its employees: Jail Administrator Calandra Allen; Assistant Jail Administrator Andrew Richards; Programs Director Edward Busta; Sergeants Tyler Carraway, Anthony Derby, and Mario Scandinato; and COs Melissa Bohlmann, Jared Davis, Dana Demaris, Brandon Feldt, James Foss, Daniel Fredrickson, Chase Gallinger, Holly Hopple, Nicholas Lorsbach, Erin Meyer, Mitchell Sella, Christopher Settle, Marlon Smith, Jacob Swiggum, and Joseph Williams*