UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Del Shea Perry,                                   Case Number.: 19-cv-02580 (KMM-LIB)

        Plaintiff,

v.

Beltrami County, et al.,

        Defendants.

---

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

### INTRODUCTION

On September 2, 2018, Hardel Harrison Sherrell ("Mr. Sherrell") passed away while incarcerated at Beltrami County Jail ("BCJ"). While tragic, it was not the result of a constitutional violation, but instead, the result of a progressive neurological disorder that unfortunately went undetected by two emergency department physicians, even after thorough evaluations, assessments, radiologic studies, and observations at two different hospitals.

Defendants Dr. Todd Leonard, Crystal Pederson, Michelle Skroch, Madison Brewster, and MEnD Correctional Care, PLLC (collectively "the MEnD Defendants") provided significant, and sufficient, cares for Mr. Sherrell during his short period of incarceration at BCJ. Plaintiff contends that the MEnD Defendants were deliberately indifferent to Mr. Sherrell's serious medical need in violation of his Fourteenth Amendment right to medical care, yet the record establishes otherwise. It establishes that MEnD Defendants visited and assessed Mr. Sherrell daily, required BCJ staff to monitor him, advocated for him to be sent

to the emergency room, and advocated for him to be seen by a neurologist despite Sanford Fargo's discharging diagnosis of malingering. Because Plaintiff cannot establish a Fourteenth Amendment violation as a matter of law, Plaintiff's direct Fourteenth Amendment claim fails, and thus necessarily her *Monell* claim fails. The MEnD Defendants bring this motion for partial summary judgment, which, when viewed in light of the record, should be granted.

**UNDISPUTED MATERIAL FACTS**

On August 24, 2018, Mr. Sherrell was transferred from Dakota County Jail to Beltrami County Jail. (Novak Declaration, Ex. A at MEND 00116). Mr. Sherrell was booked shortly after by a BCJ Correctional Officer ("CO"). (Ex. A at MEND 00116).

### A. Relevant Medical Encounters.

#### 1. August 25 through August 28, 2018.

While incarcerated, the medical clinic saw Mr. Sherrell daily. On August 25, 2018, Nurse Crystal Pederson ("Nurse Pederson") completed an initial health assessment of Mr. Sherrell. (Ex. A at MEnD 00103). Nurse Pederson took Mr. Sherrell's vitals and discussed his medical history. (Ex. A at MEND 00103-104). Other than his high blood pressure and history of migraines, Mr. Sherrell's assessment did not raise any concerns. (Ex. A at MEND 00103-104). MEnD staff continued to monitor his vitals over the next few days. (Ex. A at MEND 00103-104). On August 26, 2018, Mr. Sherrell requested Health Tech Madison Brewster ("Health Tech Brewster") take his blood pressure during medical pass, so she took his blood pressure. (Ex. H at 15:16-24, *see also* Ex. A at MEND 00124)[1]. On August 27, 2018, Nurse

---

[1] Madison Brewster is now formally known as Madison Amey. As such, she may be referred to her new name in her deposition transcript.

Pederson assessed Mr. Sherrell. (Ex. A at MEND 00112). Mr. Sherrell reported experiencing sharp pain on the left side of his chest and back pain that commenced *months* prior. (Ex. A at MEND 00112)(emphasis added). Nurse Pederson took Mr. Sherrell's vitals and ran an electrocardiogram ("EKG"). (Ex. A at MEND 00112). She testified that she ran an EKG to rule out sciatica. (Ex. G at 44:3-12). Nurse Pederson noted the EKG was abnormal, citing "probable inferior infarct." (Ex. A at MEND 00113). Nurse Pederson discussed her assessment with Dr. Leonard and Dr. Leonard ordered that Mr. Sherrell should be seen during medical rounds. (Ex. A at MEND 00112, 115).

On August 28, 2018, Nurse Pederson assessed Mr. Sherrell. (Ex. A at MEND 00122). Mr. Sherrell informed Nurse Pederson that he fell getting out of bed that morning. (Ex. A at MEND 00122). Mr. Sherrell reported experiencing back pain and right arm numbness. (Ex. A at MEND 00122). Nurse Pederson took his vitals, which indicated a slightly high blood pressure reading and pulse. (Ex. A at MEND 00121). Nurse Pederson discussed her assessment with Dr. Leonard who prescribed Mr. Sherrell various medications and ordered blood pressure work should be conducted if Mr. Sherrell was incarcerated at BCJ for longer than a week. (Ex. A at MEND 00111, 122). Due to Mr. Sherrell's complaint of falling from his bank, Nurse Pederson directed correctional staff to move Mr. Sherrell to a lower bunk. (Ex. A at MEND 00122).

### 2. August 29, 2018.

On August 29, 2018, a CO called Nurse Pederson, as the on-call nurse, and informed her that Mr. Sherrell expressed experiencing numbness in his legs. (Ex. A at MEND 00119, Ex. G at 122:20-123:15). Nurse Pederson instructed the CO to place him in medical

segregation until the oncoming nurse could assess him upon her arrival. (Ex. A at MEND 00119-120). Nurse Cassandra Lindell ("Nurse Lindell") assessed Mr. Sherrell. (Ex. A at MEND 00121). Mr. Sherrell reported numbness around his umbilical region that went downward but stated he had control of his bowel and bladder. (Ex. A at MEND 00121). Nurse Lindell took his vitals. (Ex. A at MEND 00121). Nurse Lindell relayed her observations and assessment to Dr. Leonard. (Ex. A at MEND 00121). Dr. Leonard testified about his conversation with Nurse Lindell. (Ex. J at 167:25-171:25). He remembers there was contradiction between Mr. Sherrell's subjective complaints and what Nurse Lindell witnessed and observed.  (Ex. J at 167:25-171:25). Dr. Leonard ordered medical segregation, 24-hour activity watch by BCJ, and that Mr. Sherrell use a walker rather than a wheelchair to encourage physical activity. (Ex. J at 167:25-171:25, *see also* Ex. A at MEND 00121).

### 3. *August 30, 2018.*

On August 30, 2018, at or around 0740, Nurse Pederson assessed Mr. Sherrell. (Ex. A at MEND 00123). She took his vitals which indicated an elevated blood pressure reading of 168/109, a pulse of 92, and an oxygen saturation level of 98%. (Ex. A at MEND 00123). He reported that he was numb from the waist down, had urinated on himself, and refused his medications because he was unable to swallow. (Ex. A at MEND 00123). Nurse Pederson ran a thermometer along the bottom of his feet and observed no movement. (Ex. A at MEND 00123). Mr. Sherrell also reported that his throat was swollen but Nurse Pederson did not observe any swelling around his neck. (Ex. A at MEND 00123). Nurse Pederson testified to telling Mr. Sherrell that she was going to fight for him to go to the hospital. (Ex. G at 83:3-5).

Nurse Pederson contacted Dr Leonard to discuss her assessment, which is confirmed by Dr. Leonard's testimony (Ex. A at MEND 00123, *see also* Ex. J at 181:1-16, 182:16-186:18). Dr. Leonard found Mr. Sherrell's complaints and Nurse Pederson's assessment to be concerning, so he ordered Mr. Sherrell be sent to the emergency room via ambulance ("ER"). (Ex. A at MEND 00123, *see also* Ex. G at 125:6-21, *see also* Ex. J at 181:1-16, 186:19-25). Dr. Leonard testified that he continued to contemplate Mr. Sherrell's symptoms after he ended the call with Nurse Pederson. (Ex. J at 190:15-191:8).

After ending the call, Nurse Pederson immediately found BCJ Administrator Callandra Allen ("Captain Allen") to inform her of Dr. Leonard's order. (Ex. G at 46:16-47:21). Nurse Pederson testified that she informed Captain Allen that Mr. Sherrell "is rapidly declining and we need to get him in immediately" and asked for him to be transferred by ambulance. (Ex. G at 48:22-49:9) At 1330, Captain Allen informed Nurse Pederson that she had overridden Dr. Leonard's orders to send Mr. Sherrell to the ER. (Ex. A at MEND 00123). Nurse Pederson testified that she attempted to convince Captain Allen to follow Dr. Leonard's orders at least three times. (Ex. G at 57:9-14). Nonetheless, Captain Allen explained to Nurse Pederson that Mr. Sherrell was seen using his arms and legs without difficulty and expressed a belief that Mr. Sherrell was attempting to escape. (Ex. A at MEND 00123, *see also* Ex. G at 51:16-52:11, 54:2-56:11). Nurse Pederson provided an explanation for each reason that Captain Allen raised:

> Q.  Meaning that you were trying to convince her to follow Dr. Leonard's direction?
>
> A.  Anything we could, yes.

(Ex. G at 51:16-52:11). Nurse Pederson continued to plead with Captain Allen, explaining:

A.     That I really felt uncomfortable with the patient there, that I had saw
       such a decline, that I had reached out to the provider. And I did tell her
       are you -- you know me. I wouldn't do this unless I really thought he
       needed to go.

(Ex. G at 57:20-25). Nurse Pederson actually testified to "begging" Captain Allen to change

her mind. (Ex. G at 58:18-59:15). While Nurse Pederson advocated for Mr. Sherrell to be sent

the emergency room, Nurse Pederson testified that the COs advocated against sending Mr.

Sherrell to the ER, for reasons similar to those raised by Captain Allen. (Ex. G at 56:7-11).

Nurse Pederson called Dr. Leonard to inform him that Captain Allen denied his orders

for medical transport to the ER due to "safety concerns."  (Ex. A at MEND 00123, *see also*

Ex. J at 191:9-193:2). Nurse Pederson was upset with Captain Allen's decision. (Ex. J at 191:9-

193:2).

At 1425, Nurse Pederson returned to Mr. Sherrell's cell. (Ex. A at MEND 00141).

Nurse Pederson testified that she held Mr. Sherrell's hand while informing him that he was

not going to the ER but would be seen by a provider the following day. (Ex. G at 82:20-83:11,

*see also* Ex. A at MEND 00141). Nurse Pederson also documented that Mr. Sherrell needed to

continue to be monitored. (Ex. A at MEND 00123). Nurse Pederson further testified that she

heard BCJ COs state that Mr. Sherrell was faking it. (Ex. G at 133:14-134:25).

### 4.  *August 31, 2018.*

On August 31, 2018, at or around 1020, CNP Stephanie Lundblad ("CNP Lundblad")

saw Mr. Sherrell for a provider visit. (Ex. A at MEND 00125). Upon observation of facial

drooping, slurred speech, right-side muscle weakness, and clammy skin, CNP Lundblad

observed the possibility that Mr. Sherrell had suffered a stroke and ordered Mr. Sherrell to the

emergency room for a full workup. (Ex. A at MEND 00125, *see also* Ex. J at 203:21-25). She

6

diagnosed him with uncontrolled hypertension. (Ex. A at MEND 00125). Dr. Leonard testified that CNP Lundblad called him to relay her observations. (Ex. J at 203:2-206:19). CNP Lundblad informed Dr. Leonard of her plan of care and Dr. Leonard once again agreed with CNP Lundblad's decision to send Mr. Sherrell to the ER.  (Ex. J at 203:21-206:19).

Nurse Pederson testified that before Mr. Sherrell went to the hospital, she was present with him, in fact on her hands and knees cleaning and changing him. (Ex. G at 83:11-14). She also placed him in his wheelchair and put a blanket across him to prevent him from falling forward. (Ex. G at 83:11- 22). She further testified that after the decision was made for medical transport, she continued to talk with him while helping him onto the gurney to be transported to the hospital. (Ex. G at 83:11- 22).

Mr. Sherrell was transported from BCJ to the Bemidji Sanford Medical Center ("Bemidji Sanford") by a Court Deputy and Sergeant Shane Gustafson. (Ex. C at BELTRAMI 461-465).

Mr. Sherrell presented to the emergency department at Bemidji Sanford and was seen by Dr. Hari Khalsa. (Ex. A at MEND 00200). Mr. Sherrell informed the ER nurses that he had fallen from his bed "four days ago" and was scared. (Ex. A at MEND 00201, Ex. C at BELTRAMI 461-465). Dr. Khalsa noted the following observations: Mr. Sherrell's upper extremities were weak, but he could move them if there is no resistance, and Mr. Sherrell exhibited a facial droop. (Ex. A at MEND 00200). Dr. Khalsa ordered four CT scans of Mr. Sherrell which included his head, spine, abdomen, and chest. (Ex. A at MEND 00200).  Dr. Khalsa documented that he considered various differential diagnoses including "[c]ord compression, fracture, contusions, malingering, Bell's palsy, CVA, dissection," but ultimately

diagnosed Mr. Sherrell with weakness of both lower extremities, lower extremity numbness, upper extremity weakness, and a facial droop. (Ex. A at MEND 00200).   Dr. Khalsa wanted to rule out cord compression with an MRI. (Ex. A at MEND 00200). Sanford Bemidji was unable to perform an MRI, so they transferred Mr. Sherrell to another hospital for a work-up, Sanford Hospital in Fargo, North Dakota ("Sanford Fargo"), via ambulance. (Ex. A at MEND 00200). CO Gallinger arrived at Sanford Bemidji to help transport Mr. Sherrell to Sanford Fargo. (Ex. F at 27:19-28:18).

Mr. Sherrell presented to the (second) emergency department at Sanford Fargo and was seen Dr. Dustin Leigh. (Ex. A at MEND 00175). Dr. Leigh noted Mr. Sherrell presented with pain in his neck and back and numbness in his leg. (Ex. A at MEND 00197). Dr. Leigh also noted a concern that Mr. Sherrell was developing bilateral upper and lower extremity weakness and a right-sided lower facial droop. (Ex. A at MEND 00197).  Mr. Sherrell stated he could "flick" his arms and legs but could not hold them up against gravity. (Ex. A at MEND 00197).

Mr. Sherrell underwent four MRI scans. (Ex. A at MEND 00185-196, *see also* Leigh Tr. at 105:10-105:13). Dr. Leigh determined that his brain and spinal cord revealed no abnormality. (Ex. A at MEND 00185-196). In his emergency note, Dr. Leigh documented that a CO informed him Mr. Sherrell had been observed on camera moving his extremities without difficulty. (Ex. A at MEND 00198-199, *see also* Leigh Tr. 77:3-25). Dr. Leigh testified that he had the ability to refer an ER patient to a neurologist, he did not refer Mr. Sherrell due to the COs observations and MRI findings. (Leigh Tr. at 30:6-32:18).

Dr. Leigh concluded that "after a prolonged period of observation [a]t the emergency department I do not find a cause for *acute progressive neurologic condition* warranting emergent hospitalization." (Ex. A at MEND 00198-199)(emphasis added). Dr. Leigh diagnosed Mr. Sherrell with malingering and weakness. (Ex. A at MEND 00132). Malingering is defined as "falsification or profound exaggeration of illness (physical or mental) to gain external benefits such as avoiding work or responsibility, seeking drugs, avoiding trial (law), seeking attention, avoiding military services, leave from school, paid leave from a job, among others." [2]

Upon discharge, Dr. Leigh provided a print-out of standard/template discharge instructions to the COs associated with "weakness," also known as fatigue. (Ex. A at MEND 00198-199). The template emphasized the difference between true weakness and weakness/fatigue:

> It is important to understand the difference between true weakness (real weakness from a nerve or brain problem) and the more common problem of fatigue. These words might seem similar but they do mean very different problems:
>
> - Fatigue: When a person is describing fatigue, they may feel tired out very with just a little activity. They may also say they are feeling tired, sleepy, easily exhausted and unable to do normal daily activities because they don't seem to have enough energy.
> - True Weakness: When someone has true weakness, it means that their muscles are not working right. For example, a leg might be truly weak if you can't support your weight on it or if you can't get up from a chair because the thigh muscles aren't strong enough.

(Ex. A at MEND 00132-135). The template also included the following instructions:

---

[2] Alozai Uu, McPherson PK. Malingering. [Updated 2021 Jul 24]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2022 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK507837/

YOU SHOULD SEEK MEDICAL ATTENTION IMMEDIATELY, EITHER HERE OR AT THE NEAREST EMERGENCY DEPARTMENT, IF ANY OF THE FOLLOWING OCCURS:

• Confusion, coma, agitation (becoming anxious or irritable).
• Fever (temperature higher than 100.4°F / 38°C), vomiting.
• Severe headache.
• Signs of stroke (paralysis or numbness on one side of the body, drooping on one side of the face, difficulty talking).
• Worsening weakness, difficulty standing, paralysis, loss of control of the bladder or bowels or difficulty swallowing.

(Ex. A at MEND 00132-135).

After detailed work-ups and evaluations (with diagnostics) by two different hospitals, Sanford Fargo medically cleared Mr. Sherrell, and he was discharged to BCJ at 2200. (Ex. A at MEND 00148). Dr. Leigh testified that he understood he was not transferring Mr. Sherrell to the care of another medical provider. (Leigh Tr. at 107:6-25). He further testified that if Mr. Sherrell's condition remained the same, which included weakness, difficulty with upper and lower extremities, difficulty swallowing, and a facial droop, a referral for a neurology consultation would have been reasonable. (Leigh Tr. at 106:21-107:5).

At the time of discharge, CO Gallinger testified that he and CO Fredrickson had to help Mr. Sherrell off of the hospital gurney onto the wheelchair because Mr. Sherrell stated he could not do it on his own. (Ex. F at 68:2-12). CO Gallinger further testified that he and CO Fredrickson also had to lift Mr. Sherell from the wheelchair into their squad car. (Ex. F at 74:23-75:7). The COs then transported him back to BCJ. (Ex. A at MEND 00148). CO Gallinger testified that Mr. Sherrell asked the COs to stop multiple times on the way home, which is an indication that an inmate may try to escape. (Ex. F at 93:18-94:18). CO Fredrickson

testified that Mr. Sherrell continued to express his lack of strength while transporting him to BCJ. (Ex. D at 48:15-22).

5. *September 1, 2018.*

The officers arrived to BCJ in the early hours of September 1. Gallinger testified that Mr. Sherrell's condition did not worsen during the transport. (Ex. F at 92:20-93:10). CO Gallinger testified that upon their arrival, CO Feldt and Sergeant Scandinato met them in the garage. (Ex. F at 94:24-95:18). Mr. Sherrell told the COs that he could walk if they would open the door for him. (Ex. F at 94:24-95:18). CO Gallinger testified that Mr. Sherrell went limp while CO Fredrickson attempted to help him out of the squad car. (Ex. F at 95:17-96:17). CO Gallinger further testified that he assisted Mr. Sherrell, by grabbing one arm, placing him into a wheelchair and rolling him to cell 214. (Ex. F at 95:17-96:17). Mr. Sherrell was to be placed in cell 214 for observation. (Ex. A at MEND 00148, 000153). While the COs wheeled Mr. Sherrell to the cell, CO Gallinger testified that Mr. Sherrell's head was tilted back. (Ex. F at 160:7-161:3). Although CO Gallinger did not form an opinion about Mr. Sherrell's ability to hold his head up, he testified that Mr. Sherrell's head position at BCJ was no different from his head position when he was discharged from Sanford Fargo. (Ex. F at 161:4-163:11). Once they reached cell 214, CO Gallinger testified that Mr. Sherrell slowly slid out of his wheelchair, so he placed him on his mattress. (Ex. F at 96:12-17).

At or around 0800, Mr. Sherrell informed Health Tech Brewster that he was on drugs while in jail and that was what caused him to get sick. (Ex. A at MEND 00106). Health Tech Brewster provided Mr. Sherrell with a specimen cup to obtain a urine drug screening. (Ex. A at MEND 00106). At 1210, Health Tech Brewster returned to Mr. Sherrell's cell, but the

specimen had not been provided. (Ex. A at MEND 00106). In response to questioning whether Nurse Michelle Skroch ("Nurse Skroch") informed her of the discharge instructions, she testified: "I was informed *along with the correctional staff* that if there's changes, to get ahold of them, to get ahold of the on-call nurse or emergency services if necessary, like, if that were to come." (Ex. H at 55:17-56:6)(emphasis added).

Prior to assessing Mr. Sherrell, Nurse Skroch reviewed the discharge instructions from Dr. Leigh which indicated a formal diagnosis of malingering. (Ex. A at MEND 00109). Nurse Skroch testified that she also reviewed Mr. Sherrell's chart and previous notes from the medical clinic. (Ex. I at 36:9-22, 42:22-43:5). At or around 1300, Nurse Skroch visited Mr. Sherrell's cell to assess him. (Ex. A at MEND 00109). Although she did not obtain his vitals, she assessed him and observed the following:

A.     Well, I was able to observe that he was able to communicate with me in full sentences, he was not short of breath or having to take breaks in between words that he spoke, he could speak clearly in a normal tone, he wasn't sweating, he wasn't shaking, he wasn't tremorous, he wasn't -- he did not have any agonal breathing, he was not bleeding, he was not -- his pants were not saturated from any soiling himself.

I could see -- I mean, he was laying there talking to me comfortably in a sense that he wasn't grimacing or guarding or complaining of any pain. He wasn't flinching in pain. These are all key things for an assessment.

I was able to assess his neurological standpoint, that he did not show any signs of confusion or delirium or hallucinating. When I told him that he needs to try to get up to move, he moved his hips back and forth, he moved his hands and feet, you know, and said, "Yup, I'm trying." And so I saw him moving. So there is a lot of data that I was able to collect without having to get hands on him to see that.

And not to mention, the officers warned me about the safety risk of him. So that is a component that I can't take lightly either, that I have to be mindful of safety and security of myself and everyone else, too. So, you know, it's that balancing act as a correctional nurse that you have to keep that in mind. And

based on what the hospital had told me, in his discharge summary, and then what I was seeing, he was presenting as the same as he was yesterday. And he was just back, you know, less than what, 12 hours before then with a diagnosis of malingering and weakness. So I'm like, well, he's just had vitals, and they didn't order any new vitals recheck, they didn't order any medications, they didn't order him to use a wheelchair, they didn't order him to follow up with any medical appointments. So that gave me a lot of data that I need to encourage this guy to get up today and move.

(Ex. I at 56:9-59:11).

She documented that Mr. Sherrell expressed feeling like he was choking. (Ex. A at MEND 00109). Despite his report, Nurse Skroch did not observe any signs of choking such as "guarding, grimacing, having shortness of breath, having agonal breathing." (Ex. I at 63:21-64:18). Furthermore, a health tech informed her that Mr. Sherrell took his medications that morning without any issues swallowing. (Ex. I at 60:18-24). Nurse Skroch testified that this was an improvement from the previous day. (Ex. I at 60:18-24). Mr. Sherrell provided that he was trying to move but could not, yet Nurse Skroch observed Mr. Sherrell bounce his foot, knees, thighs, and hands at times and wiggle his hips. (Ex. A at MEND 00109). Mr. Sherrell informed Nurse Skroch that he wanted to sit up and take a shower. (Ex. A at MEND 00109). Nurse Skroch advised Mr. Sherrell that he needed to try himself and reminded him that the ER imaging revealed no findings to cause immobility or incontinence. (Ex. A at MEND 00109). Mr. Sherrell complained of back pain and stiffness, so she again advised him that he needed to move. (Ex. A at MEND 00109).

While completing her assessment, Mr. Sherrell provided two odd reasons for why he was unable to move. First, he stated he thought he had a sexually transmitted disease ("STD"). (Ex. A at MEND 00109). Nurse Skroch explained that an STD would not typically cause the symptoms he was experiencing. (Ex. A at MEND 00109). Second, Mr. Sherrell stated he had

taken some "bad drugs" while incarcerated. (Ex. A at MEND 00109). Nurse Skroch advised she wanted to obtain a urinalysis. (Ex. A at MEND 00109). Nurse Skroch documented that Mr. Sherrell was not fidgeting, did not exhibit signs of shortness of breath, and was not sweating. (Ex. A at MEND 00109). Regardless, Nurse Skroch planned to recheck him the following day. (Ex. A at MEND 00109).

Importantly, after completing her assessment, rather than simply rely on the template discharge instructions, Nurse Skroch contacted the ER to obtain the full visit note. (Ex. A at MEND 00109). She received the full ER note and called Dr. Leonard to discuss it. (Ex. A at MEND 00109). Nurse Skroch testified even though she did not send Dr. Leonard the full ER note, they discussed it in detail. (Ex. I at 90:22-91:6, *see also* Ex. J at 212:24-213:11). In fact, she testified that they went through the ER note "page by page." (Ex. I at 95:8-12). Dr. Leonard testified that Nurse Skroch reported signs of improvement such as that Mr. Sherrell was able to swallow his meds and he was no longer diaphoretic. (Ex. J at 214:9-216:5). Despite the improvement in Mr. Sherrell's condition, Dr. Leonard ordered that Mr. Sherrell should be seen by neurology the next business day, the medical staff should continue to monitor him, and if Mr. Sherrell's condition worsened, he must be sent to the ER. (Ex. J at 236:17-237:8, *see also* Ex. A at MEND 00109).  Dr. Leigh testified that this approach, to monitor Mr. Sherrell and request a neurology consult, was reasonable. (Leigh Tr. at 106:21-107:5).

BCJ staff expressed doubt surrounding Mr. Sherrell's condition. Nurse Skroch documented that BCJ staff observed that although Mr. Sherrell had been laying on his back since returning from the ER, he was seen moving his extremities. (Ex. A at MEND 00109).

She also documented that the COs informed her Mr. Sherrell changed his story numerous times while at the hospital. (Ex. A at MEND 00109).

CO Gallinger returned for another shift on September 1 from 1200 to 1800. (Ex. F at 106:1-107:25). CO Gallinger testified that he saw Mr. Sherrell during this shift and did not observe any change in condition since he saw him at Sanford Bemidji and Sanford Fargo. (Ex. F at 106:1-107:25).

CO Fredrickson returned for another shift on September 1 from 1800 to 0600 the following day. (Ex. D at 78:10-17). CO Fredrickson testified that he did not notice anything about Mr. Sherrell's condition during his shift that caused him concern. (Ex. D at 78:10-17).

      6. *September 2, 2018.*

On September 2, 2018, after Mr. Sherrell asked to shower, at or around 0830, Nurse Skroch visited Mr. Sherrell's cell to assess him. (Ex. A at MEND 00108). Nurse Skroch testified that Mr. Sherrell was sitting in a wheelchair and turning his head to speak to her. (Ex. I at 115:20-119:20). As she questioned Mr. Sherrell regarding his symptoms, she observed a facial droop that switched from right side of face to left. (Ex. A at MEND 00108). During her assessment, she observed his facial droop stopped, he was able to use his core, he did not have difficulty breathing, he was not choking, he was not sweating, and he did not report any pain of distress. (Ex. I at 115:20-119:20). Nurse Skroch observed that Mr. Sherrell's pants appeared to be soaked in urine. (Ex. A at MEND 00108). Yet, she testified that he explained he did not lose control of his bladder, but rather that he could not make it to the toilet. (Ex. I at 115:20-119:20). Additionally, she documented that she observed Mr. Sherrell drink apple juice after initially declining, gargle the apple juice, and state he was choking. (Ex. A at MEND 00108).

She testified that despite his claim that he was choking, she did not observe any signs that he was indeed choking. (Ex. I at 115:20-119:20).

Nurse Skroch instructed the COs to assist Mr. Sherrell with drinking, feeding, changing his diaper, and repositioning Mr. Sherrell if he was not doing that himself. (Ex. A at MEND 00130). Nurse Skroch determined the best course of action for Mr. Sherrell was to place him in a chair and wheel him into the shower. (Ex. A at MEND 00108). The COs took Mr. Sherrell to shower. (Ex. A at MEND 00108). Nurse Skroch also documented that a CO informed her that Mr. Sherrell's mother "called yesterday & told staff to tell him to knock this off." (Ex. A at MEND 00108).

After her assessment, at or around 1100, Nurse Skroch called Dr. Leonard to update him on Mr. Sherrell's condition. (Ex. A at MEND 00108). Nurse Skroch testified that she relayed her observations to Dr. Leonard. (Ex. I at 139:22-141:2). She further testified that she informed Dr. Leonard that Mr. Sherrell appeared to be slightly improving:

A.     Well, for one, he was sitting up in his chair. He had full control of his neck. You know, he was laying uncomfortably in his bed, as you pointed out, the day before, and he was sitting up comfortably, engaging in conversation, he had more of a lightness to his demeanor, he had the core strength in his abdomen to hold himself up, he had the strength to hold his legs up. Those were all different from the day before, that he said he couldn't do the day before.

So yeah. It was telling me a lot more about his active state of how he was that day.

(Ex. I at 143:7-144:12). Dr. Leonard testified that it appeared from Nurse Skroch's assessment of Mr. Sherrell that he was improving. (Ex. J at 259:18-261:22). As a result of Mr. Sherrell's improvement in condition, their plan remained: continue to observe him, have the COs assist him with his care, and have him seen by a neurologist.

16

CO Gallinger and CO Feldt both testified that they did not notice a change in Mr. Sherrell's condition. CO Gallinger testified that he had multiple interactions with Mr. Sherrell during this shift but that he did not notice a change in his condition until suppertime. (Ex. F at 115:25-116:25). There is no documentation that this change in condition was communicated to MEnD. CO Feldt testified that he did not notice any change in Mr. Sherrell's condition from August 29 through September 2. (Ex. E at 87:1-88:7). He testified that during this period, Mr. Sherrell was unable to control his head, upper body, and lower body on his own. (Ex. E at 87:1-88:7). In other words, his condition remained the same from the time he was discharged from the hospital with a diagnosis of malingering, until he suddenly decompensated.

At or around 1647, COs entered Mr. Sherrell's cell. (Ex. C at BELTRAMI 10533-34). Mr. Sherrell was not speaking, but he appeared to be breathing. (Ex. C at BELTRAMI 10533-34). The COs contacted MEnD. (Ex. C at BELTRAMI 10533-34). Health Tech Brewster visited Mr. Sherrell in his cell to take his vitals. (Ex. A at MEND 00107). Mr. Sherrell was unresponsive, had a pulse of 66, and oxygen saturation level of 98. (Ex. A at MEND 00107). Health Tech Brewster was unable to get a blood pressure reading on either arm. (Ex. A at MEND 00107). Shortly after taking his vitals, Mr. Sherrell's pulse went to 0. (Ex. A at MEND 00107).

CO Williams grabbed the automated external defibrillator ("AED"), which was placed on Mr. Sherrell. (Ex. A at MEND 00107, *see also* Ex. C at BELTRAMI 10527). The AED advised no shock was recommended. (Ex. C at BELTRAMI 10527). CPR was commenced and emergency services were contacted. (Ex. C at BELTRAMI 10544-46). At or around 1703,

EMS arrived. (Ex. C at BELTRAMI 10527). Health Tech Brewster informed EMS of Mr. Sherrell's medical history. (Ex. A at MEND 00107). EMS took over resuscitation efforts. (Ex. C at BELTRAMI 10527). Those efforts were ended at 1723 and Mr. Sherrell was pronounced dead. (Ex. C at BELTRAMI 10527).

       *7.  September 4, 2018.*

On September 4, 2018, Ramsey County Medical Examiner Dr. Michael McGee performed an autopsy. (Ex. B at BELTRAMI22). He did not find anything that would be the cause of Mr. Sherrell's death. (Ex. B at BELTRAMI22-23).

       *8.  February 12, 2020.*

On or around February 12, 2020, a private autopsy was performed. (Ex. K). Dr. Youmans concluded that Mr. Sherrell died of Guillain-Barre Syndrome ("GBS"). (Ex. K). Guillain-Barre Syndrome is an "acute, usually rapidly progressive" neurological disorder "characterized by muscular weakness and mild distal sensory loss."[3] It is difficult to diagnose as its signs and symptoms are similar to those of other neurological disorders.[4] Dr. Leigh ruled out progressive neurological disorders. (Ex. A at 00198-199).

    **B.  Plaintiff's Allegations.**

On September 24, 2019, Del Shea Perry ("Plaintiff"), as Trustee for the heirs and next-of-kin of Mr. Sherrell and as personal representative of the Estate of Mr. Sherrell, brought this action against a number of defendants, including the MEnD Defendants. (*See generally* ECF

---

[3] https://www.merckmanuals.com/professional/neurologic-disorders/peripheral-nervous-system-and-motor-unit-disorders/guillain-barr%C3%A9-syndrome-gbs
[4] https://www.mayoclinic.org/diseases-conditions/guillain-barre-syndrome/diagnosis-treatment/drc-20363006

No. 1). Plaintiff alleges the MEnD Defendants were deliberately indifferent to Mr. Sherrell's serious medical needs while he was incarcerated at BCJ. (ECF No. 30 ¶¶ 1-59, 60-62). Plaintiff also generally alleges that MEnD maintained constitutionally deficient policies and/or customs and/or practices that caused and contributed to MEnD Defendants constitutional violations. (ECF No. 30 ¶¶ 1-59,63-71).  Plaintiff further generally alleges that the MEnD Defendants were negligent by failing to properly diagnose and treat Mr. Sherrell. (ECF No. 30 ¶¶ 1-59, 77-81).

### C.     December 17, 2021 ALJ Order.

On December 17, 2021, following an evidentiary hearing stemming from a Board of Medical Practice determination, the presiding administrative law judge issued an order recommending the Board take disciplinary action on Dr. Leonard's medical license.  The proceeding was controlled by Chapter 5615 of Minnesota Administrative Rule and thereby conducted under evidentiary rules distinct from those applicable to this civil proceeding. The latitude of such proceedings is evidenced by Minnesota Administrative Code Rule 5615.0900:

> Subp. 3. Admissible evidence. The board may admit and give probative effect to relevant evidence which possesses probative value and shall not be bound by the technical rules relating to evidence and witnesses; provided, however, that the board shall give effect to the rules of privilege recognized by law. Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions. All evidence including records and documents, except tax returns and tax reports, in the possession of the board of which it desires to avail itself shall be offered and made a part of the record in the case. Documentary evidence may be received in the form of copies or excerpts, or by incorporation by reference.

Minn. R. 5615.0900, subp. 3.

## ARGUMENT

Plaintiff's claims are all, at best, claims of medical malpractice. Although MEnD Defendants dispute and rebut the malpractice allegations, here MEnD Defendants are only seeking summary judgment on Plaintiff's deliberate indifference claims as the daily care provided by MEnD Defendants does not rise to such level as a matter of law.

## I.   Standard of Review – Summary Judgment.

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issues of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.

Once a motion for summary judgment is made and supported, the nonmoving party bears the burden of demonstrating that a genuine dispute of material fact exists. *Ortega-Maldonado v. Allstate Ins. Co.*, 519 F. Supp. 2d 981, 987 (D. Minn. 2007). The nonmoving party may not rely upon unsupported allegations to prove the existence of a material fact; he must come forward with specific facts. *See Ortega-Maldonado,* 519 F. Supp. 2d at 987; *see also Martinson v. Leason*, 22 F. Supp. 3d 952, 959 (D. Minn. 2014) ("The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.")

## II.   There Is No Genuine Dispute: The MEnD Defendants Did Not Violate Plaintiff's Constitutional Right to Medical Care.

### A. Standard of Review – Deliberate Indifference.

"The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009). A pretrial detainee's right to "medical care arises under the Due Process Clause of the Fourteenth Amendment" but is analyzed under "deliberate-indifference standard that governs claims brought by convicted inmates under the Eighth Amendment." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

The Eighth Amendment prohibition on cruel and unusual punishment extends to protect inmates from deliberate indifference to serious medical needs. *Jones v. Minn. Dept. of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008). To prevail on a deprivation of medical care claim, an inmate must prove the defendants acted with deliberate indifference either to his existing serious medical needs or to conditions posing a substantial risk of serious future harm. *Weaver v. Clark*, 45 F.3d 1253, 1255 (8th Cir. 1995) (comparing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (existing serious medical needs) with *Heling v. McKinney*, 509 U.S. 25, 35 (1993) (substantial risk of serious future harm)).

To prevail on a claim of deliberate indifference requires a two-part showing: (1) the inmate suffered from an objectively serious medical need; and (2) the prison official knew of the need, yet deliberately disregarded it. *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011)

(citing *Coleman v. Rahija*, 114 F.3d 778 (8th Cir. 1997); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are both questions of fact. *Coleman*, 114 F.3d at 785. But if Plaintiffs cannot make a sufficient showing of one of these essential elements, summary judgment is properly granted. *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997).[5]

> **B. While in Retrospect Mr. Sherrell Had A Serious Medical Need, It Was Not Known to MEnD Defendants.**

The objective component requires Plaintiff to establish a serious medical need. A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious even a layperson would easily recognize the necessity for a doctor's attention." *VonWald*, 638 F.3d at 914 (citing *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). If the need is obvious to a layperson, there is no requirement to verify this by medical evidence. *VonWald*, 638 F.3d at 914 (citing *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004)). The determination of whether a medical need is sufficiently obvious cannot be analyzed in a vacuum and background knowledge of the inmate's medical condition or medical

---

[5] In support of her claims, Plaintiff will undoubtedly point to the December 17, 2021, ALJ Order. Relying on such evidence is wholly inappropriate as the order resulted from an administrative proceeding that has an entirely different standard. Given the different standard and evidentiary rules, the ALJ had different evidence before her. Furthermore, failure to comply with the Minnesota Medical Practice Act does not ipso facto determine there has been deliberate indifference in a civil lawsuit such as this. Further, the use of the ALJ Order to bolster her argument is inappropriate as it inadmissible hearsay. *See Donald v. Rast,* 927 F.2d 379, 381 (8th Cir. 1991) (affirming district court's decision to not admit an administrative law judge's order because "the jury might have given undue consideration to the ex parte administrative findings, unfair prejudice could have resulted to the (opposing party)."

records is part of the analysis. *Jones v. Minnesota Dept. of Corrections*, 512 F.3d 478, 482 (8th Cir. 2008).

In retrospect, it is apparent that Mr. Sherrell had a serious medical need, but the presence of the serious medical need was not known to MEnD Defendants, or the COs at that time. It ultimately took subsequent review of two emergency room visits and two autopsies to determine that Mr. Sherrell had GBS. MEnD Defendants were not ignoring Mr. Sherrell's condition, instead, they reasonably relied on the knowledge and resources of hospital physicians, evaluations and observations of those physicians, physician interpretation of radiology studies, and on Dr. Leigh's diagnoses of malingering and weakness.

### C. Plaintiff Cannot Demonstrate Deliberate Indifference.

Regardless that in retrospect Mr. Sherrell had a serious medical need, the MEnD Defendants continual and appropriate treatment of Mr. Sherrell does not constitute deliberate indifference. The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need. *Grayson v. Ross*, 454 F.3d 802, 808–809 (8th Cir. 2006); *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997). Plaintiffs alleging deliberate indifference must show more than negligence, even more than gross negligence, and must establish a "mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

Deliberate indifference requires a detainee to allege facts that show officials: (i) recognized that a substantial risk of harm existed, and (ii) knew that their conduct was inappropriate in light of that risk. *Krout v. Goemmer*, 583 F.3d 557, 567-68 (8th Cir. 2015). Plaintiff must produce "evidence showing that the defendants were exposed to the underlying

facts revealing that risk." *Patterson v. Kelley*, 902 F. 3d 845, 852 (8th Cir. 2018), reh'g denied (Oct. 25, 2018). "This is an 'onerous standard,'… requiring a prisoner to 'clear a substantial evidentiary threshold.'" *Martinson v. Leason*, 22 F. Supp. 3d 952, 960 (D. Minn. 2014) (internal citations omitted). The record before this Court contains no such substantial evidence.

### i.   The MEnD Defendants Did Not Have Subjective Knowledge.

To prove subjective knowledge, Plaintiff must produce "evidence showing that the defendants were exposed to the underlying facts revealing that risk." *Patterson v. Kelley*, 902 F. 3d 845, 852 (8th Cir. 2018), *reh'g denied* (Oct. 25, 2018). An official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*" *Farmer*, 511 U.S. at 837 (emphasis added). MEnD Defendants assessed Mr. Sherrell frequently during his nine day period of incarceration at BCJ. Nurse Pederson began observing concerning symptoms on or around August 29, 2018. After Nurse Pederson expressed those concerning observations to the on-call provider, such as numbness in his legs and alleged difficulty swallowing, Dr. Leonard ultimately ordered Mr. Sherrell be transported to the ER. Although Dr. Leonard's order was overridden by Captain Allen, who insinuated that Mr. Sherrell was faking his symptoms, MEnD staff continued to advocate for and monitor Mr. Sherrell.

After CNP Lundblad sent him to the emergency room on August 31, MEnD staff received the discharge instructions from Dr. Leigh which included discharging diagnoses of malingering and weakness. Defendant Nurse Skroch read through the discharge instructions and full work-up notes in detail with Dr. Leonard. Undoubtedly, MEnD Defendants' reliance on two full work-ups from emergency room providers was reasonable as they resulted from a

higher level of care, including laboratory and neuroradiology studies, which could not be provided within BCJ by MEnD providers.

The discharge instructions also provided that if Mr. Sherrell's condition worsened, he was to return to the emergency room. The records, video from the facility, and repeated deposition testimony, show that Mr. Sherrell's condition did not worsen over September 1 and September 2. MEnD staff continued to observe Mr. Sherrell over those two days and did not notice any deterioration in his condition. In fact, Dr. Leonard and Nurse Skroch testified that his condition appeared to slightly improve.

Plaintiff will undoubtedly point to security footage that shows Mr. Sherrell struggling but such footage is irrelevant to analysis of Plaintiff's claims as to the MEnD Defendants. MEnD Defendants, and the medical clinic, did not have access to the footage as it is for *correctional and security purposes only*. There is no evidence that the any observations from the footage was communicated by BCJ to MEnD Defendants. MEnD Defendants' *actual knowledge*, stabilizing condition of Mr. Sherrell, reports from BCJ staff that Mr. Sherrell was faking his condition, and diagnosis of malingering overcame any concern prior to Mr. Sherrell's hospitalization. Nonetheless, Dr. Leonard ordered MEnD staff to closely monitor him and that a second opinion be obtained for Mr. Sherrell. MEnD Defendants could not have made inferences from Dr. Leigh's diagnosis and their observations that Mr. Sherrell had a serious medical need. Indeed, the records and testimony of MEnD Defendants evidence such inferences were not made, which is sufficient to undermine any claim to knowledge. *See Farmer*, 511 U.S. at 837.

>    *ii. MEnD Defendants Did Not Deliberately Disregard Mr. Sherrell's Medical Need.*

"[D]eliberate indifference includes something more than negligence but less than actual intent to harm; it requires proof of a reckless disregard of the known risk." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998) (internal quotation omitted). In the context of medical care, "[d]eliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed," but "a showing of deliberate indifference is greater than gross negligence." *Pietrafeso v. Lawrence County*, 452 F.3d 978, 983 (8th Cir. 2006) (internal quotations and brackets omitted). The question is not whether a defendant did all he or she could but rather what were his or her actions in light of the information he/she possessed at the time. *Gregoire*, 236 F.3d at 419.

The volume of Mr. Sherrell's medical records and significant testimony of MEnD Defendants demonstrate that he was provided diligent care. The MEnD Defendants did not deny or delay access to medical care for Mr. Sherrell. To the contrary, the evidence shows the MEnD Defendants took significant actions to assess and treat Mr. Sherrell: MEnD Defendants visited and assessed Mr. Sherrell daily, required BCJ staff to monitor him, advocated for him to be sent to the ER, and advocated for him to be seen by a neurologist despite his discharging diagnosis of malingering.

Individually too, no MEnD Defendant deliberately disregarded Mr. Mr. Sherrell's medical needs. As for Nurse Pederson, the medical records and testimony evidence that she actively tended to Mr. Sherrell. She assessed Mr. Sherrell multiple times between the day he was booked and the last day she saw him, August 31. Nurse Pederson observed abnormal symptoms and communicated them to Dr. Leonard. On August 30, she advocated for Mr.

Sherrell to be seen in the ER. After Captain Allen denied Dr. Leonard's order, Nurse Pederson explained to Mr. Sherrell that he would be seen the following day. Her attempt to comfort him, repeated assessments, and strong advocation of his behalf show there is no evidence that Nurse Pederson deliberately disregarded Mr. Sherrell's medical needs.

Health Tech Brewster also did not deliberately disregard Mr. Sherrell's serious medical need. Indeed, the medical records and testimony evidence that she had minimal interactions with Mr. Sherrell. Her interactions were all well documented and contain no indication that Mr. Sherrell was suffering and she disregarded or delayed medical care.

Nurse Skroch did not deliberately disregard Mr. Sherrell's serious medical need. The medical records and testimony evidence that Nurse Skroch closely monitored Mr. Sherrell and reported her observations to Dr. Leonard. Plaintiff will inevitably argue that Nurse Skroch deliberately disregarded Mr. Sherrell's serious medical needs by failing to take his vitals on September 1 and September 2. Yet, there is no evidence that his vitals would have indicated any change in his condition. In support of her decision to not take his vitals, Nurse Skroch noted that Mr. Sherrell was speaking in full sentences, was alert, was not short of breath, and was not sweating. Nurse Skroch, as an experienced nurse and director of nursing at the time, believed she could maintain an accurate picture of his overall condition through her observations and full hospital work-up. Nurse Skroch did not notice any change in condition after he returned from the hospital until he eventually passed away on September 2. Plaintiff may disagree with how she approached caring for Mr. Sherrell, but that does not rise to the level of deliberate indifference.

Finally, Dr. Leonard did not deliberately disregard Mr. Sherrell's serious medical need. The medical records and testimony evidence that Dr. Leonard had detailed conversations, at least once a day, with the experienced MEnD employees from August 28 through September 2. Prior to Mr. Sherrell's hospitalization, Dr. Leonard had detailed conversations with both Nurse Lindell and Nurse Pederson to discuss Mr. Sherrell's plan of care, which he modified as he saw appropriate. Furthermore, after speaking with Nurse Pederson on August 30, Dr. Leonard ordered Mr. Sherrell be sent to the ER. Ordering that a patient be sent to an ER for further evaluation and assessment is far below deliberate disregard.

Furthermore, after Mr. Sherrell returned from the ER, Dr. Leonard carefully reviewed the discharge instructions and Mr. Sherrell's ER note with Nurse Skroch. Although Dr. Leonard did not obtain a physical copy, the evidence shows they went through the note "page by page." Nurse Skroch reported to Dr. Leonard that Mr. Sherrell was showing signs of improvement such as being able to swallow his medications and he was no longer diaphoretic. Despite the apparent improvements in Mr. Sherrell's condition, Dr. Leonard ultimately determined the proper plan of care was a "monitor and follow-up" approach: he ordered that Mr. Sherrell should be seen by neurology the next business day, that medical staff continue to monitor him, and if Mr. Sherrell's condition worsened, he must be sent to the ER.

Dr. Leonard's decision to obtain a second opinion actually exceeded what a similarly suited physician did, Dr. Leigh. Dr. Leigh testified that he could have ordered Mr. Sherrell to be seen by a neurologist but that after his evaluation, he did not think it was warranted. COs and MEnD Defendants all testified that Mr. Sherrell's condition did not deteriorate after he was discharged from Sanford Fargo. Therefore, despite receiving a report from Nurse Skroch

that Mr. Sherrell's condition appeared to improve, Dr. Leonard still ordered that a second opinion must be obtained for Mr. Sherrell. Even Dr. Leigh admitted that Dr. Leonard's "monitor and send to neurology consult" approach was appropriate.

To be sure, Dr. Leonard had every right to rely on Dr. Leigh's discharging diagnosis of malingering, but he took the extra precaution of seeking an additional opinion by a neurologist. Dr. Leonard's constant contact with MEnD staff and frequent modifications to Mr. Sherrell's plan of care shows there is no evidence that Dr. Leonard deliberately disregarded Mr. Sherrell's medical needs.

### iii.   At Most, Plaintiff's Allegations Amount To A Medical Malpractice Claim.

Plaintiff argues that MEnD Defendants plan of care, to monitor Mr. Sherrell and refer him to be seen by a neurologist the following business day, constitutes deliberate indifference. This argument, and supporting evidence, is more akin to a medical malpractice claim. Although MEnD Defendants are confident that Plaintiff's malpractice claims are defensible at trial, MEnD Defendants also acknowledge there is a sufficient disagreement on that point to make this motion one for partial summary judgment. As such, MEnD Defendant's current motion is only for summary judgment on Plaintiff's deliberate indifference claim which cannot be conflated with the evidence Plaintiff uses to support her malpractice claim.

To establish deliberate indifference, Plaintiff must present evidence showing that the medical care MEnD Defendants provided was "so inappropriate" that it demonstrates "intentional mistreatment." *Jolly v. Knudsen*, 205 F. 3d 1094, 1097 (8th Cir. 2000); *see Martinson* 22 F. Supp. at 962 (observing that courts hesitate to find an Eighth Amendment violation when an inmate has received medical care). Instead, Plaintiff's argument is, at its core, about

a disagreement of treatment which is not actionable. *Bellecourt v. United States*, 784 F.Supp. 623, 634 (D. Minn. 1992) ("[A] difference of opinion between an inmate and prison medical personnel regarding appropriate medical treatment does not suffice…neither does a delay in providing medical treatment unless the delay causes substantial harm."); *Lair v. Oglesby*, 859 F.2d 605, 606 (8th Cir. 1988) (finding merely disagreeing with the treatment provided will not establish deliberate indifference).

The fact that Mr. Sherrell passed away prior to being seen by a neurologist, while tragic, was not due to denial of treatment or disregard for Mr. Sherrell's needs on the part of any MEnD Defendant. The undisputed evidence shows the care provided was appropriate in light of the information available; there was no "intentional mistreatment," and, thus, Plaintiff's claim fails.

### III. There Is No Genuine Dispute: Plaintiffs' Monell Claim Fails Because Plaintiff Has Failed to Identify a Custom or Policy that Caused a Constitutional Violation.

#### A. Standard – Monell.

A plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018 (1978)). Admittedly, this requirement "applies in suits against private entities performing functions traditionally within the exclusive prerogative of the state, such as the provision of medical care to inmates." *Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997).

However, an entity is responsible only if an injury is inflicted because of "execution of a governmental policy or custom, whether made by its lawmakers or by those whose edicts or

acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. "The challenged action must have either been taken by [a] municipality or by a private person whose action may be fairly treated as that of the municipality itself." *Reinhart v. City of Brookings*, 84 F.3d 1071, 1073 (8th Cir.1996) (*citing Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)).

Monell liability will only stand: (1) where a particular municipal policy or custom itself violates federal law or directs an employee to do so; or (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. *Moyle v. Anderson*, 571 F.3d 814, 817–18 (8th Cir. 2009). A "policy" is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). The policy must be the "moving force behind the constitutional violation." Id. An official policy "involves a deliberate choice to follow a course of action ... made from among various alternatives by an official who is determined by state law to have the final authority to establish governmental policy." *Ware v. Jackson Cnty.*, Mo., 150 F.3d 873, 880 (8th Cir. 1998) (emphasis added). Plaintiff must demonstrate that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged…and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404 (emphasis in original).

### B. There Is No Constitutional Violation.

First, Plaintiff has no evidence of a policy or custom of MEnD resulting in a constitutional violation. As shown above, Plaintiff has failed to demonstrate any constitutional

violation. To the contrary, MEnD Defendants visited and assessed Mr. Sherrell daily, required BCJ staff to monitor him, advocated for him to be sent to the emergency room, and advocated for him to be seen by a neurologist. Mr. Sherrell received continuous and appropriate medical care throughout his period of incarcerated at BCJ. Absent a constitutional violation, there can be no Monell liability. *See Malone v. Hinman,* 847 F.3d 949, 955 (8th Cir. 2017) ("Because we conclude that Officer Hinman did not violate Malone's constitutional rights, there can be no § 1983 or Monell liability on the part of Chief Thomas and the City."); *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or Monell ... municipal liability.")

### C. Plaintiff Has Failed to Identify a Policy or Custom that Caused a Constitutional Violation.

Second, there is no evidence of a policy or custom that was the moving force behind Mr. Sherrell's death. Plaintiff's amended complaint asserts MEnD has a "custom" of providing care that constitutes deliberate indifference by "fail[ing] to properly train their employees to hospitalize severely ill inmates, to maintain adequate supervision of severely ill inmates, to follow medical discharge instructions of medical professionals, and to recognize serious and life-threatening medical symptoms requiring emergency medical care." (ECF No. 30, ¶¶ 64, 68). But this is a conclusory allegation that discovery has not come to support. There is no evidence that MEnD has made a deliberate choice through policy or practice that results in constitutionally deficient medical care to inmates, as a de facto custom, and then did so in this case. To the contrary, and to reiterate, MEnD sought to send Mr. Sherrell to the hospital on two occasions, requested that BCJ supervise Mr. Sherrell, followed the medical discharge instructions, and actively and appropriately engaged in caring for and monitoring Mr. Sherrell;

his death was not the result of a policy or custom of deliberately ignoring inmates' health concerns.

## CONCLUSION

The ultimate tragedy of Mr. Sherrell's passing cannot be conflated with deliberate indifference. The record shows that the MEnD Defendants indisputably did not act with deliberate indifference towards Mr. Sherrell's medical needs. Because Plaintiff has failed to establish a genuine dispute as to any material fact Plaintiff's deliberate indifference claim, partial summary judgment is appropriate as to Count I and Count II of Plaintiff's Amended Complaint.

Date:  June 1, 2022                       **LARSON · KING, LLP**


                                          By */s/ Anthony J. Novak*
                                          Anthony J. Novak (0351106)
                                          Carolin J. Nearing (0291791)
                                          Taylor McKenney (0400905)
                                          2800 Wells Fargo Place
                                          30 E. Seventh Street
                                          St. Paul, MN  55101
                                          Tel:  (651) 312-6500
                                          Fax:  (651) 312-6618
                                          tnovak@larsonking.com
                                          cnearing@larsonking.com
                                          tmckenney@larsonking.com

                                          **Attorneys for the MEnD Defendants**