## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Del Shea Perry, | Court File No. 19-cv-02580 (KMM/LIB) |
| **Plaintiff,** | **PLAINTIFF'S MEMORANDUM OF** |
| | **LAW IN OPPOSITION TO** |
| vs. | **DEFENDANTS' MOTION FOR** |
| | **SUMMARY JUDGMENT** |
| Beltrami County, et al., | |
| **Defendants.** | |

---

## STATEMENT OF FACTS[1]

1.  ***August 24: Hardel Sherrell Arrives in Beltrami County Jail in Good Health and Spirit.***

Hardel Sherrell arrived at Beltrami County Jail on August 24, 2018, shortly after 5:30 p.m. (Ex. 101.) He was brought in on a bench warrant and booked in at approximately 5:45 p.m. (Ex. 1.)

Mr. Sherrell was 27 years old at the time (See Ex. 1), and a father to three young girls (Ex. 301, Perry Dep. 18). He "was a good father" who "was very involved in his children's lives and did whatever he could to provide for them." (Ex. 301, Perry Dep. 20-21.)

Surveillance video from the jail shows Mr. Sherrell arriving in good health and spirit. (Ex. 101; Ex. 102; Ex. 103; Ex. 104.) He was relaxed, followed instructions, stable on his feet, and able to walk easily on his own. (Ex. 101, 05:30:40 – 05:31:25; Ex. 102,

---

[1] The exhibits cited in this Statement of Facts reference the accompanying Declaration of Zorislav R. Leyderman and the exhibits attached thereto.

05:31:20 – 05:31:27; Ex. 103.) Mr. Sherrell was lively, smiling, and engaged in friendly conversations with staff. (Ex. 103; Ex. 104.) He was booked in by Defendant Officer Jared Davis at approximately 5:45 p.m. and assigned "Normal" Status and "Medium" Classification. (Ex. 2, p. 1; Ex. 104.) Mr. Sherrell noted experiencing "respiratory failure and influenza" approximately a month-and-half prior to his arrest as well as general "heart problems" but did not report any other injury or illness and did not request or require emergency medical care. (Ex. 2, p. 1.)

**2.      August 25: Initial Medical Assessment.**

Mr. Sherrell received his initial medical assessment by Defendant Nurse Crystal Pederson on August 25, 2018, 9:30 a.m. (Ex. 3, p. 392-393; Ex. 302, Pederson Dep. 114.) He reported the same "respiratory failure" from several months ago as well as migraines and upper back pain but otherwise did not report any other serious medical issues. (Ex. 3, p. 392-393.) Nurse Pederson's assessment note states that Mr. Sherrell's main concern at the time was the migraines and that his blood pressure would be monitored. (Ex. 3, p. 393.)

**3.      August 27-29: Mr. Sherrell Develops Concerning Medical Symptoms.**

On the morning of August 27, 2018, Mr. Sherrell requested a blood pressure check and was evaluated by Defendant Nurse Pederson. (Ex. 3, p. 402; Ex. 302, Pederson Dep. 117.) He reported "sharp" pain on the left side of his chest that was radiating to his neck that had been ongoing for approximately 45 minutes. (*Id.*) Mr. Sherrell was sweating and reported that the fingers on his left hand were tingling. (*Id.*) Nurse Pederson consulted with Defendant Dr. Todd Leonard, who prescribed Mr. Sherrell one doze of Ibuprofen,

2

Tylenol, and Hydroxyzine. (*Id.*) Nurse Pederson also ordered an EKG. (*Id.*; see also Ex. 3, p. 403.) Dr. Leonard admitted in his deposition that he received and reviewed the EKG results by email on August 27, 2018. (Ex. 304, Leonard Dep. 95, 137, 140, 143.) The EKG results "clearly indicated either current or past heart attack or heart stress." (Ex. 203, Venters Expert Rep., p. 6.) Oddly, Dr. Leonard testified that, upon reviewing the EKG on August 27, 2018, he was "reassure[d] . . . that Mr. Sherrell was not experiencing a cardiac event." (Ex. 304, Leonard Dep. 145.) The medical record for August 27, 2018, shows no response to or acknowledgment of the abnormal EKG by Dr. Leonard or anyone else. (Ex. 3, p. 402.)

Mr. Sherrell saw Nurse Pederson again at 8:30 a.m. on August 28, 2018. (Ex. 3, p. 411.) Mr. Sherrell reported back pain, arm numbness, and pain upon walking and lying down. (*Id.*) Mr. Sherrell also reported that he had fallen out of bed earlier in the morning and was unable to get up for 25 minutes. (*Id.*) Nurse Pederson reported that Mr. Sherrell "was in tears." (*Id.*) Nurse Pederson reported this information to Dr. Leonard, and Dr. Leonard prescribed Ibuprofen, Flexeril, and Lisinopril and authorized a lower bunk and extra blanket. (*Id.*; Ex. 304, Leonard Dep. 156-161.) Mr. Sherrell's condition continued to deteriorate and, at 7:58 p.m., he submitted a medical request to MEnD pleading for medical attention: "I need to be seen and taken to the hospital on account of i can't feel my legs and cannot be physically mobil.. Plz be fast about this because im also in incruciating pain in all my muscles all over my body." (Ex. 3, p. 410.)

On August 29, 2018, at 6:25 a.m., a MEnD health tech called Defendant Nurse Pederson and reported that Mr. Sherrell "cannot feel his legs or be physically mobile."

(Ex. 3, p. 408; Ex. 302, Pederson Dep. 123.) Nurse Pederson directed the health tech to place Mr. Sherrell into medical segregation "in a tank until nurse can evaluate upon arrival in the AM." (Ex. 3, p. 408.) Later that morning, Mr. Sherrell saw MEnD Nurse Cassandra Lindell. (See Ex. 302, Pederson Dep. 123; Ex. 4, p. 386; Ex. 3, p. 410.) Mr. Sherrell reported that he was experiencing numbness around his umbilical region and going down. (Ex. 3,  p. 410.) Mr. Sherrell also reported not being able to move his arms, fingers, and legs. (*Id.*) Mr. Sherrell was able to move his hands sporadically and reported that "they go numb sometimes and he 'hasn't been able to lift them to eat for 2 days.'" (*Id.*) Nurse Lindell called Dr. Leonard, and Dr. Leonard discontinued Mr. Sherrell's access to a wheelchair and instead ordered for him to use a walker, which would be "d[iscontinued] shortly." (*Id.*; Ex. 304, Leonard Dep. 168-171.) Dr. Leonard also ordered for Mr. Sherrell to be kept "in tank" for a 24-hour activity watch. (*Id.*)

Nurse Lindell's visit with Mr. Sherrell was captured on surveillance video. (Ex. 105.) The visit lasted approximately 7 minutes. (*Id.*) Mr. Sherrell is seen sitting in the wheelchair and exhibiting clear and obvious signs of weakness and difficulty maintaining posture. Although his body appears limp, Mr. Sherrell was able to move his hands and fingers, move his neck, and support his head using his neck while being transported in the wheelchair. (Ex. 105, 09:29:00 – 09:29:30 and 09:31:25 – 09:31:35.)

Mr. Sherrell was then brought to Cell 215, where he spent the rest of the day suffering in his bunk with limited mobility and limited assistance from jail staff. At 4:15 p.m., Defendant Officer Settle came in and assisted Mr. Sherrell to a sitting position. (Ex. 106, 04:14:00 – 04:14:40; Ex. 6, p. 6.) Officer Settle acknowledged that "[Mr. Sherrell]

complained of having little to no feeling in his hands and arms. He appeared to have a difficult time making contact with my hand to lift him, nor did he make any attempt to assist himself into a seated position." (Ex. 6, p. 6.) Surveillance video shows Officer Settle leaving the cell in less than a minute, (Ex. 106, 04:14:00 – 04:14:40), and he confirmed in his deposition that, despite these troubling symptoms, he left Mr. Sherrell in the cell and had no further contact with him that day, (Ex. 303, Settle Dep. 12.) Although Mr. Sherrell was exhibiting clear signs of weakness and difficulty with mobility, he did have limited range of motion with his hands/arms and was able to hold up his head using his neck. (Ex. 106, 04:18:00 – 04:20:00.)

At 4:35 p.m., Defendant Officer Williams walked into Mr. Sherrell's cell to bring him dinner. (Ex. 5, p. 6.) Surveillance video shows Officer Williams removing an untouched lunch tray, replacing it with a dinner tray, and then leaving the cell. (Ex. 107, 04:35:00 – 04:35:40.) Officer Williams then returned to move the dinner tray further back and get Mr. Sherrell into a seated position and closer to the walker that was in the cell. (*Id.*) Mr. Sherrell made numerous attempts to get up using the walker. (Ex. 107, 04:35:30 – 04:39:38.) He was able to move his torso forward and grab the walker, but he could not get up or push himself up to use the walker. (*Id.*) At 6:52 p.m., Mr. Sherrell fell out of his bunk and landed face-down on the floor. (Ex. 108, 06:51:45 – 06:52:15.) Defendant Officers Smith, Davis, and Demaris came in and pulled him off the floor and back onto the bunk. (Ex. 108, 06:53:00 – 06:58:00; Ex. 6, p. 2.) Surveillance video shows Mr. Sherrell spending the rest of the night with limited mobility but still able to move his hands and hold, lift, and drink from a water bottle. (Ex. 108, 07:00:00 – 07:26:00.)

At 7:47 p.m., Mr. Sherrell asked to be placed into a wheelchair and Officer Davis attempted to move Mr. Sherrell from the bunk to the wheelchair. (Ex. 6, p. 3; Ex. 109, 07:49:00 – 07:53:00.) In the process, Mr. Sherrell collapsed to the floor and Officer Davis was unable to place Mr. Sherrell into the wheelchair on his own. (*Id.*) Defendant Sgt. Carraway then assisted Officer Davis and they were able to get Mr. Sherrell into the wheelchair. (*Id.*) Once in the wheelchair, Mr. Sherrell, with obvious difficulty, was again able to use his hands to adjust his legs and was then able to push himself around the cell in the wheelchair. (Ex. 109, 07:53:30 – 08:00:00.)

**4.    *August 30: Jail Administrator Calandra Allen Overrides Dr. Leonard's Order to Transport Mr. Sherrell to the Emergency Department for a Medical Evaluation and Captain Allen, Dr. Leonard, and Nurse Pederson Abandon Mr. Sherrell at the Jail.***

On the morning of August 30, 2018, at approximately 7:40 a.m., Defendant Nurse Pederson examined Mr. Sherrell. (Ex. 3, p. 412.) Mr. Sherrell reported that he could not feel anything from his waist down and that he urinated on himself at night because he could not get himself to the toilet. (*Id.*) Mr. Sherrell refused medication and explained that he was having difficulty swallowing because his throat felt swollen. (*Id.*) Nurse Pederson also ran a thermometer across Mr. Sherrell's feet, which produced no response. (*Id.*) Nurse Pederson testified that Mr. Sherrell's condition was "dramatically different" when she saw him on the morning of August 30, and that she was concerned. (Ex. 302, Pederson Dep. 44-45.) She also admitted that Mr. Sherrell's condition deteriorated on a daily basis every time she saw him. (Ex. 302, Pederson Dep. 117-118.) Nurse Pederson called Dr. Leonard and requested that he order Mr. Sherrell to be transported to the ER by

ambulance as soon as possible, and he ordered Mr. Sherrell to be sent to the ER by ambulance to be evaluated. (Ex. 302, Pederson Dep. 44-45, 50-51.)

Having received Dr. Lenard's order for an urgent transfer to the ER by ambulance, Nurse Pederson located Captain Allen and relayed to her that Dr. Leonard had ordered Mr. Sherrell to be transported to the ER by ambulance. (Ex. 302, Pederson Dep. 51.) Captain Allen initially said, "just a minute" and then she later told Nurse Pederson "that the transfer isn't going to happen." (*Id.*) Nurse Pederson attempted to negotiate with Captain Allen to convince her to carry out Dr. Leonard's order, but Captain Allen refused. (Ex. 302, Pederson Dep. 51-55.)

Nurse Pederson attempted to convince Captain Allen to send Mr. Sherrell to the ER "[a] couple [times]" but she ultimately realized that she would not change her mind and gave up trying. (Ex. 302, Pederson Dep. 56-57.) During this attempted negotiation process, Nurse Pederson told Captain Allen that Mr. Sherrell really needed to go to the ER: "[I told her that] I really felt uncomfortable with the patient there, that I had saw such a decline, that I had reached out to the provider. And I did tell her . . .  -- you know me. I wouldn't do this unless I really thought he needed to go." (Ex. 302, Pederson Dep. 58.) In fact, Nurse Pederson testified that she "almost begged" Captain Allen to change her mind but all to no avail. (Ex. 302, Pederson Dep. 58-59.) After she was certain Captain Allen would not change her mind, Nurse Pederson called Dr. Leonard and "told him what she said hoping that Dr. Leonard would call the captain back and advocate." (Ex. 302, Pederson Dep. 58.)

During her deposition, Captain Allen admitted that she did not personally review any surveillance video as part of her risk assessment and that she did not review Mr. Sherrell's prior history at Beltrami County Jail. (Ex. 321, Allen Dep. 168, 180.) She did not interview Mr. Sherrell and did not review his booking information. (Ex. 321, Allen Dep. 176-177, 184-185.) In fact, the probation officer on which Captain Allen allegedly relied to override Mr. Sherrell's ER visit never told Captain Allen that Mr. Sherrell had prior escape attempts and that Mr. Sherrell was actually in compliance with probation at the time. (Ex. 321, Allen Dep. 174.) And, in her own "informational report," Captain Allen describes calling the probation officer and then unilaterally deciding that the ER visit was not going to happen: "I inquired if he would be considered a high flight risk and Agent Uddin agreed. At that time I informed MEnD RN Crystal Pederson that we wouldn't be sending him today due to his high flight risk and that we didn't have an armed guard to bring him to the ER." (Ex. 17, p. 12648.)

In her deposition, Captain Allen admitted that her report states that she unilaterally decided to override Mr. Sherrell's ER visit, but she then claimed that her own report is chronologically incorrect. (Ex. 321, Allen Dep. 230-231.) It should also be noted that whatever the probation officer allegedly told Captain Allen is inadmissible hearsay and cannot be used to support summary judgment. *See Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817 (8th Cir. 2010).

Nurse Pederson admitted in her deposition that, on August 30, she "felt that Mr. Sherrell was experiencing some kind of an emergency medical condition that needed to be evaluated by a doctor." (Ex. 302, Pederson Dep. 60-61.) She worked past 4:30 p.m.

8

that day and claims that she at some point went in his cell to tell him that jail administration was refusing to take him to the hospital and that she held his hand and cried with him. (Ex. 302, Pederson Dep. 82, 86.) Nurse Pederson testified that this was the last time she saw Mr. Sherrell that day and that she "didn't want him to feel like [she] abandoned him." (Ex. 302, Pederson Dep. 86.)

But surveillance video from the afternoon of August 30, 2018, shows that Nurse Pederson did, in fact, abandon Mr. Sherrell. Surveillance video shows Nurse Pederson coming in to speak with Mr. Sherrell at 2:25 p.m. (Ex. 110, 02:25:00.) Nurse Pederson stayed and spoke with Mr. Sherrell until 2:32 p.m., and then exited the cell. (Ex. 111, 02:25:09 – 02:32:40.) When Mr. Sherrell struggled to put on an adult diaper and a pair of pants – to the point of exhaustion – Nurse Pederson was nowhere to be found. (Ex. 111, 03:00:00 – 03:18:00.) And When Mr. Sherrell collapsed out of his wheelchair at 3:20 p.m., Nurse Pederson was likewise nowhere to be found. (Ex. 111, 3:20:00 – 03:38:18.) Although, per MEnD's policy, Nurse Pederson had the ability to call 911 in an effort to get Mr. Sherrell to the hospital, (Ex. 9, p. 232), she left work and took no other action to arrange an ER transport for Mr. Sherrell. (Ex. 302, Pederson Dep. 76.) In the end, Dr. Leonard provided Nurse Pederson positive feedback on her performance and told her "[she] did a great job." (Ex. 302, Pederson Dep. 92.)

Dr. Leonard admits that he and Nurse Pederson had a "fairly in-depth conversation about all the things that [Mr. Sherrell] . . . was bringing up," (Ex. 304, Leonard Dep. 181), and that Nurse Pederson reported to him that Mr. Sherrell was unable to feel anything from the waist down, that he urinated on himself at night, and that he was

reporting difficulty swallowing, (Ex. 304, Leonard Dep. 182-184.) Nurse Pederson told Dr. Leonard that she "was very strongly feeling that this patient needed to go in, (Ex. 302, Pederson Dep. 45), and Dr. Leonard decided that he "want[ed] . . . [Mr. Sherrell] to get evaluated at the emergency department that day," (Ex. 304, Leonard Dep. 181). Dr. Leonard testified that, given Mr. Sherrell's symptoms, he "needed a further evaluation with means beyond what we have in the facility." (Ex. 304, Leonard Dep. 183.) At the conclusion of their conversation, Dr. Leonard directed Nurse Pederson to have Mr. Sherrell transported to the "emergency department for an evaluation on August 30th." (Ex. 304, Leonard Dep. 187.) Nurse Pederson testified that Dr. Leonard ordered for Mr. Sherrell to be transported to the ER by ambulance, (Ex. 302, Pederson Dep. 49), which Dr. Leonard does not dispute, (Ex. 304, Leonard Dep. 187.)

Dr. Leonard admits that Nurse Pederson called him back on the afternoon of August 30, 2018, and reported that "we were being told in no uncertain terms that [Mr. Sherrell] was not going to go to the ER that day," (Ex. 304, Leonard Dep. 191), and that Captain Allen made a decision that Mr. Sherrell was a security risk and that he would not be transported to the ER, (Ex. 304, Leonard Dep. 192-93, 195). Dr. Leonard understood that Captain Allen unilaterally refused to follow his  medical directive without consulting him. (Ex. 304, Leonard Dep. 195.)

Even though earlier that morning Dr. Leonard had ordered Mr. Sherrell to be transported to the ER by *ambulance*, once he learned that Captain Allen refused to follow his medical directive he decided that "we will accept this for now." (Ex. 304, Leonard Dep. 193.) And despite his own admission that there was inadequate means at Beltrami

County Jail to properly evaluate Mr. Sherrell's medical condition, (Ex. 304, Leonard Dep. 183, 200), Dr. Leonard took no action whatsoever to contact Captain Allen to enforce his medical directive, (Ex. 304, Leonard Dep. 197-198). Despite MEnD's own "Medical Autonomy" policy directing that all "medical decisions concerning health care services provided to detainees are the sole responsibility of qualified health care personnel and will not be unduly compromised solely for security reasons," (Ex. 9, p. 248), and despite the fact that he "wanted [Mr. Sherrell] to go the emergency department," (Ex. 304, Leonard Dep. 199-200), Dr. Leonard refused to intervene because he felt that there was nothing he could do. (Ex. 304, Leonard Dep. 198-199.) Dr. Leonard also made no attempt or effort to travel to Beltrami County Jail to assess Ms. Sherrell or arrange for his medical care. (Ex. 304, Leonard Dep. 208.)

After Nurse Pederson reported that Captain Allen had canceled his ER evaluation directive, Dr. Leonard had no further involvement in Mr. Sherrell's care that day and did not contact the jail to check on his status. (Ex. 304, Leonard Dep. 201.) In fact, Dr. Leonard testified that not hearing anything else about Mr. Sherrell that day was "obviously very reassuring." (*Id.*) Unfortunately, Mr. Sherrell was not feeling so reassured as he collapsed out of his wheelchair and got trapped under the bunk mattress at 3:20 p.m. on August 30:



(Ex. 111, 03:31:49.) Nonetheless, Mr. Sherrell had retained some degree of strength, function, and mobility that day. He was able to turn his head and hands and eat a meal independently around 5:30 p.m. (Ex. 112.) He was able to hold, drink, and set down a bottle of water independently. (Ex. 112, 03:39:19 – 04:11:00.) He was able to grab, hold, lift, bite, and lower an apple on his own. (Ex. 112, 05:37 – 05:50.) And he was also able to push his wheelchair back and forth using his hand. (Ex. 112, 05:51:00 – 05:52:00.) The record is undisputed that Mr. Sherrell remained in cell 215 until the morning of August 31, 2018.

5. ***August 31: Mr. Sherrell is Finally Transported to Sanford ER After Evaluation by Stephanie Lundblad.***

On the morning of August 31, 2018, at approximately 9:45 a.m., MEnD Certified Nurse Practitioner Stephanie Lundblad arrived at the jail and examined Mr. Sherrell. (Ex. 3, p. 412; Ex. 113, 09:44:00 - 10:01:00.) Ms. Lundblad noted that Mr. Sherrell's symptoms had gone on for 3-4 days, that Mr. Sherrell did not have feeling from his stomach down, and that he had trouble swallowing. (Ex. 3, p. 412.) She observed facial drooping, slight slurring of speech, and muscle weakness and was concerned that Mr. Sherrell had suffered a stroke. (*Id.*; Ex. 304, Leonard Dep. 203.) Nurse Lundblad requested an immediate ER transport and made arrangements with jail staff. (Ex. 3, p. 412.)

6. ***August 31: Mr. Sherrell is Misdiagnosed with Malingering Due to False Statement by Defendant Officer Fredrickson.***

Mr. Sherrell was initially admitted to Sanford ER in Bemidji at 10:34 a.m. (Ex. 11, p. 1.) Dr. Darshan Khalsa examined Mr. Sherrell and noted lower extremity weakness and loss of sensation, including loss of reaction to painful stimuli, upper extremity weakness, and complete upper and lower facial droop. (Ex. 11, p. 1-6.) Dr. Khalsa requested an MRI but an MRI could not be performed at Sanford Bemidji at the time. (*Id.*) Dr. Khalsa then arranged for Mr. Sherrell to be transported to Sanford Fargo for an MRI. (Ex. 11, p. 3-4.)

Mr. Sherrell arrived at Sanford ER in Fargo at approximately 5:35 p.m. and was placed under the care of Dr. Dustin G. Leigh. (Ex. 11, p. 66.) Dr. Leigh examined Mr. Sherrell and also found lower extremity weakness, upper extremity weakness, loss of

sensation, and facial droop. (Ex. 11, p. 69.) Dr. Leigh ordered lab testing and an MRI, and both returned and showed no abnormalities. (Ex. 11, p. 71.) Dr. Leigh's note states, "[f]ollowing MRI, . . . a second deputy arrived providing further history that the patient was reportedly on a monitor last evening unknown to the patient i[t] was witnessed moving his extremities without apparent difficulty." (Ex. 11, p. 71.) Dr. Leigh's note also states, "I did discuss both with the deputy sheriffs as well as patient indications for emergent return locally or to Sanford." (Ex. 11, p. 71.)

Dr. Leigh diagnosed Mr. Sherrell with "malingering" and "weakness" and discharged him back to the jail with a set of specific discharge instructions. (Ex. 11, p. 129-131.) The discharge instructions stated as follows:

> YOU SHOULD SEEK MEDICAL ATTENTION IMMEDIATELY, EITHER HERE OR AT THE NEAREST EMERGENCY DEPARTMENT, IF ANY OF THE FOLLOWING OCCURS:
> - Confusion, coma, agitation (becoming anxious or irritable).
> - Fever (temperature higher than 100.4ºF / 38ºC), vomiting.
> - Severe headache.
> - Signs of stroke (paralysis or numbness on one side of the body, drooping on one side of the face, difficulty talking).
> - Worsening of weakness, difficulty standing, paralysis, loss of control of the bladder or bowels or difficulty swallowing.

(Ex. 11, p. 130.) Notably, the same discharge instructions were printed independently and appear as a 4-page document in Mr. Sherrell's Beltrami County Jail Medical record. (Ex. 12.)

Dr. Leigh was deposed in this case and he testified that he was a new physician at Sanford and that he saw Mr. Sherrell during his first week of seeing patients. (Ex. 306, Leigh Dep. 44.) Dr. Leigh denied telling Mr. Sherrell that he could walk unassisted if he

tried and he likewise denied telling Mr. Sherrell that there was nothing wrong with him and that he could start walking if he chooses to. (Ex. 306, Leigh Dep. 76.) Dr. Leigh testified that there were two officers present with Mr. Sherrell, one of whom pulled Dr. Leigh aside and told him that Mr. Sherrell had been recently seen moving his extremities without difficulty. (Ex. 306, Leigh Dep. 77.) Dr. Leigh trusted what this officer was saying and found him to be reliable. (Ex. 306, Leigh Dep. 78.) Critically, Dr. Leigh testified that he would not have diagnosed Mr. Sherrell with malingering but for the information he received from one of the officers indicating that Mr. Sherrell had been recently seen on camera moving his extremities without difficulty. (Ex. 306, Leigh Dep. 27-28, 81.)

Dr. Leigh testified that, at the time of the malingering diagnosis, he did not know that Mr. Sherrell had difficulty swallowing or that he was unable to eat solids. (Ex. 306, Leigh Dep. 83-84.) At the time of the malingering diagnosis, Mr. Sherrell did not present symptoms of clearing his throat or choking. (Ex. 306, Leigh Dep. 84.) Mr. Sherrell also did not present with the symptom of inability to hold or control his neck. (Ex. 306, Leigh Dep. 86-87.) Mr. Sherrell also did not present with the symptoms of inability to control his bladder or bowels. (Ex. 306, Leigh Dep. 87-88.) Mr. Sherrell also did not present the symptoms of slurred speech or inability to speak. (Ex. 306, Leigh Dep. 88-89.) Dr. Leigh testified that he tested the range of motion of Mr. Sherrell's neck and found it to be within normal limits, meaning that he observed Mr. Sherrell being able to turn his neck at least 45 degrees in each direction. (Ex. 306, Leigh Dep. 99-100.)

Dr. Leigh testified that he is confident that he discussed Mr. Sherrell's discharge instructions with the officers because that is what he charted in his note on the day of Mr. Sherrell's ER visit. (Ex. 306, Leigh Dep. 94.) Dr. Leigh told Mr. Sherrell and the two officers that if Mr. Sherrell's weakness becomes worse or if his condition progresses that he should return to the ER. (Ex. 306, Leigh Dep. 71.) Dr. Leigh further testified that the printed discharge instructions would have been provided to Mr. Sherrell by the nurse shortly prior to discharge and after Dr. Leigh verbally discussed the discharge instructions with Mr. Sherrell and the two deputies. (Ex. 306, Leigh Dep. 95-96.) Dr. Leigh specifically expected that the verbal and written discharge instructions that were provided to the officers would be communicated and turned over to jail administration and jail medical staff upon Mr. Sherrell's return to the jail. (Ex. 306, Leigh Dep. 96-97.)

**7.    *September 1 and 2: Mr. Sherrell is Returned to Beltrami County Jail and is Abandoned to Die.***

Surveillance video shows that Mr. Sherrell returned to Beltrami County Jail intake at approximately 12:30 a.m. on September 1, 2018. (Ex. 133.) From there, he was brought to cell 214, where he was dumped onto the bunk by Defendant Officers Gallinger, Fredrickson, and Sgt. Scandinato and left in the cell partially hanging off the edge of the bunk. (Ex. 114, 12:45:20.) Mr. Sherrell spent the last two days of his life suffering on the floor of this cell while paralyzed, alone, immobile, and unable to move, eat, drink, use the restroom, or contact his family. (See Ex. 114-131.) After fighting for his life for two more days, Mr. Sherrell's respiratory muscles succumbed to paralysis and he became unresponsive and stopped breathing. (Ex. 5, p. 13-14, 16-17; Ex. 130-131.)

After all life-saving efforts failed, Mr. Sherrell was pronounced deceased at 5:25 p.m. on September 2, 2018. (Ex. 18.)

Although it would be ideal to provide more detail as to what occurred on September 1 and 2 in this Statement of Facts, doing so will result in excessive repetition and use of words, which are limited per the local rules and this Court's order. Since Plaintiff is required to establish individual liability for each defendant and provide specific citation to evidence in the record, Plaintiff has elected to provide a detailed factual account as to each Defendant she seeks to hold liable in the Argument section of this memorandum below. For a general overview of the suffering Mr. Sherrell endured during the last two days of his life while Defendants went on about their business believing that he was faking, Plaintiff respectfully directs the Court's attention to Exhibits 114-131 (surveillance video) as well as Plaintiff's First Amended Complaint (Doc. No. 30).

## 8. *Mr. Sherrell's Cause of Death: Guillain-Barre Syndrome.*

Mr. Sherrell's autopsy was initially performed by Dr. Michael McGee from Ramsey County Medical Examiner's Office, but Dr. McGee was unable to determine a cause of death. (Ex. 13.) Mr. Sherrell's cause of death was subsequently determined by Dr. Amanda Youmans, who is a licensed physician and board certified anatomic and forensic pathologist, and Dr. Jeffrey A. Allen, a board certified neurologist and University of Minnesota professor who specializes in inflammatory neuropathies. Dr. Youmans and Dr. Allen have both opined, with high degree of medical certainty, that Mr. Sherrell died as a result respiratory failure cause by undiagnosed and untreated Guillain-

Barre Syndrome (GBS). (Ex. 201, p. 9; Ex. 205, p. 3-4.) Dr. Youmans and Dr. Allen's diagnosis of GBS remains unchallenged by any of the defendants in this lawsuit and no evidence has been submitted that in any way challenges or rebuts this diagnosis.

GBS is a "disease . . . caused by the body's immune system attacking its own nerves, damaging the protective covering of the nerve fibers and preventing signals from getting to the brain." (Ex. 205, p. 3.) Common symptoms associated with GBS include "weakness, numbness, and paralysis." (*Id.*) "The hallmark of this disease is an ascending paralysis of the limbs." (*Id.*) "When untreated, this disease may progress to affect the nerves that control the diaphragm leading to breathing difficulties, respiratory failure, and death." (*Id.*) "[Mr. Sherrell's] symptoms were entirely consistent with the most common way that GBS presents and evolves (i.e., tingling and pain, then leg weakness, then arm and face weakness, then trouble chewing, swallowing, and respiratory failure)." (Ex. 201, p. 9.)

Dr. Allen has opined that, if Mr. Sherrell "was admitted to the hospital on 9/2/2018, but prior to developing respiratory failure, there is about a 70% likelihood that at 6 months Mr. Sherrell would have been able to walk independently." (Ex. 201, p. 10.) Dr. Allen has further opined that, "if Mr. Sherrell was admitted to the hospital prior to developing respiratory failure on 9/1/2018 or 9/2/2018, there is about a 97-98% chance that Mr. Sherrell would have survived his condition and be alive today." (Ex. 201, p. 14.) Dr. Allen's opinions regarding Mr. Sherrell's chances for recovery and survival, as his opinions regarding the cause of death, remain unchallenged in this litigation.

**9.**      ***The Minnesota Department of Corrections Determines that Beltrami County Committed "Regular and Gross Violation[s]" of the Minnesota Jail Standards in Relation to Mr. Sherrell's Death.***

In May of 2020, the Minnesota Department of Corrections (DOC) concluded a comprehensive investigation into Mr. Sherrell's death and issues its findings:

> The result of our review is a finding of regular and gross violation of Minnesota Jail standards as set forth in chapter 2911 of the promulgated rules. While it is beyond the scope of our authority to determine whether or not compliance with the rules would or could have resulted in a different outcome, the deterioration of Mr. Sherrell's condition over his nine-day term of incarceration in the Beltrami County Jail is notable and disturbing. Below you will find a description of some of our findings. It should be noted that we did not document each specific violation of well-being checks or other requirements. However, our review did find that policy failures were pervasive and likely stemming from the incorrect belief that Mr. Sherrell was demonstrating symptoms of malingering versus a bonafide medical condition.

(Ex. 24.) The DOC specifically determined that Beltrami County violated Rule 2911.5800, which requires availability of medical services for jail inmates. (Ex. 24, p. 4.)

**10.**      ***The* Minnesota *Board of Medical Practice Suspends Dr. Leonard's License to Practice Medicine in Relation to Mr. Sherrell's Death.***

On January 21, 2022, the Minnesota Board of Medical Practice issued its final findings in response to the complaint filed by Stephanie Lundblad. (Ex. 25.) The Board's investigation, which lasted several years, focused on Dr. Leonard's egregious mishandling of Mr. Sherrell's medical care and Mr. Sherrell's death. The Board determined that Dr. Leonard "failed to conform the minimal standard of acceptable and prevailing medical practice" in his failure to return Mr. Sherrell to the ER on September 1 and 2, 2018. (Ex. 25, p. 87.) The board further determined that Dr. Leonard's conduct "demonstrated a careless disregard for the health, welfare and safety of [Mr. Sherrell] and

19

created unnecessary danger to [Mr. Sherrell's] life, health, and safety." (*Id.*) As a result of Dr. Leonard's "egregious" misconduct, the Board suspended Dr. Leonard's license to practice medicine "for an indefinite period of time." (Ex. 25, p. 88.)


## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).


## STANDARD OF REVIEW FOR QUALIFIED IMMUNITY

Public officers are entitled to qualified immunity unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009). To overcome the defendants' qualified immunity claims, the plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional right; and, (2) the right was clearly established at the time of the

deprivation. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010). This Court can exercise its sound discretion to determine which qualified immunity prong to address first. *Pearson*, 129 S. Ct. at 818. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal quotations omitted); *see also Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012).

The second prong of the qualified immunity analysis is whether the police officers' actions violated a clearly established statutory or constitutional right of which a reasonable person would have known. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Baribeau*, 596 F.3d at 478. "The fundamental question under this analysis is whether the state of the law, as it existed at the time of the arrest, gave the defendants 'fair warning' that the arrest was unconstitutional." *Baribeau*, 596 F.3d at 478 (quoting *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007)). "For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Pelzer,* 536 U.S. at 739. "The Supreme Court . . . has made it clear that there need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution." *Selk*, 508 F.3d at 875 (quoting *Pelzer*, 536 U.S. at 736).

## ARGUMENT

I.     **COUNT I (INDIVIDUAL CAPACITY - DELIBERATE INDIFFERENCE) -
GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY
JUDGMENT AGAINST DEFENDANTS LEONARD, SKROCH,
PEDERSON, ALLEN, SCANDINATO, FELDT, LORSBACH,
FREDRICKSON, GALLINGER, FOSS, SMITH, SELLA, WILLIAMS, AHD
HOPPLE.**

### A.     Legal Standard for Deliberate Indifference.

As a pretrial detainee, Mr. Sherrell's right to medical care arises under the Due

Process Clause of the Fourteenth Amendment to the United States Constitution. *See

Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). However, the Eighth Circuit

applies the Eighth Amendment deliberate indifference standard to cases involving pretrial

detainees' right to medical care. *Id.*

The Eighth Amendment prohibits the infliction of cruel and unusual punishment.

"[T]he treatment a prisoner receives in prison and the conditions under which he is

confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509

U.S. 25, 31 (1993). To prevail on an Eighth Amendment claim for deprivation of medical

care, an inmate must show that the prison official was deliberately indifferent to the

inmate's serious medical needs. *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997).

This requires a two-part showing that (1) the inmate suffered from an objectively serious

medical need, and (2) the prison official knew of the need yet deliberately disregarded it.

*Id.; see also Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Estelle v. Gamble,* 429 U.S.

97, 105 (1976).

A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995). A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary. *Hartsfield v. Colburn,* 371 F.3d 454, 457 (8th Cir. 2004).

Deliberate indifference is equivalent to criminal-law recklessness, which is "more blameworthy than negligence," yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate. *See Farmer,* 511 U.S. at 835, 839-40. An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. *Lenz v. Wade,* 490 F.3d 991, 995 (8th Cir. 2007). Deliberate indifference must be measured by the official's knowledge at the time in question, not by "hindsight's perfect vision." *Id.* at 993 n.1 (quoting *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir. 1998)). Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact. *Coleman,* 114 F.3d at 785. "[T]he law [is] clearly established that a prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Meloy v. Bachmeier*, 302 F.3d 845, 847 (8th Cir. 2002).

> **B.**    **Facts Establishing Individualized Liability as to Defendants Leonard, Skroch, Pederson, Allen, Scandinato, Feldt, Lorsbach, Fredrickson, Gallinger, Foss, Smith, Sella, Williams, and Hopple.**

> **1.**    **Nurse Michelle Skroch (September 1-2).**

Nurse Skroch testified that she received information pertaining to Mr. Sherrell prior to September 1 from Nurse Pederson. (Ex. 305, Skroch Dep. 27-29.) Nurse Pederson reported to her that Mr. Sherrell was experiencing lower extremity weakness and that he was being sent to the hospital for an evaluation. (Ex. 305, Skroch Dep. 29.)

As soon as Nurse Skroch got to work on September 1, she recovered Mr. Sherrell's discharge instructions from Sanford either at central control or at the medical station desk. (Ex. 305, Skroch Dep. 34-35.) In addition, Mr. Sherrell's chart was on the nurse's desk where Nurse Pederson left it the day prior. (Ex. 305, Skroch Dep. 36.) Nurse Skroch testified that she also spoke with correctional staff who reported to her that Mr. Sherrell had returned from the hospital and that he "wiggled himself off the bunk and onto the floor" and that he was doing the same thing as the day before. (Ex. 305, Skroch Dep. 38.) Officers also reported to her concerns about Mr. Sherrell being a flight risk. (Ex. 305, Skroch Dep. 40.) Based on all this information, Nurse Skroch knew she "needed to follow up with him that day." (Ex. 305, Skroch Dep. 38.) Nurse Skroch testified, "it's our standard protocol that when anyone comes back from the hospital, we do need to *meet* with them. So I knew he needed to be seen." (Ex. 305, Skroch Dep. 42 (emphasis added).) Prior to seeing Mr. Sherrell, Nurse Skroch "paged through" his discharge instructions from Sanford and she "skimmed the last couple notes" from his jail medical record. (Ex. 305, Skroch Dep. 43.) Nurse Skroch admitted that she was

"suspicious" of the malingering diagnosis initially on September 1, but even more so after she spoke with Mr. Sherrell on September 2 and believed that Mr. Sherrell had been misdiagnosed at Sanford. (Ex. 305, Skroch Dep. 75-76, 122-123.)

The medical record indicates that Nurse Skroch charted her first note pertaining to Mr. Sherrell at 11:45 a.m., which means that she was already at work by 11:45 a.m. (Ex. 3, p. 399.) Nurse Skroch confirmed that she only saw Mr. Sherrell once on September 1, 2018, at what she charted as 1300 hours (1:00 p.m.). (Ex. 305, Skroch Dep. 29; Ex. 3, p. 399.) However, surveillance video for September 1 establishes that Nurse Skroch fabricated the time of her visit with Mr. Sherrell and that she did not see him until after 2:00 p.m., which means that she had been at work for over two hours on September 1, when she finally decided to "meet" with Mr. Sherrell. (Ex. 118, 2:00:00 – 02:08:45; Ex. 305, Skroch Dep. 49.) During her entire shift on September 1, Nurse Skroch saw Mr. Sherrell only one time and she never returned to check on him even though the medical record indicates she was at the jail until at least 5:30 p.m.. (Ex. 305, Skroch Dep. 46-47.)

Based on the surveillance video, Nurse Skroch's "meeting" with Mr. Sherrell lasted just minutes. (Ex. 118, 2:00:00 – 02:08:45.) She admitted that she failed to take any of Mr. Sherrell's vital signs at any time on September 1. (Ex. 305, Skroch Dep. 55.) She never measured his temperature, she never measured his heart rate, she never took his blood pressure, and she never measured his respiratory rate, and she never measured his oxygen saturation. (Ex. 305, Skroch Dep. 55.) Nurse Skroch testified that during her visit with him, Mr. Sherrell was "laying there talking to me comfortably in a sense . . . ." (Ex. 305, Skroch Dep. 56.) Mr. Sherrell's comfort level during his entire visit with Nurse

Skroch is depicted accurately in the screenshot below as his body barely moved during the entire time Nurse Skroch stood in the doorway:



(Ex. 118, 02:06:00.) As the video shows, Nurse Skroch never even entered Mr. Sherrell's cell and spoke with him through the threshold. (Ex. 118, 2:00:00 – 02:08:45.)

Nurse Skroch did not generate a care plan for Mr. Sherrell but instead relied on what occurred at Sanford:

> So I'm like, well, he's just had vitals, and they didn't order any new vitals recheck, they didn't order any medications, they didn't order him to use a wheelchair, they didn't order him to follow up with any medical appointments. So that gave me a lot of data that I need to encourage this guy to get up today and move.

(Ex. 305, Skroch Dep. 58.) When Nurse Skroch was reminded that Mr. Sherrell had not "just had vitals," she stated, "I honestly don't think that makes that big of a difference in

26

my mindset." (Ex. 305, Skroch Dep. 59.) During her visit with Mr. Sherrell on September 1, Mr. Sherrell was not drooling or spitting his saliva and she did not observe any drool or saliva around his face. (Ex. 305, Skroch Dep. 61.) However, his cell smelled like urine and feces and he was clearing his throat and telling Nurse Skroch that he was choking. (Ex. 3, p. 399; Ex. 305, Skroch Dep. 63.) Nurse Skroch dismissed his report of choking because it "wasn't matching what [she] was seeing." (Ex. 305, Skroch Dep. 63.) In addition, Mr. Sherrell reported wanting to but not being able to move and asked for assistance with a shower. (Ex. 3, p. 399.) Despite Nurse Skroch's own note stating that Mr. Sherrell's cell "smelled like urine and feces," (Ex. 3, p. 399), she claims she did not see anything warranting concern about incontinence. (Ex. 305, Skroch Dep. 65.) Oddly, even though Nurse Skroch planned to be at the jail for several hours longer, she determined shortly after 2:00 p.m. that she was not going to see Mr. Sherrell again until the following day. (Ex. 3, p. 399 ("Will recheck tomorrow."); Ex. 305, Skroch Dep. 70.)

Despite Mr. Sherrell's concerning physical appearance and the seriousness of his symptoms, Nurse Skroch failed to perform any physical examination of Mr. Sherrell at any time on September 1. (Ex. 305, Skroch Dep. 64.) When asked why she had not, her response was that she "didn't see any observation of concern." (Ex. 305, Skroch Dep. 64.) Nurse Skroch also confirmed that the primary reason for her decision not to perform a physical exam was not the safety concern but instead that she simply felt that a physical exam was unnecessary at the time. (Ex. 305, Skroch Dep. 65.) When asked to explain her treatment plan for Mr. Sherrell on September 1, Nurse Skroch responded, "My plan was

that he needed to try to get up and move around that day based on the hospital's discharge instruction." (Ex. 305, Skroch Dep. 73.)

However, per report of Officer in Charge Melissa Bohlman, Nurse Skroch advised Officer Bohlman "that there was nothing medically wrong with him and that we shouldn't be assisting him with feeding, toileting, etc. as he is capable of doing it himself as he was medically cleared by the hospital." (Ex. 5, p. 15; Ex. 307, Bohlman Dep. 65.) Nurse Skroch testified that she did not believe that Mr. Sherrell was experiencing a medical emergency when she left work on September 1, 2018. (Ex. 305, Skroch Dep. 104.)

Nurse Skroch returned to Beltrami County Jail around 8:30 a.m. on the morning of September 2, at which point she immediately saw Mr. Sherrell. (Ex. 305, Skroch Dep. 112.) She was told by correctional staff that Mr. Sherrell was up and in a wheelchair getting ready for a bath. (Ex. 305, Skroch Dep. 115.) She claims she "was worried about him, so [she] obviously wanted to see him right away." (Ex. 305, Skroch Dep. 114.) Although this interaction was not captured on surveillance video, Mr. Sherrell was brought to Cell 222 immediately thereafter, and his condition immediately after speaking with Nurse Skroch is captured on that surveillance video. (Ex. 132.) Nurse Skroch's note indicates that Mr. Sherrell was sitting in the chair with "urine soaked pants" and that he spoke only using the right side of his mouth but then switched to using both sides. (Ex. 3, p. 398.) Mr. Sherrell reported that he was thirsty and tried to eat and move but could not. (*Id.*) Nurse Skroch charted that she offered Mr. Sherrell some apple juice but he initially declined; when she insisted, he stated he could not hold the bottle. (*Id.*) Nurse Skroch

then poured some apple juice into his mouth and Mr. Sherrell swallowed and said he was choking. (*Id.*)

Nurse Skroch testified that, based on her conversation with Mr. Sherrell, she observed "that he has muscle control of his core to hold himself up and hold his legs up." (Ex. 305, Skroch Dep. 119.) These observations are clearly inconsistent with Mr. Sherrell's condition as depicted in the surveillance video from Cell 222. (Ex. 132.) Nurse Skroch testified that Mr. Sherrell turned and held his head when she approached to see him. (Ex. 305, Skroch Dep. 120.) Once again, surveillance video from Cell 222 is inconsistent with this finding and shows Mr. Sherrell having no ability to hold his body and also being unable to support his head/neck. (Ex. 132, 09:06:00 – 09:06:30.) Nurse Skroch claims that Mr. Sherrell told her that he had urinated on himself because he was unable to get to the toilet and not because he was experiencing incontinence, a finding Nurse Skroch testified "was really important to [her]." (Ex. 305, Skroch Dep. 119.) Yet this alleged comment by Mr. Sherrell, which Nurse Skroch now claims was so important, is nowhere to be found in her medical record. (See Ex. 3, p. 398; Ex. 305, Skroch Dep. 124.) Nurse Skroch admitted that this was the only time she spoke with Mr. Sherrell that day. (Ex. 305, Skroch Dep. 127.)

Nurse Skroch admitted that the facial droop she observed on September 2 was a new development as she had not noticed facial droop on September 1. (Ex. 305, Skroch Dep. 126.) Similarly, Nurse Skroch did not see Mr. Sherrell with urine soaked pants on September 1 as he presented to her on September 2, so that was a new development as well. (Ex. 305, Skroch Dep. 131.) The only physical contact between Nurse Skroch and

Mr. Sherrell on September 2 was that she put her hand on his shoulder when she poured juice into his mouth. (Ex. 305, Skroch Dep. 131.) Nurse Skroch admitted that she did not measure Mr. Sherrell's vital signs at any time on September 2, 2018. (Ex. 305, Skroch Dep. 137.) Madison Brewster (now Madison Amey) also confirmed during her deposition that, prior to his respiratory failure at approximately 4:45 p.m., she never took Mr. Sherrell's vitals on September 2 and was not directed to do so by Nurse Skroch. (Ex. 327, Brewster Dep. 63-64.) Nurse Skroch did not perform any strength testing on Mr. Sherrell at any time. (Ex. 305, Skroch Dep. 144.) Even though Nurse Skroch observed facial droop and urine soaked pants, both new developments from September 1, and even though Mr. Sherrell still claimed he was unable to swallow and that he felt like he was choking, Nurse Skroch was reassured and concluded that "things were heading in a positive direction." (Ex. 305, Skroch Dep. 137.)

Nurse Skroch testified that Mr. Sherrell was "very calm about everything" when she saw him that morning and that he "wasn't angry" and "wasn't scared" and "was very nonchalant." (Ex. 305, Skroch Dep. 132.) But Defendant Officer James Foss testified that he was at work that morning and remembers moving Mr. Sherrell from his cell for a bath. (Ex. 308, Foss Dep. 43-44.) During this time, Nurse Skroch was "screaming at him, telling him he's faking, telling him to get up." (Ex. 308, Foss Dep. 42-44.) Officer Foss testified that he felt Nurse Skroch was disrespectful and angry at Mr. Sherrell. (Ex. 308, Foss Dep. 45-46.)

When asked whether she was following the ER discharge instructions from Sanford, she testified that she was "doing above and beyond what they're

recommending." (Ex. 305, Skroch Dep. 150.) To be sure, Nurse Skroch testified that could not even remember whether she was aware of the specific discharge instructions listed on the Sanford discharge instructions document, (Ex. 12). (Ex. 305, Skroch Dep. 148-155.) Even though she was present at the jail during lunch meal pass, she did not check in on Mr. Sherrell during lunch to see whether he was eating or drinking or needed assistance. (Ex. 305, Skroch Dep. 158-159.)

After the initial morning visit, Nurse Skroch checked on Mr. Sherrell at 11 a.m. and charted that he was on the floor with apple juice in hand. (Ex. 3, p. 398.) During her deposition, Nurse Skroch testified that Mr. Sherrell was sleeping at the time. (Ex. 305, Skroch Dep. 162.) Her next and final note for September 2 is timed 1400 hours and states that Mr. Sherrell was "laying on back on mattress" with "[s]pit rolling down his cheek." (Ex. 3, p. 398.) However, during her deposition, Nurse Skroch changed her story and testified that Mr. Sherrell "was sleeping comfortably, like he was sleeping so hard he was drooling." (Ex. 305, Skroch Dep. 163.) She further testified that "there was no distress in his breathing, there was no shallow breaths or agonal breathing." (Ex. 305, Skroch Dep. 163.)

But surveillance video from Mr. Sherrell's cell tells quite a different story. (Ex. 129.) In fact, precisely at 2:00 p.m. on September 2, Mr. Sherrell does experience a clear episode of distress and labored breathing. (Ex. 129, 02:00:00 – 02:01:00.) This is finding not only obvious to a lay person, but that has also been corroborated by Plaintiff's experts Dr. Allen, (Ex. 207, p. 2, ¶7), and Nurse Ward, (Ex. 209, p. 18), in their supplemental reports. If Nurse Skroch found a slight bit of compassion for Mr. Sherrell and popped in

to check his vitals when she saw him on the floor with "spit rolling down his cheek," she could have easily saved his life. As Dr. Allen explains in his supplemental report, a simple vital sign check at 2:00 p.m. on September 2 would have likely saved Mr. Sherrell's life:

> The record in this case establishes that Nurse Michelle Skroch saw Mr. Sherrell for the last time on September 2, 2018, at 2:00 p.m. Her chart note states that, at this time, Mr. Sherrell was "laying on back on mattress [with] spit rolling down his cheek." I have reviewed the surveillance video of Mr. Sherrell at 2:00 p.m. on September 2, 2018, as well as the period immediately before and after 2:00 p.m. The surveillance video shows Mr. Sherrell suffering respiratory impairment and difficulty breathing at 2:00 p.m., which is evidenced by labored breathing and pronounced chest movement. . . . [A] vital signs check at this time would have most likely revealed cardiovascular instability and an ECG, if performed, would have revealed episodes of cardiac arrhythmias. This, in conjunction with Mr. Sherrell's labored breathing, should have prompted an immediate return to the emergency department for evaluation and monitoring.

(Ex. 207, p. 2, ¶7.) But Nurse Skroch instead chose to do nothing in response to Mr. Sherrell's condition as observed at 2:00 p.m., determined that he was not in need of emergency medical care (or any medical care), and left the jail shortly after to go home. (Ex. 305, Skroch Dep. 165.)

In addition to abandoning Mr. Sherrell at the jail, she failed to inform jail staff what to look for while monitoring Mr. Sherrell; instead, Nurse Skroch simply told the jail staff to "call [her] if anything changes." (Ex. 305, Skroch Dep. 173.) During his shift on September 2, Officer Williams was not provided Mr. Sherrell's discharge instructions in paper or verbally, was not provided any instructions as to how to monitor Mr. Sherrell, and did not receive any instructions as to what type of symptoms to look for while monitoring Mr. Sherrell or what to look for to determine whether he needs to return to the

hospital. (Ex. 310, Williams Dep. 61-68.) Even though Beltrami County Jail had the Pass On Logs, (Ex. 4), a form specifically designed to allow nurses to pass on necessary medical information to correctional staff, Nurse Skroch failed to make any mention of Mr. Sherrell's discharge instructions, or the symptoms listed in the discharge instructions, in the Pass On log. (Ex. 4, p. 382-383.) In fact, Nurse Skroch's Pass On log for September 1 contains no information pertaining to Mr. Sherrell at all. (Ex. 4, p. 383.)

### 2.   Dr. Todd Leonard (August 27-September 2).

Nurse Skroch testified that she had one conversation with Dr. Leonard on September 1 pertaining to Mr. Sherrell and then another one prior to Mr. Sherrell's death on September 2. (Ex. 305, Skroch Dep. 80, 139.)

On September 1, Nurse Skroch reported to Dr. Leonard that Mr. Sherrell was still experiencing significant weakness. (Ex. 304, Leonard Dep. 217.) Dr. Leonard never asked Nurse Skroch to provide Mr. Sherrell's vital signs. (Ex. 304, Leonard Dep. 217-218.) When asked whether Nurse Skroch took Mr. Sherrell's vitals on September 1, his response was, "I don't recall that level of detail." (Ex. 304, Leonard Dep. 217.) Dr. Leonard testified that Mr. Sherrell was "stable clinically" on September 1, 2018. (Ex. 304, Leonard Dep. 220.) After speaking with Nurse Skroch, Dr. Leonard decided that Mr. Sherrell should see a neurologist. (Ex. 304, Leonard Dep. 222-223.) When asked to explain why he though a neurology consult was warranted, Dr. Leonard explained that he was concerned about Mr. Sherrell's medical condition: "I didn't feel like things were matching still. I felt like there was just something odd and bizarre about this case. While there was some really reassuring formation from the emergency department, my clinical

gut told me that there's just not something right about this case, and I still had concerns."
(Ex. 304, Leonard Dep. 223-224.) Dr. Leonard explained, "I was not convinced that [Mr.
Sherrell] didn't have some sort of neurological issue, and that's why I wanted neurology
involved. (Ex. 304, Leonard Dep. 224.)

As for Mr. Sherrell's medical record from Sanford, Dr. Leonard never asked
Nurse Skroch to send him a copy and he never obtained a physical or electronic copy
prior to Mr. Sherrell's death. (Ex. 304, Leonard Dep. 228-229.) Dr. Leonard didn't need a
copy, it turns out, because he was "getting all the information literally spoon-fed to [him]
on the phone." (Ex. 304, Leonard Dep. 229.) Dr. Leonard did learn that Mr. Sherrell had
been diagnosed with malingering and weakness. (Ex. 304, Leonard Dep. 230.) Dr.
Leonard was also advised about the note in Dr. Leigh's chart indicating that a Beltrami
County officer told him that Mr. Sherrell had been seen moving his extremities without
difficulty, and Dr. Leonard understood that this comment factored into Dr. Leigh's
decision-making process leading to the malingering diagnosis at Sanford. (Ex. 304,
Leonard Dep. 233-234.)

After reviewing the Sanford medical record, Dr. Leonard became suspicious of the
malingering diagnosis and he testified that he "wasn't convinced." (Ex. 304, Leonard
Dep. 236-237.) Even though Dr. Lenard was having doubts about how the malingering
diagnosis was reached and was concerned that Mr. Sherrell was experiencing an ongoing
neurological illness, he did not drive out to Beltrami County Jail on September 1 to
examine Mr. Sherrell himself: "I didn't feel that driving up there would yield some
additional information when I've already referred this man to higher care and they've

done an extensive workup and given all the information to me." (Ex. 304, Leonard Dep. 237-238.)

Dr. Leonard knew that Sanford provided a set of discharge instructions for Mr. Sherrell and he testified that he and Nurse Skroch at least glanced over the discharge instructions during their call on September 1. (Ex. 304, Leonard Dep. 244-247.) Dr. Leonard also testified that he knew that once Nurse Skroch finished here shift, there would be no medical staff on site and Mr. Sherrell would be left in the care of jail correctional officers with no medical training. (Ex. 304, Leonard Dep. 242.) But, oddly, Dr. Leonard did not feel that it was appropriate for Nurse Skroch to share Mr. Sherrell's discharge instructions with correctional staff:

> Q.    . . . My question was, in your opinion, was it important for Nurse Skroch to relay this information [in the Sanford discharge instructions] to the jail correctional staff to have while she was not on duty at the jail?
>
> . . .
>
> A.    No. . . . I think it's important to have a . . . good solid pass-on to the correctional staff, and I believe she was doing that.

(Ex. 304, Leonard Dep. 247.) Of course, Nurse Skroch's pass-on note from September 1 makes no mention about Mr. Sherrell whatsoever and her pass-on note from September 1 makes no mention of the discharge instructions from Sanford or what types of symptoms correctional officers should have been looking for while monitoring Mr. Sherrell. (Ex. 4, p. 328-383.) When asked whether he directed Nurse Skroch to relay the specific symptoms outlined in the Sanford discharge instructions to correctional staff, Dr Leonard

testified, "I don't know if I can speak to that level of detail. I don't remember the exact words we used." (Ex. 304, Leonard Dep. 248.)

On September 2, 2018, Nurse Skroch called Dr. Leonard and reported that she found Mr. Sherrell in urine-soaked pants and with facial droop. (Ex. 305, Skroch Dep. 141.) Nurse Skroch also reported to Dr. Leonard that Mr. Sherrell was reporting not being able to swallow and that he was reporting choking while swallowing. (*Id.*) Dr. Leonard admits that Nurse Skroch told him about the facial droop she observed on September 2 as well as Mr. Sherrell's difficulty with swallowing and choking. (Ex. 304, Leonard Dep. 260-262.) Dr. Leonard never asked Nurse Skroch whether she took his temperature, heart rate, blood pressure, respiratory rate, or oxygen saturation. (Ex. 305, Skroch Dep. 99-100.) Dr. Leonard did not ask whether Mr. Sherrell was eating or drinking, nor did he ask whether nurse Skroch assisted Mr. Sherrell with eating or drinking. (Ex. 305, Skroch Dep. 100.)

Dr. Leonard admits that he did not direct Nurse Skroch to take Mr. Sherrell's vital signs on September 2. (Ex. 304, Leonard Dep. 263.) Dr. Lenard stated that having Mr. Sherrell's blood pressure and oxygen saturation "would have been helpful information, but [he] did not ask for that information." (Ex. 304, Leonard Dep. 264.)

The simple task of assessing Mr. Sherrell's vital signs was not just "helpful information," as Dr. Leonard put it, but performing routine vital sign checks on September 2 would have saved Mr. Sherrell's life. As Dr. Allen explains in his supplemental report, if Mr. Sherrell's vitals had been taken on September 1 and 2, his "vital signs would have shown strong indicators of cardiovascular instability, including

episodes of bradycardia, tachycardia, hypotension, or hypertension, as well as episodes of unexplained blood pressure fluctuation." (Ex. 207, p. 2, ¶5.) And, [i]f an ECG was performed in the hours before Mr. Sherrell's death, it would have likely revealed episodes of cardiac arrhythmias (irregular heart beat). (Ex. 207, p. 2, ¶6.)

> [I]f Mr. Sherrell's vital signs had been taken on a regular basis on September 1 and September 2, 2018, the results would have prompted any competent nurse or medical doctor to return Mr. Sherrell to the emergency department well in advance of Mr. Sherrell's respiratory failure and in time for Mr. Sherrell to receive life-saving medical care.

(Ex. 207, p. 1.)

During his deposition, Dr. Leonard admitted that, on September 1 and September 2, 2018, he considered Guillain-Barre Syndrome as a differential diagnosis for Mr. Sherrell. (Ex. 304, Leonard Dep. 249-250.)

> Q.   Would you agree that Guillain-Barre Syndrome was part of your thinking process in terms of trying to figure out what was wrong with Mr. Sherrell?
>
> A.   Yeah . . . to some degree that was in my differential . . . .

(Ex. 304, Leonard Dep. 250.)





(Ex. 14, p. 1697-1698). During his deposition, Dr. Leonard also admitted that he knew in September of 2018 that untreated Guillain-Barre Syndrome can lead to paralysis of the respiratory muscles which, in turn, can lead to death:

> Q.   Were you aware back on September 1st and September 2nd, 2018, that untreated Guillain-Barre syndrome can lead to paralysis of respiratory muscles?
>
> . . .
>
> A.   Yes.
>
> Q.   And paralysis of respiratory muscles, you would also be aware, can lead to death; right?
>
> A.   Yes.

(Ex. 304, Leonard Dep. 255.)

Dr. Leonard never visited, spoke with, or examined Mr. Sherrell while he was detained in Beltrami County Jail in August and September, 2018. (Ex. 304, Leonard Dep. 130-131.) Despite Dr. Leonard directing Mr. Sherrell's medical care at Beltrami County Jail and Mr. Sherrell dying on his watch, Dr. Leonard never authored any type of medical record or report pertaining to his involvement in Mr. Sherrell's care. (Ex. 304, Leonard Dep. 131-132.) Dr. Leonard testified that he instead relied on his nurses to accurately

chart the information they were relaying to him and information he was relaying back to them. (Ex. 304, Leonard Dep. 150-151; 179-180.)

Stephanie Lundblad (the MEnD nurse practitioner who arranged Mr. Sherrell's ER visit on August 31) spoke with Dr. Leonard on September 4, 2018, just two days after Mr. Sherrell's death, at which time she discussed Mr. Sherrell with Dr. Leonard. (Ex. 10.) Dr. Leonard told Ms. Lundblad that he was updated over the weekend and knew that Mr. Sherrell was deteriorating and had trouble swallowing. (Ex. 10, p. 2.) Dr. Leonard told Ms. Lundblad that he believed that Mr. Sherrell killed himself by giving himself a blood clot from faking his illness or swallowing a sock. (Ex. 10, p. 2.) Dr. Leonard next spoke to a registered nurse from Beltrami County jail and told her the same thing. (Ex. 10, p. 2.) Ms. Lundblad was so disgusted with Dr. Leonard's handling of Mr. Sherrell's medical care that she felt "ethically obligated" to file complaints about what happened with Ramsey County Medical Examiner, the Minnesota Department of Corrections, the Minnesota Board of Medical Practice, and the Minnesota Nursing Board. (Ex. 10, p. 3.)

### 3.     Nurse Crystal Pederson (August 27-31).

The record shows that Nurse Pederson did not see Mr. Sherrell after he was taken to Sanford on the morning of August 31. The facts supporting liability against Nurse Pederson pertaining to her involvement during the period of August 27-31 are set forth in detail the Statement of Facts. Accordingly, to avoid repetition, Plaintiff respectfully directs the Court's attention to the Statement of Facts, Sections 3 and 4, *supra*, for the individualized facts as to Defendant Crystal Pederson.

### 4.    Captain Calandra Allen (August 30-September 2).

Plaintiff seeks liability against Captain Allen in her individual capacity for (1) overriding Mr. Sherrell's ER visit on August 30 and (2) failing to have Mr. Sherrell transferred to a hospital or other medical/nursing care facility on September 1-2. The facts supporting liability against Captain Allen pertaining to her involvement on August 30 (override of the ER transport order) are set forth in detail the Statement of Facts. Accordingly, to avoid repetition, Plaintiff respectfully directs the Court's attention to the Statement of Facts, Sections 4, *supra*, for the individualized facts as to Captain Allen's involvement on August 30. The facts supporting liability against Captain Allen for her involvement on September 1-2 are outlined below.

Officer Melissa Bohlman worked as the officer in charge during the morning/day shifts on September 1 and September 2, 2018. (Ex. 15, p. 12996; Ex. 307, Bohlman Dep. 9.) During these shifts, Officer Bohlman was the supervising officer on duty at the jail. (Ex. 307, Bohlmann Dep. 10.) When she arrived for her shift on the morning of September 1, Sgt. Scandinato briefed Officer Bohlmann that Mr. Sherrell was back and that the hospital was unable to find anything wrong with him. (Ex. 5, p. 14.) By 9:08 a.m., Officer Bohlmann had learned that Mr. Sherrell was reporting weakness and inability to feel his legs. (*Id.*) She also learned that Mr. Sherrell was continuing not to move his extremities and when staff tried to help, "he would just go limp and was dead weight." (*Id.*) Officer Bohlmann called and reported this information to Captain Allen, who told Officer Bohlman to just wait until medical staff arrived for further instruction. (*Id.*; Ex. 307, Bohlmann Dep. 57-61.)

When Nurse Skroch arrived, Officer Bohlman reported the same information to her and asked Nurse Skroch to examine Mr. Sherrell and provide instructions for how to care for him. (Ex. 5, p. 15.) Later that afternoon, Nurse Skroch advised that "there was nothing medically wrong with him and that we shouldn't be assisting him with feeding, toileting, etc as he is capable of doing it himself as he was medically cleared by the hospital." (*Id.*; Ex. 307, Bohlman Dep. 65.) Officer Bohlman reached out to Captain Allen again to get further instructions and, at 3:43 p.m., Captain Allen called back and told Officer Bohlmann, "if medical states there is nothing wrong …just go with it." (*Id.*; Ex. 307, Bohlman Dep. 68.) Officer Bohlman interpreted that to mean "we didn't need to do anything for him." (Ex. 307, Bohlman Dep. 68.) Officer Bohlman then relayed this directive to the jail staff. (Ex. 307, Bohlman Dep. 70.) The record is undisputed that Captain Allen took no action whatsoever to have Mr. Sherrell transported to a hospital or nursing care facility.

### 5.    Sgt. Mario Scandinato (September 1-2).

Sgt. Scandinato was on duty when Mr. Sherrell arrived back from Sanford. (Ex. 5, p. 11.) Sgt. Scandinato assisted with bringing Mr. Sherrell back inside the jail and described Mr. Sherrell's body as "limp" at the time. (Ex. 320, Scandinato Dep. 82.) Surveillance video shows Officer Scandinato dumping Mr. Sherrell onto the bunk in Cell 214 and leaving the cell. (Ex. 114, 12:45:20.) Sgt. Scandinato was not concerned about Mr. Sherrell falling off the bunk even though Mr. Sherrell had just fallen out of the squad. (Ex. 320, Scandinato Dep.154.) Sgt. Scandinato admits that he immediately believed that Mr. Sherrell was faking and that he was "fairly certain." (Ex. 320,

Scandinato Dep. 96, 100.) When asked whether he still believed that Mr. Sherrell was faking at the time of this deposition, Sgt. Scandinato responded, "I guess I don't have an opinion on it." (Ex. 320, Scandinato Dep. 101.)

Sgt. Scandinato knew that Mr. Sherrell had difficulty walking and difficult standing once he returned from Sanford. (Ex. 320, Scandinato Dep. 125.) Sgt. Scandinato also knew that Mr. Sherrell displayed signs of paralysis when he returned from the ER. (*Id.*) Officer Scandinato also knew that Mr. Sherrell was unable to move. (Ex. 320, Scandinato Dep. 165.) After dumping Mr. Sherrell in Cell 214, Sgt. Scandinato did not return to check on Mr. Sherrell even once for the remainder of the shift. (Ex. 320, Scandinato Dep. 108-109, 155.)

Sgt. Scandinato took no action to recover Mr. Sherrell's discharge instructions from Sanford. (Ex. 320, Scandinato Dep. 159.) He also did not contact MEnD when Mr. Sherrell returned to the jail. (Ex. 320, Scandinato Dep. 159-160.) Sgt. Scandinato did nothing to arrange for Mr. Sherrell's care or medical care once he returned from Sanford. (Ex. 320, Scandinato Dep. 160-164.) When asked what actions he took to ensure Mr. Sherrell's medical care at the jail, Sgt. Scandinato responded, "Nothing." (Ex. 320, Scandinato Dep. 172.) Sgt. Scandinato admitted that he has a professional obligation to preserve inmate life at the jail and that he has a level of personal care to ensure that inmates are kept alive. (Ex. 320, Scandinato Dep. 176.) However, Sgt. Scandinato apparently did not reserve the same level of care for Mr. Sherrell:

Q.    Did you have the same care for Mr. Sherrell?

A.    I don't know.

42

(Ex. 320, Scandinato Dep. 176-177.)

### 6.   Officer Joseph Williams (September 1-2).

Officer Williams initially interacted with Mr. Sherrell on August 27, when Mr. Sherrell complained of chest pain and Office Williams escorted him to the nurse's station. (Ex. 5, p. 5-6.) Mr. Sherrell was able to walk to the nurse's station that day. (Ex. 310, Williams Dep. 26.) He also complained of back pain and Officer Williams gave him a tip to relieve the pain. (*Id.*) Officer Williams saw Mr. Sherrell again on the morning of August 29 when he was complaining of weakness and difficulty moving. (Ex. 5, p. 6.) During this shift, Officer Williams observed Mr. Sherrell "moving himself across his cell and up to the door," and "kick or ram the wheel chair into the door" (Ex. 5, p. 6.) Officer Williams testified that he witnessed Mr. Sherrell "was able to get himself out of the wheelchair and assist himself to the floor." (Ex. 310, Williams Dep. 27-28.) On the same day, Officer Williams also observed Mr. Sherrell transporting himself using a wheelchair. (Ex. 310, Williams Dep. 29.) Officer Williams also worked on August 31, at which time he learned that Mr. Sherrell was not improving and was sent out to Sanford for testing. (Ex. 5, p. 6-7.) He testified that Mr. Sherrell's condition had not changed between August 29 and August 31. (Ex. 310, Williams Dep. 30.)

Next time Officer Williams saw Mr. Sherrell was during his shift on September 2. Officer Williams worked a shift at Beltrami County Jail on September 2, 2018, from 6 a.m. to 9 p.m. (Ex. 310, Williams Dep. 18.) In the morning, Mr. Sherrell's cell smelled like urine and feces. (Ex. 310, Williams Dep. 77.) Around 3:20 p.m., Officer Williams stopped by Mr. Sherrell's cell for a welfare check and Mr. Sherrell asked him to come

inside to "dry his face because he had been spitting off the mat and he didn't get it all off." (Ex. 310, Williams Dep. 48.) At 3:24 p.m., Officer Williams entered the cell to wipe Mr. Sherrell's face. (Ex. 310, Williams Dep. 48-49.) Mr. Sherrell had previously explained to Officer Williams that "he had a difficult time swallowing his spit" and that was why he was spitting his saliva out that now needed to be wiped off. (Ex. 310, Williams Dep. 50.) Officer Williams "could see that he was clearly trying to spit off the side of the mattress." (Ex. 310, Williams Dep. 51.) Mr. Sherrell asked Officer Williams to "clean his face, and he asked to be put on his side so when he spit again he would make it off the mattress." (Ex. 310, Williams Dep. 52.)

During their contacts on September 2, Mr. Sherrell did tell Officer Williams that he was unable to move his hands and legs. (Ex. 310, Williams Dep. 60.) Officer Williams described Mr. Sherrell's condition as a "quadriplegic." (Ex. 310, Williams Dep. 73, 85-86.)

> Q.    Would you agree . . . that he displayed the symptoms of a quadriplegic on September 2, 2018?
>
> A.    From what I saw, yes. . . .

(Ex. 310, Williams Dep. 60.) Officer Williams knew that Mr. Sherrell had not eaten anything the entire day and he also knew that Mr. Sherrell did not drink anything the entire day. (Ex. 310, Williams Dep. 86.) Officer Williams knew Mr. Sherrell was having trouble swallowing and was spitting his saliva out as a result. (Ex. 310, Williams Dep. 87.) Officer Williams knew that Mr. Sherrell could not stand up, sit up, or use the bathroom independently. (*Id.*) And Officer Williams knew that Mr. Sherrell was urinating

on himself throughout the day. (*Id.*) Officer Williams also knew that Mr. Sherrell spent the entire day on the cell floor, unable to move. (*Id.*)

Officer Williams admitted that if he found himself in Mr. Sherrell's condition, he would take himself to see a doctor at the ER. (Ex. 310, Williams Dep. 88.) He also admitted that he would do the same for a loved one if he found them in Mr. Sherrell's condition. (*Id.*) However, despite Mr. Sherrell's "quadriplegic" condition, Officer Williams believed that Mr. Sherrell was faking his illness from the start. (Ex. 310, Williams Dep. 72.) Because he believed Mr. Sherrell was faking, Officer Williams did not do anything to better understand Mr. Sherrell's condition on September 2 and he did not contact MEnD or anyone else for assistance with Mr. Sherrell. (Ex. 310, Williams Dep. 84-85.) Officer Williams also did not do anything to get medical care for Mr. Sherrell until Mr. Sherrell became unresponsive around 4:45 p.m. (Ex. 310, Williams Dep. 92-93.)

### 7. Officer James Foss (September 1-2).

Officer Foss worked a morning shift at Beltrami County Jail on September 1 and another morning shift on September 2. (Ex. 5, p 3-4; Ex. 6, p. 7-8). Officer Foss reported that, on September 1, Mr. Sherrell "wouldn't stay in a sitting position." (Ex. 5, p. 3.) On September 1 and 2, Officer Foss knew that Mr. Sherrell was having difficulty moving his hands and legs. (Ex. 308, Foss. Dep. 50.) On September 1 and 2, Officer Foss also knew that Mr. Sherrell was so weak that he was unable to support his own weight. (*Id.*) On September 1 and 2, Officer Foss knew that Mr. Sherrell was not eating anything and that he was not drinking anything unless he was assisted. (*Id.*) Officer Foss knew that Mr.

Sherrell was urinating and defecating on himself on September 1 and 2. (Ex. 308, Foss. Dep. 50-51.)

Surveillance video from the morning of September 1 shows Officer Foss and Officer Smith attempt to get Mr. Sherrell seated on his bunk. (Ex. 116, 07:45:00 – 08:00:00.) After several unsuccessful attempts, the officers finally got Mr. Sherrell on the bunk and moved the walker towards him for support. (*Id.*) At this point, Mr. Sherrell's paralyzed body collapsed backwards and the back of his head slammed against the concrete block wall. (Ex. 116, 07:48:00 – 07:48:45.) Getting Mr. Sherrell into a safe position on the bunk proved to be a challenge:







(Ex. 116, 07:48:00 – 07:55:00.) After all else failed, Officers Foss and Smith finally settled on this:



(Ex. 116, 07:58:39.)

Officer Foss knew that, on September 1 and 2, Mr. Sherrell was unable to get up to get up to wash himself, never got up to take a shower, never got up to use the bathroom, and that Mr. Sherrell was unable to stand or sit on his own. (Ex. 308, Foss. Dep. 51.) Officer Foss knew that Mr. Sherrell had spent the last two days on the floor. (Ex. 308, Foss. Dep. 51-52.) Officer Foss knew that, on September 1 and 2, Mr. Sherrell was unable to hold up his head with his neck, was unable to hold anything in his hands, and was unable to lift anything with his hands. (Ex. 308, Foss. Dep. 54-55.) Officer Foss knew that Mr. Sherrell exhibited slurred speech which "wasn't as bad at first, and it gradually got worse." (Ex. 308, Foss. Dep. 55-56.)

Despite these symptoms, Officer Foss did not believe that Mr. Sherrell was experiencing a medical emergency. (Ex. 308, Foss. Dep. 52.) Officer Foss testified, "I know that he was alive. That's what I know." (Ex. 308, Foss. Dep. 52.) Officer Foss did nothing to obtain medical care for Mr. Sherrell. (Ex. 308, Foss. Dep. 56.)

### 8.    Officer Holly Hopple (September 2).

Officer Hopple worked a shift at Beltrami County Jail on September 2, 2018, from 6 a.m. to 10 p.m. (Ex. 312, Hopple Dep. 11.) On September 2, 2018, Officer Hopple knew that Mr. Sherrell was complaining of weakness and was unable to move. (Ex. 312, Hopple Dep. 41.) On September 2, Officer Hopple knew that Mr. Sherrell was unable to move his legs, that he was unable to stand up, that he was unable to walk, and that he was unable to support his own weight. (*Id.*) Officer Hopple admitted that she knew that Mr. Sherrell was experiencing a medical emergency on September 2, 2018. (Ex. 312, Hopple Dep. 42.) Yet Officer Hopple also admitted that she failed to take any steps to obtain medical care for Mr. Sherrell on September 2. (Ex. 312, Hopple Dep. 44.)

### 9.    Officer Chase Gallinger (September 1-2).

Officer Gallinger worked a short shift on September 1, 2018, from noon to 6 p.m. and he also worked the morning/day shift at Beltrami County Jail on September 2, 2018, starting at 6:00 a.m. (Ex. 313, Gallinger Dep. 105, 115.) Prior to that, Officer Gallinger also participated in Mr. Sherrell's transport to and from Sanford Fargo. (Ex. 6, p. 8-12.) During his deposition, Officer Gallinger testified that he was present for multiple conversations between Mr. Sherrell and medical staff at Sanford Fargo and the only two symptoms Mr. Sherrell reported to medical staff at the hospital was that Mr. Sherrell was

unable to move his hands and his legs. (Ex. 313, Gallinger Dep. 65.) Officer Gallinger denies telling Dr. Leigh at Sanford that Mr. Sherrell had been seen moving his extremities without difficulty. (Ex. 313, Gallinger Dep. 66.) Officer Gallinger testified that he has no memory of being provided or offered ER discharge instructions for Mr. Sherrell at Sanford Fargo. (Ex. 313, Gallinger Dep. 80-81.) Officer Gallinger did not learn at Sanford that Mr. Sherrell had been diagnosed with malingering or weakness, and he testified that he never learned Mr. Sherrell's diagnoses at any time. (Ex. 313, Gallinger Dep. 81-82.)

On September 2, Officer Gallinger and Mr. Sherrell had multiple interactions. (Ex. 313, Gallinger Dep.116.) During this shift, Mr. Sherrell asked Officer Gallinger for assistance multiple times and reported that he was unable to move:

> Often Hardel was able to yell my name. I would ask what he wants and often he would say that he couldn't move. When I would ask Hardel what he wants me to do about the situation he would say "I don't know". I told Hardel numerous times that both hospitals couldn't find anything wrong with him and that he should be able to move if he tries.

(Ex. 6, p. 11; Ex. 313, Gallinger Dep. 118-119.)

On September 2, Officer Gallinger knew that Mr. Sherrell had not gotten up even once to use the restroom since returning from Sanford. (Ex. 313, Gallinger Dep. 122.) Officer Gallinger also knew that Mr. Sherrell was urinating on himself on September 2. (Ex. 313, Gallinger Dep. 123.) Officer Gallinger knew that Mr. Sherrell never got up to wash himself or shower since returning from Sanford Fargo. (Ex. 313, Gallinger Dep. 123.) Officer Gallinger knew that Mr. Sherrell had been lying down either on the bunk or on the floor for the entire time since returning from Sanford Fargo. (Ex. 313, Gallinger

Dep. 123-124.) Officer Gallinger knew that Mr. Sherrell never sat up on his own and did not walk even once since coming back from Sanford. (Ex. 313, Gallinger Dep. 124.) Officer Gallinger knew that Mr. Sherrell never lifted him arms or legs since returning from Sanford. (Ex. 313, Gallinger Dep. 124-125.) Officer Gallinger knew that Mr. Sherrell was unable to reposition his body on his own after returning from Sanford. (Ex. 313, Gallinger Dep. 125.) Officer Gallinger also learned that Mr. Sherrell had exhibited facial droop on September 2. (Ex. 6, p. 11; Ex. 313, Gallinger Dep. 133-134.) When asked whether Officer Gallinger reported Mr. Sherrell's complaints to medical staff, he responded, "I can't recall." (Ex. 313, Gallinger Dep. 119.)

### 10.   Officer Daniel Fredrickson (August 31 and September 1-2).

Plaintiff seeks liability against Defendant Officer Fredrickson in his individual capacity for (1) interfering with Mr. Sherrell's medical care on August 31 while at Sanford Hospital and (2) deliberate indifference on September 1-2. The facts supporting liability against Officer Fredrickson pertaining to his involvement at Sanford on August 31 are set forth in detail the Statement of Facts. Accordingly, to avoid repetition, Plaintiff respectfully directs the Court's attention to the Statement of Facts, Sections 6, *supra*, for the individualized facts as to Officer Fredrickson's involvement at Sanford on August 31. The facts supporting liability against Officer Fredrickson for his involvement on September 1-2 are outlined below.

Officer Fredrickson worked a night shift starting at 6 p.m. on September 1 through 6 a.m. on September 2. (Ex. 15, p. 12997.) Officer Fredrickson also participated in Mr. Sherrell's visit to Sanford Fargo and the transport back to Beltrami County Jail. (Ex. 6, p.

12-13.) Officer Fredrickson testified that, while at Sanford Fargo, he asked to speak with the doctor in private and reported that "we did not have any video footage indicating that Sherrell had fallen." (Ex. 309, Fredrickson Dep. 19.) Officer Fredrickson denies telling Dr. Leigh that Mr. Sherrell had been seen moving without difficulty at Beltrami County Jail. (Ex. 309, Fredrickson Dep. 20.) Officer Fredrickson observed Mr. Sherrell drinking water at Sanford and Mr. Sherrell did not have any difficulty swallowing and did not have any episodes of choking. (Ex. 309, Fredrickson Dep. 24-25.) Officer Fredrickson testified that at one point medical staff at Sanford brought in discharge instructions, and Officer Gallinger instructed medical staff to instead fax them to the jail. (Ex. 309, Fredrickson Dep. 26.) Ultimately, Officers Fredrickson and Gallinger left Sanford without Mr. Sherrell's discharge instructions. (*Id.*) Mr. Sherrell was also not provided a copy. (Ex. 309, Fredrickson Dep. 26-27.)

On September 2, Officer Fredrickson knew that Mr. Sherrell was unable to move his hands and legs. (Ex. 309, Fredrickson Dep. 66.) Officer Fredrickson also personally saw and knew that Mr. Sherrell could not move and could not support his body weight on September 2. (*Id.*) Just several days prior, on August 30, Officer Fredrickson observed Mr. Sherrell "mov[ing] in wheelchair to sink, pushed with arms." (Ex. 309, Fredrickson Dep. 83.) Despite a substantial change in his condition, Officer Fredrickson did not believe that Mr. Sherrell was experiencing a medical emergency during the last shift he worked when Mr. Sherrell was alive, (Ex. 309, Fredrickson Dep. 68), and he testified that the new symptoms did not concern him, (Ex. 309, Fredrickson Dep. 78).   Officer

Fredrickson took no steps to obtain medical care for Mr. Sherrell during the September 1 night shift he worked at Beltrami County Jail. (Ex. 309, Fredrickson Dep. 71.)

### 11.   Officer Brandon Feldt (September 1-2).

Officer Feldt worked the night shift starting at 6 p.m. on August 31 and another night shift starting at 6 p.m. on September 1. (Ex. 15, p. 12997.)

Officer Feldt's initial interaction with Mr. Sherrell was on August 28, when Mr. Sherrell advised Officer Feldt that he could not feel his legs from the knees down. (Ex. 5, p. 12; Ex. 315, Feldt Dep. 14-15.) During this incident, Officer Feldt was within reaching distance of Mr. Sherrell and he watched Mr. Sherrell moving his legs and feet. (Ex. 315, Feldt Dep. 15-16.) During the same incident, Officer Feldt also observed Mr. Sherrell walking from the bathroom to his bunk and then standing for 10 minutes next to his bunk, all without assistance. (Ex. 315, Feldt Dep. 17-18.) Later on, Officer Feldt watched Mr. Sherrell climb back into his bunk without assistance. (Ex. 315, Feldt Dep. 19.) On the same date, Officer Feldt also observed Mr. Sherrell walking around the block, standing, holding the phone, and using the phone, all without assistance from anyone. (Ex. 315, Feldt Dep. 20-21.)

When Officer Feldt returned back to work on the evening of August 31, Mr. Sherrell was out at Sanford. (Ex. 315, Feldt Dep. 22.) Mr. Sherrell returned around 12:30 a.m. and Officer Feldt assisted Officers Gallinger and Fredrickson with bringing Mr. Sherrell from the sally port to Cell 214. (Ex. 5, p. 12; Ex. 315, Feldt Dep. 22-23.) Shortly after being placed into Cell 214, Mr. Sherrell collapsed from his bunk face-down onto the

cell floor. (Ex. 114, 02:33:00 – 02:34:00.) He landed in an awkward position, as depicted below.



(Ex. 114, 02:33:31.) Mr. Sherrell was then left in that same position for over 5 hours, with his left hand trapped under his torso and his feet stuck at an angle, propped up by his toes. (Ex. 114, 02:33:00 – Ex. 116, 07:50:00.) No one assisted Mr. Sherrell the entire night or made any effort to reposition him to a more comfortable state on the floor. (*Id.*)

Officer Feldt watched Mr. Sherrell collapse on surveillance video but he did nothing to assist Mr. Sherrell the entire night. (Ex. 5, p. 12.) In fact, Officer Feldt claims he was conducting welfare checks on Mr. Sherrell while he was pinned on the floor in the condition depicted above. (*Id.*) This is confirmed by the Special Watch Log which has Officer Feldt's entries (Badge No. 8247) at various intervals between 2 a.m. and 6 a.m.

on the morning of September 1. (Ex. 16, p. 318.) During his deposition, Officer Feldt confirmed that he never even asked Mr. Sherrell what happened and he never asked if Mr. Sherrell was injured or if Mr. Sherrell needed any help getting back on the bunk. (Ex. 315, Feldt Dep. 26.) In fact, Officer Feldt never even reentered Mr. Sherrell's cell for the rest of the night shift. (Ex. 315, Feldt Dep. 27.)

Officer Feldt returned to work for his next night shift at 5:00 p.m. on September 1. (Ex. 315, Feldt Dep. 29.) Officer Feldt had contact with Mr. Sherrell at 6:45 p.m. when he and Officer Smith attempted to place Mr. Sherrell into a wheelchair, an event that was captured on surveillance video. (Ex. 5, p. 13; Ex. 121, 06:45:00 – 07:10:00.) What seemed like an easy task was ultimately abandoned after nearly 30 minutes because Mr. Sherrell's body was completely paralyzed and would not stay safely in the wheelchair:



(Ex. 121, 07:06:29.)



(Ex. 121, 07:00:06; Ex 5, p. 13; Ex. 315, Feldt Dep. 36-37.) For the remainder of the night, Mr. Sherrell asked for assistance with various things like "move to his side or stating that he needed his arm moved because it was pinned even though it was right beside him." (Ex. 5, p. 13; Ex. 315, Feldt Dep. 37-38.) However, Officer Feldt refused to enter the cell or offer Mr. Sherrell any assistance with his requests. (Ex. 315, Feldt Dep. 38.)

During the period of September 1 and 2, Officer Feldt knew that Mr. Sherrell was unable to use his hands and legs and he never saw Mr. Sherrell using his hands or legs. (Ex. 315, Feldt Dep. 56-57.) Officer Feldt also knew that Mr. Sherrell was unable to support his own weight and that he spent all of his time lying down. (Ex. 315, Feldt Dep. 57, 59.) Officer Feldt did not observe Mr. Sherrell get up even once during those last two

days of his life, he never saw him sitting, he never saw him standing, and he never saw him walking. (Ex. 315, Feldt Dep. 59-60.) Despite this condition, and despite Mr. Sherrell's deterioration from Officer Feldt's observations of Mr. Sherrell from just several days prior on August 28, Officer Feldt did not believe that Mr. Sherrell was experiencing a medical emergency. (Ex. 315, Feldt Dep. 61.) Officer Feldt took no action to obtain medical care for Mr. Sherrell during the last two days of Mr. Sherrell's life. (Ex. 315, Feldt Dep. 67.)

### 12.    Officer Nicholas Lorsbach (September 1-2).

Officer Lorsbach initially had contact with Mr. Sherrell on August 28 when he found Mr. Sherrell lying down and complaining about being given too much medication. (Ex. 5, p. 9.) Shortly after, Officer Lorsbach watched Mr. Sherrell "pull himself up into his second level bunk." (Ex. 5, p. 9-10.) Later that same day, Officer Lorsbach watched Mr. Sherrell "sit up in the lower bunk." (*Id.*) Shortly after, Officer Lorsbach observed Mr. Sherrell standing next to his bunk and sitting down onto the bunk without assistance. (*Id.*) On the same day, Officer Lorsbach observed Mr. Sherrell grab the medication cup and tip the cup into his mouth to take the medications, all without assistance. (Ex. 316, Lorsbach Dep. 16.) Officer Lorsbach then observed Mr. Sherrell grabbing a mug of water and drinking water without assistance. (Ex. 316, Lorsbach Dep. 17-18.) Mr. Sherrell did not choke as he drank the water. (Ex. 316, Lorsbach Dep. 18.) Mr. Sherrell also walked with assistance from other inmates, which Officer Lorsbach observed. (Ex. 316, Lorsbach Dep. 21.)

Next time Officer Lorsbach had contact with Mr. Sherrell was on September 1, when he assisted Officers Feldt and Smith attempt to get Mr. Sherrell into the wheelchair (same incident described above as to Officer Feldt). (Ex. 5, p. 10.) At this point, Officer Lorsbach observed that Mr. Sherrell was "unable to support any part of his body. (*Id.*) Shortly after, Officer Lorsbach asked Mr. Sherrell if he was able to sit up to take his medications, and Mr. Sherrell responded that he could not. (*Id.*) Despite Mr. Sherrell's condition as depicted in the surveillance video, (Ex. 121, 06:45:00 – 07:10:00), and the deterioration of his condition as compared to their contact on August 28, Officer Lorsbach did not believe that Mr. Sherrell was experiencing a medical emergency. (Ex. 316, Lorsbach Dep. 42-43.) Officer Lorsbach took no action to obtain medical care for Mr. Sherrell. (Ex. 316, Lorsbach Dep. 44.)

### 13.   Officer Mitchell Sella (September 1-2).

Officer Sella's initial contact with Mr. Sherrell was on the morning of August 31, at which time Mr. Sherrell reported that "he can only move while sitting in the wheelchair." (Ex. 6, p. 13.) Several hour later, Mr. Sherrell "had pulled his blanket over himself to cover up." (*Id.*) Later that morning Officer Sella assisted with placing Mr. Sherrell into a squad for the transport to Sanford and Mr. Sherrell was able to lift and hold his legs off the floor while being transported in the wheelchair. (*Id.*) Once in the squad, Mr. Sherrell was able to slide over an inch inside the squad without assistance. (Ex. 6, p. 13-14.)

The next contact Officer Sella had with Mr. Sherrell was on September 1. (Ex. 6, p. 14.) Office Sella walked into Mr. Sherrell's cell around 3:17 p.m. and noticed that "he

had sweat beading up on his chest as he was laying sideways in his bunk." (Ex. 6, p. 14.) Officer Sella then decided to get Mr. Sherrell into a sitting position to attempt to feed him. (Ex. 119, 03:28:39) After some maneuvering, Officer Sella finally succeeded in getting Mr. Sherrell to sit in his bunk unassisted, which looked like this:



(Ex. 119, 03:33:36.) Shortly after, Officer Sella attempted to feed Mr. Sherrell some broth, and Mr. Sherrell collapsed backwards, striking his head against the concrete block wall:



(Ex. 119, 03:34:00 – 03:35:00). Then Officer Sella tried the wheelchair and, when that

didn't work out, he became frustrated and lashed out at Mr. Sherrell:



(Ex. 119, 03:41:11; Ex. 5, p. 15.) At that point, Officer Sella had had enough: "I told Sherrell I was done helping him if he wasn't going to help me help him, and exited the cell," (Ex. 5, p. 15), leaving Mr. Sherrell like this:



(Ex. 119, 03:39:44 – 04:11:12.) Later on, Officer Smith came to the rescue and offered Mr. Sherrell a slightly more comfortable accommodation:



(Ex. 119, 04:23:03.) Despite Officer Sella's personal experience with Mr. Sherrell's complete paralysis and inability to move or support his body in any way, Officer Sella did not believe Mr. Sherrell was experiencing a medical emergency. (Ex. 317, Sella Dep. 62.)

### 14.   Officer Marlon Smith (September 1-2).

Officer Smith worked a shift on September 1, from 6:00 a.m. to midnight. (Ex. 15, p. 12999.) During this shift, Mr. Sherrell told Officer Smith that he could not move his legs. (Ex. 318, 10/12/21 Smith Dep. 58.) Mr. Sherrell also told Mr. Smith that he could move his hands. (*Id.*) Officer Smith testified, "That's why we had to be changing his Pampers like a baby and giving him showers, because he said he can't . . . move." (Ex. 318, 10/12/21 Smith Dep. 59.) Office Smith knew that Mr. Sherrell was unable to get up

and use the restroom on September 1. (Ex. 319, 10/15/21 Smith Dep. 91.) Officer Smith knew that Mr. Sherrell was urinating and defecating on himself on September 1. (*Id.*) Officer Smith also knew that Mr. Sherrell was unable to get up and wash or shower on September 1. (Ex. 319, 10/15/21 Smith Dep. 92.) Office Smith knew that Mr. Sherrell was unable to sit up on his own on September 1. (*Id.*) Officer Smith knew that Mr. Sherrell was unable to stand up on his own on September 1. (Ex. 319, 10/15/21 Smith Dep. 93.) Office Smith also knew that, besides the times he was moved by staff, Mr. Sherrell spent the entire day lying down on September 1. (Ex. 319, 10/15/21 Smith Dep. 94.) Despite this information, and despite Officer Smith's physical contact with Mr. Sherrell as preserved on surveillance video, Officer Smith did not believe that Mr. Sherrell was suffering a medical emergency on September 1. (*Id.*)

During his deposition, Officer Smith claimed that he did not know that Mr. Sherrell was unable to support his head on September 1. (Ex. 319, 10/15/21 Smith Dep. 96.) But surveillance video from the jail belies this assertion:



(Ex. 116, 07:48:33.)



(Ex. 121, 07:06:29.)

Officer Smith admitted that he did not make any reports to medical staff about Mr. Sherrell and that he did nothing to obtain medical care for Mr. Sherrell on September 1 because he claims there was nothing to report. (Ex. 319, 10/15/21 Smith Dep. 96.) He testified, "I did all I could have done." (Ex. 319, 10/15/21 Smith Dep. 108.)

**C.   Expert Evidence Establishing Individualized Liability as to Defendants Leonard, Skroch, Pederson, Allen, Scandinato, Feldt, Lorsbach, Fredrickson, Gallinger, Foss, Smith, Sella, Williams, and Hopple.**

**1.   Expert evidence establishing recklessness and deliberate indifference by the MEnD Defendants.**

In support of her claims against the MEnD Defendants, Plaintiff has produced the reports and expert opinions of Dr. Jeffrey Keller, Dr. Homer Venters, and Registered Nurse Suzanne Ward. These experts' conclusions are summarized below:

1.  Dr. Keller determined that Dr. Leonard "grossly deviated from accepted standards of care in correctional medicine" in his handling of Mr. Sherrell's medical care. (Ex. 202, p. 7.) Dr. Leonard's most critical omissions include his "failure to conduct an in-person examination," "fail[ure] to respond to jail administration's override of a medical order," "fail[ure] to order a post-hospital examination," "fail[ure] to implement an observation/treatment plan for Mr. Sherrell after his return from the ER," "fail[ure] to order frequent vital signs/respiratory function checks for Mr. Sherrell after his return from the hospital," and failure to "determine that Mr. Sherrell was suffering a life-threatening neurological emergency on September 1 and September 2, 2018." (Ex. 202, p. 7-9.) Dr. Keller opines that, on September 1 and 2, 2018, "Dr.

Leonard and Nurse Skroch deprived Mr. Sherrell of the most basic and essential medical care that was necessary to save his life." (Ex. 202, p. 9.) Dr. Keller opines that Dr. Leonard and Nurse Skroch "should have known that Mr. Sherrell was dying but they did absolutely nothing to save his life . . . , demonstrat[ing] a knowing and reckless disregard for Mr. Sherrell's life." (Ex. 202, p. 10.)

2. Dr. Venters is Plaintiff's second correctional medical expert and he offered opinions mirroring those of Dr. Keller, which are outlined in detail in his report. (Ex. 203.) Similar to Dr. Keller, Dr. Venters determined that "Dr. Leonard's conduct reflects a failure to deliver competent care to patients and . . . demonstrates knowing and reckless disregard for Mr. Sherrell's life." (Ex. 203, p. 9.)

3. Plaintiff's correctional nursing expert Suzanne Ward, RN, has offered detailed opinions about the care provided by Defendant Nurses Pederson and Skroch. (Ex. 204.) Nurse Ward has opined that, [a]s a trained nurse, Nurse Pederson knew of the danger to Mr. Sherrell's health, safety and life from not obtaining needed emergency care, but she knowingly ignored and disregarded the risks." (Ex. 204, p. 13.) Nurse Ward opined that, from "8/24 to 8/31 Nurse Pederson failed and refused to perform any comprehensive nursing assessments of Mr. Sherrell's persistent hypertension and obviously abnormal neurological condition that steadily declined more each day." (Ex. 204, p. 14.) "As a trained nurse, Nurse Pederson knew of the danger to Mr. Sherrell's health, safety and

life but knowingly ignored and disregarded the risks." (*Id.*) As to Nurse Skroch, Nurse Ward opines that she "repeatedly failed and refused to perform obviously required assessments of Mr. Sherrell's worsening health, cardiac, and neurological compromise from 9/1 through 9/2/18" and "fail[ed] to conduct any nursing assessment whatsoever." (Ex. 204, p. 17-18.) "Nurse Skroch's refusal and failure to provide care for Mr. Sherrell's serious medical needs was reckless, dangerous, incompetent, and intentionally and deliberately indifferent to his serious medical needs." (Ex. 204, p. 20.) "Nurse Skroch failed and refused to obtain necessary care and denied Mr. Sherrell's access to the emergency medical care he needed to maintain his health, his safety, and his life." (Ex. 204, p. 21-22.) Nurse Ward's supplemental report, (Ex. 209) was written after discovery was completed and expands further on Nurse Skroch's utter cruelty and incompetence towards Mr. Sherrell. (Ex. 209, p. 8-23.)

**2.    Expert evidence establishing recklessness and deliberate indifference by the Beltrami County Defendants.**

In support of her claims against the Beltrami County Defendants, Plaintiff has produced the report and expert opinions of Gary Raney, who is a qualified expert in the field of corrections. (Ex. 210.) Mr. Raney reached the following conclusions, all of which are substantiated by extensive discussion and evidence recovered through discovery in this litigation:

1.  "Jail Administrator Captain Calandra Allen unreasonably denied the medical order to take Sherrell to the hospital on August 30th." (Ex. 210, p. 6-10.) Mr.

Raney has opined that generally accepted jail practices "simply require the jail to provide additional security measures proportional to the inmate's potential escape risk when they are ordered to an emergency room." (Ex. 210, p. 9.) Mr. Raney further opines that Captain Allen's decision as well as testimony from others in jail administration who testified that jail staff have authority to override a medical directive "demonstrates the failures of policy and training" at Beltrami County Jail. (Ex. 210, p. 10.) "The jail administration's disregard for standards and generally accepted jail practices on this issue shows their deliberate indifference for inmate's medical right and needs." (Ex. 210, p. 10.)

2. Beltrami County Jail staff "unreasonably failed to provide Sherrell with a proper care facility to attend his medical needs." (Ex. 210, p. 15.) Mr. Raney opined that, on September 1 and 2, 2018, Mr. Sherrell's medical needs exceeded what could be accommodated at Beltrami County Jail and that "[Captain] Allen had a duty to see that Sherrell was placed in a facility where his medical needs cold be properly met." (Ex. 210, p. 16.) "Allen's directive to discontinue assisting Sherrell with basic needs and her failure to make arrangements for Sherrell to be transported to a medical/nursing care facility was reckless and dangerous." (Ex. 210, p. 17.) "Allen's conduct towards Sherrell, starting from her refusal to have him transported to the emergency department on August 30, and including her actions on September 1 and 2, demonstrate deliberate indifference to an obvious risk of serious harm." (*Id.*)

3. Beltrami County Jail staff "failed to recognize medical distress and provide necessary medical care for Sherrell." (Ex. 210, p. 17.) "As a whole, the evidence shows a blatant disregard for Sherrell's reasonable safety and care with no recognition that he was in serious medical distress." (Ex. 210, p. 18.) "The correctional staff's failure to recognize Sherrell's distress and their failure to have him transported to the emergency department, especially on September 2, shows deliberate indifference to a serious medical need and deliberate indifference to a serious risk of harm." (Ex. 210, p. 19.)

**D.     Mr. Sherrell was Suffering an Objectively Serious Medical Need.**

The U.S. Supreme Court has clearly held that the Eighth Amendment prohibits "unnecessary and wanton infliction of pain" and that denial of medical care which results in such pain violates the Eighth Amendment. *Estelle*, 429 U.S. at 103. The Court has also made clear that the protections of the Eighth Amendment and the inmates' right to medical care are not limited to cases involving extreme situations or life-threatening emergencies: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. . . . In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* Thus, even "less serious" medical conditions which result in unnecessary physical pain violate the Eighth Amendment. *Id.*

The Eighth Circuit defines a "serious medical need" as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos*, 73

F.3d at 176. A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary. *Hartsfield*, 371 F.3d at 457.

In the present case, Mr. Sherrell's condition was so severe and obvious that even a layperson would easily recognize that Mr. Sherrell was suffering a medical emergency requiring admission to the emergency department. The record shows that Mr. Sherrell initially experienced pain, numbness, limited mobility, and hypertension, which progressed to full body paralysis within a matter of days. On September 1 and 2, 2018, Mr. Sherrell was completely immobile and was unable to care for himself. He was unable to move his hands or legs; he was unable to sit, stand, or walk; he had absolutely no strength and could not even lift a cup of juice; he was unable to get up to wash, shower, or use the restroom; he was unable to eat, drink, or swallow; he was choking on his own saliva and spitting saliva out the side of his mouth to avoid choking; he was experiencing labored breathing; he had facial droop; he was urinating and defecating on himself; he was unable to support his own weight; and he was unable to support his head using his neck. Also critical to consider is the fact that Mr. Sherrell walked into Beltrami County Jail on August 24 completely healthy and showing none of the symptoms he developed over the course of the next several days.

Mr. Sherrell's symptoms, as outlined above, were so obvious that even a layperson would easily recognize that Mr. Sherrell required emergency medical care. Defendant Officer Williams admitted during his deposition that he would seek emergency medical care if he found himself in the same position as Mr. Sherrell on September 1-2 and described Mr. Sherrell's condition as a "quadriplegic." (Ex. 310, Williams Dep. 73, 85-

86, 88.) Defendant Officer Hopple also admitted during her deposition that she knew Mr. Sherrell was experiencing a medical emergency on September 2. (Ex. 312, Hopple Dep. 42.) Defendant Officer Davis likewise admitted that he would seek emergency medical care if he had developed symptoms similar to Mr. Sherrell's. (Ex. 326, Davis Dep. 44-45.) "Had, say, a plumber or bus driver or dishwasher seen [Mr. Sherrell's condition], that layperson would undoubtedly have told him: 'You really need to see a doctor.'" *See, Trujillo v. Corizon Health, Inc.*, No. 17-cv-1633 (PJS/ECW), 2019 WL 1409331, at *3 (D. Minn. Mar. 28, 2019).

In addition, on August 30, Defendants Nurse Pederson and Dr. Leonard attempted to send Mr. Sherrell to the ER and Nurse Pederson testified that she believed Mr. Sherrell was experiencing a medical emergency on August 30. (Ex. 302, Pederson Dep. 60-61.) Finally, on August 31, Stephanie Lundblad ordered Mr. Sherrell to be taken to the emergency room because she believed he was very ill and may have suffered a stroke.

Plaintiff's burden at this stage of the proceedings is not to prove that Mr. Sherrell was suffering an objectively serious medical need but to instead raise a genuine issue of material fact for trial. Based on the evidence set forth above, a reasonable jury can easily conclude that Mr. Sherrell was suffering an objectively serious medical need. Therefore, Plaintiff has sufficiently established, for purposes of summary judgment, that Mr. Sherrell was suffering an objectively serious medical need.

**E.      Plaintiff has Raised a Genuine Issue of Fact for Trial as to the Subjective Element of Deliberate Indifference.**

A prison official exhibits deliberate indifference when the official actually knows and disregards a prisoner's serious medical needs." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995) (internal quotations marks omitted). In *Estelle v. Gamble*, the Court made clear that a deliberate indifference claim can be established by proving that a prison official "intentionally deni[ed] or delay[ed] access to medical care" or "intentionally interfering with the treatment once prescribed. 429 U.S. at 104-05. To establish a deliberate indifference claim, the plaintiff must show that the prison official knew of the serious medical condition yet deliberately disregarded it. *Coleman,* 114 F.3d at 784*; see also Farmer*, 511 U.S. at 837. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his [or her] knowledge of a substantial risk of serious harm." *Farmer,* 511 U.S. at 842. The factual determination that a prison official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence or from the very fact that the risk was obvious. *Id.*

In *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990), the Eighth Circuit held that "medical care so inappropriate as to evidence . . . refusal to provide essential care violates the eighth amendment." *Smith* also made clear that the mere fact that *some* medical treatment was offered to an inmate does not automatically result in a finding of no deliberate indifference: "While it is true that courts hesitate to find an eighth amendment violation when a prison inmate has received medical care . . ., that hesitation does not

mean . . . that the course of a [nurse's] treatment of a prison inmate's medical . . .

problems can never manifest the [nurse's] deliberate indifference to the inmate's medical

needs." *Id.* As the Seventh Circuit recently observed in *Petties v. Carter*,

> The difficulty is that except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge. Rarely if ever will an official declare, "I knew this would probably harm you, and I did it anyway!" Most cases turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care. While evidence of medical malpractice often forms the basis of a deliberate indifference claim, the Supreme Court has determined that plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference. . . . But blatant disregard for medical standards could support a finding of mere medical malpractice, or it could rise to the level of deliberate indifference, depending on the circumstances.

836 F.3d 722, 728 (7th Cir. 2016). "The question of whether the official knew of the risk

is subject to demonstration, like any other question of fact, by inference from

circumstantial evidence." *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998).

"Therefore, if a plaintiff presents evidence of very obvious and blatant circumstances

indicating that the defendant knew the risk existed, the jury may properly infer that the

official *must* have known." *Id.* (internal quotations omitted, emphasis in original).

### 1.  MEnD Defendants.

The evidence outlined above raises a genuine issue of fact for trial on the

subjective element of deliberate indifference as to Defendants Leonard, Pederson, and

Skroch. Overall, the record shows that the MEnD Defendants subjected Mr. Sherrell to

medical care that was utterly incompetent, reckless, and inhumane.

On August 30, Defendants Dr. Leonard and Nurse Pederson both determined that

Mr. Sherrell was experiencing an emergency neurological condition and determined that

he needed to go to the ER to be evaluated because the jail clinical services were inadequate to properly assess his condition. However, once Captain Allen budged in and canceled the ER visit order, Dr. Leonard and Nurse Pederson failed to take any action to get Mr. Sherrell to the hospital. Nurse Pederson knew that she could call 911 to get care for Mr. Sherrell but she failed to do so. Although her alleged efforts to convince Captain Allen to permit the visit were appropriate, she admitted that she knew Mr. Sherrell was experiencing a medical emergency on August 30. Instead of doing her job and getting him the care hr needed, she claims that she cried and went home, leaving Mr. Sherrell to suffer at the jail.

As for Dr. Leonard – he showed no backbone at all and took no action whatsoever to contact jail administration or drive to the jail to provide medical care and oversight for Mr. Sherrell. Instead, Dr. Leonard reverted to "we will accept this for now" and forgot about Mr. Sherrell until he was reminded about him the next day by Stephanie Lundblad. How could the chief medical officer of a large correctional healthcare company think that he is not the final authority on when a sick inmate gets to go to the ER? And why didn't he at least attempt to call Captain Allen to figure out why his transport order was being denied? The answer, as determined by the Minnesota Board of Medical Practice, is simple – professional incompetence. As confirmed in the expert reports of Nurse Ward, Dr. Keller, and Dr. Venters, (Ex. 202, 203, 204, 208, and 209), Nurse Pederson and Dr. Leonard's failure to get Mr. Sherrell to the hospital on August 30 demonstrates recklessness, professional incompetence, and deliberate indifference.

Moving on to the events of September 1 and 2, Nurse Skroch and Dr. Leonard abandoned Mr. Sherrell to die on the jail floor while they claim to have been engaged in "extensive" discussions pertaining to his medical condition. Nurse Skroch refused to enter Mr. Sherrell's cell to examine him, fabricated a medical record, told jail staff not to offer any assistance to Mr. Sherrell on September 1, refused to read or share his discharge instructions with jail staff who had no idea how to care for Mr. Sherrell without her guidance, and refused to take Mr. Sherrell's vital signs even once. When he told her he could not move, she screamed that he's faking; when he told her he was choking, she told him to keep drinking; when she saw his exhausted body propped up in a wheelchair with facial droop and urine dripping down his pants, she decided he was making progress; and when he was gasping for air on the jail floor with "spit rolling down his cheek" she decided that her job was finished and went home. The "medical care" offered by Nurse Skroch far surpasses "recklessness" and can only be described as a callous and inhumane disregard for human life.

As for Defendant Dr. Leonard, he fares no better than his incompetent partner. In an effort to ease the sting, Dr. Leonard's briefing discloses the recent findings of the Minnesota Board of Medical Practice and essentially asks the Court to set them to one side. Although the Board's findings are both damning and admissible, *see* Fed. R. Civ. P. 803(8)(A)(iii), the evidence against Dr. Leonard is overwhelming even without them. As the record shows, Dr. Leonard was suspicions of the "malingering" misdiagnosis and did not trust it. Furthermore, while Mr. Sherrell was still alive, Dr. Leonard was himself concerned that Mr. Sherrell was suffering from Guillain-Barre Syndrome which he knew

can cause paralysis of the respiratory organs which, in turn, he knew would result in death. Rather than taking charge and driving himself to jail to make sure Mr. Sherrell didn't die on his watch (as he was required to do by contract), Dr. Leonard decided to take a more liberal approach and postpone Mr. Sherrell's medical care until after the holiday weekend. Dr. Leonard's knowing and deliberate failure to act on a life-threatening and progressing emergent medical condition is a textbook example of recklessness and deliberate indifference.

But that's not all. Dr. Leonard failed to inquire about Mr. Sherrell's vital signs, failed to implement a treatment plan, failed to arrange for any type of physical examination upon Mr. Sherrell's return from the ER, and failed to take any action at all in response to a 27-year old man who was fully healthy just days prior and had suddenly turned into a "quadriplegic" dressed in "Pampers like a baby" who was unable to eat or drink, unable to stand on his two feet, and residing on the jail floor while under the care of jail correctional staff with no medical training. Other than ordering some medications, requesting an ER transport, and then "accepting" the jail's refusal to accommodate it, Dr. Leonard did *nothing* to save the life of a young man who was rapidly deteriorating and presenting clear symptoms of a life-threatening medical emergency. As confirmed by the expert reports of Nurse Ward, Dr. Keller, and Dr. Venters, (Ex. 202, 203, 204, 208, and 209), Nurse Skroch and Dr. Leonard's failure to get Mr. Sherrell to the hospital on September 1 and 2 demonstrates recklessness, professional incompetence, and deliberate disregard for human life.

2.    **Captain Allen.**

In *Estelle v. Gamble*, the U.S. Supreme Court announced that "intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed" constitutes deliberate indifference. 429 U.S. at 105; *see also Erickson v. Pardus*, 551 U.S. 89, 90 (2007). Here, Captain Allen did precisely what *Estelle* prohibits – she denied Mr. Sherrell access to emergency medical care on August 30 after it had been prescribed and ordered by Dr. Leonard and Nurse Pederson. Defense makes much of the fact that Dr. Leonard's order to have Mr. Sherrell taken to the ER was not an order but a recommendation or suggestion or something in-between. But *Estelle* uses the term "prescribed" and, though the evidence viewed in light most favorable to the Plaintiff shows that Dr. Leonard and Nurse Pederson ordered the ER transport, even if they did not "order" it, they definitely "prescribed" it. Accordingly, genuine issues of material fact preclude summary judgment as to Captain Allen's decision to cancel Mr. Sherrell's ER transport on August 30. *See Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) ("Prison officials cannot substitute their judgment for a medical professional's prescription.").

With respect to September 1 and 2, the evidence shows that Captain Allen was advised by Officer Bohlmann that Mr. Sherrell was unable to move his extremities and the he could not feel his legs. She was also advised that when correctional staff would try to assist him, Mr. Sherrell would "just go limp and was dead weight." After speaking with Nurse Skroch, Officer Bohlmann spoke with Captain Allen again and reported that Nurse Skroch stated that jail staff should not do anything for Mr. Sherrell as there was

nothing medically wrong with him. Officer Bohlman inquired how to proceed, whether jail staff should still continue to assist Mr. Sherrell with "toileting, feeding, etc." Instead of making an effort to find appropriate accommodations for Mr. Sherrell, Captain Allen directed, "if medical states there is nothing wrong … then go with it." (Ex. 5, p. 15) Officer Bohlman interpreted that to mean "we didn't need to do anything for him." (Ex. 307, Bohlman Dep. 68.)

In his expert report, Mr. Raney addresses Captain Allen's failure to make arrangements for Mr. Sherrell to be transported to a facility with a higher level of available care. "On September 1 and 2, Sherrell required a level of care that is typically found in a skilled nursing facility as evidenced by his inability to move, feed himself, bathe, toilet, etc." (Ex. 210, p. 15.) "Instead of locating proper medical placement for him, [Captain Allen] subjected both Sherrell, and the correctional staff, to unreasonable and inappropriate expectations of care." (*Id.*)

> The NCCHC standard on Hospital and Specialty Care (J-D-08) reads "Hospitalization and *specialty care* are available to patients who need the services [emphasis in original] and goes on to read, "evidence demonstrates that there is appropriate and timely access to hospital and specialist care when necessary." Again, the NCCHC standard clearly recognizes that not all specialty care may need to be delivered in a hospital.
> . . .
>
> The evidence in this case shows that Jail Administrator Allen was receiving regular briefing from the jail on Sherrell's condition after he returned from the emergency department. Allen knew that Sherrell was not moving, eating, toileting, or taking care of himself in any meaningful way. As the jail administrator, Allen had a duty to see that Sherrell was placed in a facility where his medical needs could be properly met. Instead, when she spoke to OIC Bohlmann who had called her, she directed jail staff to terminate any assistance they were providing to Sherrell after he returned from the emergency department. **Allen's directive to discontinue assisting**

**Sherrell with basic needs and her failure to make arrangements for
Sherrell to be transported to a medical/nursing care facility was
reckless and dangerous. Leaving a partially paralyzed inmate who
cannot feed or hydrate himself without assistance is inherently
dangerous and can lead to the obvious consequences of serious illness,
starvation, dehydration, and death.** Allen's conduct towards Sherrell,
starting from her refusal to have him transported to the emergency
department on August 30, and including her actions on September 1 and 2,
demonstrate deliberate indifference to an obvious risk of serious harm.

Additionally, it was unreasonable . . . to direct staff to provide specialized
personal care that included significant exposures to biohazards and
potential allegations of sexual misconduct. Generally accepted jail practices
would never expect correctional officers to bathe and change diapers for
someone in Sherrell's condition. If a person in jail needed this level of care,
it would be provided by properly trained healthcare staff. This simply adds
to the overwhelming evidence that Sherrell should have been placed in a
hospital or care facility other than the jail on September 1 and 2.

(Ex. 210, p. 16-17 (emphasis added)). Based on this evidence, a jury can easily determine

that Captain Allen exhibited deliberate indifference to a serious risk of harm when she

ordered for jail staff to discontinue assisting Mr. Sherrell and when she refused to take

action to transfer him to a facility where his medical needs could be addressed.

Accordingly, genuine issues of material fact preclude summary judgment on Plaintiff's

individual capacity deliberate indifference claim against Defendant Captain Allen.

### 3.    Officer Daniel Fredrickson (August 31).

Dr. Leigh, Mr. Sherrell's physical at Sanford Fargo who misdiagnosed him with

malingering, testified that one of the transport officers pulled him aside and told him, in

private, that Mr. Sherrell had been recently seen moving his extremities without

difficulty. (Ex. 306, Leigh Dep. 77.) This is also reflected in Mr. Sherrell's medical

record from Sanford: "Following MRI, . . . a second deputy arrived providing further

history that the patient was reportedly on a monitor last evening unknown to the patient i[t] was witnessed moving his extremities without apparent difficulty." (Ex. 11, p. 71.) Dr. Leigh trusted what this officer was saying and found him to be reliable. (Ex. 306, Leigh Dep. 78.) Critically, Dr. Leigh testified that he would not have diagnosed Mr. Sherrell with malingering but for the information he received from one of the officers indicating that Mr. Sherrell had been recently seen on camera moving his extremities without difficulty. (Ex. 306, Leigh Dep. 27-28, 81.)

To be sure, Officer Fredrickson denies making this statement to Dr. Leigh. But he admits that, while at Sanford Fargo, he asked to speak with the doctor in private and reported that "we did not have any video footage indicating that Sherrell had fallen." (Ex. 309, Fredrickson Dep. 19.) Based on this combination of disputed evidence, a reasonable jury can determine that Officer Fredrickson did, in fact, falsely tell Dr. Leigh that Mr. Sherrell had been recently seen moving his extremities without difficulty which resulted in the malingering diagnosis which, in turn, derailed the remainder of Mr. Sherrell's life and resulted in multiple correctional and medical staff abandoning Mr. Sherrell to die because they thought he was faking.

This evidence raises a genuine issue of fact for trial as to whether Officer Fredrickson engaged in deliberate indifference when he "intentionally interfere[ed]" with Mr. Sherrell's emergency medical treatment by making a false statement to Dr. Leigh. *See Estelle*, 429 U.S. at 105 (deliberate indifference includes "intentionally interfering with treatment once prescribed"). Furthermore, since Officer Fredrickson would have known that Dr. Leigh's determination that Mr. Sherrell was malingering (or that that

there was nothing wrong with him) was based on the false assertion that Mr. Sherrell had been seen moving without difficulty, he is not entitled to qualified immunity based on the theory that he, as a layperson, was relying on a medical doctor's diagnosis. *See McRaven v. Sanders*, 557 F.3d 974, 981 (8th Cir. 2009) (officer who relied on erroneous diagnosis that the officer knew or should have known was made based on inaccurate information is not entitled to qualified immunity because reliance on such diagnosis is unreasonable). Accordingly, Defendant Officer Fredrickson is not entitled to summary judgment.

### 4.   Defendants Scandinato, Feldt, Lorsbach, Fredrickson, Gallinger, Foss, Smith, Sella, Williams, and Hopple (September 1-2).

The record shows that during the period of September 1-2, Mr. Sherrell had deteriorated into complete paralysis and his bodily functions were rapidly shutting down right before Defendants' very eyes. Mr. Sherrell had lost all strength and muscle tone and could not so much as slightly lift his hand. By September 2, he was spitting pools of saliva out the corner of his mouth just to keep alive. He was urinating and defecating on himself. He was left stranded in awkward and uncomfortable positions for hours while soiled in his own urine and feces. He was thirsty but unable to drink and he was hungry but unable to eat. As seen in the surveillance video, his body rotated through periods of stillness and involuntary jerks and shivers. At times, he gasped for air and labored to breathe.

True, some of the Defendant Officers moved Mr. Sherrell around, washed him, changed his diaper, and accommodated some of his request. Some, such as Officers Sella, tried to help but then got frustrated and lashed out. And others, such as Sgt. Scandinato,

81

simply did not care about Mr. Sherrell and still do not even to this day. Every one of them could have stopped Mr. Sherrell's suffering at any time and saved his life. Even at 3:30 p.m. on September 2, when Officer Williams walked in to wipe up the pool of spit, was still not too late. (Ex. 207.) But whatever sense of compassion and humanity the Defendant Officers may have had Mr. Sherrell apparently did not deserve. Hour by hour, minute by minute, they did their rounds, switched shifts, performed welfare checks, checked boxes, filled out forms, brought and removed meals, and mopped the floors all while Mr. Sherrell slowly neared the end until he suffocated to death right before their eyes.

The Defendant Officers now claim that they are entitled to qualified immunity because Mr. Sherrell was evaluated and discharged from Sanford and because he was under the care of Nurse Skroch who also did not request any change in Mr. Sherrell's care. But "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." *Schaub v. VonWald*, 638 F.3d 905, 918 (8th Cir. 2011) (quoting *West v. Atkins*, 487 U.S. 42, 56 (1988)) (internal quotations removed). And a jail "official may rely on a medical professional's opinion [only] if such reliance is reasonable." *McRaven*, 577 F.3d at 981. "Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." *Id.* (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006)) (internal quotations removed). "When the defendant is aware of medical information of which the medical professional was not privy, it is unreasonable for the

defendant to rely upon a medical opinion without informing the medical professional of the relevant facts." *Casler v. MEND Correctional Care, PLLC*, 18-cv-1020 (WMW/LIB), 2020 WL 7249877, at *20 (D. Minn. Sept. 28, 2020) (Report and Recommendation adopted by 2020 WL 6886386 (D. Minn. Nov. 24, 2020)). In the present case, Mr. Sherrell's condition on September 1 and 2 was so severe, debilitating, and disturbing that it was unreasonable for the Defendant Officers to ignore Mr. Sherrell's suffering under the presumption that "there was nothing wrong with him" that they believed was determined by medical staff.

The Defendant Officers knew that Mr. Sherrell had been healthy just a week prior and that he had deteriorated into a state of complete paralysis over a matter of days. One does not have to be a doctor to understand that a person who undergoes such drastic medical deterioration over the course of just days is gravely ill. Furthermore, given the state of Mr. Sherrell's condition and the extent of his paralysis, any layperson would know that whatever medical professional disregarded such a condition as "nothing" must be either misinformed or incompetent.

Here, the facts show that Dr. Leigh was tricked by Defendant Officer Fredrickson into believing that Mr. Sherrell was faking his medical condition. Dr. Leigh clearly testified that he would not have misdiagnosed Mr. Sherrell with malingering but for Officer Fredrickson's false statement that Mr. Sherrell had been recently seen moving his extremities without difficulty. In addition, Mr. Sherrell developed several troubling symptoms by September 2 of which Dr. Leigh was never informed at the time of his malingering misdiagnosis. Dr. Leigh testified that he did not know that Mr. Sherrell had

difficulty swallowing or that he was unable to eat solids. (Ex. 306, Leigh Dep. 83-84.) Dr. Leigh testified that he did not know anything about Mr. Sherrell choking or clearing his throat. (Ex. 306, Leigh Dep. 84.) Mr. Sherrell did not present with the symptom of inability to hold or control his neck. (Ex. 306, Leigh Dep. 86-87.) Mr. Sherrell did not present with the symptoms of inability to control his bladder or bowels. (Ex. 306, Leigh Dep. 87-88.) Finally, Dr. Leigh testified that he tested the range of motion of Mr. Sherrell's neck and found it to be within normal limits, meaning that he observed Mr. Sherrell being able to turn his neck at least 45 degrees in each direction which was no longer happening by September 2. (Ex. 306, Leigh Dep. 99-100.)

Since Dr. Leigh was misinformed and the Defendant Officers were "aware of medical information of which . . . [Dr. Leigh] was not privy, it [wa]s unreasonable for the[m] . . . to rely upon [his] . . . medical opinion." *See Casler,* 2020 WL 7249877, at *20. And as to Nurse Skroch, this is precisely the "unusual case where it would [have] be[en] evident to a layperson that [Mr. Sherrell] [was] receiving inappropriate [and incompetent] [medical] treatment." *See McRaven*, 577 F.3d at 981. The fact that Nurse Skroch was feeding the Defendant Officers nonsense that they wanted to hear and they blindly nodded and followed along is not a basis for qualified immunity. And, if one of the Defendant Officers found themselves in Mr. Sherrell's condition and was told by a doctor that there is nothing wrong with them, they would have certainly disregarded such a bogus diagnosis and went elsewhere for a second opinion. Defendants are not entitled to qualified immunity because their reliance on Nurse Skroch's incompetent care of Mr. Sherrell was unreasonable. Accordingly, genuine issues of material fact preclude

summary judgment as to Defendant Officers Scandinato, Feldt, Lorsbach, Fredrickson,

Gallinger, Foss, Smith, Sella, Williams, and Hopple.


II.     **COUNT II (*MONELL* LIABILITY) - GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT AGAINST DEFENDANTS BELTRAMI COUNTY, MEND, AND CAPTAIN ALLEN, DR. LEONARD, AND NURSE SKROCH IN THEIR OFFICIAL CAPACITIES.**

> Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an "official municipal policy," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), (2) an unofficial "custom," *id.*; or (3) a deliberately indifferent failure to train or supervise, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Policy and custom are not the same thing. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Alternatively, a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).

*Corwin v. City of Independence*, 829 F.3d 695, 699–700 (8th Cir. 2016). Finally, "an

unconstitutional government policy [can] be inferred from a single decision taken by the

highest officials responsible for setting policy in that area of the government's business."

*Copeland v. Locke*, 613 F.3d 875, 882 (8th Cir. 2010).

"There are two basic circumstances under which municipal liability will attach: (1)

where a particular municipal policy or custom itself violates federal law, or directs an

employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009) (quoting *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008). "There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach." *Id.* at 818; *see also Parrish v. Luckie,* 963 F.2d 201, 207 (8th Cir.1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable.").

As explained in detail below, Defendants Beltrami County and MEnD maintained an unconstitutional "Detainee Medical Care" policy. Furthermore, Defendants Beltrami County and MEnD maintained an unconstitutional custom of withholding ER discharge instructions from corrections officers and they failed to train staff to read ER discharge instructions and communicate them to the jail correctional staff. Finally, since Defendants Allen, Leonard, and Skroch are the highest policy-making officials for Beltrami County and MEnD, their misconduct and constitutional violations raise an inference of an unconstitutional policy within Beltrami County and MEnD. Accordingly, Beltrami County and MEnD are not entitled to summary judgment on Plaintiff's *Monell* claim.

### A.    MEnD's Operation, Customs, Policies, Procedures, and Training.

In August and September, 2018, Dr. Leonard was the sole owner, president, and chief medical officer for MEnD Correctional Care. (Ex. 304, Leonard Dep. 9-10.) Pursuant to a contract between MEnD and Beltrami County, MEnD was required to

provide Beltrami County Jail with a "medical director" whose duty was to oversee the entire medical operation at Beltrami County Jail, "visit[] the jail to care for inmates as demand warrants," and "[b]e available . . . at all times, by phone or in person, to assist nursing staff." (Ex. 7, p. 1; Ex. 8, p. 1.) Dr. Leonard admitted during his deposition that he was the "medical director" for Beltrami County Jail in August and September, 2018, (Ex. 304, Leonard Dep. 16.), but he claimed that he was in the process of transitioning Stephanie Lundblad into that position during this period, (Ex. 304, Leonard Dep. 14-16.)

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████

In August and September of 2018, MEnD's "leadership team" had the responsibility and authority to implement MEnD policies and procedures. (Ex. 304, Leonard Dep. 99-100.) The "leadership team" included the "director of nursing" and Dr. Leonard himself as the chief medical officer. (Ex. 304, Leonard Dep. 60.) Dr. Leonard agreed that during the period of 2017 and 2018, his authorization was required for new MEnD policies to be implemented. (Ex. 304, Leonard Dep. 102-103.) In August and September of 2018, Defendant Nurse Skroch was the "director of nursing" for MEnD. (Ex. 304, Leonard Dep. 69; Ex. 305, Skroch Dep. 10.) Nurse Skroch also confirmed that,

in this capacity, she was involved policy-making for MEnD in 2018. (Ex. 305, Skroch Dep. 12.) During the period of August and September of 2018, MEnD had a Nursing Policy Manual for Beltrami County Jail, (Ex. 9; Ex. 302, Leonard Dep. 105-106), which was executed by Defendants Dr. Leonard and Nurse Skroch on February 2, 2018. (Ex. 304, Leonard Dep. 106; Ex. 9, p. 220.) This same policy manual was in effect and governed MEnD nursing services in Beltrami County jail in August and September, 2018. (Ex. 304, Leonard Dep. 110-111.)

One of MEnD's nursing policies in effect was the "Medical Autonomy" policy which directed MEnD nurses that "medical decision concerning health care services provided to detainees are the sole responsibility of qualified health care personnel and will not be unduly compromised solely for security reasons." (Ex. 9, p, 248.) Another policy that was in effect was MEnD's "Emergency Response to Detainees" policy directed that in "the event a detainee requires transportation to a hospital or outside medical facility, 911 emergency response services may be activated for emergency needs." (Ex. 9, p. 232.) Dr. Leonard testified that MEnD trains its nurses on this policy to ensure nurses understand that they are authorized to call 911 to request emergency medical care for inmates when necessary. (Ex. 304, Leonard Dep. 122.)

MEnD's sole policy covering the procedure for medical care for inmates returning from the emergency department was MEnD's "Detainee Medial Care" Policy. (Ex. 9, p. 226-227.) This policy merely stated that, "[a]nytime a detainee is referred to the Emergency Department . . ., medical staff will visit with that detainee on the next clinic day, or sooner where indicated." (Ex. 9, p. 227.) The term "visit" is not defined, but Dr.

Leonard testified a "visit" required "a conversation, at minimum." (Ex. 304, Leonard Dep. 125.) MEnD's nursing policies in effect in 2018 did not require MEnD nurses to assess or record the inmate's vital signs upon return from the ER, nor did the policies require nurses to create a treatment plan for inmates returning from the ER. (Ex. 9, p. 227.) Similarly, the policies did not have any guidance for how inmate discharge instructions should be treated upon return from the ER. (Ex. 9, p. 227.) During his deposition, Dr. Leonard was unable to point to any other policies covering procedure for inmates returning from the ER as no such other policies were in existence. (Ex. 304, Leonard Dep. 126-128.)

Nurse Pederson testified that MEnD never trained her to communicate ER discharge instructions to correctional officers, correctional sergeants, or jail administration. (Ex. 302, Pederson Dep. 66-67.) Nurse Pederson similarly testified that MEnD never trained her to provide a written copy of the ER discharge instructions to correctional officers, correctional sergeants, or jail administration. (Ex. 302, Pederson Dep. 67.) Nurse Pederson also admitted that MEnD never trained her to copy a patient's ER discharge instructions into the Pass On Log for that particular patient or inmate. (*Id.*) In fact, Nurse Pederson testified that she "has no right to tell correctional staff what the [inmate's] discharge instructions are." (Ex. 302, Pederson Dep. 70.) MEnD provided no training to Nurse Pederson regarding how to handle a situation where jail administration refuses to carry out a medical order to transport an inmate to the ER. (Ex. 302, Pederson Dep. 75, 76-77.) However, MEnD did train nurse Pederson that jail administration has

final authority in determining whether an inmate would be transported to the ER per the order of medical staff. (Ex. 302, Pederson Dep. 75-76.)

In August and September of 2018, Nurse Skroch was the "director of nursing" for MEnD. (Ex. 305, Skroch Dep. 10.) As a "director of nursing," Nurse Skroch supervises MEnD's regional nursing directors and was involved in "formulat[ing] policies and protocols [and] in formulating form revisions." (Ex. 305, Skroch Dep. 12.) She testified that she has never received training from MEnD as to how to handle ER discharge instructions that are provided to a county jail after an inmate goes to the ER. (Ex. 305, Skroch Dep. 171.) Nurse Skroch confirmed that MEnD does not train nursing staff to relay emergency department discharge instructions to jail administration:

> Q.   Did MEnD ever provide training to you directing you that you as a staff nurse must relay emergency department discharge instructions to the jail administration? So when an inmate comes back from the emergency department and MEnD receives those discharge notes, did MEnD train you that the staff nurse must then relay those discharge instructions to jail administration?
>
> A.   No. That's not our practice.

(Ex. 305, Skroch Dep. 172.) Nurse Skroch testified that MEnD does not train its staff nurses to relay ER discharge instructions to the jail sergeants or officers. (Ex. 305, Skroch Dep. 174.) Even after Mr. Sherrell's death, MEnD still has not implemented any training to ensure that medical staff communicate ER discharge instructions to jail correctional staff. (Ex. 305, Skroch Dep. 188.)

Dr. Leonard similarly testified that he did not feel that it was appropriate for Nurse Skroch to share Mr. Sherrell's discharge instructions with correctional staff. (Ex. 304,

Leonard Dep. 247.) Later on he further clarified that sharing ER discharge instructions with correctional staff "wouldn't be standard operating procedure anyways." (Ex. 304, Leonard Dep. 281.) Despite the fact that Mr. Sherrell died while exhibiting symptoms listed in the discharge instructions of which correctional staff was never advised, Dr. Leonard claims that he completed an investigation of Mr. Sherrell's death which revealed "appropriate conversation between the nursing staff and correctional staff, nursing staff and jail administration." (Ex. 304, Leonard Dep. 281.) But, of course, as Dr. Leonard readily admits, there is no written report or any other record documenting this alleged investigation." (Ex. 304, Leonard Dep. 278-79.)

### B.    Beltrami County's Operation, Policies, Procedures, and Training.

### 1.    Adoption of MEnD's "Detainee Medical Care" Policy.

The deposition record in this case shows that Beltrami County adopted MEnD's "Detainee Medical Care" Policy as its own. Several members of Beltrami County Jail administration who were deposed in this lawsuit confirmed that, back in 2018, Beltrami County Sheriff's Manual, (Ex. 22), contained a note referencing jail staff to a physical folder located at Beltrami County Jail containing MEnD's Nursing Policy/Procedure Manual, (Ex. 9). This issue was covered in detail with Assistant Jail Administrator Lt. Richards, who explained that jail staff are trained to access the Beltrami County Jail Policy Manual electronically through Lexipol. (Ex. 324, Richards Dep. 112-126.) He further testified that, even though the PDF version of the manual (Ex. 22) did not contain Chapter 7, the Lexipol version did have a Chapter 7 which referred jail staff to an electronic folder that was locally stored on the county server that contained the MEnD

91

Policy Manual. (Ex. 324, Richards Dep. 112-126.) In addition, the Beltrami County

Procedures Manual (Ex. 23), also contained a reference to "Chapter 7, MEND

Correctional Care policies and Protocols." (Ex. 23, p. 12315.)

> **2.     Custom of Permitting Jail Administration to Override a Medical Directive to Send and Inmate to the Hospital.**

Plaintiff deposed the entire Beltrami County Jail administration in this lawsuit

which revealed that Captain Allen's dangerous act of overriding Dr. Leonard's order to

send Mr. Sherrell to the ER was not an isolated incident but instead a decision made

pursuant to a Beltrami County Jail Custom. One member of jail administration deposed

was Edward Busta, who is the program director for Beltrami County Jail. (Ex. 323, Busta

Dep. 7-8.) He testified that jail administration has the authority to override a medical

directive to send an inmate to the ER:

> Q.     . . . If the nurse says they should go to the ER, does correctional staff have the authority to override their decision and say that the inmate is not going anywhere, they're staying here?
>
> A.     I don't know if it's written, but I would say yeah.
>
> Q.     Okay. And so you received -- based on your training, your opinion is that correctional staff in their discretion have the authority to override a medical order to take someone to the ER, take an inmate to the ER?
>
> A.     Yes.
>
> Q.     And is that still your opinion today?
>
> A.     Yeah. You would just have to document why you did it.

(Ex. 323, Busta Dep. 159.)

Notably, after the Minnesota Department of Corrections reprimanded Beltrami County for its mistreatment and neglect of Mr. Sherrell, Beltrami County implemented a new policy (Policy 700) which went into effect in 2020 (prior to Officer Busta's deposition) and which specifically prohibits jail administration from interfering with medical directives: "Clinical decision and actions regarding inmate health care are the sole responsibility of qualified health care professionals and should not be countermanded by others." (Ex. 20.) Even though this policy went into effect in 2020 and Officer Busta was deposed in June of 2021, his testimony makes clear that he was either never trained on this new policy or that he received the training and decided to disregard it.

Plaintiff also deposed Assistant Jail Administrator Lieutenant Andrew Richards. (Ex. 324, Richards Dep. 8.) Not surprisingly, Lt. Richards also testified that Beltrami County Jail had and still has authority to override a medical directive to send an inmate to the ER:

> Q.    In September 2018, did you believe that jail staff did have the authority to cancel an ER visit ordered by a doctor for an inmate?
>
> A.    Correct. They can.
>
> Q.    And is that still your position today, that jail staff has the authority to cancel an ER visit ordered by a doctor for an inmate?
>
> A.    Yes.

(Ex. 324, Richards Dep. 78.) Lt. Richards was deposed in June, 2021, once again long after the implementation of Policy 700 which explicitly prohibits jail staff from interfering with medical directives. What's more, when Policy 700 was implemented in

2020, Lt. Richards was tasked with formulating and administering a test to jail staff to ensure that the new policy is understood and being followed. (Ex. 324, Richards Dep. 196.) In fact, the test he developed specifically addressed the issue of whether jail staff can override a medical directive to send an inmate to the ER. (Ex. 21, question No. 2.) How is it possible that the member of jail administration tasked with administering testing on a new policy implemented in response to an inmate death turns around and ignores and disregards the very same policy?

Finally, Plaintiff deposed Sheriff Ernie Beitel, the current Sheriff of Beltrami County. (Ex. 325, Beitel Dep. 24.) At one point, Sheriff Beitel sent an email to all jail staff to boost staff morale in response to media criticism surrounding Mr. Sherrell's death. (Ex. 325, Beitel Dep. 49.) In this email, Sheriff Beitel wrote, "Please understand our case is very strong – that we, our corrections officers, did nothing wrong." (*Id.*) Sheriff Beitel testified that his positive feedback was intended not just for corrections officers but for jail administration as well, including Captain Allen. (Ex. 325, Beitel Dep. 50.) Sheriff Beitel then proceeded to testify that he knew about Captain Allen's override of Mr. Sherrell's ER visit and that it was fine by him:

> Q.   Did she tell you, sir, that she had cancelled an ER visit that was ordered by the doctor?
>
> A.   Yes.
>
> Q.   And did you know about that before you sent out the e-mail in Exhibit 10?
>
> A.   Yes.

Q.      And so your statement that "our corrections officers did nothing wrong," that assumes that her canceling the ER visit was not anything wrong, correct?

A.      I don't believe that she did anything wrong with that.

(Ex. 325, Beitel Dep. 53.)

### 3.      Custom and Training of Intentionally Withholding ER Discharge Instructions for Inmates Returning from the ER.

Deposition testimony from multiple correctional officers and administrative staff revealed that Beltrami County Jail had a custom, that was reinforced by training, of intentionally withholding information from ER discharge instructions from corrections officers. Testimony shows that ER transport officers were trained to turn ER discharge instructions directly to MEnD without reading them and that there was a widespread custom at Beltrami County Jail of MEnD staff not relaying ER discharge instructions to correctional staff. Multiple officers testified that they were specifically trained that ER discharge instructions for inmate patients are essentially none of their business. In addition, multiple officers testified that they were never briefed on discharge instructions of inmate patients returning from the ER whom they were charged with monitoring. The citations to this testimony establishing a custom within Beltrami County Jail is set forth in detail below.

- **Officer Joseph Williams:** trained not to read inmate ER discharge instructions; could not recall a single incident where an inmate returned from the ER and he received a briefing on that inmate's discharge instructions. (Ex. 310, Williams Dep. 98-100.)

95

- **Officer James Foss:** no training on how to handle verbal or written ER discharge instructions; no training on how to supervise inmates returning from the ER; never received briefing on discharge instructions for inmate returning from the ER. (Ex. 308, Foss Dep. 59-61.)

- **Officer Anthony Derby:** trained not to read inmate ER discharge instructions. (Ex. 311, Derby Dep. 59.)

- **Officer Holly Hopple:** never received discharge instructions briefing for an inmate returning from the ER. (Ex. 312, Hopple Dep. 43-44.)

- **Officer Chase Gallinger:** MEnD staff do not share ER discharge instructions for inmate patients returning from the ER; MEnD staff do not relay information from ER discharge instructions for inmate patients returning from the ER; has never received briefing regarding contents of ER discharge instructions for any inmate patient returning from the ER; "we are not trained to recognize all symptoms . . . that's why we have MEnD;" trained that best practice for ER discharge instructions is to have them faxed instead of bringing a paper copy back to the jail; trained not to read ER discharge instructions (Ex. 313, Gallinger Dep. 84-85, 92, 173-174.)

- **Officer Daniel Fredrickson:** has never received briefing regarding contents of ER discharge instructions for any inmate patient returning from the ER; trained that discharge instructions should only be provided to MEnD; no training on what to do if provided verbal discharge

instructions during an inmate's ER visit; no training as to obligation to follow ER discharge instructions for inmate patients. (Ex. 309, Fredrickson Dep. 70-71, 75-76.)

- **Officer Nicholas Lorsbach:** no training that officers must follow ER discharge instruction; no training on how to care for inmates returning from the ER; no training on how to handle verbal discharge instructions provided during an inmate's ER visit. (Ex. 316, Lorsbach Dep. 47.)

- **Officer Mitchell Sella:** Beltrami County Jail has practice of not reading inmate discharge instructions; never received discharge instructions briefing for an inmate returning from the ER. (Ex. 317, Sella Dep. 64-65, 66.)

- **Officer Marlon Smith:** no training on discharge instructions; no training on caring for inmates returning from the emergency room; "I was just there to provide safety and security;" not reading ER discharge instructions was "protocol" and "standard" at Beltrami County Jail. (Ex. 319, 10/15/21 Smith Dep. 101-107.)

- **Officer Melissa Bohlmann:** "We [don't] look at the discharge instructions. . . . They are none of our business and we weren't trained how to read those reports;" it is not the practice in Beltrami County Jail for correctional staff to review ER discharge instructions. (Ex. 107, Bohlmann Dep. 149-151.)

- **Lt. Andrew Richards:** no policy in place on how to handle discharge instructions for inmates returning from the ER; officers are trained to bring back ER discharge instructions without reading them; correctional staff was not trained that staff was required to review discharge instructions for inmates coming back from the ER. (Ex. 324, Richards Dep. 234, 247-248.)

- **Officer Jared Davis:** would not read discharge instructions for inmates returning from the ER; "I'm not a medical professional; I can't interpret medical orders;" unable to recall a situation where jail or MEnD staff provided a briefing on discharge instructions for any inmate returning from the ER. (Ex. 326, Davis Dep. 51-53.)

    4.    **Pursuant to Beltrami County Jail Custom, Mr. Sherrell's ER Discharge Instructions and Their Contents Were Withheld from Every Officer Who Worked at the Jail on September 1 and 2, 2018.**

The record shows that, pursuant to this dangerous custom at Beltrami County Jail, not a single corrections officer who was in charge of monitoring Mr. Sherrell on September 1 or 2 had ever seen his discharge instructions from Sanford or was provided any type of briefing about what the instructions said, what symptoms to look for, how to monitor Mr. Sherrell's medical condition, when or how to report changes to his condition, or when to call an ambulance. Citations to all of this testimony are set forth below:

- o   Officer Joseph Williams, (Ex. 310, Williams Dep. 61-68);

- o   Officer James Foss, (Ex. 308, Foss Dep. 31-39);

- o   Officer Holly Hopple, (Ex. 312, Hopple Dep. 24-28);

- o   Officer Erin Meyer, (Ex. 314, Meyer Dep. 44-49);

- o   Officer Chase Gallinger, (Ex. 313, Gallinger Dep. 85-91);

- o   Officer Daniel Fredrickson, (Ex. 309, Fredrickson Dep. 54-58);

- o   Officer Brandon Feldt, (Ex. 315, Feldt Dep. 43-47);

- o   Officer Nicholas Lorsbach, (Ex. 316, Lorsbach Dep. 27-32);

- o   Officer Mitchell Sella, (Ex. 317, Sella Dep. 46-51);

- o   Officer Marlon Smith, (Ex. 318, 10/12/21 Smith Dep. 62-66; Ex. 319, 10/15/21 Smith Dep. 76-79);

- o   Officer Melissa Bohlman, (Ex. 307, Bohlmann Dep. 102-105);

- o   Sgt. Mario Scandinato, (Ex. 320, Scandinato Dep. 120-121).

**5.      Beltrami County Had Been on Prior Notice of Deficient Communication Between MEnD Medical Staff and Correctional Staff.**

On September 1, 2017, one year prior to Mr. Sherrell's death, Beltrami County was cited by the Minnesota Department of Corrections for maintaining deficient communication between jail medical and correctional staff. (Ex. 19.) The 2017 citation pertained to the death of Stephanie Bunker who committed suicide inside Beltrami County Jail and died on July 1, 2017, and Beltrami County was cited for "lack of communication between medical staff and custody staff." (Ex. 19, p. 1.) Sheriff Philip Hodapp (Beltrami County Sheriff in 2018) testified that he was aware of communication

problems between MEnD medical staff and Beltrami County Jail staff, such as "information getting lost" or "some of th[e] information didn't get passed along." (Ex. 322, Hodapp Dep. 42.) Thus, Beltrami County had at least one-year notice prior to Mr. Sherrell's death of deficient communication between MEnD medical staff and jail correctional staff. It should also be noted that Sheriff Hodapp agreed during his testimony that it was "important for correctional staff to have access to the discharge instructions from the emergency room so that if there's information there and MEnD is not on site, the jail staff can act on it." (Ex. 322, Hodapp Dep. 46.) Since the County Sheriff himself agreed that sharing of discharge instructions with correctional staff is important, Beltrami County's claim that this is only a trivial issue (or not an issue at all) is not credible.

## C.   Expert Evidence Supporting Plaintiff's Monell Claims.

1. In his supplemental report, Dr. Keller provided opinions regarding Beltrami County and MEnD's policy for inmate medical care. (Ex. 208.) "It is my opinion that Beltrami County Jail / Mend's "Detainee Medical Care" policy which only requires an unspecified "visit" with a jail nurse after an ER visit was adopted by both Beltrami County and MEND with deliberate indifference to its known and obvious consequences." (Ex. 208, p. 6.) "Beltrami County Jail / MEND's policy and procedure for patients who return from the emergency department constitutes deviation from accepted standards of general correctional care . . . and places inmate patients in obvious risk of developing life-threatening illness and/or death." (Ex. 208, p. 6.)

2. In addition to Dr. Keller, Mr. Raney has also opined that Beltrami
   County Jail "had also adopted the MEND policy and procedure for
   inmates' return from the emergency department, but this policy was
   inadequate and its adoption was deliberately indifferent to its obvious
   consequences for medical care." (Ex. 210, p. 19.) "In 2018, [Beltrami
   County Jail] had no medical policies that informed correctional officers
   about their obligations to ensure medical care." (Ex. 210, p. 20.) "The
   evidence in this case shows that [Beltrami County Jail] adopted
   MEND's medical policies . . . ." (Ex. 210, p. 21.) But "MEND's
   'Detainee Medical Care' Policy was  inadequate because it had no
   guidance or instruction requiring medical staff to relay pertinent medical
   discharge instructions to jail correctional staff." (*Id.*) "[T]he result [from
   these policy failures] is obvious – inmates requiring medical care may
   suffer serious illness or death due to the jail staff's failure to follow
   emergency department discharge instructions." (*Id.*)  Beltrami County
   Jail "adopted MEND's inadequate 'Detainee Medical Care' policy with
   deliberate indifference to its obvious and potentially life-threatening
   risks and consequences." (*Id.*)

3. Mr. Raney has also opined that Beltrami County Jail "had an
   unreasonable and dangerous custom and practice, which was reinforced
   by inadequate training, of intentionally not reading emergency
   department discharge instructions and failing to communicate

emergency department instructions to jail correctional staff." (Ex. 210, p. 11.) Mr. Raney has determined that, in September of 2018, Beltrami County jail "had a widespread and persistent practice of (1) failure to have correctional staff read or understand emergency department discharge instructions and (2) failure of MEND medical staff to communicate emergency department discharge instructions to correctional staff." (Ex. 210, p. 12.) "The evidence establishe[s] that Beltrami County Jail had developed and implemented a dangerous and unreasonable custom and practice of ignoring information on medical cautions and directions from the emergency department." (Ex. 210, p. 13.) The Beltrami County Jail's "custom to actively ignore important medical instructions . . . is simply a self-imposed ignorance that creates unreasonable medical danger for inmates." (Ex. 210, p. 15.)

### D. Defendant Beltrami County and MEnD's "Detainee Medical Care" Policy is Unconstitutional.

As explained above, Beltrami County did not have its own policy on inmate medical care and instead adopted MEnD's "Detainee Medical Care" policy. This policy does cover the procedure for inmates returning from the ER, but the only procedure listed is that the staff nurse must "visit" with the patient on the next clinic day or sooner if needed. Dr. Keller and Mr. Raney have both opined that this policy is deficient and was adopted with deliberate disregard for its obvious and life-threatening consequences.

The policy does not mention what should happen at this visit, which is that the medical staff should do a formal patient encounter with vital signs, an

appropriate physical exam, documentation of review of the discharge notes and creation of a care plan for the future—which would, of course, include communication of ER discharge instructions to the jail correctional staff.

Nurse Skroch technically was in compliance with the MEND requirement for a "visit," but did not do vital signs, an examination of the patient, document the orders of the ER physician on the discharge paperwork, or create a care plan involving the jail staff which incorporated the ER discharge instructions. Nurse Skroch testified that MEND did not train her properly on correct procedure to follow for patients returning from an ER visit. In fact, Nurse Skroch testified that MEND did not train her that she is required to communicate emergency department discharge instructions to correctional staff and she further confirmed that communicating discharge instructions to jail staff "[is] not our practice." As a result, while Mr. Sherrell deteriorated and slowly died over a period of two days, he received no medical care whatsoever and jail correctional staff went on with their daily routines without any knowledge or understanding of the Sanford ER discharge instructions which necessitated Mr. Sherrell's return to the ER.

. . .

It is my opinion that Beltrami County Jail / MEND's "Detainee Medical Care" policy which only requires an unspecified "visit" with a jail nurse after an ER visit was adopted by both Beltrami County and MEND with deliberate indifference to its known and obvious consequences. In correctional medical care, it is essential to ensure proper continuation of medical care between medical facilities as well as communication of emergency department discharge instructions to jail correctional staff. It is also essential to ensure that jail medical staff review emergency department discharge instructions in detail and incorporate those discharge instructions into the patient's care plan upon return from the ER. Finally, in a correctional setting, it is essential that patients returning from the emergency department receive a full medical exam with vital signs to reassess the patient's condition and incorporate it into the patient's care plan. Failure to follow these basic and essential procedures can lead to the obvious consequence of patients suffering life-threatening illness and death due to the fact that their medical condition is left unmonitored after returning from the emergency department. In addition, failure to communicate ER discharge instructions to correctional staff can lead to the obvious consequence of correctional staff failing to recognize and act on life-threatening symptoms which may require emergent re-hospitalization.

In all, Beltrami County Jail / MEND's policy and procedure for patients who return from the emergency department constitutes deviation from accepted standards of general correctional care and correctional medicine and places inmate patients in obvious risk of developing life-threatening illness and/or death. It is further my opinion that Beltrami County Jail / MEND's policy, which only requires a "visit" with a nurse, is so deficient that it constitutes incompetence and deliberate disregard for patient health and well-being in a correctional setting. Communication of ER discharge instructions to jail correctional staff is a fundamental and basic standard in the field of correctional medicine and corrections in general. The fact that Beltrami County Jail administration and MEND administration failed to implement this standard into their policies and procedures is a strong indication of knowing and deliberate disregard for inmate health, safety, and preservation of life. For all of these reasons, it is my opinion that Beltrami County Jail and MEND adopted the "Detainee Medical Care" policy with deliberate indifference to its obvious consequence of inmate patients suffering easily preventable life-threatening illness and/or death.

(Ex. 208, p. 5-7.)

The evidence in this case shows that BCJ adopted MEND's medical policies, but they were not applicable to jail staff. Although I'm not qualified to offer opinions on medical care, I am qualified to offer opinions on the jail's obligation to oversee and ensure that proper medical policies are in place. The MEND medical policy on "Detainee Medical Care" only required medical staff to "visit" with an inmate upon their return from the emergency room. Generally accepted jail practices would require the medical staff to examine the hospital records, examine or follow-up with the inmate if indicated and relay any relevant information to correctional staff.

As stated above, communication between medical staff and correctional staff is crucial, especially in facilities that do not offer 24-hour medical care. For inmates who are returning from the emergency department, jail correctional staff must be briefed on any discharge or cautionary instructions that must be followed, especially at times when no medical staff is available at the jail.

MEND's "Detainee Medical Care" policy was inadequate because it had no guidance or instruction requiring medical staff to relay pertinent medical discharge instructions to jail correctional staff. It also failed to require any communication between jail and medical staff for inmates returning from the emergency department. This inadequate policy was coupled with BCJ's practice and training (already discussed in detail above) of having

correctional officers avoid reading or learning the contents of emergency department discharge instructions for inmates returning to the jail. If correctional staff should not read emergency department discharge instructions and jail policies do not require medical staff to relay such instructions to correctional staff, the result is obvious — inmates requiring medical care may suffer serious illness or death due to the jail staff's failure to follow emergency department discharge instructions. The BCJ failed to provide appropriate oversight of MEND's medical policies and adopted MEND's inadequate "Detainee Medical Care" policy with deliberate indifference to its obvious and potentially life-threatening risks and consequences.

(Ex. 210, p. 21-22.)

The evidence outlined above establishes that Beltrami County and MEnD adopted the "Detainee Medical Care" policy with "deliberate indifference to its known or obvious consequences." *See Moyle*, 571 F.3d at 817-18. As a result of this policy, Mr. Sherrell's ER discharge instructions were not relayed to correctional staff, Mr. Sherrell was never evaluated by a nurse or doctor after returning from Sanford, and Mr. Sherrell never received even a single vitals check after he was discharged from the ER. As Dr. Allen explains in his supplemental expert report, even a single vitals check on September 2 would have been life-saving because it would have revealed an immediate need to return Mr. Sherrell to the ER. (Ex. 207.) However, since there was no care plan in place, no vitals taken, and no physical exam after Mr. Sherrell's discharge from Sanford, Mr. Sherrell's emergent deterioration was ignored and he was left to die on the jail floor. These facts establish that Defendants' "Detainee Medical Care" policy was unconstitutional and that it was also the driving force behind the violations of Mr. Sherrell's constitutional rights as well as his death. Therefore, Beltrami County and MEnD are not entitled to summary judgment on Plaintiff's *Monell* claim.

E.     **Defendants Beltrami County and MEnD Maintained an Unconstitutional Custom and Training Regimen of Withholding ER Discharge Instructions from Correctional Staff.**

The evidence outlined above makes clear that Beltrami County and MEnD had an established and widespread custom of withholding inmates' ER discharge instructions from correctional staff. Multiple Beltrami County officers and administrative staff testified reviewing inmate ER discharge instructions was essentially none of their business and was MEnD's responsibility. However, the evidence shows that MEnD also had an identical custom of withholding ER discharge instructions from jail correctional staff. In fact, Nurse Skroch testified that relaying ER discharge instructions to correctional staff "[is] not our practice." (Ex. 305, Skroch Dep. 172.) So in a facility like Beltrami County Jail where medical staff is not available 24/7, how can ER discharge order be followed if they are not relayed and instead intentionally withheld from jail staff?

Multiple correctional officers testified that they were not trained to read ER discharge instructions and many testified that they were trained *not* to read them. Nurse Skroch, Nurse Pederson, and Dr. Leonard likewise testified that MEnD nurses are not trained to relay ER discharge instructions to correctional staff and, in this case, Nurse Skroch did not even read them herself. The predictable result is precisely what happened to Mr. Sherrell where he returned from the ER and exhibited specific symptoms listed in the ER discharge instructions; but, because no one knew what the instructions said, the entire jail staff just stood by and watched him deteriorate to the point or respiratory failure. Dr. Keller and Mr. Raney have opined that Beltrami County and MEnD's custom

and training of withholding ER discharge instructions from correctional staff violates correctional and correctional medical standards, demonstrates deliberate indifference to the medical needs of inmate patients returning from the ER, and subjects inmates to unnecessary risk of harm. (Ex. 210, p. 11-15; Ex. 208, 3, 5-8.)

In Mr. Sherrell's case, not a single officer who was tasked with supervising Mr. Sherrell knew what his discharge instructions said. But if they did, they could have saved his life. For example, on September 1, Office Sella walked into Mr. Sherrell's cell around 3:17 p.m. and noticed that "he had sweat beading up on his chest as he was laying sideways in his bunk." (Ex. 6, p. 14.) If Officer Sella was advised to look for signs of a fever, he could have requested a temperature check for Mr. Sherrell and, if elevated, he likewise would have presumably taken action to get Mr. Sherrell back to Sanford.

On September 2, Officer Williams went into Mr. Sherrell's cell to wipe the saliva Mr. Sherrell was spitting because he could not swallow. (Ex. 310, Williams Dep. 48-52.) If Officer Williams was ordered to return Mr. Sherrell to the ER if he developed trouble swallowing, he would have presumably carried out the directive and requested an ER transfer for Mr. Sherrell.

On September 2, Officer Foss determined that Mr. Sherrell's slurred speech had become progressively worse. (Ex. 308, Foss Dep. 55-56.) If Officer Foss knew that Mr. Sherrell was to return to the ER if his slurred speech progressed, he would have presumably taken action to get Mr. Sherrell back to the ER on September 2. Officer Gallinger testified that he was made aware that Mr. Sherrell had developed facial droop on the morning of September 2, (Ex. 6, p. 11; Ex. 313, Gallinger Dep. 133-134), and, if

he knew about the discharge order to return to the ER immediately if facial droop developed, he would have also presumably requested to take Mr. Sherrell back to the ER. As such, Defendants' unconstitutional custom caused and was the moving force behind the constitutional violation of depriving Mr. Sherrell of his right to timely and necessary emergency medical care.

Clearly, if correctional staff knew that Mr. Sherrell was ordered to return to the ER with presentation of certain symptoms and if staff knew what symptoms to look for, they could have easily saved Mr. Sherrell's life. But, since they knew nothing of what the discharge instructions said, they were left with no guidance or direction as to how to monitor Mr. Sherrell or when to return him to the hospital. Blinded by their incorrect assumption that Mr. Sherrell was faking, they instead stood by and watched him die for a period of 2 days. As such, Plaintiff has sufficiently established that Beltrami County and MEnD maintained an unconstitutional custom of withholding ER discharge instructions from correctional staff.

**F.     Official Capacity Claims Against Defendants Captain Allen, Dr. Leonard, Nurse Skroch, and Beltrami County and MEnD.**

"Although '[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* an unconstitutional government policy [can] be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.'" *Copeland*, 613 F.3d 875, 882 (8th Cir. 2010) (quoting *Davison v. City of Minneapolis,* 490 F.3d 648, 659 (8th Cir.2007)). "In this scenario, [m]unicipal liability attaches only where the decisionmaker possesses final

authority to establish municipal policy with respect to the action ordered." *Id.* (internal quotation marks omitted).

In the present case, Defendant Captain Allen is the highest-ranking policy-making official for Beltrami County Jail. (Ex. 321, Allen Dep. 251-252; Ex. 325, Beitel Dep. 99-100; see also Minn. Rule 2911.1900 (designating the facility administrator as the responsible authority for annual review of jail policies).) Similarly, Defendants Dr. Leonard and Nurse Skroch are the highest-ranking policy-making officials for MEnD. (Ex. 304, Leonard Dep. 60, 69, 99-103; Ex. 305, Skroch Dep. 10-12.) As explained in detail in Section I above, Captain Allen, Dr. Leonard, and Nurse Skroch all committed constitutional violations (deliberate indifference) in their care and supervision of Mr. Sherrell. Since they are highest-ranking policy-making officials for Beltrami County and MEnD, an unconstitutional policy is inferred from even a single constitutional violation they commit. *Copeland*, 613 F.3d at 882.

Based on this theory, Captain Allen's unconstitutional decision to override a medical directive and her unconstitutional failure to arrange for appropriate care for Mr. Sherrell are inferred to be actions taken pursuant to Beltrami County's policies. Similarly, Dr. Leonard and Nurse Skroch's unconstitutional conduct of failing to relay Mr. Sherrell's discharge instructions to correctional staff, failing to create and implement a treatment plan for Mr. Sherrell, and their deliberate indifference to Mr. Sherrell's serious medical needs is likewise inferred to be actions taken pursuant to MEnD's policies. Accordingly, Plaintiff's official capacity claims against Defendants Captain Allen, Dr.

Leonard, Nurse Skroch, and her *Monell* claims against Beltrami County and MEnD survive summary judgment.

## III.   PLAINTIFF'S WRONGFUL DEATH CLAIM SURVIVES.

The Beltrami County Defendants seek to dismiss Plaintiff's wrongful death claim on the basis of official immunity. As explained below, Plaintiff's wrongful death claim survives based on the theories of federal constitutional violations.

Plaintiff's wrongful death claim against the Beltrami County Defendants is based on both state and federal constitutional violations: "Defendants caused Mr. Sherrell's wrongful death through their deliberate indifference towards his serious medical needs (as alleged in Counts 1 and 2 above) and/or negligence (as alleged in the preceding paragraph)." (Doc. No. 30, p. 21, ¶74.) "Counts 1 and 2 above" as referenced in Plaintiff's Complaint, are the deliberate indifference and *Monell* claims that are addressed in detail in this memorandum. Although Plaintiff is no longer pursuing her negligence claim, she is still pursuing her § 1983 and *Monell* claims. In other words, Plaintiff seeks to establish that defendants caused Mr. Sherrell's "wrongful death" by violating his constitutional rights, which then gives rise to the "wrongful death" claim under Minnesota state law. *See* Minn. Stat. § 573.02 ("When death is caused by the wrongful act or omission of any person or corporation, the trustee appointed . . . may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission."). Accordingly, Plaintiff's wrongful death claim against the Beltrami County Defendants survives summary judgment.

## <u>CONCLUSION</u>

As explained in detail above, Mr. Sherrell suffered and ultimately died due to egregious constitutional violations, incompetent medical care, and reckless disregard for his health, his wellbeing, and his life. Genuine issues of material fact preclude summary judgment, and Mr. Sherrell's parents and children deserve an opportunity to seek justice for Mr. Sherrell. For all the foregoing reasons, Plaintiff respectfully requests that Defendants' motions for summary judgment be denied.


THE LAW OFFICE OF ZORISLAV R. LEYDERMAN


Dated: June 27, 2022         By: s/ Zorislav R. Leyderman
                                 ZORISLAV R. LEYDERMAN
                                 Attorney License No. 0391286
                                 Attorney for Plaintiff
                                 The Law Office of Zorislav R. Leyderman
                                 222 South 9th Street, Suite 1600
                                 Minneapolis, MN 55402
                                 Tel: (612) 876-6626
                                 Email: zrl@ZRLlaw.com